ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
SEAN P. CONNELL, ESQ.
Nevada Bar No. 7311
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com
        sean@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Aatif Iqbal (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:    (212) 661-1100
Fax:    (917) 463-1044
Email: jalieberman@pomlaw.com
        mjsteven@pomlaw.com
        aiqbal@pomlaw.com

*Attorneys for Lead Plaintiffs John V. and JoAnn M. Ferris*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| JOHN V. FERRIS and JOANN M. FERRIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>         v.<br><br>WYNN RESORTS LIMITED, STEPHEN A. WYNN, CRAIG SCOTT BILLINGS, STEPHEN COOTEY, MATTHEW O. MADDOX, JOHN J. HAGENBUCH, ROBERT J. MILLER, PATRICIA MULROY, CLARK T. RANDT JR., ALVIN V. SHOEMAKER, KIMMARIE SINATRA, DANIEL B. WAYSON, JAY | Case No. 2:18-CV-00479-GMN-CWH<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

L. JOHNSON, RAY R. IRANI, and J.
EDWARD VIRTUE,

                    Defendants.

# TABLE OF CONTENTS

Preliminary Statement ..................................................................................................... 1

Jurisdiction and Venue ................................................................................................... 3

Parties ............................................................................................................................ 3

    Plaintiffs .................................................................................................................... 3

    Defendants ................................................................................................................. 4

        Individual Defendants ......................................................................................... 4

        Director Defendants ............................................................................................ 7

Factual Background ...................................................................................................... 11

    Casino Regulation ................................................................................................... 11

        Nevada .............................................................................................................. 12

        Massachusetts ................................................................................................... 16

    Defendant Wynn's "Decades-Long Pattern of Sexual Misconduct" .................... 18

        Defendant Wynn's Alleged Misconduct before Wynn Resorts ........................ 18

        Defendant Wynn's Pattern of Sexual Harassment at Wynn Resorts ................ 20

The Class Period ........................................................................................................... 26

    Wynn Resorts' Code of Conduct ............................................................................ 26

    The 2013 10-K ........................................................................................................ 32

    The 2014 Proxy Statement ...................................................................................... 35

    Misrepresentations in 2014 about Compliance ...................................................... 37

    Misrepresentations about the Massachusetts License and Resort ......................... 39

    The 2014 10-K ........................................................................................................ 41

    2015 ........................................................................................................................ 45

    The 2015 10-K ........................................................................................................ 51

    2016 ........................................................................................................................ 56

        2016 Proxy Statement ...................................................................................... 56

        Elaine Wynn's Counterclaim and the Company's Responses .......................... 58

        Other False and Misleading Statements in 2016 .............................................. 65

    The 2016 10-K ........................................................................................................ 67

    2017 ........................................................................................................................ 72

The Truth Begins to Emerge ........................................................................................ 78

    The January 2018 *WSJ* Article ............................................................................. 78

i

Investigations Ensue ................................................................................................79

Market Reaction .......................................................................................................80

Defendant Wynn Resigns .........................................................................................83

More Accusations of Sexual Assault ........................................................................86

Executive and Board Reshuffling ............................................................................87

Nevada Gaming Control Board Settlement and Fine ...............................................90

The Company Admits How Badly It Had Failed In the Past...................................102

Loss Causation ...............................................................................................................105

Class Action Allegations.................................................................................................105

First Claim for Relief ......................................................................................................107

Second Claim for Relief..................................................................................................109

Prayer for Relief .............................................................................................................111

Jury Demand ...................................................................................................................111

Lead Plaintiffs John V. Ferris and JoAnn M. Ferris and Named Plaintiff Jeffrey Larsen, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, inter alia, SEC filings by Wynn Resorts Limited ("Wynn" or the "Company"), press releases and other public statements by Defendants, conference calls and announcements made by Defendants, media and analyst reports and advisories about the Company, regulatory filings, and other public information. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **Preliminary Statement**

1.     This is a federal securities class action, against the Company and certain of its directors and executive officers, on behalf of all persons who purchased or otherwise acquired the Company's securities between February 28, 2014 and February 12, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Wynn Resorts is a leading developer, owner, and operator of destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, distinctive entertainment theaters, and large meeting complexes. It owns and operates Wynn Las Vegas and Encore in Las Vegas, Nevada, and Wynn Macau and Wynn Palace in Macau, China. It is currently constructing a new $2.4 billion property called Wynn Boston Harbor in Everett, Massachusetts.

3.     This case arises out of a decades-long pattern of sexual abuse and harassment by Defendant Steven Wynn that remained unchecked, tacitly permitted, and eventually covered up by Defendants. During the Class Period, Defendants misrepresented to investors their "full" compliance with applicable laws and touted their Code of Conduct as part of the Company's purported commitment to "continually strive to abide by high standards of ethical business

conduct." But while making such statements Defendants concealed the fact that (a) Defendant Wynn had engaged in a pattern of sexual misconduct that included alleged instances of sexual assault and led to several multi-million-dollar settlements with Wynn Resorts employees, and (b) discovery of this misconduct would necessarily jeopardize Wynn's tenure at the Company and subject the Company to significant legal liability and heightened regulatory scrutiny.

4.      On January 26, 2018, the *Wall Street Journal* published an article titled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn" (the "January 2018 *WSJ* Article"), revealing detailed accounts that Wynn had coerced and pressured several Wynn Resorts employees to perform sex acts. According to the *Wall Street Journal*, "dozens of people… who have worked at Mr. Wynn's casinos told of behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn." It was further revealed that Wynn had paid a Wynn Resorts employee $7.5 million after being accused of forcing the employee to have sex with him.

5.      On this news, Wynn Resorts' stock price fell $20.31, or 10.12%, to close at $180.29 on January 26, 2018.

6.      In response to these revelations, the Nevada Gaming Commission and Massachusetts Gaming Commission (where Wynn had recently obtained a lucrative license to open a new casino) promptly began investigating the Company over the sexual misconduct allegations reported by the Wall Street Journal, raising the specter that Wynn might be stripped of its gaming licenses in these lucrative markets.

7.      The Company's Board of Directors also announced that a Special Committee would conduct an internal investigation of the *WSJ* allegations.

8.      On February 6, 2018, Defendant Wynn resigned as CEO and Chairman of the Board, effective immediately.

9.      On February 13, 2018, media outlets reported that two women had filed new sexual misconduct reports concerning Wynn with the Las Vegas Metropolitan Police Department, alleging that Wynn had sexually assaulted them in the 1970s. One woman reported that Wynn assaulted her in Las Vegas and the other said she was assaulted in Chicago, the Las

Vegas Metropolitan Police Department said in a statement. Following this news, Wynn Resorts' share price closed at $164.16 on February 14, 2018—a decline of $36.44, or 18.16%, compared to its January 25, 2018 closing price.

10.     As a result of Defendants' false and misleading and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## Jurisdiction and Venue

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

12.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company is headquartered in this District and a significant portion of Defendants' actions took place in this District.

14.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## Parties

### Plaintiffs

15.     **Lead Plaintiffs John V. Ferris** and **JoAnn M. Ferris** acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

16.     **Named Plaintiff Jeffrey Larsen** acquired the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**Defendants**

17.     **Defendant Wynn Resorts, Limited** ("Wynn Resorts" or the "Company") is a Nevada corporation with principal executive offices at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109. Its securities trade on NASDAQ under the ticker symbol "WYNN."

*Individual Defendants*

18.     **Defendant Stephen A. Wynn**, a Nevada citizen, founded the Company and served as its CEO and Chairman from June 2002 until his resignation on February 6, 2018. He was also Chairman of the Board of Directors and Chief Executive Officer for several of the Company's subsidiaries, including Wynn Macau, Limited and Wynn Resorts (Macau) S.A. Before founding Wynn Resorts, Defendant Wynn was Chairman and CEO of Mirage Resorts, where he developed and operated The Mirage, Treasure Island and Bellagio in 1989, 1993 and 1998, respectively. He was also named the Finance Chairman of the Republican National Committee in February 2017.

19.     **Defendant Matthew O. Maddox** joined the Company in 2002 and has served as its President since November 2013 and its CEO since February 2018. He also served as its CFO and Principal Accounting Officer from March 2008 until May 2014. Before 2008, he served in a variety of roles including Senior Vice President of Business Development and Treasurer, and Treasurer and Vice President-Investor Relations. He has also held positions at the Company's subsidiaries, including Senior Vice President of Business Development for Wynn Las Vegas; CFO of Wynn Resorts (Macau); and Non-Executive Director of Wynn Macau, Limited. Before joining the Company, he graduated with a B.B.A. in finance from Southern Methodist University and worked as an M&A banker at Bank of America Securities and in Corporate Finance at Caesars Entertainment, Inc. (formerly Park Place Entertainment, Inc.).

20.     Between 2014 and 2017, Defendant Maddox sold 223,157 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of

$32,162,053:

| Sell Date | Price | Shares Sold | Selling Proceeds |
| --- | --- | --- | --- |
| 5/12/14 | $204.02 | 12,697 | $2,590,442 |
| 5/12/14 | $204.88 | 3,991 | $817,676 |
| 4/27/17 | $124.25 | 60,000 | $7,455,000 |
| 6/16/17 | $134.35 | 44,309 | $5,952,914 |
| 9/15/17 | $143.41 | 40,833 | $5,855,861 |
| 9/15/17 | $144.03 | 2,067 | $297,710 |
| 11/13/17 | $155.11 | 58,258 | $9,036,398 |
| 11/13/17 | $155.74 | 1,002 | $156,051 |
| Totals: | | 223,157 | $32,162,053 |

21.    Defendant Maddox has admitted he knew of the 2005 sexual misconduct allegations involving Defendant Wynn no later than March 28, 2016 when Elaine Wynn filed court documents revealing the alleged assault and the "pattern of reckless risk-taking" behavior by Defendant Wynn that "left the directors and the Company vulnerable to potential liability and regulatory exposure."[1] Maddox's subsequent denial of any knowledge of Defendant Wynn's pervasive pattern of sexual misconduct cannot be reconciled with his awareness of Elaine Wynn's March 28, 2016, court filing.

22.    **Defendant Kimmarie Sinatra** served as Executive Vice President, General Counsel and Secretary of the Company from February 2006 until her resignation on July 15, 2018. She joined the Company in January 2004 as Senior Vice President and General Counsel of its development activities. Before joining Wynn Resorts, she was Executive Vice President and Chief Legal Officer of Caesars Entertainment, Inc.; General Counsel for Merv Griffin's investment management company the Griffin Group, Inc.; and a partner of the law firm Gibson, Dunn & Crutcher LLP.

---

[1] Richard N. Velotta, *Call from Steve Wynn led Maddox to career in casino work,* Las Vegas Review-Journal, Feb. 20 2018, https://www.reviewjournal.com/business/casinos-gaming/call-from-steve-wynn-led-maddox-to-career-in-casino-work/

23.     Between 2014 and 2017, Defendant Sinatra sold 121,235 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $16,173,959:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/9/2014 | $198.74 | 13,907 | $2,763,877 |
| 5/9/2014 | $199.20 | 100 | $19,920 |
| 11/29/2016 | $99.76 | 41,743 | $4,164,282 |
| 11/29/2016 | $100.22 | 600 | $60,132 |
| 6/9/2017 | $129.12 | 22,624 | $2,921,211 |
| 9/15/2017 | $143.62 | 21,451 | $3,080,793 |
| 11/8/2017 | $152.03 | 20,795 | $3,161,464 |
| 11/9/2017 | $152.07 | 15 | $2,281 |
| Totals: | | 121,235 | $16,173,959 |

24.     **Defendant Stephen Cootey** served as the Company's Chief Financial Officer, Senior Vice President, and Treasurer from March 16, 2014 to March 1, 2017. He has also served as Treasurer and Senior Vice President-Finance for the Company. Before joining Wynn Resorts, he served as Senior Vice President-Corporate Finance for Las Vegas Sands Corp. and as Partner and Senior Research Analyst with Prides Capital, LLC.

25.     **Defendant Craig S. Billings** has served as the Company's CFO, Principal Accounting Officer and Treasurer since March 1, 2017. The Company's March 10, 2017 Definitive Proxy Statement described his past work experience as follows:

> Prior to joining the Company, he was an independent advisor and investor to the gaming industry from November 2015 through February 2017. From July 2012 to November 2015, Mr. Billings served in various roles at Aristocrat Leisure Ltd, including Chief Digital Officer and Managing Director of Strategy & Business Development. Before joining Aristocrat, Mr. Billings served as the Chief Executive Officer and President of ZEN Entertainment, Inc. from March 2011 to June 2012. He served in various senior roles at International Game Technology from March 2009 to October 2010 and also worked in the Investment Banking Division of Goldman Sachs, most recently as a Vice President in the London office. He

6

began his career in the audit practice of Deloitte & Touche. Mr. Billings serves as a Director of NYX Gaming Group Limited.

26.     Together, Defendants Wynn, Maddox, Sinatra, Cootey, and Billings are referred to herein as the "Individual Defendants."

27.     The following table summarizes the Individual Defendants' executive compensation, according to the Company's March 4, 2016 and April 18, 2018 Definitive Proxy Statements:

| Name | Total Compensation Received | | | | |
|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Stephen Wynn** | $19,790,059 | $25,396,896 | $20,680,391 | $28,156,985 | $34,522,695 |
| **Matt Maddox** | $5,059,294 | $4,814,400 | $4,078,932 | $4,614,703 | $24,816,633 |
| **Kim Sinatra** | $2,580,881 | $4,325,954 | $2,339,156 | $2,638,740 | $13,294,043 |
| **Stephen Cootey** | - | $5,296,853 | $1,186,406 | $1,299,115 | $175,481 |
| **Craig Billings** | - | - | - | - | $5,632,293 |

28.     The Individual Defendants possessed the power and authority to control the contents of Wynn's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public (as further detailed herein), the Individual Defendants knew that the adverse facts about Defendant Wynn's misconduct specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

### *Director Defendants*

29.     **Defendant John J. Hagenbuch** is a citizen of Idaho and has served as a director of the Company since December 2012. Defendant Hagenbuch serves as the Chairman of the

Audit Committee and as a member of the Compensation Committee. During fiscal years 2012 through 2016 Wynn Resorts paid Defendant Hagenbuch $1,904,619 in total compensation. As of March 2017, Defendant Hagenbuch held 27,535 shares of Wynn Resorts stock and options.

30.     In 2017, Defendant Hagenbuch sold 1,150 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $147,662:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/16/2017 | $128.50 | 1,100 | $141,350 |
| 5/17/2017 | $126.23 | 50 | $6,312 |
| Totals: | | 1,150 | $147,662 |

31.     **Defendant Dr. Ray R. Irani** is a citizen of California and served as a director of the Company from October 2007 through March 5, 2018, when he abruptly resigned as a Director. Defendant Irani served as a member of the Corporate Governance Committee. During fiscal years 2012 through 2016 Wynn Resorts paid Defendant Irani $1,864,963 in total compensation. According to the Company's Proxy Statement filed on March 24, 2008, Defendant Irani was nominated as a potential director by Defendant Wynn himself. As of March 2017, Defendant Irani held 91,137 shares of Wynn Resorts stock and options.

32.     **Defendant Jay L. Johnson** is a citizen of Idaho and has served as a director of the Company since August 2016. Defendant Johnson serves as a member of the Compensation Committee. In 2016, Wynn Resorts paid Defendant Johnson $380,935 in total compensation. As of March 2017, Defendant Johnson held 10,000 shares of Wynn Resorts stock and options.

33.     **Defendant Robert J. Miller** is a citizen of Nevada and has served as a director of the Company since October 2002. Defendant Miller serves as the Company's Lead Independent Director, Chairman of the Corporate Governance Committee, and as a member of the Audit Committee. Defendant Miller is also the Chairman of the Company's Compliance Committee and serves as the Company's Compliance Director. On February 27, 2014, the Board acted to combine these roles under the Chairman of the Company's Compliance

Committee. Previously, Defendant Miller served as President and then Counselor to the International Association of Gaming Advisors from 1999-2012. Upon information and belief, and at all times relevant herein, Defendant Miller is a resident of Clark County, Nevada. During fiscal years 2012 through 2016 Wynn Resorts paid Defendant Miller $2,448,794 in total compensation. As of March 2017, Defendant Miller held 38,637 shares of Wynn Resorts stock and options.

34.     **Defendant Patricia Mulroy** is a citizen of Nevada and has served as a director of the Company since October 2015. Defendant Mulroy serves as a member of the Corporate Governance Committee and a member of the Company's Compliance Committee. From July 2014 through October 2015, Defendant Mulroy served on the Nevada Gaming Commission. Upon information and belief, and at all times relevant herein, Defendant Mulroy is a resident of Clark County, Nevada. During fiscal years 2015 and 2016 Wynn Resorts paid Defendant Mulroy $617,577 in total compensation. As of March 2017, Defendant Mulroy held 12,559 shares of Wynn Resorts stock and options.

35.     In 2017 Defendant Mulroy sold 2,226 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $285,106:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/16/2017 | $128.08 | 2,226 | $285,106 |
| **Totals:** | | **2,226** | **$285,106** |

36.     **Defendant Clark T. Randt, Jr.** is a citizen of Utah and has served as a director of the Company since October 2015. Randt received a $600,000 consulting agreement in 2015 before his appointment to the Board. The Company admits that Defendant Randt is not independent under NASDAQ independence criteria. During fiscal years 2015 and 2016 Wynn Resorts paid Randt $564,545 in total compensation. As of March 2017, Defendant Randt held 12,559 shares of Wynn Resorts stock and options.

37.     In 2017, Defendant Randt sold 3,000 shares of Wynn Resorts common stock

9

while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $387,000:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 7/31/2017 | $129.00 | 3,000 | $387,000 |
| Totals: | | 3,000 | $387,000 |

38. **Defendant Alvin V. Shoemaker** is a citizen of Idaho and has served as a director of the Company since December 2002. Defendant Shoemaker serves as a member of the Compensation Committee and as a member of the Audit Committee. During fiscal years 2012 through 2016 Wynn Resorts paid Defendant Shoemaker $1,911,836 in total compensation. As of March 2017, Defendant Shoemaker held 38,637 shares of Wynn Resorts stock and options. On March 7, 2018, Wynn Resorts announced that Defendant Shoemaker would not stand for re-election in 2019, when his term is due to expire, but that he would serve out the remainder of his term.

39. Between 2015 and 2017, Defendant Shoemaker sold 25,000 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $3,866,100:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 2/13/15 | $159.00 | 10,000 | $1,159,000 |
| 11/8/2017 | $151.74 | 15,000 | $2,276,100 |
| Totals: | | 25,000 | $3,866,100 |

40. **Defendant J. Edward Virtue** is a citizen of Florida and has served as a director of the Company since November 2012. Virtue serves as Chairman of the Compensation Committee and as a member of the Corporate Governance Committee. Virtue managed the Wynn family's money prior to his appointment to the Board in 2012. During fiscal years 2012 through 2016 Wynn Resorts paid Defendant Virtue $1,921,313 in total compensation. As of March 2017, Defendant Virtue held 21,385 shares of Wynn Resorts stock and options.

10

41.      **Defendant D. Boone Wayson** is a citizen of Maryland and has served as a director of the Company since August 2003. Wayson serves as a member of the Audit Committee and as a member of the Corporate Governance Committee. On February 6, 2018, Defendant Wayson was named the Non-Executive Chairman of the Board. During fiscal years 2012 through 2016 Wynn Resorts paid Defendant Wayson $1,969,086 in total compensation. As of March 2017, Defendant Wayson held 123,637 shares of Wynn Resorts stock and options.

42.      In 2016, Defendant Wayson sold 37,500 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $3,267,000:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 11/9/2016 | $87.12 | 37,500 | $3,267,000 |
| Totals: | | 37,500 | $3,267,000 |

43.      Wayson has known of Defendant Wynn's history of sexual misconduct since at least 1997, when eleven waitresses at the Wynn-owned Mirage (where Wayson was then a current director) filed suit alleging a culture of harassment, coerced sexual relations, and misconduct by Defendant Wynn.[2]

# Factual Background

44.      Founded in 2002 by Defendant Wynn, Wynn Resorts is a leading developer, owner, and operator of destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, distinctive entertainment theaters, and large meeting complexes. It owns and operates Wynn Las Vegas and Encore in Las Vegas, Nevada, and Wynn Macau and Wynn Palace in Macau, China.

## Casino Regulation

45.      Wynn Resorts is subject to the gaming laws of each jurisdiction where it does

---

[2] The case, captioned *Arrowsmith, et al. v. Mirage Casino-Hotel*, No. 97-cv-00638-RLH-LRL (D. Nev. 1997), settled in 2003.

11

business. During the Class Period, the Company operated gaming establishments in Nevada and Macau and was actively developing a new gaming property in Massachusetts.

46.     All of these jurisdictions impose comprehensive regulatory requirements upon gaming licensees in order to ensure that they—as well as their officers, directors, and employees—have the necessary character, qualifications, and integrity to be suitable to hold that privilege so as not to pose a threat to the public interest or the integrity of the regulation and control of gaming. A violation of such regulations could result in the loss of gaming licenses critical to the Company's success.

### *Nevada*

47.     The Nevada Gaming Control Act, Nev. Rev. Stat. §§ 463.010 *et seq.*, mandates the "strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments" in order to maintain "public confidence and trust that licensed gaming is conducted honestly and competitively… and that gaming is free from criminal and corruptive elements." Nev. Rev. Stat. § 463.0129.

48.     As noted in the Company's own 2014 10-K, one of the most significant public policy concerns underlying Nevada gaming law is "preventing unsavory or unsuitable persons from being directly or indirectly involved with gaming at any time or in any capacity." Nevada Gaming Commission Regulation 5.040 also explicitly states that a "gaming license is a revocable privilege."

49.     To that end, the Nevada Gaming Commission ("NGC") and Nevada Gaming Control Board ("NGCB") are "charged with the awesome responsibility of regulating the gaming industry in Nevada and keeping undesirable elements out of the gaming industry." *Rosenthal v. Nevada*, 514 F. Supp. 907, 914 (D. Nev. 1981). Together, they "determine which people will or will not be 'players' in" the "highly regulated gaming industry in Nevada." *Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir. 1999). The ability to operate a casino in Nevada is **entirely** dependent on the approval of the NGC and NGCB. *See Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980) (no "protectable property interest" in being able to operate a

casino in Nevada).

50.     Any applicant for a gaming license must submit to the NGC an "application to…
be found suitable" to participate in Nevada gaming. Nev. Rev. Stat. § 463.170. The NGC has
"full and absolute power and authority to deny any application for **any cause deemed
reasonable**." Nev. Rev. Stat. § 463.220(6). Moreover, the NGC cannot grant such an
application unless it is "satisfied" that the applicant is:

> (a) A person of good character, honesty and integrity;
>
> (b) A person whose prior activities, criminal record, if any, reputation,
> habits and associations do not pose a threat to the public interest of this
> state or to the effective regulation and control of gaming…; and
>
> (c) In all other respects qualified to be licensed or found suitable
> consistently with the declared policy of the state.

Nev. Rev. Stat. § 463.170.

51.     Nevada law also imposes a continuing obligation on all licensees to ensure that
"all establishments wherein gaming is conducted in this state be operated in a manner **suitable**
to protect the public health, safety, morals, good order and general welfare of the inhabitants of
the State of Nevada." Nevada Gaming Commission Regulation 5.010.

52.     Nevada Gaming Commission Regulation 5.030 provides as follows:

> Violation of any provision of the Nevada Gaming Control Act or of
> these regulations by a licensee, the licensee's agent or employee shall
> be deemed contrary to the public health, safety, morals, good order and
> general welfare of the inhabitants of the State of Nevada and grounds
> for suspension or revocation of a license. Acceptance of a state gaming
> license or renewal thereof by a licensee constitutes an agreement on
> the part of the licensee to be bound by all of the regulations of the
> Commission as the same now are or may hereafter be amended or
> promulgated. It is the responsibility of the licensee to keep informed of
> the content of all such regulations, and ignorance thereof will not
> excuse violations.

53.     To that end, the NGCB is "charged by law with the duty of observing the
conduct of all licensees to the end that licenses shall not be held by unqualified or disqualified

persons or unsuitable persons or persons whose operations are conducted in an unsuitable manner." Nevada Gaming Commission Regulation 5.040.

54.     Moreover, "**any activity on the part of any licensee, the licensee's agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada**, or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry" is considered "**to be an unsuitable method of operation and shall be grounds for disciplinary action**." Examples of such "unsuitable methods of operation" include, among other things, "Failure to exercise discretion and sound judgment to prevent incidents which might reflect on the repute of the State of Nevada and act as a detriment to the development of the industry" and "Failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry." Nevada Gaming Commission Regulation 5.011.

55.     Nevada also imposes special requirements on publicly-traded companies involved in gaming. Nevada Gaming Commission Regulation 16.440 provides as follows:

**16.440 Proscribed activities with respect to "unsuitable" persons.**

1. If a person required by the Commission to apply for a finding of suitability fails, refuses or neglects to apply for a finding of suitability or a license within 30 days after the Commission orders that such application be made, the Commission may find such person to be unsuitable.

2. The Commission may determine a publicly traded corporation registered with the Commission to be unsuitable, or take other disciplinary action, if the publicly traded corporation, after the Commission serves notice to the publicly traded corporation that a person is unsuitable to be a stockholder or to have any other relationship or involvement with such publicly traded corporation or with a corporate licensee or any other affiliated company:

(a) Pays to any person found to be unsuitable any dividend or interest upon any voting securities or any payment or

14

distribution of any kind whatsoever except as permitted by paragraph (d) of this regulation;

(b) Recognizes the exercise by any such unsuitable person, directly or indirectly, or through any proxy, trustee or nominee, of any voting right conferred by any securities or interest in any securities referred to in NRS 463.643;

(c) Pays to any such unsuitable person any remuneration in any form for services rendered or otherwise except as permitted pursuant to NRS 463.645; or

(d) Fails to pursue all lawful efforts to require such unsuitable person to relinquish his or her voting securities including, if necessary, the immediate purchase of said voting securities by the publicly traded corporation for cash at fair market value.

56.    Nevada takes compliance with these requirements very seriously—in particular, with the requirement that all affiliated persons always remain "suitable." The 2014 10-K summarized the consequences of being found unsuitable as follows:

> ***Individual Licensing Requirements.*** No person may become a more than 5% stockholder or member of, or receive any percentage of the profits of, an intermediary company or company licensee without first obtaining licenses and approvals from the Nevada Gaming Authorities. **The Nevada Gaming Authorities may investigate any individual who has a material relationship to or material involvement with us to determine whether the individual is suitable** or should be licensed as a business associate of a gaming licensee. Certain of our officers, directors and key employees have been or may be required to file applications with the Nevada Gaming Authorities and are or may be required to be licensed or found suitable by the Nevada Gaming Authorities. All applications required as of the date of this report have been filed. However, the Nevada Gaming Authorities may require additional applications and may also deny an application for licensing for any reason which they deem appropriate. **A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation**….in addition to their authority to deny an application for a finding of suitability or licensing, the Nevada Gaming Authorities have the jurisdiction to disapprove a change in a corporate position.

**If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person**. In addition, the Nevada Gaming Commission may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

\* \* \*

***Consequences of Violating Gaming Laws.*** If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

### *Massachusetts*

57.     During the Class Period, Wynn Resorts was in the process of building a new "integrated resort containing a hotel, restaurants, casino, spa, premium retail offerings, meeting and convention space and a waterfront boardwalk" in Everett, Massachusetts.

58.     Massachusetts law imposes comprehensive regulatory requirements upon gaming licensees, including requiring that all those associated with the licensee possess the necessary character, qualifications, and integrity to be suitable to hold that privilege so as to not pose a threat to the public interest or the integrity of the regulation and control of gaming.

59.     Before issuing a gaming license, the Massachusetts Gaming Commission must "consider the overall reputation" and "the integrity, honesty, good character and reputation of

16

the applicant." M.G.L. c. 23K § 12. It must "deny an application for a gaming license" if, among other things, the application "contains false or misleading information" or the applicant "committed prior acts which have not been prosecuted or in which the applicant was not convicted but form a pattern of misconduct that makes the applicant unsuitable for a license." *Id.* at § 16.

60.    The 2014 10-K summarized Massachusetts gambling law as follows:

> **Company Registration Requirements.** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. Wynn Resorts and all individual qualifiers were found suitable by the MGC....A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation....

> If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

> **Consequences of Violating Gaming Laws.** If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

17

**Defendant Wynn's "Decades-Long Pattern of Sexual Misconduct"**

61.     Even as Defendants aggressively touted Defendant Wynn's experience and skills and reputation to investors throughout the Class Period, they utterly failed to disclose anything about what the *Wall Street Journal* would later describe as "a **decades-long pattern of sexual misconduct by Mr. Wynn**" that started as early as the 1970s and continued until very recently.

### *Defendant Wynn's Alleged Misconduct before Wynn Resorts*

62.     The alleged sexual misconduct by Defendant Wynn began in the 1970s.

63.     On February 12, 2018, the Las Vegas police announced that two women had filed police reports alleging that Defendant Wynn had sexually assaulted them in the 1970s. A February 27, 2018 *Associated Press* report[3] detailed the alleged assaults as follows:

> One police report shows a woman told officers that Wynn raped her at least three times around 1973 and 1974 at her Chicago apartment. She reported she got pregnant and gave birth to a girl in a gas station restroom.

> In one instance, the woman claimed that Wynn pinned her against the refrigerator and raped her. She said he then made a phone call, kissed her on the cheek and left. The report does not explain how Wynn is alleged to have entered the apartment or if they knew each other. The woman claimed she did not give him a key.

> The second police report shows a woman told police she had consensual sex with Wynn "several times" while she worked as a dealer at the downtown Las Vegas casino-hotel Golden Nugget, but "felt coerced to perform the acts." She reported she was forced to resign when she turned him down.

> "In the Summer of 1976, Wynn approached her in the back hall and wanted her to go with him," according to the report filed Jan. 29. "(S)he told him, "no", she was done and had someone she was seeing. She was soon after accused of stealing $40.00 and forced to resign."

---

[3] https://nypost.com/2018/02/27/woman-tells-police-she-gave-birth-to-child-after-steve-wynn-raped-her/

64.    According to the *Wall Street Journal,* in the early 1990s, Dennis Gomes, an executive at Golden Nugget (one of Defendant Wynn's casinos at the time), described a "***disgraceful pattern of personal and professional conduct***" by Wynn and testified that he "routinely received complaints from various department heads regarding ***Wynn's chronic sexual harassment of female employees.***"

65.    According to the *Nevada Forward*, a cocktail waitress at the Golden Nugget described predatory behavior in the 1980s by Defendant Wynn as follows: "Did I want to have sex with him? No. He signed my checks. I had two little kids, and no child support. He made a habit of going after single moms who were scared and couldn't afford to lose their jobs."

66.    Another set of allegations that date back to the late 1980s involve Defendant Wynn sexually harassing waitresses at The Mirage, which Defendant Wynn owned at the time. The *Las Vegas Review-Journal* reports that Defendant Wynn allegedly had sex with one of the waitresses he harassed – a grandmother – who asked Defendant Wynn, "Why don't you just leave me alone?" Defendant Wynn reportedly responded that he had "never had [sex with] a grandmother before" and wanted "to see how it feels."

67.    In 1997, eleven waitresses at the Wynn-owned Mirage filed suit alleging a culture of harassment, coerced sexual relations, and misconduct by Wynn. *See Arrowsmith, et al. v. Mirage Casino-Hotel*, No. 97-cv-00638-RLH-LRL (D. Nev. 1997). According to the *Las Vegas Review-Journal*, the lawsuit contained allegations that supervisors did not protect women from gamblers who harassed them, and that waitresses were sent to sexually "accommodate" high rollers at the resort through the 1990s. The suit also alleged that Defendant Wynn told the waitresses they had "fat asses" and did not look good in their uniforms, and that the waitresses were required to maintain their weight at the time they were hired throughout their employment. Specifically, in 1995, Defendant Wynn required the cocktail waitresses to meet with him in the Mirage's executive offices to tell them they had "fat asses" and unless they lost weight, he would transfer them to different departments. A few days later, the cocktail waitresses had to be weighed and measured and were forced to sign a document stating that if they gained six pounds or more they would be put on probation.

68.     In 1998, two of the plaintiffs in *Arrowsmith* spoke with *Las Vegas Review-Journal* reporter Carri Geer. As she was preparing the story, Geer was called into a meeting with Wynn's attorneys. After subjecting the plaintiffs to polygraph examinations, the newspaper killed the publication of the story, and ordered Geer to delete it from the newspaper's computer system, demonstrating Defendant Wynn's extraordinary power and influence.

69.     *Arrowsmith* settled in 2003. Because the case is public record and involved Wynn Resorts' CEO and Chairman, all of Wynn Resorts' Board members, particularly Defendants Shoemaker, Wayson, and Miller, who were directors in 2003, should have been aware of the litigation and of Wynn's propensity for sexually predatory conduct that could jeopardize the Company, its relationships with necessary regulators, and its gaming licenses. In addition, Defendant Wayson was a director of Mirage Resorts, Inc. from 1997-2000 while *Arrowsmith* was being litigated, and thus can be presumed to have knowledge of the plaintiffs' allegations regarding Defendant Wynn. As detailed below, however, the Board failed to heed the warnings from *Arrowsmith*, and instead allowed Defendant Wynn to continue his pattern of sexual harassment and abuse at Wynn Resorts.

### Defendant Wynn's Pattern of Sexual Harassment at Wynn Resorts

70.     After Wynn Resorts was founded in 2002—and especially after it opened its flagship resort Wynn Las Vegas in 2005— numerous sexual harassment claims were made against Defendant Wynn by Wynn Resorts employees. The public only became aware of these claims—and of the extent of the alleged sexual misconduct by Defendant Wynn -- as a result of the January 2018 *WSJ* Article and other corrective disclosures.

71.     As a result of the Nevada Gaming Commission investigation, the Company recently admitted to eight sexual harassment claims by employees against Defendant Wynn that were not investigated by the Company. On January 25, 2019, the NGCB filed a disciplinary

complaint[4] (the "NGCB Complaint") in connection with the NGCB's investigation of the Company's response to sexual misconduct allegations against Defendant Wynn. As more specifically detailed herein, the NGCB Complaint listed eight instances of sexual harassment claims by employees against Defendant Wynn that were not investigated by the Company, and further stated that at least seven former executives knew of sexual harassment allegations made by female employees and did not investigate. Moreover, pursuant to the accompanying settlement, the Company "admit[ted] each and every allegation set forth in the Complaint…except that RESPONDENTS neither admit[ted] nor den[ied] paragraphs 72 - 73 of the Complaint and that portion of paragraph 57 of the Complaint that alleges Maurice Wooden was aware of the allegations of sexual misconduct."

72.     Perhaps the most troubling instance involved a $7.5 million settlement in 2005 in connection with an accusation of rape by Defendant Wynn (the "2005 Settlement"). According to the NGCB Complaint, a manicurist who worked at the Wynn Las Vegas told several colleagues in 2005 "that she had been raped by Mr. Wynn and that she became pregnant as a result." Her allegations were reported to the HR department, and "Marc Schorr, former WYNN President and RESORTS Chief Operating Officer; Doreen Whennen, former WYNN Vice President of Hotel Operations; and Arte Nathan, former WYNN Senior Vice President and Chief Human Resources Officer" learned of the allegations "at or around the time the allegations were made," but the Company failed to investigate. Ultimately, Defendant Wynn "reached a private, confidential settlement with Employee 1 in which she and her husband were paid $7.5 million through a separate legal entity funded personally by Mr. Wynn."

73.     Ms. Whennen worked as the Vice President of Hotel Operations at Wynn Las Vegas until 2007 when she was transferred to Wynn Macau where she acted as Executive Vice President until she retired in 2014. In Las Vegas, Ms. Whennen participated in interviews and investigations with employees who worked in non-gaming divisions at Wynn-affiliated

---

[4] *Nev. Gaming Control Bd. v. Wynn Las Vegas, LLC,* No. NGC 18-15 (Nev. Gaming Comm'n Jan. 25, 2019).

21

properties. Upon retiring, she entered into a Resignation and Release Agreement with Wynn Resorts. As set forth above, Ms. Whennen contacted the manicurist with whom Mr. Wynn paid a $7.5 million settlement. During the course of the *Okada* litigation described herein, Ms. Whennen was deposed on July 14, 2017, at which deposition, Ms. Whennen revealed that she retained certain notes from the 2005 investigation into the manicurist's allegations of sexual assault. On December 8, 2017, in a further effort by Defendants to keep Defendant Wynn's sexual misconduct under wraps, Worldwide Wynn LLC, a subsidiary of Wynn Resorts, sued Ms. Whennen for misappropriating and wrongfully retaining the notes from the investigation into the manicurist's allegations. According to the lawsuit, Ms. Whennen has repeatedly refused to turnover her notes to Wynn Resorts, claiming that they are her personal property.

74.     Meanwhile, in an effort to conceal the 2005 assault, Defendant Wynn created a secret limited liability company, Entity Y, in 2005 to make the $7.5 million settlement payment, according to the *WSJ*. Entity Y's manager is James Pisanelli, a lawyer who was at the time with Brownstein Hyatt Farber Schreck LLP and has served as Wynn Resorts' outside counsel for years.

75.     According to a lawsuit filed on February 28, 2018, Defendant Wynn began assaulting another Wynn Resorts employee, a masseuse, in or around 2006. The complaint details that in or around 2006, after his first or second massage, Defendant Wynn made unwanted sexual advances that included forcing the masseuse to perform various sexual acts with him, and demanded oral sex ***more than fifty times*** over the course of two to three years. The lawsuit alleged that Wynn manipulated her into performing sexual acts on him by exploiting her financial dependency on her job, even though she "consistently objected" to the advances. Following the sessions, Defendant Wynn would leave her a "tip" of $400. Significantly, the lawsuit also alleges that the Wynn board of directors was aware of Defendant Wynn's "predatory behaviors" and that the Board failed to prevent harm to her.

76.     Defendant Wynn's sexual harassment and assault of masseuses was a pattern. Indeed, another massage therapist filed suit against Defendant Wynn and the Wynn Resorts' Board on March 1, 2018. She alleges that in or around 2011, Defendant Wynn began making

appointments for massages with her. The massages took place in Defendant Wynn's office at Wynn Resorts, while the door to his office was locked and security personnel, and dogs, which Defendant Wynn said would attack on command, were outside the door. According to her complaint, after the first two massages, Defendant Wynn discovered that she was going through a divorce and relied on her salary at Wynn Resorts to support her children. Defendant Wynn soon began a pattern of sexually abusive behavior towards the employee, including exposing himself to her, touching her inappropriately, repeatedly propositioning her for sex, and instructing her to massage his penis, which she did approximately a dozen times over the year because she feared for her physical and financial security. The woman repeatedly told him she did not want to have sex with him, to perform sexual acts on him, or to see him naked. After these sessions, Defendant Wynn routinely "tipped" the woman $1,000.

77.     In addition to these assaults, Defendant Wynn created a hostile working environment, where female employees were constantly uncomfortable. For example, several former Wynn Las Vegas employees recalled that Defendant Wynn often walked around areas of the Wynn Las Vegas in short shorts without underwear, and that he would get pedicures at the salon and sit in a way so as to expose himself.

78.     The *WSJ Article* reports that one former employee said Defendant Wynn asked if he could kiss her, and sexually propositioned her. On another occasion, as she was leaving his office, he grabbed her waist as she stood against a wall and told her to kiss him. She slipped out of his hold and left. After two weeks of pursuit, he stopped. The employee's supervisor and another colleague confirmed being told of these advances at the time, but sought to "manage" the situation rather than report it for fear of repercussions.

79.     The *WSJ Article* further reported that one former massage therapist said several years ago Defendant Wynn booked multiple appointments a week with her in the private massage room in his office suite. He continually adjusted a towel to expose himself, and ultimately instructed her to perform sexual acts on him. The therapist felt obligated to agree to his requests because he was her boss. She said this type of behavior became a frequent part of the massage sessions for several months. In subsequent sessions, Defendant Wynn asked her to

perform oral sex on him. She refused this request and told a colleague that Defendant Wynn had generally been inappropriate with her. That colleague told the *WSJ* that Wynn also made advances toward her while she massaged him in his office's private massage room.

80.     Former employees told the *WSJ* that they sometimes entered fake appointments in the books to help other women workers get around a request for services in Defendant Wynn's office or arranged for others to pose as assistants so they would not be alone with him.

81.     Former employees also told of female employees hiding in the bathroom or back rooms when they heard Defendant Wynn was on the way to the salon. "Everybody was petrified," said Jorgen Nielsen, a former artistic director at the salon. Nielsen said he and others repeatedly told high-level company executives Defendant Wynn's sexual advances were causing a problem, but "nobody was there to help us."

82.     On March 6, 2018, a Wynn Resorts manicurist filed yet another lawsuit against Defendant Wynn and the Director Defendants alleging sexual assault by Defendant Wynn, this time beginning in or around 2015. The manicurist alleged that Defendant Wynn would demand that the manicurist sit so close to Defendant Wynn that her knee was touching his crotch. Further, he would place his hand being manicured over his genitals necessitating her to touch them in order to perform her work. If she objected to this physical contact, Defendant Wynn became angry and agitated. The employee complained to her supervisor and management at Wynn Resorts and, despite being taken to the highest level at Wynn Resorts, was told that nothing would be done to change Defendant Wynn's misbehavior. Moreover, in complaining to her co-workers, she learned that they had many similar stories of sexual advances during the manicures and pedicures that they provided. The employee and her colleagues tried to avoid taking appointments with Defendant Wynn. The employee alleges that Wynn Resorts' management never contacted her to investigate her claim.

83.     Even after the *WSJ Article*, the Board continued to allow Defendant Wynn free reign to intimidate salon employees by permitting him to demand that they publicly disavow his misconduct. As detailed in the manicurist's complaint, described in the prior paragraph, the manicurist alleged that on January 31, 2018, Defendant Wynn accompanied by Wynn Resorts'

executives, came into the Claude Baruk Salon at Wynn Las Vegas (the "Salon") and, in a group setting, instructed anyone who had ever felt assaulted or abused by Defendant Wynn to raise their hands. The next day, on or about February 1, 2018, Defendant Wynn returned to the Salon with audio-video personnel and demanded that all employees record a video in which they stated that Defendant Wynn had never assaulted them.[5]

84.     According to deposition testimony revealed in court on March 9, 2018, Defendant Wynn testified that he skipped a mandatory sexual harassment training for all Wynn Resorts employees, including company executives. When asked if he had attended the training, Defendant Wynn responded, "No. I don't need it."

85.     In the wake of the *WSJ article*, the Nevada Gaming Control Board received numerous reports about Defendant Wynn, and the volume of calls it received prompted it to introduce a new online system for the public to send in confidential complaints and tips.

86.     According to CNN, National Labor Relations Board ("NLRB") records also document Defendant Wynn's flagrant misogyny and abusive treatment of his female employees. In late 2006, Defendant Wynn was involved in proceedings before Judge Burton Litvack of the NLRB stemming from a labor dispute with his employees in which Defendant Wynn called some employees, among other things, "muggers and thieves." In ruling against Defendant Wynn, Judge Litvack wrote that Defendant Wynn's "statements and actions during the meeting [with employees] must be viewed in the context of his desire to frighten and intimidate" them. The Judge told CNN that he "came out of his chair" listening to Defendant Wynn make "very disparaging comments about the women who were at the [employee] meeting, particularly some of them that . . . were crying."

87.     On March 19, 2018, it was further reported by the *WSJ* that Defendant Wynn had paid a settlement to a second Wynn Resorts employee in 2006 relating to sexual misconduct allegations. When she informed Defendant Wynn that she wanted to publicly disclose the details

---

[5] https://www.reviewjournal.com/local/local-las-vegas/lawsuit-wynn-told-employees-to-say-he-never-assaulted-them/

of the event following the January 26, 2018 *WSJ article*, his attorneys contacted the FBI asking the agency to investigate her for extortion. The former employee only sought the ability to reveal information underlying her settlement; no money was ever demanded. The FBI closed the investigation two weeks later.

# The Class Period

## Wynn Resorts' Code of Conduct

88.     Throughout the Class Period, Defendants not only failed to disclose Defendant Wynn's alleged misconduct but also consistently assured investors that the Company adhered to rigorous standards of ethics. In particular, up to and throughout the Class Period, Wynn Resorts repeatedly made available to investors its Code of Business Conduct and Ethics (the "Code of Conduct").[6]

89.     The Code of Conduct's stated purposes were "to **comply with federal securities laws**" and "to **reinforce and enhance the Company's commitment to an ethical way of doing business**." It described itself as "a statement of policies for the individual and business conduct" and "the basis for the Company to **continue a tradition of high ethical business**

---

[6] All citations to the Code of Conduct herein are to the Code of Conduct as amended on August 1, 2016.

The Company made minor changes to the Code of Conduct on August 1, 2016 in order "to clarify the persons covered by the policy and to update certain contact information." *See* https://web.archive.org/web/20170510184605/http://phx.corporate-ir.net/phoenix.zhtml?c=132059&p=amendmentcodeofconduct. The August 1, 2016 changes were minor and not material here. Otherwise, the Code of Conduct remained the same throughout the Class Period.

After the Class Period, however, the Company was forced to make much more substantial changes to its Code of Conduct. The August 3, 2018 amendments "among other things: (i) reiterated the Company's commitment to maintaining a professional workplace free from discrimination; (ii) provided clarification on where employees can seek guidance or report complaints; and (iii) clarified permitted disclosures." https://wynnresortslimited.gcs-web.com/amendments-code-conduct (last visited Mar. 1, 2019).

**standards**."

90.    The Code of Conduct opened with a letter from Defendant Wynn, stating in relevant part:

> We live in an age where legal and ethical missteps of others have resulted in the law imposing **special duties on our personal and business lives**. In the midst of this unfortunate environment, the good name and reputation of Wynn Resorts are a result of the dedication and hard work of all of us. **Together, we are responsible for preserving and strengthening this reputation. Our goal is not just to comply with the laws, rules and regulations that apply to our business; we also continuously strive to abide by high standards of ethical business conduct.**
>
> **This booklet is not to be ignored or taken lightly. All employees, officers and directors, agents and representatives of Wynn Resorts and its affiliates must comply with the Code.** Please read the Code carefully and make sure that you understand it, the consequences of non-compliance, and the Code's importance to the success of the Company. Your signature on the acknowledgement form at the conclusion of the Code certifies that you have read, understood and complied with its contents.

91.    The Code of Conduct purported to apply to "all employees, officers, directors, agents, and representatives of the Company and its affiliates ('Covered Persons')" as well as "certain independent contractors and consultants who work at the Company's facilities or on the Company's behalf." It emphasized that "[e]ach of us is responsible for knowing and understanding the policies and guidelines contained in the following pages" and that "[o]ur conduct should reflect the Company's values, demonstrate ethical leadership, and promote a work environment that upholds the Company's reputation for integrity, ethical conduct and trust."

92.    The Code of Conduct described the responsibilities of all Covered Persons as including the following:

> ***2.2 Promoting a Diverse and Productive Workforce***
>
> The Company is an equal opportunity employer committed to complying with all state and federal fair employment practice laws, as

27

well as maintaining a workforce that reflects the diversity of the community. The Company believes in and supports equal opportunity in employment to all persons regardless of race, color, national origin, citizenship status, sex, marital status, gender identity or expression, sexual orientation or perceived sexual orientation, age, religion, veteran status, military status, disability, history of disability or perceived disability. Harassment or discrimination of any sort will not be tolerated.

93.     The Code of Conduct also included a number of implementation and enforcement provisions. Among other things, it created a "Compliance Officer" who was "responsible for overseeing and monitoring compliance with this Code" and required all Covered Persons to report any known or suspected "violation of applicable laws, rules or regulations, the Code, or the Company's related policies" to the Compliance Officer. It also stated the following:

### 7. IMPLEMENTATION OF THE CODE

#### *7.1 Responsibilities*

While each of us is individually responsible for putting the Code to work, we need not go it alone. The Company has a number of resources, people and processes in place to answer our questions and guide us through difficult decisions. Copies of this Code are available from the Compliance Officer and on the Company's website. This Code will be distributed annually to all Covered Persons and other individuals to whom it applies who will be asked to certify that they have read and understand the Code and that they have complied and will comply with its terms. **If you know of or suspect a violation of applicable laws, rules or regulations, the Code, or the Company's related policies, you must immediately report that information** as described in Section 1.4 of this Code.

#### *7.2 Investigations of Suspected Violations*

**All reported violations of the Code will be taken seriously and promptly investigated**. All reports will be treated confidentially to the extent reasonably possible. It is the Company's policy that no one will be subject to retaliation or adverse employment action because of a good faith report of suspected misconduct or for assisting in any investigation of suspected misconduct. It is imperative that reporting persons not conduct their own preliminary investigations.

28

Investigations of alleged violations may involve complex legal issues, and acting on your own may compromise the integrity of an investigation and adversely affect both you and the Company.

### 7.3 Discipline for Violations

**The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible** after its discovery. Subject to applicable law and agreements, Covered Persons who violate this Code and other Company policies and procedures may be subject to disciplinary action, up to and including discharge.

94.     The Code of Conduct further noted that the "Company has additional policies that supplement the policies in this Code." Some of these policies, as relevant to this Action, were summarized as follows in the NGCB Complaint:

27. During all times relevant to this Complaint, RESPONDENTS maintained a policy concerning sexual harassment. RESPONDENTS' harassment policy was "to prohibit any conduct, whether intentional or unintentional which results in the harassment or discrimination of employees . . . . " RESPONDENTS' harassment policy specifically defined one type of harassment to be sexual harassment.

28. RESPONDENTS' harassment policy defined sexual harassment as "any unwelcomed sexual advances, request for sexual favors, or other conduct of a sexual nature either verbal or physical . . . . "

29. RESPONDENTS' harassment policy set out that an employee who experiences or witnesses sexual harassment "should immediately report the conduct to: 1. The Employee Relations Department; 2. The Vice President of Human Resources, the Legal department, or your particular Divisional Vice President; 3. Any other member of management with whom [the employee] feel[s] comfortable. "

30. RESPONDENTS' harassment policy set out that supervisors who observe or become aware of harassment must immediately report such harassment "to the Employee Relations department and take appropriate steps to stop the offending behavior. "

31. During all times relevant to this Complaint, RESPONDENTS maintained a personal relationships policy. This policy discouraged "romantic or intimate relationships involving a direct or indirect

supervisory relationship between employees regardless of whether the relationship is voluntary and/or welcomed by both parties. "

32. RESPONDENTS' personal relationships policy also set out "Department managers are responsible for conducting themselves in a professional manner and strictly maintaining professional relationships with their employees at all times."

33. During all times relevant to this Complaint, RESPONDENTS maintained a policy setting out how the Employee Relations Department (ER) should investigate alleged workplace conduct violations. Specifically: 1. Obtain verbal and written statements from all parties involved, including the complainant and accused. 2. Take photographs/video of any injury or damage (if applicable). 3. Preserve all evidence, and secure the evidence in a locked location. Document all evidence obtained. 4. Determine if there is a potential for risk occurrence. If there is a potential, take all measures appropriate to protect employees. 5. Complete an investigation report and provide all relevant and necessary information, including findings.

34. RESPONDENTS' investigations policy also set out that the ER should make and document findings as "violation found," "no violation found," or "inconclusive investigation."

95.    The Code of Conduct was materially false and misleading, because, among other things, it was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of Conduct to Defendant Wynn, Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees. Contrary to the Code's statement that "[a]ll reported violations of the Code will be taken seriously and promptly investigated," in fact, Defendants failed to investigate the alleged sexual misconduct, and also failed to report these incidents to the applicable gaming regulators, as required by law, thus jeopardizing the Company's critically needed gaming licenses. Moreover, contrary to the Code's statement that "[h]arassment" and "discrimination of any sort will not be tolerated" and its requirement that violators will be disciplined, in fact such conduct by Defendant Wynn was tolerated and condoned at the highest levels of management, and he was never disciplined until the January 2018 *WSJ* Article revealed the extent of his egregious conduct and forced his ouster from the Company.

96.     The Code of Conduct played a very significant role in a major lawsuit involving the Company and some of its largest shareholders that began in 2012 and continued until after the Class Period. The lawsuit was styled *Wynn Resorts, Limited v. Kazuo Okada, et al.*, No. A-12-656710-B in the Eighth Judicial District Court in Clark County, Nevada (the "*Okada Litigation*").

97.     Among other things, the *Okada* Litigation made clear that the Code of Conduct was not "just a document [the Company] wrote to fulfill a corporate obligation." The *Okada* Litigation arose out of the fact that the Company used the Code of Conduct to "find Kazuo Okada -- an early investor and formerly the largest single shareholder of Wynn Resorts -- unsuitable to be a shareholder in the company, which ultimately led to not only his ouster from the Board of Directors but Wynn Resorts redeeming his shares."[7]

98.     Throughout the *Okada* Litigation, the Company consistently made clear that it considered a violation of the Code of Conduct not just a violation of internal Company policy, but **sufficient to render someone "unsuitable" under Nevada law**.

99.     The 2014 10-K explained the Company's determination to forcibly redeem Okada's Wynn securities, pursuant to the Company's articles of incorporation, after having concluded that Okada was an "unsuitable" individual. These actions underscored to investors the significance of the "suitability" requirement under Nevada law and also demonstrated the very severe consequences of failing to meet that requirement:

> ***Redemption of Securities Owned By an Unsuitable Person.*** The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts.

---

[7] https://finance.yahoo.com/news/steve-wynn-allegations-could-mean-143700942.html

\* \* \*

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that the Okada Parties are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. After authorizing the redemption of the Aruze shares, as discussed below, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons and formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting….

On February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013. Although the Company has retained the structure of the Executive Committee, the Board has resumed its past role in managing the business and affairs of the Company.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and canceled Aruze's 24,549,222 shares of Wynn Resorts' common stock….

### The 2013 10-K

100.    On February 28, 2014, Wynn Resorts filed an annual report on Form 10-K for 2013 (the "2013 10-K"). The 2013 10-K was signed by Elaine Wynn and Defendants Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Maddox. The 2013 10-K contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendants Wynn and Maddox, stating that the information contained in the 2013 10-K "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

101.    The 2013 10-K contained the following false and misleading statement:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company.

102.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

103.    The 2013 10-K contained the following false and/or misleading statements:

> We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises.

> * * *

> **The loss of Stephen A. Wynn could significantly harm our business.**

> Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2020. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts, Limited. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

104.    This statement was false and/or misleading because, while touting the "distinct

33

advantage" Defendant Wynn's involvement provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Wynn as Chief Executive Officer.

105.    The 2013 10-K contained the following false and/or misleading statement:

> **_Consequences of Violating Gaming Laws._** If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

106.    This statement was false and/or misleading because, while warning investors generally of the consequences of violating gaming laws, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing its critical gaming licenses and incurring substantial fines.

107.    The 2013 10-K also contained the following false and/or misleading statement referring to Wynn Resorts' Code of Conduct:

> **As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees** of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

108.    This reference to the Code of Conduct was false and/or misleading because, among other things, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of Conduct to Defendant Wynn, the Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees. Thus, contrary to its public representations, the Company did not have a "commitment to integrity."

**The 2014 Proxy Statement**

109.    The Company's March 31, 2014 Definitive Proxy Statement—which asked shareholders to vote for his re-election as Chairman of the Board and to approve his proposed compensation of millions of dollars as CEO—described Defendant Wynn as the "**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our brand." It touted his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused

35

leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

> ***Experience, qualifications attributes and skills.*** Mr. Wynn is the ***founder and creative and organizational force of Wynn Resorts***. Mr. Wynn's 45 years of experience in the industry have contributed to his brand name status as the ***preeminent designer, developer and operator of destination casino resorts***. Mr. Wynn's involvement with our casino resorts provides a ***distinct advantage over other gaming enterprises***. As founder, Chairman and Chief Executive Officer, he has a ***unique perspective into the operations and vision for the Company.***

> ***Chairman and CEO.*** Mr. Wynn currently serves as the Chairman and CEO of the Company. Mr. Wynn has served in these roles since the Company's inception in 2002 and during that period, has delivered ***exceptional value*** to our stockholders. Under Mr. Wynn's leadership our stockholders have received approximately $5.4 billion, or $48.75 per share, through the payment of dividends and seen a compounded annual total stockholder return (including reinvestment of dividends) of 32% from our initial public offering in 2002 through the end of 2013. Mr. Wynn is the founder, creator and name behind our brand. He brings ***extraordinary talent to our Company*** that is unrivaled by others in our industry. In addition, the Board believes that Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts.

> * * *

> ***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and during that period, has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership our stockholders have received approximately $5.4 billion, or $48.75 per share, through the payment of dividends as well as seen a compounded annual total stockholder return (including reinvestment of dividends) of 32% from our initial public offering in 2002 through the end of 2013. Mr. Wynn is the founder, creator and name behind our brand. He brings ***extraordinary talent to our Company that is unrivaled*** in our industry….

> ***Other Key Considerations.*** Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino

resorts and services are unique and integral components of our success and provided the context for determining Mr. Wynn's compensation for 2013. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the ***unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands***…

110.    This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

## Misrepresentations in 2014 about Compliance

111.    On April 22, 2014, Wynn Resorts filed a Form 8-K, signed by Defendant Maddox, attaching as an exhibit the Annual Report of Wynn Macau, Ltd. for 2013 (the "2013 Wynn Macau Annual Report"). The 2013 Wynn Macau Annual Report stated, in relevant part, as follows:

Other regulators may pursue separate investigations into Wynn Resorts' compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with Wynn Resorts' donation to the University of Macau. While ***Wynn Resorts believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against Wynn Resorts.

112.    On May 9, 2014, Wynn Resorts filed a quarterly report on Form 10-Q for the

first quarter of 2014 (the "2014 Q1 10-Q"). The 2014 Q1 10-Q was signed by Defendant Maddox and also contained signed SOX certifications by Defendants Wynn and Maddox, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

113.   The 2014 Q1 10-Q stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

114.   On August 8, 2014, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2014 (the "2014 Q2 10-Q"). The 2014 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

115.   The 2014 Q2 10-Q stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

116.    On November 7, 2014, Wynn Resorts filed a quarterly report on Form 10-Q for the third quarter of 2014 (the "2014 Q3 10-Q"). The 2014 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

117.    The 2014 Q3 10-Q stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

118.    The italicized text in all of the above-quoted excerpts was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by failing to report the incidents involving Defendant Wynn to regulators, as required.

**Misrepresentations about the Massachusetts License and Resort**

119.    The Company held an earnings call on February 3, 2015. On that call, Defendant Wynn made the following false and misleading statement:

> We worked very hard to compete for the right to operate in Massachusetts, as you know, and it was expensive to do that process, and time-consuming. We had an 1,800 pound application, when we finally finished. We spent $25 million just to get to the end of the game, in terms of local elections and requirements with related

communities. You know that we had $130 million in infrastructure that we had to agree to, and then there was another $100 million in the cost of the license, other miscellaneous stuff. We're in $230 million of our budget already.

Our promises for that, that are separate and apart from the construction and that project budget. We are going to be the one of the top five private employers in the history of the State of Massachusetts. We're going to be responsible for $50 million a month in revenue for the state, probably another $50 million in related revenues to all the surrounding communities. We're going to employ thousands and thousands of people. It's the largest construction budget in recent history in Massachusetts, maybe forever.

We've got a serious presence there in Massachusetts. And we're delighted to have that position and we finished the design of the hotel. And I think it's – along with the Palace, the best work we've ever done, based upon 40 years of experience. Best of all, with the same group of executives that have learned from all of our past experiences and projects, and hopefully, our next stuff that comes up will reflect the evolution and the enlightenment that we've been able to achieve because of those experiences….

So, all-in-all, the setup is just right for Massachusetts, and as we wind our way through the complexities of the agent situation, our setup is just right to keep our promise to our employees and to the government in China.

120.    These statements were false and/or misleading because, while touting their newly earned right to operate in Massachusetts, Defendants failed to disclose that Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to Massachusetts regulators when applying for the license, although required to do so under gaming regulations. As a result, the Company was at grave risk of losing the Massachusetts gaming license.

1

2

**The 2014 10-K**

3

121.    On March 2, 2015, Wynn Resorts filed an annual report on Form 10-K for 2014

4

(the "2014 10-K"). The 2014 10-K was signed by Elaine Wynn and Defendants Wynn,

5

Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey. It also contained signed

6

SOX certifications by Defendants Wynn and Cootey, stating that the information contained

7

therein "fairly present in all material respects the financial condition, results of operations and

8

cash flows of the registrant as of, and for, the periods presented in this report."

9

122.    The 2014 10-K stated, in relevant part, as follows:

10

> On February 18, 2012, the Board of Directors of Wynn Resorts
> received a report from Freeh, Sporkin & Sullivan, LLP detailing
> numerous instances of conduct constituting prima facie violations of
> the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada
> (formerly the largest beneficial owner of our shares) and certain of his
> affiliates. . . . . The Company has provided the Freeh Report to
> applicable regulators and has been cooperating with related
> investigations of such regulators. The conduct of Mr. Okada and his
> affiliates and the outcome of any resulting regulatory findings could
> have adverse consequences to the Company. A finding by regulatory
> authorities that Mr. Okada violated the FCPA on Company property
> and/or otherwise involved the Company in criminal or civil violations
> could result in actions by regulatory authorities against the Company.
> Relatedly, regulators have and may pursue separate investigations into
> the Company's compliance with applicable laws in connection with
> the Okada matter . . . . While ***the Company believes that it is in full
> compliance with all applicable laws***, any such investigations could
> result in actions by regulators against the Company, which could
> negatively affect the Company's financial condition or results of
> operations.
>
>                         * * *
>
> Other regulators may pursue separate investigations into the
> Company's compliance with applicable laws arising from the
> allegations in the matters described above and in response to the
> Counterclaim and other litigation filed by Mr. Okada suggesting
> improprieties in connection with the Company's donation to the
> University of Macau. While ***the Company believes that it is in full***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41

***compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

123.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

124.    The 2014 10-K referred to Wynn Resorts' Code of Conduct as follows:

**As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees** of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

125.    This reference to the Code of Conduct was false and/or misleading because, among other things, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of Conduct to Defendant Wynn, Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees. Accordingly, the Company did not have a "commitment to integrity."

126.    The 2014 10-K contained the following false and/or misleading statement:

We believe that Stephen A. Wynn is the ***preeminent designer, developer and operator of destination casino resorts*** and has developed brand name status. Mr. Wynn's involvement with our resorts provides a ***distinct advantage over other gaming enterprises***.

* * *

**The loss of Stephen A. Wynn could significantly harm our business.**

Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2022. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

127. This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of significant harm from losing Defendant Wynn as Chief Executive Officer.

128. The 2014 10-K contained the following false and/or misleading statement:

*Consequences of Violating Gaming Laws*. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or

43

suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

\* \* \*

***Consequences of Being Found Unsuitable.*** Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities, including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

\* \* \*

***Company Registration Requirements.*** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were

44

therefore subject to a suitability investigation. ***Wynn Resorts and all individual qualifiers were found suitable by the MGC***....A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation....

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

***Consequences of Violating Gaming Laws.*** If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

129.    This statement was false and/or misleading because, while telling investors that Defendant Wynn and all "individual qualifiers" had been found suitable, and while warning investors generally of the consequences of violating gaming laws, it failed to disclose that Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to the Massachusetts Gaming Commission during the license application process although required to do so under gaming regulations. As a result, the Company was at grave risk of losing its Massachusetts license.

## **2015**

130.    The Company's February 27, 2015 Definitive Proxy Statement—which asked shareholders to vote for Wynn's re-election as Chairman of the Board and to approve his

45

proposed compensation of millions of dollars—described Defendant Wynn as the "**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our brand." It touted his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

> *Experience, qualifications, attributes and skills.* Mr. Wynn is the founder and creative and organizational force of Wynn Resorts. Mr. Wynn's 45 years of experience in the industry have contributed to his brand name status as the preeminent designer, developer and operator of destination casino resorts. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. As founder, Chairman and Chief Executive Officer, he has a unique perspective into the operations and vision for the Company.

> *Chairman and CEO.* Mr. Wynn currently serves as the Chairman and CEO of the Company. Mr. Wynn has served in these roles since the Company's inception in 2002 and during that period, has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2014, we have paid approximately $5.9 billion, or $53.75 per share, in dividends to our stockholders, and our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 27% over that same timeframe. Mr. Wynn is the founder, creator and name behind our brand. He brings extraordinary talent to our Company that is unrivaled by others in our industry. In addition, the Board believes that Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts.

* * *

46

***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and during that period, has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2014, we have paid approximately $5.9 billion, or $53.75 per share, in dividends to our stockholders, and our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 27% over that same timeframe. Mr. Wynn is the founder, creator and name behind our brand. He brings extraordinary talent to our Company that is unrivaled in our industry....

***Other Key Considerations. Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success and provided the context for determining Mr. Wynn's compensation for 2014. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands....***

131. This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

132. On March 24, 2015, the Company filed a Schedule 14A attaching a presentation from the Board to the Company's shareholders. The presentation argued that Elaine Wynn should not be retained as a director because she "has placed her individual interests ahead of her director duties" and her ongoing dispute with Defendant Wynn has "reduced the effectiveness of her participation on the Board." It also contained the following language defending the Board's purported commitment to diversity:

47

**WYNN RESORTS HAS A TRACK RECORD OF PROMOTING DIVERSITY**

Wynn Resorts' commitment to diversity is reflected by the number of women in senior leadership roles throughout the Company.

In fact, 34% of employees at the Vice President and above level and 38% of employees at the Executive Director or Assistant Vice President level are women.

Key leadership positions held by women at Wynn Resorts include:

– Linda Chen, Director on the Board of Wynn Macau, Ltd.; Chief Operating Officer of Wynn Macau, Ltd; President, Wynn International Marketing Ltd.

– Kim Sinatra, Executive Vice President, General Counsel and Secretary, Wynn Resorts Ltd.

– Teri Peers, Chief Accounting Officer, Wynn Resorts, Ltd.

– Debra Nutton, Executive Vice President of Gaming Operations, Wynn/Encore Las Vegas

– Chris Flatt, Executive Vice President of Hotel Sales and Marketing, Wynn/Encore Las Vegas

– Carrie Messina, Senior Vice President of Human Resources, Wynn/Encore Las Vegas

– Stacie Michaels, General Counsel, Wynn/Encore Las Vegas

Importantly, the Nominating and Corporate Governance Committee recognizes that gender diversity is important for the Board, not only to make sure that the Board and the Company benefit from diverse perspectives, but also to set the right "tone at the top."

133.    These statements were false and misleading because while boasting about the Company's "track record" and "commitment" to diversity, Defendants failed to disclose that Defendant Wynn had created a hostile work environment for Wynn's female employees, which was known to, but condoned by, senior management. The statements were further misleading because Defendant Wynn had placed his own interests ahead of his duty to the Board by repeatedly violating company policy and Nevada law.

134.    On May 8, 2015, Wynn Resorts filed a quarterly report on Form 10-Q for the

48

first quarter of 2015 (the "2015 Q1 10-Q"). The 2015 Q1 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

135.    The 2015 Q1 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

136.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

137.    On August 7, 2015, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2015 (the "2015 Q2 10-Q"). The 2015 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

138.    The 2015 Q2 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the

49

allegations in the matters described above and in response to the
Counterclaim and other litigation filed by Mr. Okada suggesting
improprieties in connection with the Company's donation to the
University of Macau. While ***the Company believes that it is in full
compliance with all applicable laws***, any such investigations could
result in actions by regulators against the Company. Prior
investigations by the Nevada Gaming Control Board and SEC were
closed with no actions taken.

139.    The italicized text above was false and/or misleading because Defendants knew
that the Company was not, in fact, "in full compliance with all applicable laws" at the time
because, among other things, Defendant Wynn was in violation of gaming regulations due to his
"unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering
up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to
regulators, as required.

140.    On October 15, 2015, the Company held an earnings call. During that call,
Defendant Wynn stated:

> In 45 years, I've never had a layoff. I think we once dropped 100
> people in this company. 45 years. We don't do layoffs. People come to
> work for us. They get job security. And I've never broken a promise
> about job security to my employees in my entire career, and I don't
> like facing that possibility one bit.

141.    This statement was false and/or misleading because it failed to disclose that
Defendant Wynn had engaged in a pattern of sexual misconduct towards female Wynn
employees which created a hostile work environment and undermined their job security.

142.    On November 6, 2015, Wynn Resorts filed a quarterly report on Form 10-Q for
the third quarter of 2015 (the "2015 Q3 10-Q"). The 2015 Q3 10-Q was signed by Defendant
Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating
that the information contained therein "fairly present in all material respects the financial
condition, results of operations and cash flows of the registrant as of, and for, the periods
presented in this report."

143.    The 2015 Q3 10-Q stated in relevant part:

50

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While **the Company believes that it is in full compliance with all applicable laws**, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

144. The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Defendant Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

## The 2015 10-K

145. On February 29, 2016, Wynn Resorts filed an annual report on Form 10-K for 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey, and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

146. The 2015 10-K referred to Wynn Resorts' Code of Conduct as follows:

**As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company** and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate

51

Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

147.    This reference to the Code of Conduct was false and/or misleading because, among other things, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of conduct to Defendant Wynn, Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees.

148.    The 2015 10-K stated, in relevant part, as follows:

> **Potential violations of law by Mr. Okada (former director and formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.**
>
> The Freeh Reported detailed numerous instances of conduct constituting prima facie violations of the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. . . . . The Company has provided the Freeh Report to applicable regulators and has been cooperating with related investigations of such regulators. The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators have and may pursue separate investigations into the Company's compliance with applicable laws in connection with the Okada matter, as discussed in Item 8—"Financial Statements and Supplementary Data," Note 17 "Commitments and Contingencies." While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company, which could negatively affect the Company's financial condition or results of operations.
>
> * * *
>
> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting

improprieties in connection with the Company's donation to the
University of Macau. While ***the Company believes that it is in full
compliance with all applicable laws***, any such investigations could
result in actions by regulators against the Company. Prior
investigations by the Nevada Gaming Control Board and SEC were
closed with no actions taken.

149.     The italicized text above was false and/or misleading because Defendants knew

that the Company was not, in fact, "in full compliance with all applicable laws" at the time

because, among other things, Defendant Wynn was in violation of gaming regulations due to his

"unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering

up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to

regulators, as required.

150.     The 2015 10-K contained the following false and/or misleading statement:

The Company's integrated resort business model, pioneered by
Chairman and Chief Executive Officer Stephen A. Wynn, integrates
luxury hotel rooms, high-end retail, an array of dining and
entertainment options, meeting space, and gaming, all supported by
superior levels of customer service. Given his extensive design and
operational experience across numerous gaming jurisdictions, we
believe that ***Mr. Wynn's involvement with our resorts provides a
distinct advantage over other gaming enterprises.***

\* \* \*

**The loss of Stephen A. Wynn could significantly harm our
business.**

Our ability to maintain our competitive position is dependent to a large
degree on the efforts, skills and reputation of Stephen A. Wynn, the
Chairman of the Board, Chief Executive Officer and one of the
principal stockholders of Wynn Resorts. Mr. Wynn's employment
agreement expires in October 2022. However, we cannot assure you
that Mr. Wynn will remain with Wynn Resorts. If we lose the services
of Mr. Wynn, or if he is unable to devote sufficient attention to our
operations for any other reason, our business may be significantly
impaired.

151.     This statement was false and/or misleading because, while touting the "distinct

53

advantage" Defendant Wynn's involvement provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to report this misconduct to regulators as required under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

152.   The 2015 10-K contained the following false and/or misleading statement:

*Consequences of Violating Gaming Laws*. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

* * *

*Consequences of Being Found Unsuitable.* Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a

54

registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities, including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

* * *

**Company Registration Requirements.** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. ***Wynn Resorts and all individual qualifiers were found suitable by the MGC***….A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation….

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

**Consequences of Violating Gaming Laws.** If the MGC determines that we have violated the Gaming Act or any of its regulations, it could

55

limit, condition, suspend or revoke our registrations and gaming
license. In addition, the MGC set forth certain conditions in our
gaming license. Any violation of the Gaming Act, its regulations or
any of our license conditions resulting in a limitation, conditioning or
suspension of our gaming license would have a significant negative
effect on our Massachusetts gaming operations.

153.    This statement was false and/or misleading because, while telling investors that
Defendant Wynn and all "individual qualifiers" had been found suitable, and while warning
investors generally of the consequences of violating gaming laws, it failed to disclose that
Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable"
under applicable gaming regulations and jeopardizing the Company's critical gaming licenses),
and that senior Wynn Resorts management was aware of this conduct yet failed to adequately
investigate or report this misconduct to the Massachusetts Gaming Commission during the
license application process although required to do so under gaming regulations. As a result, the
Company was at grave risk of losing its Massachusetts license.

## **2016**

### *2016 Proxy Statement*

154.    The Company's March 4, 2016 Definitive Proxy Statement—which asked
shareholders to vote for Defendant Wynn's re-election as Chairman of the Board and to approve
his proposed compensation as CEO—described Defendant Wynn as the "**founder and creative
and organizational force** of Wynn Resorts" and "the founder, creator and name behind our
brand." It touted his "brand name status as the preeminent designer, developer and operator of
destination casino resorts." It told investors that "Wynn's involvement with our casino resorts
**provides a distinct advantage over other gaming enterprises**" and "brings extraordinary
talent to our Company that is unrivaled in our industry." It told investors to re-elect him as
Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes
unified leadership and direction for the Board and management, and provides focused leadership
for the Company's operational and strategic efforts." It also stated the following with respect to

56

his proposed compensation:

> ***Experience, qualifications, attributes and skills.*** Mr. Wynn is the **founder and creative and organizational force** of Wynn Resorts. Mr. Wynn's over 46 years of experience in the industry have contributed to his brand name status as the **preeminent designer, developer and operator of destination casino resorts**. Mr. Wynn's involvement with our casino resorts provides a **distinct advantage** over other gaming enterprises. As founder, Chairman and Chief Executive Officer, he has a **unique perspective into the operations and vision for the Company.**

> ***Chairman and CEO.*** Mr. Wynn currently serves as the Chairman and CEO of the Company. Mr. Wynn has served in these roles since the Company's inception in 2002. We believe that during his tenure, Mr. Wynn has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2015, we have paid approximately $6.2 billion, or $56.75 per share, in dividends to our stockholders. Our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 18% over the same timeframe. Mr. Wynn is the founder, creator and name behind our brand. We believe he brings **extraordinary talent to our Company that is unrivaled** by others in our industry. In addition, the Board believes that Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts.

> \* \* \*

> ***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and we believe that during that period he has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2015, we have paid approximately $6.2 billion, or $56.75 per share, in dividends to our stockholders. Our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 18% over the same timeframe. Mr. Wynn is the founder, creator and name behind our brand. We believe that he brings **extraordinary talent to our Company that is unrivaled** in our industry….

> ***Other Key Considerations.*** We believe **that Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success** and these considerations provided the context for determining Mr. Wynn's compensation for 2015. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the **unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands**....

155.   This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

### Elaine Wynn's Counterclaim and the Company's Responses

156.   On March 28, 2016, Elaine Wynn filed the *First Amended Answer of Elaine P. Wynn to Aruze and Universal's Fourth Amended Counterclaim; Fifth Amended Counterclaim and Crossclaim of Elaine P. Wynn* (the "Elaine Wynn Counterclaim") in the *Okada* Litigation.

157.   The Elaine Wynn Counterclaim described a "multi-million-dollar payment" by Defendant Wynn following allegations that he engaged in "serious misconduct" "on company property against an employee." It also detailed a "pattern of reckless risk-taking" behavior by Defendant Wynn that "left the directors and the Company vulnerable to potential liability and regulatory exposure." Specifically, it stated in relevant part:

2. Ms. Wynn raises these issues reluctantly: she had hoped, for the sake of her family and of the Company she helped to build, that the issues plaguing the operation of Wynn Resorts and the *reckless risk-taking of its Chairman and CEO Mr. Wynn* could be addressed through proper corporate processes and channels. They cannot be. *Mr. Wynn has intentionally kept the Wynn Resorts Board in the dark and has turned the General Counsel of the Company into his co-conspirator. He has engaged in reckless, risk-taking behavior, leaving himself vulnerable to allegations of serious wrongdoing—that he made a multi-million dollar payment and used Company resources to silence* and that he did not properly disclose to the Board of Directors. This and other such decisions have left the directors and the Company *vulnerable to potential liability and regulatory exposure*.

3. Every time Elaine Wynn sought information, as a director should, she confronted a *"tone at the top" that punished inquiry, even by her*, a major shareholder, director and co-founder of Wynn Resorts. *Mr. Wynn operates the Company without the effective checks and balances that the law requires*, beginning with independent and effective Board members. Ms. Wynn and her fellow Board members were *intentionally fed misinformation by Mr. Wynn and Kimmarie Sinatra, the Company's General Counsel, a process that depended on the deficiencies in the internal controls and their intentional circumvention with regard to the decisions of the Chairman and CEO.* Although bound by the January 2010 Stockholders Agreement to support Elaine Wynn's director candidacy, Mr. Wynn instead engineered her removal from the Board in retaliation for her challenging his decisions and questioning his judgment. Ms. Wynn cannot sit by idly and accept punishment for doing what is right and daring even to inquire about Mr. Wynn's reckless operation of the Company.

* * *

8. Neither Mr. Wynn nor Ms. Sinatra made any effort to hide their antipathy for Ms. Wynn's insistence on carrying out her duties as a director. For her part, *Ms. Wynn became increasingly concerned about the pattern of reckless risk-taking by the Chairman and CEO, unconstrained by proper internal controls; the "tone at the top" that discouraged any challenge to Mr. Wynn*; the fact that Mr. Wynn and Ms. Sinatra decided what would and would not be disclosed to the

59

Board; and the fact that they made decisions based not on what was best for the shareholders, but what was best for management, specifically the Chairman and CEO. No other plausible explanation could justify *the decision to keep secret from the Board and other Company counsel besides Ms. Sinatra the fact that the Chairman and CEO had engaged in alleged misconduct on Company property against at least one Company employee serious enough to warrant a multimillion dollar payment* and thereby to expose the Company and other directors to liability without their knowledge or consent.

* * *

**F. Mr. Wynn's Abandonment of His Promises to Ms. Wynn and Pattern of Reckless Behavior**

51. Working very long days, and trusting that (whatever Mr. Wynn might do in his personal life) Mr. Wynn would not put the Company they had co-founded and so painstakingly worked to build at risk, Ms. Wynn cannot say with any certainty when Mr. Wynn's reckless risk-taking began or accelerated. But beginning at the time of her divorce, and for obvious reasons, Ms. Wynn began examining the extent to which Mr. Wynn was withholding information from the Board on critical issues and using a public company to fund his lavish lifestyle and personal politics. *Mr. Wynn, along with Ms. Sinatra, effectively undermined the role and proper decision-making authority of the Board by withholding information from or affirmatively misleading the Board, including on matters that indisputably should have been reported by the Board, and by retaliating against Ms. Wynn for raising proper inquiries into the conduct of the Company, including by Mr. Wynn.*

52. Among other things, Ms. Wynn learned that Mr. Wynn, using the services of a private criminal defense attorney and a private gaming attorney, *had previously made a multimillion dollar payment after apparently being threatened with allegations of serious misconduct occurring on Company property against a Wynn Resorts employee.* When Ms. Wynn made inquiries of Ms. Sinatra, the Company's General Counsel, *Ms. Sinatra stated that Mr. Wynn had decided that the matter should not be disclosed to the Board or other Company counsel—even though Mr. Wynn, as the Chairman and CEO of a public company, had exposed himself to sufficiently serious allegations of wrongdoing that he had been forced to pay millions of dollars and had used Company resources to conceal the allegations.*

* * *

57. Both Wynn Resorts and Mr. Wynn entertain lavishly, which is common in the gaming industry. The dollar volume of such entertaining, not to mention the costs of a fleet of jets, and the overlap between what is personal and what should be a business expense, demand effective internal controls including careful review by the Audit Committee. ***Mr. Wynn misused Company resources to support his legendary lifestyle***. There was no effective protocol, or at least none approved by the Board, to oversee entertainment and travel expenditures, and Ms. Wynn's inquiries were rebuffed. On information and belief, ***on no occasion did the Audit Committee of the Board ever investigate or even conduct an in-depth review of the Company's internal controls governing such large expenditures***; certainly, no such reports have been produced, and there is evidence of regular shredding of audit committee materials and notes. The tone at the top of senior management, in particular Mr. Wynn and Ms. Sinatra, was to discourage even Board members from questioning the unilateral apportionment decisions of Mr. Wynn. Again, Ms. Wynn's efforts to act as a truly independent director were stonewalled: she was specifically barred from sitting in on a meeting of the Audit Committee.

* * *

59. ***Mr. Wynn has exerted, and continues to exert, control over his Board, including by exercising control over their access to information and by retaliating against Ms. Wynn for her proper inquiries into Company matters***, as described previously. All Wynn Resorts directors who have ever served on the Board have been, without exception, selected by Mr. Wynn. In only three instances in the history of the Company - with one of them being Ms. Wynn's renomination (where the board was following Mr. Wynn's signals but not his vote) and the other two being lone dissenting votes from Ms. Wynn on one occasion and Mr. Okada on the other - has a director voted against Mr. Wynn's intentions at any time or on any subject.

**G. Mr. Wynn's Disregard of His Agreement and of His Repeated Assurances to Engineer Elaine Wynn's Removal from the Board of the Company She Built**

60. On information and belief, ***Mr. Wynn and Ms. Sinatra,*** including by using the Nominating and Governance Committee, ***engineered the 2015 removal of Elaine Wynn from the Board of the Company*** she

co-founded, worked tirelessly to create, and in which she owns a significant shareholder stake. Doing so violated both the written and oral agreements between the Wynns. It was ***Ms. Wynn's punishment for asking too many questions that Mr. Wynn and Ms. Sinatra did not want to answer***. Mr. Wynn no longer wanted Ms. Wynn's participation, despite his obligations under the January 2010 Stockholders Agreement and even as he insisted on his absolute right to control her property.

\* \* \*

64. ***Mr. Wynn and Ms. Sinatra wanted Ms. Wynn expelled from the Board in retaliation for her proper inquiries into Company activities, including without limitation those involving Mr. Wynn as described above***. Indeed, in the entire history of the Company, Ms. Wynn was the only director who wanted to stay on the Board who was not renominated and reelected.

158.   On March 28, 2016, Wynn Resorts issued a press release titled "Statement from Wynn Resorts in Response to Elaine Wynn's Recent Filing" stating in relevant part:

***Ms. Wynn's latest allegations regarding our Board, its composition and its independence are simply not true*** and are rehashed from her previous, unfounded statements made during her proxy campaign. Our company has nine distinguished directors, seven of whom are independent under NASDAQ standards.

Throughout her campaign, in which she directly communicated with shareholders via numerous personal letters, she never once raised the new allegations set forth in her recent complaint. ***Her allegations regarding the use of company assets are without merit***. The use of company assets is governed by many internal policies and is ***closely supervised both by the Audit Committee***, which is comprised solely of independent directors, ***and our external auditors***. As outlined in recent proxy statements, Mr. Wynn reimburses the Company for his accommodations at the hotel, his personal use of corporate aircraft and all other company assets subject to company policy. These policies and any perquisites he receives have always been set forth in our proxy statements.

***As a leader in a highly regulated industry, Wynn Resorts prides itself on its transparency and full disclosure to regulators and shareholders. Allegations made by Ms. Wynn that the company***

*would hide any relevant activities from our regulators are patently false.*

By any measure, Wynn Resorts has ascended to a position of unrivaled stature and it is a symbol of unquestioned excellence and quality the world over. None of what Wynn Resorts has accomplished would be possible without its extraordinary employees and *the sense of family and community that Mr. Wynn has created*. Ms. Wynn's actions today run counter to *the culture of everything Mr. Wynn has worked so hard to create*.

159.     This statement was false and misleading because i) the Company was not, in fact, transparent with regulators and had unlawfully withheld from them material information regarding serious allegations of sexual misconduct by Defendant Wynn; and ii) Defendant Wynn had not created a "sense of family and community at Wynn Resorts," but in fact had created a coercive and hostile work environment for Wynn's female employees by engaging in his egregious pattern of predatory sexual behavior towards them. Wynn's conduct violated the Company's Code of Conduct and exposed the Company to substantial legal liability.

160.     On April 5, 2016, Elaine Wynn issued a press release titled "Stephen Wynn, Aided by General Counsel Kimmarie Sinatra, with Putting Wynn Resorts at Risk by Engaging in Unchecked Business Activities and Reckless Behavior," which stated in relevant part:

Supporting documents have been filed with the Nevada Clark County Court on behalf of Elaine Wynn, co-founder of Wynn Resorts (NASDAQ: WYNN) (the "Company") and one of the Company's largest shareholders, in conjunction with her amended complaint against Stephen Wynn, the Company's Chairman and CEO, Kimmarie Sinatra, the Company's General Counsel, and Wynn Resorts, Limited. The amended complaint charges *Mr. Wynn, aided and abetted by Ms. Sinatra, set a tone at the top of the Company that has given rise to years of unchecked business activities and reckless behavior within the Company*. The amended complaint asserts that the Board of Directors was intentionally kept in the dark by Mr. Wynn and Ms. Sinatra and, as a result, *failed consistently to apply appropriate corporate governance standards*. Only once - in all of its meetings over a 14 year period -- did the Wynn Resort's Board reject Mr. Wynn's so called recommendation, and that was when he engineered Elaine Wynn's ouster from the Board.

63

The supporting documents include sworn deposition testimony by certain Wynn Resorts Directors, filed but with redactions pursuant to the Court's Protective Order. Among the redacted excerpts of deposition testimony filed are those of Wynn Resorts directors Governor Robert J. Miller, D. Boone Wayson and Dr. Ray R. Irani.

As noted in Ms. Wynn's motion for leave to amend filed in conjunction with these supporting documents, "...depositions that have been taken in recent weeks--consisting mostly of Wynn Resorts Directors--revealed new facts that were not previously disclosed to Ms. Wynn...And while Ms. Wynn did not have access to those facts until the other Directors recently were deposed, no one on Mr. Wynn's side can claim to be surprised by Ms. Wynn's amended allegations; *Mr. Wynn and Wynn Resorts are far more familiar with the threat the Company faces from the pattern of misconduct detailed in the amended pleading* than Ms. Wynn...who was ousted from her Director position for asking too many questions about the Company's governance and losing the favor of the controlling shareholder."

\* \* \*

As the amended complaint explains, Ms. Wynn had believed that "the issues plaguing the operation of Wynn Resorts and the reckless risk-taking of its Chairman and CEO Mr. Wynn could be addressed through proper corporate processes and channels."

The amended complaint continues: "Mr. Wynn has intentionally kept the Wynn Resorts Board in the dark and has turned the General Counsel of the Company into his co-conspirator. *He has engaged in reckless, risk-taking behavior, leaving himself vulnerable to allegations of serious wrongdoing - that he made a multi-million dollar payment and used Company resources to silence* and that he did not properly disclose to the Board of Directors. This and other such decisions have *left the directors and the Company vulnerable to potential liability and regulatory exposure*."

161.   On April 5, 2016, Wynn Resorts issued a press release titled "Statement from Wynn Resorts in response to Elaine Wynn's news release of April 4, 2016" once again denying Elaine Wynn's allegations:

Elaine Wynn continues to rehash the same accusations she has made, accusations which will be fully adjudicated when heard by the court early next year. Neither her nor the company's recent filings contain

64

any new facts or revelations, as she so passionately claims. ***Ms.
Wynn's comments regarding our Board of Directors, their
independence and their actions in this matter are false***. Our company
has nine distinguished directors, seven of whom are independent under
NASDAQ standards, each deeply committed to the best interests of
our shareholders.

Ms. Wynn's allegations about Mr. Schorr's departure from the
company are not true. Her ***previous allegations that Mr. Wynn
applied company resources for personal use are false***; Mr. Wynn's
use of company assets is fully audited by both the Board and our
external auditors, as well as completely outlined in our proxy
statements.

162.    This statement was false and misleading because it implied that Elaine Wynn's
allegations regarding Defendant Wynn were not credible and were motivated by improper
reasons.

### *Other False and Misleading Statements in 2016*

163.    On May 6, 2016, Wynn Resorts filed a quarterly report on Form 10-Q for the
first quarter of 2016 (the "2016 Q1 10-Q"). The 2016 Q1 10-Q was signed by Defendant Cootey
and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the
information contained therein "fairly present in all material respects the financial condition,
results of operations and cash flows of the registrant as of, and for, the periods presented in this
report."

164.    The 2016 Q1 10-Q stated in relevant part:

Other regulators may pursue separate investigations into the
Company's compliance with applicable laws arising from the
allegations in the matters described above and in response to the
Counterclaim and other litigation filed by Mr. Okada suggesting
improprieties in connection with the Company's donation to the
University of Macau. While ***the Company believes that it is in full
compliance with all applicable laws***, any such investigations could
result in actions by regulators against the Company. Prior
investigations by the Nevada Gaming Control Board and SEC were
closed with no actions taken.

65

165.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

166.    On August 9, 2016, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2016 (the "2016 Q2 10-Q"). The 2016 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

167.    The 2016 Q2 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

168.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

169.    On November 4, 2016, Wynn Resorts filed a quarterly report on Form 10-Q for

the third quarter of 2016 (the "2016 Q3 10-Q"). The 2016 Q3 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

170.   The 2016 Q3 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

171.   The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

## The 2016 10-K

172.   On February 24, 2017, Wynn Resorts filed an annual report on Form 10-K for 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendant Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson and Cootey, and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

173.    The 2016 10-K referred to Wynn Resorts' Code of Conduct as follows:

**As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics** applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

174.    This reference to the Code of Conduct was false and/or misleading because, among other things, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of conduct to Defendant Wynn, the Wynn defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own Wynn employees.

175.    The 2016 10-K stated, in relevant part, as follows:

**<u>Potential violations of law by Mr. Okada (former director and formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.</u>**

The Freeh Reported detailed numerous instances of conduct constituting prima facie violations of the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. . . . . The Company has provided the Freeh Report to applicable regulators and has been cooperating with related investigations of such regulators. The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators have and may pursue separate investigations into the Company's compliance with applicable laws in connection with the Okada matter, as discussed in Item 8—"Financial Statements and Supplementary Data," Note 17 "Commitments and Contingencies." While ***the Company believes that***

68

*it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company, which could negatively affect the Company's financial condition or results of operations.

\* \* \*

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

176.   The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

177.   The Company's 2016 10-K stated the following:

The Company's **integrated resort business model, pioneered by Chairman and Chief Executive Officer Stephen A. Wynn**, integrates luxury hotel rooms, high-end retail, an array of dining and entertainment options, meeting space, and gaming, all supported by superior levels of customer service. Given his **extensive design and operational experience** across numerous gaming jurisdictions, *we believe that Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises*.

\* \* \*

**Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn**, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment

69

agreement expires in October 2022; however, we cannot assure you that Mr. Wynn will remain with Wynn Resorts. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

178.    This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

179.    The 2016 10-K contained the following false and/or misleading statement:

**Consequences of Violating Gaming Laws**. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

* * *

**Consequences of Being Found Unsuitable.** Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by

70

the Chairman of the Nevada Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities, including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

* * *

***Company Registration Requirements.*** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. ***Wynn Resorts and all individual qualifiers were found suitable by the MGC.*** As our progress in Massachusetts continues, additional entities and key employees may be required to file applications with the MGC and are or may be required to be licensed or found suitable by the MGC. Following Wynn America, LLC ("Wynn America"), an indirect wholly owned subsidiary of Wynn Resorts, Limited, entering into a senior secured credit facility in November 2014, the MGC has

71

requested additional applications, which are pending. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. An applicant for licensing or an applicant for a finding of suitability must pay or must cause to be paid all the costs of the investigation. Changes in licensed positions must be reported to the MGC.

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

***Consequences of Violating Gaming Laws.*** If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

180.    This statement was false and/or misleading because, while warning investors generally of the consequences of violating gaming laws, it failed to disclose that at the time this statement was made, the Company's top officer Defendant Wynn had engaged in a pattern of sexual misconduct, that senior Wynn management was aware of this conduct, yet failed to report this misconduct to regulators although it was required to do so under applicable gaming regulations.

## **2017**

181.    The Company's March 10, 2017 Definitive Proxy Statement—which asked shareholders to vote for Defendant Wynn's re-election as Chairman of the Board and to approve his proposed compensation as CEO—described Defendant Wynn as the "**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our

brand." It touted his "over 47 years of experience in the industry" and his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

> **Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success**. Mr. Wynn has served as our Chairman and CEO since the Company's inception in 2002, and we believe that during that period he has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2016, we have paid approximately $6.4 billion, or $58.75 per share, in dividends to our stockholders. Our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 19% over the same timeframe. Mr. Wynn is the founder, creator and name behind our brand. We believe that he brings extraordinary talent to our Company that is unrivaled in our industry. The Compensation Committee believes that Mr. Wynn's contributions to our longstanding, consistent achievement over the last decade have been, and continue to be, instrumental in creating significant long-term value for our stockholders. These factors were key in the determination of Mr. Wynn's compensation during fiscal 2016.

> *    *    *

> We believe that Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success and these considerations provided the context for determining Mr. Wynn's compensation for 2016. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands. In addition, the Company's operations in

73

widely separated international locations, has required that NEOs provide extraordinary levels of commitment and financial, development and operating expertise. In fulfilling the Company's goal of attracting and retaining high-quality and experienced executives, the Compensation Committee considers these factors in its determination of total compensation for the NEOs.

182.    This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

183.    On April 25, 2017, the Company held an earnings call. During that call, Defendant Wynn stated:

> [T]hen we're going to open this place in Boston in two dozen months, and we're going to have a case study of how a grand hotel, built in a major metropolitan city, can change the neighborhood for the better. And be the largest private investment in the Commonwealth of Massachusetts and the second largest employer in the Commonwealth of Massachusetts, behind Mass General Hospital.
>
> So I'd like the direction we're in and I'm feeling comfortable about the pace of our growth. And, you know, I don't feel like anybody's after us. I think we're moving along exactly the way we should be. And my colleagues join me in that confidence.

184.    This statement was false and/or misleading because it failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although

required to do so under gaming regulations. As a result, the Company was at grave risk of losing its critical gaming licenses and incurring substantial fines.

185.    On May 4, 2017, Wynn Resorts filed a quarterly report on Form 10-Q for the first quarter of 2017 (the "2017 Q1 10-Q"). The 2017 Q1 10-Q was signed by Defendant Billings and also contained signed SOX certifications by Defendants Wynn and Billings, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

186.    The 2017 Q1 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

187.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Defendant Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

188.    On July 25, 2017, the Company held an earnings call. During that call, Defendant Wynn stated:

> The regulatory agency has tightened its controls and supervision of the junket operators. I think that's the form of expression that has been adopted and we don't know of any arbitrary number that is in government thinking on this subject. Only thing we do know is that they wanted to improve the standards of probity and investigative

activity, and they have done that. And the main operators sailed right through, as they always have.

I remember when we were being licensed to Massachusetts, the question was, well, Macau has a reputation that may be questionable in some quarters, especially in Massachusetts. And I remember that we said, wait a minute, let's put this matter to rest. We told each of our operators that, in addition to being licensed in Macau, they had to go to the organized crime criminal division of the Hong Kong Police Department and get certificates of clean bill of health certificates.

They actually would investigate someone and then come to a conclusion and make a statement in writing that that person was free of any criminal association. And ***every one of our operators went instantly and did it without hesitation***. And that impressed the folks in Boston. ***We were happy to do it because we wouldn't want to do business with anybody that couldn't pass such an examination.***

***So, the regulatory issue is the one that I think is at stake here***. I don't know that anybody has an arbitrary number about growth rates.

189.   This statement was false and/or misleading because, while implying that the Company wouldn't do business with any unsuitable operators or individuals, it failed to disclose that at the time this statement was made, Defendant Wynn himself had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing its critical gaming licenses and incurring substantial fines.

190.   On August 4, 2017, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2017 (the "2017 Q2 10-Q"). The 2017 Q2 10-Q was signed by Defendant Billings and also contained signed SOX certifications by Defendants Wynn and Billings, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

191.   The 2017 Q2 10-Q stated in relevant part:

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

192.    The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

193.    On November 8, 2017, Wynn Resorts filed a quarterly report on Form 10-Q for the third quarter of 2017 (the "2017 Q3 10-Q"). The 2017 Q3 10-Q was signed by Defendant Billings and also contained signed SOX certifications by Defendants Wynn and Billings, stating that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

194.    The 2017 Q3 10-Q stated in relevant part:

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

195.     The italicized text above was false and/or misleading because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

## The Truth Begins to Emerge

### The January 2018 *WSJ* Article

196.     On January 26, 2018, the *Wall Street Journal* published an article titled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn" (the "January 2018 *WSJ* Article"), revealing detailed accounts that Defendant Wynn had coerced and pressured several Wynn Resorts employees to perform sex acts. According to the *Wall Street Journal*, "dozens of people… who have worked at Mr. Wynn's casinos told of behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn." It was further revealed that Defendant Wynn had paid a Wynn Resorts employee $7.5 million after being accused of forcing the employee to have sex with him. The article stated, in relevant part:

> "Everybody was petrified," said Jorgen Nielsen, a former artistic director at the salon. Mr. Nielsen said he and others repeatedly told high-level company executives Mr. Wynn's sexual advances were causing a problem, but "nobody was there to help us."
>
> ***
>
> Dennis Gomes, who was an executive at the Golden Nugget in Las Vegas when Mr. Wynn was running that casino decades ago, said in a deposition in an early 1990s lawsuit that Mr. Gomes "routinely received complaints from various department heads regarding Wynn's chronic sexual harassment of female employees," according to a court filing that summarized his testimony.
>
> In the suit over Mr. Gomes's departure to work for a Trump casino, Mr. Gomes described what he called a "disgraceful pattern of personal

78

and professional conduct" that he said included Mr. Wynn's directing him to get the home phone numbers of casino cocktail waitresses.

197.    On this news, Wynn Resorts' share price fell $20.31, or 10.12%, to close at $180.29 on January 26, 2018. The stock's high trading volume and price decline continued for several days, and the stock closed at $163.48 on January 29.

**<u>Investigations Ensue</u>**

198.    Defendant Wynn immediately denied the accusations and said the "idea that I ever assaulted any woman is preposterous. The instigation of these accusations is the continued work of my ex-wife, Elaine Wynn, with whom I am involved in a terrible and nasty lawsuit in which she is seeking a revised divorce settlement."

199.    On January 26, 2018, the Company's Board of Directors announced the formation of a "Special Committee of the Board comprised solely of independent directors to investigate" the allegations in the January 2018 *WSJ* Article, chaired by "Ms. Patricia Mulroy, a member of the Board's Corporate Governance and Compliance Committees and a former member of the Nevada Gaming Commission." On February 2, the Special Committee announced that it had hired O'Melveny & Myers LLP to investigate the allegations against Defendant Wynn.

200.    Around January 31, 2018, the Massachusetts Gaming Commission's Investigations and Enforcement Bureau commenced an investigation to determine whether Wynn Resorts was qualified to hold a gaming license under Massachusetts law in light of the sexual misconduct allegations reported in the January 2018 *WSJ* Article and elsewhere.[8] The

---

[8] Previously, in December 2013, the Massachusetts Gaming Commission had found Wynn had passed a "suitability" test that measured his "integrity, honesty, good character and reputation," concluding that "[a]s a result of the comprehensive background investigation, a lengthy adjudicatory proceeding and an intensive deliberation conducted by the five-member gaming commission, the commission finds by a unanimous vote that (Wynn Resorts) has met its burden of proof and accordingly is issued a positive determination of suitability." Since then, the Company had been in the process of "building a $2.4 billion hotel casino on the Mystic River in

Nevada Gaming Control Board (the "NGCB") also began its own investigation.

201.    On January 31, 2018, the University of Pennsylvania revoked the honorary degree it had bestowed on Defendant Wynn, explaining: "***The nature, severity, and extent of these allegations [against Steve Wynn], and the patterns of abusive behavior they describe, involve acts and conduct that are inimical to the core values of our University***."

## Market Reaction

202.    Media outlets quickly started to emphasize how devastating the new revelations, and the resulting investigations, could be for the Company. In particular, analysts quickly recognized that Defendant Wynn would likely have no choice but to step down as Chairman and CEO, and that the Company's future development and growth would suffer as a result.

203.    A January 31, 2018 *Motley Fool* article emphasized that Defendant Wynn was the "vision and driving force behind [the Company's] strategy and execution" and "[m]ore than most CEOs… a large part of why the company is as valuable as it is." Among other problems, "Massachusetts and Nevada regulators…could force Steve Wynn out as the operator and major shareholder of the company if they deem him unfit to hold a gaming license." Moreover, "the corporate repercussions could be severe for both Steve Wynn and Wynn Resorts if the inquiry into these allegations turns up serious wrongdoing" because Defendant Wynn's alleged actions "would have ***violated Wynn Resorts' Code of Business Conduct And Ethics***"—which the Company had repeatedly touted publicly and even relied upon "to find Kazuo Okada—an early investor and formerly the largest single shareholder of Wynn Resorts—unsuitable to be a shareholder in the company, which ultimately led to not only his ouster from the Board of Directors but Wynn Resorts redeeming his shares."[9]

_____

Everett, the only resort casino permitted in Greater Boston."
https://www.bostonglobe.com/metro/2018/01/31/gaming-commission-launches-review-into-whether-wynn-resorts-suitable-keep-license/jEDQ8gel8OcA0llDbAlnxH/story.html; *see also* http://massgaming.com/wp-content/uploads/IEB-Report-Wynn-MA-LLC.pdf

[9] https://finance.yahoo.com/news/steve-wynn-allegations-could-mean-143700942.html

204.    *Jefferies* noted that the "revocation of licenses has been rare but not unprecedented" and recognized that, in light of the "profound nature of the press reports on 1/26 regarding Steve Wynn," there was now a very real risk that "Steve Wynn could be forced to step aside as Chairman and CEO" due to "pressure from gaming regulators… as well as from investors."

205.    *Barclays*, in a January 29, 2018 report titled "Wynn Resorts Ltd. Assessing the Risk, " emphasized that "[t]**o many investors, if Steve goes, the quality of the company goes with him**,"—in fact, the top risk factor in the Company's own SEC filings was "our dependence on Stephen A. Wynn"—and that the "main risk" to the Company following the revelations was the fact "that **Steve Wynn is the vision behind this company and there is no clear succession plan.**" It also stated that "the future development driven growth and a part of the brand cachet that are likely impaired if Mr. Wynn leaves the company."

206.    Analysts also focused on the fact that Defendant Wynn's misconduct jeopardized the Company's licenses in both Nevada and Massachusetts, the site of the Company's new touted casino. *JP Morgan*, in a January 26, 2018 report titled "Thoughts Post Negative Reaction to WSJ CEO Sexual Harassment Allegations," wrote that the potential consequences "could be very serious," threatening not only the Company's future growth prospects but even its gaming licenses in Nevada, Massachusetts, and Macau. It also reiterated that Wynn Resorts had "the single largest individual CEO dependency versus any of the other 30 gaming and lodging companies [in] our coverage universe" and predicted that the Company would "likely sees some valuation multiple contraction" if Defendant Wynn were forced to step down. It concluded:

> We think the news reports alleging sexual harassment by Steve Wynn creates a sizable overhang in the shares and see value that compensates investors for risk related to these allegations at the ~$150 level, versus the ~$180 level it last traded on Friday.
>
> * * *
>
> First off, we think these allegations could be very serious for WYNN, given that (1) the gaming industry is a highly regulated business and individual gaming licenses have character clauses in these licenses (of note, on Friday, Nevada and Massachusetts gaming commission each

81

announced that they were launching reviews), (2) Steve's name is on each one of his resorts in Las Vegas and Macau and therefore they are potentially susceptible to downward swings in patronage, and (3) such allegations can't be helpful to WYNN in competitive integrated resort licenses/development globally (e.g., Japan) and/or in gaming license renewals (Macau, Nevada).

\* \* \*

A scenario where WYNN doesn't have Steve as a CEO is not good for the company. We have always held the belief that WYNN possesses the single largest individual CEO dependency versus any of the other 30 gaming and lodging companies our coverage universe (well, maybe LVS with CEO Sheldon Adelson is tie with WYNN). We also have always held the belief that Steve Wynn, given his long history of creating shareholder value going back to his Mirage Resorts days, has received a premium multiple for his hands-on involvement. A WYNN without Steve likely sees some valuation multiple contraction, and obviously, some of this was factored into the stock price on Friday. If a change in WYNN CEO were to happen and the valuation suffers, we can't help but also think this may attract the attention of other gaming operators since the industry has been in consolidation mode of sorts for a while now and looking to grow free cash flow per share through consolidation. Who could find WYNN appealing and has the size and financial wherewithal to do so? In our view, there a number of global large cap operators, also gaming REITS, and gaming licensed private equity firms.

207. The *Boston Globe*[10] insisted that the Company remove Defendant Wynn as CEO "and take his name off the casino that's rising along the Mystic River in Everett"—and suggested further that the Massachusetts Gaming Commission needed to investigate not just the new allegations against Defendant Wynn, but also needed to investigate the Massachusetts Gaming Commission's own finding in December 2013 that Defendant Wynn was "suitable":

To get the go-ahead in Massachusetts, Wynn <u>passed</u> a "suitability" test that measured his "integrity, honesty, good character and reputation." Wynn's now-acknowledged failure to tell gaming commission

---

[10] https://www.bostonglobe.com/opinion/editorials/2018/02/05/steve-wynn-not-suitable/oDYSFttvkM5UyXsPe9dnzK/story.html

investigators about a $7.5 million settlement to a Las Vegas manicurist who accused him of forcing her into sex is c*lear evidence of dishonesty*. The Journal report that revealed the settlement, along with allegations that Wynn pressured other employees into sex, also *raises serious questions about Wynn's integrity, good character, and reputation*.

* * *

Wynn Resorts can and should fire Wynn. But that doesn't resolve the matter of whether Massachusetts wants to do business with a casino company that still bears Wynn's name, even if he's no longer officially associated with it. To determine that, *the gaming commission needs to determine who else in Wynn's company knew about the $7.5 million settlement and was involved in the decision to cover it up. If Wynn Resorts perpetuated a fraud on Massachusetts, the company, not just Wynn, flunks the suitability test*.

The gaming commission should also explore how a supposedly *exhaustive* investigation into Wynn and his company failed to turn up any information about the allegations reported by the Journal. Karen Wells, director of the commission's enforcement arm, told commissioners it was a private agreement "and steps were taken to keep it from the public domain." Yet, according to the Journal, the manicurist who made the charges against Wynn informed a supervisor, who filed a detailed report to the casino's human resources department.

According to page 94 of the gaming commission's suitability report on Wynn, investigators "reviewed the Wynn Resorts' Code of Business Conduct and Ethics Policy, with which all employees, officers and directors of Wynn Resorts and its subsidiaries are expected to comply." Apparently *no one checked to see if the CEO was complying with them*. If that written report still exists, it would document a losing hand when it comes to Wynn's suitability.

### Defendant Wynn Resigns

208.    On February 6, 2018, the Company announced that Defendant Wynn had resigned as CEO and Chairman of the Board, effective immediately. In his place, the Board had appointed Defendant Maddox to serve as CEO and D. Boone Wayson to serve as Non-

83

Executive Chairman. The Company issued a press release titled "Wynn Resorts CEO Steps

Down," which stated in relevant part:

> The Board of Directors of Wynn Resorts reluctantly announced today
> that it accepted the resignation of Steve Wynn as CEO and Chairman
> of the Board of Directors. The board has appointed Matt Maddox,
> currently President of the Company, as its CEO, and Boone Wayson as
> Non-Executive Chairman of the Board of Directors, effective
> immediately.

> "It is with a collective heavy heart, that the board of directors of Wynn
> Resorts today accepted the resignation of our founder, CEO and friend
> Steve Wynn," said Non-Executive Chairman of the Board Boone
> Wayson. "Steve Wynn is an industry giant. He is a philanthropist and a
> beloved leader and visionary. He played the pivotal role in
> transforming Las Vegas into the entertainment destination it is today.
> He also assembled a world-class team of executives that will continue
> to meet the high standards of excellence that Steve Wynn created and
> the Wynn brand has come to represent."

> Steve Wynn created modern Las Vegas. He transformed the city into
> an economic powerhouse by making it a world-wide tourist
> destination. He designed, built and operated the most iconic resorts on
> the Las Vegas strip, beginning with the Mirage, then Treasure Island,
> the Bellagio, Wynn Las Vegas and Encore at Wynn Las Vegas. Wynn
> Macau, Mr. Wynn's first resort in the SAR of Macau in China, was
> designated by Forbes Travel Guide as the best resort in the world.
> Along with Wynn Palace in Cotai, the company built by Steve Wynn
> has been recognized as having more Five Star awards than any
> independent hotel company in the world.

> Wynn Resorts remains as committed as ever to upholding the highest
> standards and being an inclusive and supportive employer. In fact,
> more than 40 percent of all Wynn Las Vegas management are women;
> the highest in the gaming industry. The company will continue to fully
> focus on its operations at Wynn Macau, Wynn Palace and Wynn Las
> Vegas; the development and opening of the first phase of Wynn
> Paradise Park, currently under construction on the former Wynn golf
> course; as well as the construction of Wynn Boston Harbor, which will
> open in June 2019.

209.    Media outlets continued to emphasize the negative repercussions for the

Company. A February 11, 2018 *New York Times* article[11] noted in relevant part:

> The ***repercussions for the Wynn brand could cut far deeper and last far longer*** than they have for other companies that have faced harassment allegations in recent months, such as NBC, which fired Matt Lauer, and Fox, which let Bill O'Reilly go.
>
> "Steve Wynn is arguably the father of modern-day Las Vegas," said Aaron Perlut, founder and managing partner of Elasticity, a brand consulting firm. "The fact that ***his name is, in and of itself, the brand*** makes it far more complicated, in a similar way that Harvey Weinstein's personal brand was also the name of his company."
>
> * * *
>
> "If you find that it was not only occurring with Steve Wynn but on level after level of his organization, then I think ***it could be devastating to the brand***," Mr. Perlut said. He added that the company would then likely need to be sold or change its name.

210.    *Barclays* commented, in a February 7, 2018 report titled "Wynn Resorts Ltd.: As Clear As Mud," that the Company was "not out of the woods" yet because "many questions remain regarding the future of this company without Steve Wynn at the helm and the outcome of suitability investigations in Vegas and Massachusetts," and the "Board remains liable, in our view, until the independent investigations are complete."

211.    On February 9, 2018, the Cornell University School of Hotel Administration, which in 2017 had awarded Defendant Wynn its 9th Cornell Hospitality Icon award, announced that it had "decided to rescind the award, as we can no longer consider Mr. Wynn to be an exemplary role model for the industry and, more importantly, for our students. We have read with dismay the reports of his sexual misconduct, including the high incidence within his organization. Service employees are particularly vulnerable, and hospitality leaders have a keen responsibility to ensure that they provide a safe working environment for their employees, free from harassment of any kind."

212.    Following Defendant Wynn's resignation, the Company's Special Committee

---

[11] https://www.nytimes.com/2018/02/11/business/media/steve-wynn-advertising.html

initially announced that it "no longer requires the services" of O'Melveny & Myers LLP, which it had hired on February 2. The dismissal of O'Melveny & Myers LLP was heavily criticized. For example, "John C. Coffee Jr., a Columbia Law School professor and the director of its Center on Corporate Governance, said the board's decision to cut ties with the outside counsel is 'a strong signal that not much has changed in the culture of the board.'"[12]

213.    Accordingly, shortly afterwards, on February 12, 2018, the Company issued a press release titled "Special Committee of Wynn Resorts Board of Directors Retains Gibson, Dunn & Crutcher LLP, Expands Review Nominating and Corporate Governance Committee to Evaluate Board Enhancement," stating that the Special Committee had "retained Gibson, Dunn & Crutcher LLP as outside counsel to assist with its review" and "will conduct an ***expanded and comprehensive review of Wynn Resorts' internal policies and procedures*** with the goal of ensuring the Company employs best practices to maintain a safe and respectful workplace for all employees."

214.    On February 12, 2018, the Nevada Gaming Control Board (the "NGCB") opened an "online portal" for people to submit voluntary, confidential statements regarding any publicly announced investigation, including the investigation into allegations of sexual misconduct against Defendant Wynn. According to the *Nevada Independent*, "Board chairwoman Becky Harris said the volume of phone calls into the board's offices in Las Vegas and Carson City in the wake of the Wynn allegations was 'disruptive' and the board needed a new mechanism for the public to communicate information."[13]

## More Accusations of Sexual Assault

215.    On February 12, 2018, the Las Vegas Metropolitan Police Department revealed that two women had filed sexual misconduct reports against Defendant Wynn alleging that he

---

[12] https://www.wsj.com/articles/wynn-resorts-board-cancels-outside-investigation-of-steve-wynns-conduct-1518218666

[13] https://thenevadaindependent.com/article/las-vegas-police-receive-two-reports-about-wynn-in-wake-of-sexual-misconduct-allegations

had sexually assaulted them in the 1970s. One woman reported that Wynn assaulted her in Las Vegas and the other said she was assaulted in Chicago. The alleged victims contacted the Las Vegas Metropolitan Police Department on January 29 and February 5, respectively—only days after the January 2018 *WSJ* Article.

216.   On this news, Wynn Resorts' share price closed at $162.92 on February 12, 2018. Compared to the February 9 closing price ($166.22), this was a drop of $3.30, or 2%. Compared to its January 25 closing price ($200.60), this was a drop of $37.68, or 18.8%.

217.   A February 27, 2018 *Associated Press* report[14] provided additional details about the allegations:

> One police report shows a woman told officers that Wynn raped her at least three times around 1973 and 1974 at her Chicago apartment. She reported she got pregnant and gave birth to a girl in a gas station restroom.
>
> In one instance, the woman claimed that Wynn pinned her against the refrigerator and raped her. She said he then made a phone call, kissed her on the cheek and left. The report does not explain how Wynn is alleged to have entered the apartment or if they knew each other. The woman claimed she did not give him a key.
>
> The second police report shows a woman told police she had consensual sex with Wynn "several times" while she worked as a dealer at the downtown Las Vegas casino-hotel Golden Nugget, but "felt coerced to perform the acts." She reported she was forced to resign when she turned him down.
>
> "In the Summer of 1976, Wynn approached her in the back hall and wanted her to go with him," according to the report filed Jan. 29. "(S)he told him, "no", she was done and had someone she was seeing. She was soon after accused of stealing $40.00 and forced to resign."

**Executive and Board Reshuffling**

218.   On April 18, 2018, the Company announced that it had "expanded its board to 11

[14] https://nypost.com/2018/02/27/woman-tells-police-she-gave-birth-to-child-after-steve-wynn-raped-her/

87

members, with the appointment of Betsy Atkins, Dee Dee Myers and Wendy Webb as
independent directors, effective immediately."

219.    On May 14, 2018, the Company announced that director Robert J. Miller was
resigning from the Board and that director John J. Hagenbuch had decided not to run for re-
election. The Company's press release noted that these "departures, along with the previously
announced departures of directors Steve Wynn, Ray Irani, and Ted Virtue, and the upcoming
departure of director Alvin Shoemaker in 2019, represent 60% of the Board that was serving at
the beginning of the year."

220.    On November 7, 2018, the Company announced that D. Boone Wayson was
retiring as Chairman of the Board and that Philip G. Satre, "an independent director who joined
the Board in August 2018 as Vice Chairman," would replace him.

221.    On December 14, 2018, the Company issued a press release titled "Wynn Resorts
Announces Changes to Executive Team" which announced "several changes to its senior
executive team, including the return of experienced resort executive Marilyn Spiegel as the
President of Wynn Las Vegas." It went on to state, in relevant part:

> Ms. Spiegel previously served as president of the Las Vegas resort
> from 2010 to 2013. She will replace Maurice Wooden, who has
> elected to step down as the resort's president at year-end.
>
> "I am very pleased that Marilyn will return to lead the team at Wynn
> Las Vegas and Encore," said Wynn Resorts CEO Matt Maddox. "Our
> company's legendary service and guest experiences call for someone
> who truly understands our brand and appreciates what it means to our
> guests and employees. Marilyn not only shares that understanding, she
> helped to create it. Her deep experience in Human Resources and
> knowledge of what it takes to deliver the Wynn promise, make her the
> ideal person to lead Wynn Las Vegas into the future."
>
> Ms. Spiegel's career has included leadership in Human Resources,
> development, marketing and operations. Before joining Wynn Las
> Vegas for the first time in 2010, Ms. Spiegel served as President of
> five different Caesars Entertainment-owned resort brands in Las
> Vegas. She also served as corporate Senior Vice President of Human
> Resources for Harrah's Entertainment from 1999 to 2003. Most
> recently, Ms. Spiegel served on the Board of Directors of Caesars

Entertainment and consulted in Human Resource matters for emerging technology companies.

"Wynn Las Vegas and Encore are recognized globally for creating outstanding guest experiences," said Marilyn Spiegel. "Without question, that success is driven by the employees. The Wynn team is the most talented in our industry – I eagerly look forward to working with them again."

Maurice Wooden, who has been President of Wynn Las Vegas since 2013, announced he was stepping down from his current position. Mr. Wooden led numerous resorts and departments during the course of a nearly 30-year career in the industry. Under Mr. Wooden's leadership, Wynn Las Vegas and Encore continued to set the highest standards for guest service, including maintaining its luxury rating of Five Stars from Forbes Travel Guide, and setting records for profitability among casino resorts in North America.

In addition, the company has appointed Scott Moore as Chief Marketing Officer. Mr. Moore comes to the company with extensive experience in digital marketing, omni-channel consumer engagement, brand development and accelerating growth. Previously, Mr. Moore served as a Chief Marketing Officer at Best Buy where he led marketing activities for the company across all brands, categories, and channels. He began his marketing career at Fallon, producing award winning work for brands such as Time Magazine, PBS, and The Coca Cola Company. Most recently, he was the Chief Operating Officer at Augeo which delivers loyalty and engagement solutions for customers, employees, and membership organizations.

Additionally, Michael Weaver, has been appointed Chief Communications Officer. Mr. Weaver has been with Wynn Resorts since 2011, having served in various leadership positions in marketing, branding, communications and development.

The appointments of Ms. Spiegel, Mr. Moore and Mr. Weaver will become effective January 2, 2019.

Wynn Resorts has also recently made leadership changes to its Legal and Human Resources departments:

- Ellen Whittemore was recently named General Counsel of Wynn Resorts. Ms. Whittemore has more than 30 years of experience in gaming law in Nevada, previously representing

89

gaming companies as outside counsel for numerous regulatory, acquisition and development matters.

- Rose Huddleston recently joined Wynn Resorts as Senior Vice President of Human Resources, North America, a new position. Ms. Huddleston has more than 25 years of experience in luxury hospitality and spent the past 18 years with Ritz-Carlton/Marriott International as Regional Director of Human Resources, where she oversaw 18,000 employees and 78 hotels.

Said CEO Matt Maddox, "I am excited to begin 2019 with such strong enhancements to our executive team, each of whom brings a unique skill set and deep expertise to Wynn Resorts. Combined with the steadfast leadership of Ian Coughlan and Linda Chen in Macau, Wynn Resorts is well positioned to achieve the growth and development goals we envision for our company both in 2019 and longer term."

### Nevada Gaming Control Board Settlement and Fine

222.    On January 25, 2019, the Nevada Gaming Control Board (the "NGCB") filed a disciplinary complaint[15] (the "NGCB Complaint") and accompanying settlement against the Company and Wynn Las Vegas, LLC, relating to the NGCB's investigation of the response of certain Company employees to sexual misconduct allegations against Defendant Wynn.

223.    The NGCB Complaint further confirmed the allegations of the January 2018 *WSJ* Article. Specifically, it listed eight instances of sexual harassment claims by employees against Defendant Wynn that were not investigated by the Company, and further stated that at least seven former executives knew of sexual harassment allegations made by female employees and did not investigate. Moreover, pursuant to the accompanying settlement, "RESPONDENTS admit each and every allegation set forth in the Complaint, NGC Case No. 18-15, except that RESPONDENTS neither admit nor deny paragraphs 72 - 73 of the Complaint and that portion of paragraph 57 of the Complaint that alleges Maurice Wooden was aware of the allegations of sexual misconduct."

---

[15] *Nev. Gaming Control Bd. v. Wynn Las Vegas, LLC,* No. NGC 18-15 (Nev. Gaming Comm'n Jan. 25, 2019).

224. Count One of the NGCB Complaint summarized the 2005 settlement as follows:

36. In 2005, Employee 1, employed in the WYNN Salon, alleged to various individuals at the WYNN that she had been raped by Mr. Wynn and that she became pregnant as a result.

37. WYNN Salon management followed company policies and procedures by reporting Employee l's allegations to WYNN Human Resources.

38. The following individuals learned about Employee l's allegations at or around the time the allegations were made: Marc Schorr, former WYNN President and RESORTS Chief Operating Officer; Doreen Whennen, former WYNN Vice President of Hotel Operations; and Arte Nathan, former WYNN Senior Vice President and Chief Human Resources Officer.

39. Mr. Schorr, Ms. Whennen, and Mr. Nathan all failed to initiate an investigation into Employee l's allegations of sexual misconduct in violation of RESPONDENTS' policies and procedures.

40. Mr. Wynn reached a private, confidential settlement with Employee 1 in which she and her husband were paid $7.5 million through a separate legal entity funded personally by Mr. Wynn (2005 Settlement).

41. In January 2012, at the latest, Kimmarie Sinatra, former General Counsel, Secretary, and Senior Vice President for RESORTS, learned of the 2005 Settlement. By July 2017, at the latest, Ms. Sinatra learned that Employee 1 had alleged that Mr. Wynn raped her.

42. RESORTS did not conduct a timely investigation into Employee l's allegations or into Mr. Wynn's admitted sexual relationship with a subordinate.

43. At least four (4) former executives of RESORTS and WYNN, failed to initiate and/or conduct an investigation after obtaining knowledge of allegations of sexual misconduct against Mr. Wynn as required by RESPONDENTS' policies and procedures.

44. The failures of RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees to initiate and/or conduct an investigation as described herein, in whole or in part, constitute violations of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10).

45. Each separate occasion when RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to initiate and/or conduct an investigation as described herein constitutes a separate violation of the Gaming Control Act and Regulations of the Commission, as herein specified, for purposes of NRS 463.310 (4)(d)(2).

46. The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10) is an unsuitable method of operation and is grounds for disciplinary action against RESPONDENTS.

225.    Count Two of the NGCB Complaint summarized the 2006 settlement as follows:

48. Employee 2, a cocktail server at WYNN, alleged that Mr. Wynn pressured her into a nonconsensual sexual relationship that lasted from 2005 through her departure from RESORTS in 2006. Mr. Wynn entered into a private settlement with Employee 2 and her parents in the amount of $975,000 on December 6, 2006 (2006 Settlement).

49. Marc Schorr, former WYNN President and RESORTS Chief Operating Officer, Arte Nathan, former WYNN Senior Vice President and Chief Human Resources Officer, and Kevin Tourek, former WYNN General Counsel, knew about Employee 2's allegations of sexual misconduct against Mr. Wynn in 2006.

50. Mr. Schorr, Mr. Nathan, and Mr. Tourek all failed to initiate an ER investigation into Employee 2's allegations of sexual misconduct in violation of RESPONDENTS' policies and procedures.

5 1. At least three (3) former executives of RESORTS and WYNN, failed to initiate and/or conduct an investigation after obtaining knowledge of allegations of sexual misconduct against Mr. Wynn as required by RESPONDENTS' policies and procedures.

52. The failures of RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees to initiate and/or conduct an investigation as described herein, in whole or in part, constitute violations of NRS 463. 170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and 5.011(10).

53. Each separate occasion when RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to initiate and/or conduct an investigation as described herein constitutes a separate violation of the Gaming Control Act and Regulations of the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Commission, as herein specified, for purposes of NRS 463.3
10(4)(d)(2).

54. The failure of RESPONDENTS to comply with NRS 463. 170(8)
and Nevada Gaming Commission Regulations 5.011, 5.011(1) and
5.011(10) is an unsuitable method of operation and is grounds for
disciplinary action against RESPONDENTS.

226.   Count Three of the NGCB Complaint summarized another instance of alleged

sexual misconduct by Defendant Wynn in 2005 as follows:

56. In 2014, Employee 3, a former WYNN Las Vegas cocktail server
and flight attendant, alleged that Mr. Wynn engaged in sexual
misconduct against her in 2005.

57. Kevin Tourek, former WYNN General Counsel, and Maurice
Wooden, former WYNN President, were aware of the allegations of
sexual misconduct made against Mr. Wynn by Employee 3.

58. Mr. Tourek and Mr. Wooden both failed to initiate an ER
investigation into Employee 3's allegations of sexual misconduct in
violation of RESORTS policies and procedures.

59. At least two (2) former executives of WYNN, failed to initiate
and/or conduct an investigation after obtaining knowledge of
allegations of sexual misconduct against Mr. Wynn as required by
RESPONDENTS' policies and procedures.

60. The failures of RESPONDENTS, RESPONDENTS' former
agents, and/or RESPONDENTS' former employees to initiate and/or
conduct an investigation as described herein, in whole or in part,
constitute violations of NRS 463. 170(8) and/or Nevada Gaming
Commission Regulations 5.010, 5.011(1) and 5.011(10).

6 1. Each separate occasion when RESPONDENTS,
RESPONDENTS' former agents, and/or RESPONDENTS' former
employees failed to conduct and/or initiate an investigation as
described herein constitutes a separate violation of the Gaming Control
Act and Regulations of the Commission, as herein specified, for
purposes of NRS 463.310(4)(d)(2).

62. The failure of RESPONDENTS to comply with NRS 463.170(8)
and Nevada Gaming Commission Regulations 5.011, 5.011(1) and
5.011(10) is an unsuitable method of operation and is grounds for
disciplinary action against RESPONDENTS.

227.   Count Four of the NGCB Complaint summarized three separate instances of alleged sexual misconduct by Defendant Wynn in 2014 as follows:

64. Employee 4, Employee 5, and Employee 6, each of whom worked at WYNN's Encore Spa at all times relevant to this Complaint, made allegations that Mr. Wynn had engaged in sexual harassment during massages that were performed on him in 2014.

65. Employee 4, Employee 5, and Employee 6, reported some 01' all of the alleged sexual harassment by Mr. Wynn to RESPONDENTS' management, and those allegations were communicated among other members of RESPONDENTS' management, but no one in RESPONDENTS' management reported the allegations to ER, or otherwise ensured that the allegations had been reported thereto, as would have been required by RESPONDENTS' policies and procedures in effect at the time, so ER could conduct an investigation into the allegations.

66. Several individuals, including managers and executives of RESPONDENTS, became aware of some or all of the allegations of sexual harassment by Mr. Wynn made by Employee 4, Employee 5, and/or Employee 6 but did not report the allegations to HR or otherwise ensure that the allegations had been reported thereto, as would have been required by RESPONDENTS' policies and procedures in effect at the time, so HR could conduct an investigation into the allegations.

67. The failure of RESPONDENTS, RESPONDENTS' agents, and/or RESPONDENTS' employees to report and/or investigate each instance of sexual harassment by Mr. Wynn alleged by Employee 4, Employee 5, and/or Employee 6, in whole or in part, constitutes a violation of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1), and/or 5.011(10).

68. Each occasion where RESPONDENTS, RESPONDENTS' agents, and/or RESPONDENTS' employees failed to report an allegation of sexual harassment by Mr. Wynn made by Employee 4, Employee 5, and/or Employee 6 to ER, and/or failed to initiate and/or conduct an investigation into each allegation, constitutes a separate violation of the Gaming Control Act and the regulations adopted thereunder, as herein specified, for purposes of NRS 463.310(4)(d)(2).

69. The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011, 5.011(1), and/or 5.011(10) constitutes an unsuitable method of operation and provides grounds for disciplinary action against RESPONDENTS.

228.    Count Five of the NGCB Complaint summarized alleged sexual misconduct by Defendant Wynn against multiple flight attendants as follows:

71. Employee 7, who was a flight attendant with LV Jet, LLC (LV Jet), a wholly owned subsidiary of RESORTS, at all times relevant to this Complaint, submitted written correspondence to Mr. Wynn dated October 27, 2016, in which she made allegations that Mr. Wynn engaged in sexual harassment with multiple LV Jet flight attendants.

72. Kimmarie Sinatra, former RESORTS General Counsel, Secretary, and Executive Vice President, was made aware of Employee 7's allegations of multiple instances of sexual harassment by Mr. Wynn related to LV Jet flight attendants through the above-referenced written correspondence, which was forwarded to Ms. Sinatra by Mr. Wynn's personal assistant. Ms. Sinatra, however, did not report the allegations to ER, or otherwise ensure that the allegations had been reported thereto, as would have been required by RESPONDENTS' policies and procedures in effect at the time, so ER could conduct an investigation into the allegations.

73. Stacie Michaels, former WYNN General Counsel, was made aware of Employee 7's allegations of multiple instances of sexual harassment by Mr. Wynn related to LV Jet flight attendants through the above-referenced written correspondence, which was forwarded to Ms. Michaels by Mr. Wynn's personal assistant. Ms. Michaels, however, did not report the allegations to ER, or otherwise ensure that the allegations had been reported thereto, as would have been required by RESPONDENTS' policies and procedures in effect at the time, so ER could conduct an investigation into the allegations.

74. The failure of RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees to report and/or investigate each instance of sexual harassment of Mr. Wynn alleged by Employee 7 in her written correspondence dated October 27, 2016 referenced above, in whole or in part, constitutes a violation of NRS 463. 170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1), and/or 5.01 1(10).

75. Each occasion where RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to report an allegation of sexual harassment by Mr. Wynn made by Employee 7 in her written correspondence dated October 27, 2016 referenced above to ER, and/or failed to initiate and/or conduct an investigation into each allegation, constitutes a separate violation of the Gaming Control Act and the regulations adopted thereunder, as herein specified, for purposes of NRS 463.3 1O(4)(d)(2).

76. The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011, 5.011(1), and/or 5.011(10) constitutes an unsuitable method of operation and provides grounds for disciplinary action against RESPONDENTS.

229.    Count Six of the NGCB Complaint summarized alleged sexual misconduct by Defendant Wynn against cocktail servers as follows:

78. Multiple allegations were made by various individuals that Employee 8 had facilitated sexual relationships between cocktail servers at WYNN and Mr. Wynn and/or guests of WYNN.

79. Arte Nathan, during his tenure as WYNN Senior Vice President and Chief Human Resources Officer, was aware of rumors that Employee 8 was facilitating the sexual relationships referred to above. Mr. Nathan, however, did not investigate the rumors, or otherwise ensure that the rumors had been reported thereto, as would have been required by RESPONDENTS' policies and procedures in effect at the time, so ER could conduct an investigation into the rumors.

80. The failure of RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees to report and/or investigate the allegations and/or rumors that Employee 8 was facilitating the sexual relationships referred to above, in whole or in part, constitutes a violation of NRS 463. 170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1), and/or 5.011(10).

81. Each occasion where RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to report an allegation and/or rumor regarding the misconduct of Employee 8 referred to above, to ER, and/or failed to initiate and/or conduct an investigation into each allegation and/or rumor, constitutes a separate

violation of the Gaming Control Act and the regulations adopted thereunder, as herein specified, for purposes of NRS 463.310(4)(d)(2).

82. The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011, 5.011(1), and/or 5.011(10) constitutes an unsuitable method of operation and provides grounds for disciplinary action against RESPONDENTS.

230.    Count Seven of the NGCB Complaint stated as follows:

84. In 2007, Kevin Tourek, former WYNN General Counsel, received an e-mail alleging a former executive "loves sleeping with cocktail servers. "

85. Mr. Tourek did not report this allegation to ER or initiate and/or conduct an investigation after receiving the e-mail alleging the former executive's conduct with cocktail servers.

86. The failures of RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees to comply with RESPONDENTS' policies and procedures and failing to initiate and/or conduct an investigation as described herein, in whole or in part, constitute violations of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10).

87. Each separate occasion when RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to comply with RESPONDENTS' policies and procedures and failed to initiate and/or conduct an investigation as described herein constitutes a separate violation of the Gaming Control Act and Regulations of the Commission, as herein specified, for purposes of NRS 463.31O(4)(d)(2).

88. The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011 is an unsuitable method of operation and is grounds for disciplinary action against RESPONDENTS.

231.    Count Eight of the NGCB Complaint summarized Defendants' failure to comply with the Company's policies and procedures as follows:

90. RESPONDENTS' policies and procedures requiring employee attendance at annual compliance training were not applied to Mr. Wynn.

91. RESPONDENTS' policies and procedures pertaining to WYNN spas were not applied to Mr. Wynn.

92. RESPONDENTS' policies and procedures pertaining to conflicts of interest were not followed for several settlements, including, but not limited to, the 2005 Settlement, and the 2006 Settlement.

93. The ability of former WYNN executives to operate outside of Company policies and procedures, contributed to the internal control breakdowns that occurred in relation to allegations of misconduct as described in this Complaint.

94. RESPONDENTS' failure to ensure compliance with RESPONDENTS' policies and procedures, as described herein, in whole or in part, constitutes a violation of NRS 463.170 (8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10).

95. Each separate occasion when RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to ensure compliance with RESPONDENTS' policies and procedures, as described herein, constitutes a separate violation of the Gaming Control Act and Regulations of the Commission, as herein specified, for purposes of NRS 463.31O(4)(d)(2).

96. The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10) is an unsuitable method of operation and is grounds for disciplinary action against RESPONDENTS.

232.   Count Nine of the NGCB Complaint summarized Defendants' failure to comply with the Company's policies and procedures as follows:

98. At all times relevant to this Complaint, RESPONDENTS maintained a policy on personal relationships between employees that "discourage[d] romantic or intimate relationships involving a direct or indirect supervisory relationship between employees regardless of whether the relationship is voluntary and/or welcomed by both parties.

99. At all times relevant to this Complaint, RESPONDENTS maintained a policy for harassment and discrimination that stated that "all employees are responsible for maintaining a professional work environment by treating everyone . . . with respect and by being aware of their own behavior toward others in the workplace. "

98

100. Mr. Wynn, while Chairman of the Board of Directors and Chief Executive Officer of RESORTS, engaged in intimate and sexual conduct with WYNN employees.

101. Mr. Wynn failed to comply with RESPONDENTS' policies that he maintain a professional work environment and/or failed to comply with the spirit of RESPONDENTS' policies that discouraged intimate relationships between himself and employees.

102. Regardless of whether the conduct of Mr. Wynn, as described herein, expressly violated any of RESPONDENTS' policies, such conduct is inappropriate and unsuitable given the position of Mr. Wynn as head of RESORTS and WYNN and given the inherent disparity in power between himself and non-management employees.

103. RESPONDENTS are ultimately responsible for the actions of their agents and employees. See Nev. Gaming Comm'n Reg. 5.030.

104. RESPONDENTS failed to ensure that Mr. Wynn conducted himself in accordance with RESPONDENTS' policies and procedures and/or failed to ensure that Mr. Wynn conducted himself in an appropriate and suitable manner.

105. RESPONDENTS' failures, as described herein, resulted in negative reporting in widely disseminated media outlets, including, but not limited to, the Wall Street Journal.

106. RESPONDENTS' failures, as described herein, in whole or in part, constitute violations of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10). 107. The failure of RESPONDENTS to comply with NRS 463.170(8) and Nevada Gaming Commission Regulations 5.011, 5.011(1) and/or 5.011(10) is an unsuitable method of operation and is grounds for disciplinary action against RESPONDENTS.

233.    Count Ten of the NGCB Complaint summarized Defendants' failure to comply with the Company's policies and procedures as follows:

109. RESPONDENTS did not enforce their policies and procedures with regard to their executives and other high level employees following the reporting procedures for sexual harassment and related matters.

110. RESPONDENTS' past failures to enforce its policies and procedures have led to multiple instances, a number of which are set

out in this Complaint, where sexual harassment allegations concerning RESPONDENTS' executives were not investigated.

111. RESPONDENTS' past failures to enforce its policies and procedures have led to multiple instances where allegations of sexual harassment by executives of RESPONDENTS were not appropriately addressed by RESPONDENTS.

112. RESPONDENTS' past failures to appropriately address allegations of sexual harassment by executives and high level employees of RESPONDENTS resulted in negative articles published in widely disseminated media publications, including, but not limited to, the Wall Street Journal.

113. Thus, the BOARD, in order to protect gaming in the State of Nevada; to protect the welfare of the gaming industry; to protect the welfare of the inhabitants of the State of Nevada, including gaming industry employees; and to attempt to mitigate the discredit caused by RESPONDENTS to the State of Nevada and the gaming industry, has had to file this Complaint.

114. By itself and/or in conjunction with the actions contained in the other counts of this Complaint, the failures of RESPONDENTS to ensure RESPONDENTS' policies and procedures were followed by and enforced against RESPONDENTS' executives and high level employees reflect or tend to reflect poorly on the reputation of gaming in the State of Nevada and/or acts as a detriment to the development of the gaming industry and/or reflect or tend to reflect discredit upon the State of Nevada or the gaming industry.

115. The past failures of RESPONDENTS to follow and enforce RESPONDENTS' policies and procedures as described herein, in whole or in part, constitute violations of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011.

116. The past failures of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011 is an unsuitable method of operation and is grounds for disciplinary action against RESPONDENTS.

234.   On February 26, 2019, the Company was fined "a record $20 million by Nevada gambling regulators… for failing to investigate claims of sexual misconduct" against Defendant

Wynn. An *Associated Press* report describing the fine[16] continued:

> The penalty against Wynn Resorts Ltd. ends an investigation that began after The Wall Street Journal reported that several women said the company founder harassed or assaulted them.
>
> Wynn Resorts will keep its gambling license under the Nevada Gaming Commission settlement approved by four commissioners who set the fine.
>
> "It's not about one man," said Commissioner Philip Pro, a former federal court judge. "It's about a failure of a corporate culture to effectively govern itself as it should."
>
> * * *
>
> The previous highest fine in state history was $5.5 million in 2014 against the sports betting and mobile gambling system company now known as CG Technology….
>
> Chairman Tony Alamo said $20 million "makes it clear to all licensees that this culture cannot be tolerated," while also letting the publicly traded company "heal."
>
> * * *
>
> Details about the investigation and its findings were not made public.
>
> But Wynn Resorts acknowledged in settlement documents that several former board members and executives knew about but failed to investigate after Wynn paid $7.5 million in 2005 to a former salon employee who alleged he raped her and that she became pregnant as a result.
>
> "Mr. Wynn ... engaged in intimate and sexual conduct with (company) employees," the settlement documents said.
>
> The company also failed to investigate a cocktail server's allegation that from 2005 to 2006 Wynn pressured her into a nonconsensual sexual relationship, the documents said. Wynn paid a $975,000 private settlement to that woman and her parents, the settlement said….
>
> "The company's initial response during this period was driven by Mr. Wynn's adamant denial of all allegations," said a statement from

---

[16] https://www.washingtonpost.com/business/regulators-fine-wynn-resorts-20m-over-sex-allegations/2019/02/26/9927ae84-3a14-11e9-b10b-f05a22e75865_story.html.

Wynn Resorts spokesman Michael Weaver. It acknowledged a "short-sighted focus on initially defending Mr. Wynn, rather than reassuring employees of the company's commitment to a safe and respectful work environment."

### The Company Admits How Badly It Had Failed In the Past

235. The Company issued two press releases in response to the news of the NGCB disciplinary complaint and fine: one titled "Nevada Gaming Control Board and Wynn Resorts Agree to Settlement" on January 28, 2019, and another titled "Nevada Regulatory Process Completed for Wynn Resorts" on February 26, 2019. Although those two press releases tried to spin a record-breaking $20 million fine as somehow positive, they ultimately only underscored just how badly the Company had failed during the Class Period and how thoroughly the Company had had to "transform[]" itself in order to bring its policies and procedures into compliance with the law.

236. For example, the January 28, 2019 press release stated in relevant part:

"The completion of the NGCB's investigation of the response of certain employees to allegations against our founder and previous CEO Steve Wynn is an important remedial step. We have fully cooperated and been transparent with the Board in this in-depth investigation. We look forward to appearing before the Nevada Gaming Commission to review the settlement and establish the final resolution of the investigation.

"Upon learning of the extent of the allegations, the new leadership of Wynn Resorts took immediate actions to ensure an open and safe work environment for all employees and **made dramatic changes at every level of key decision-making in the Company**. As an example, any employee mentioned in the NGCB report who was aware of allegations of sexual assault against the company's former chairman and did not investigate or report it is no longer with the company.

"We have **undergone an extensive self-examination over the last 12 months, intended to reinvigorate and implement meaningful change across all levels of the organization, cultivate a safe, healthy and supportive workplace culture**, and build on our core

102

values of respecting our employees, corporate responsibility and citizenship, and service to the community."

Philip G. Satre, Chairman of the Board of Wynn Resorts, issued the following statement:

"In my extensive experience working in the highly-regulated gaming industry I have never seen a company take **action that was as swift and comprehensive** as the executive team at Wynn Resorts. Much of that occurred before I joined the Board in August 2018, however I believe our board's follow-up and reaction to the regulatory investigations has been just as **thorough and decisive**."

237. Similarly, the February 26, 2019 press release stated in relevant part:

"This brings to a conclusion the Nevada gaming regulators review of who in the Company was aware of allegations against the Company's founder and former CEO.

"We are pleased that the Nevada Gaming Commission has recognized the **company's transformation and 'refreshed culture' over the course of the last twelve months** and acknowledged the **'paradigm shift' that has occurred within the company.**

"The completion of the review by Nevada regulators is an important step forward, and we deeply appreciate the trust and confidence they have placed in the new leadership of Wynn Resorts to 'grow and prosper.'"

Over the past year, **the Company has taken many remedial actions**, several of which were recognized by the Commission during the hearing:

- Executed a separation agreement with founder Steve Wynn that paid him no severance and arranged for liquidation of all his Wynn Resorts shares.

- Separated the roles of CEO and Chairman of the Board, consistent with current corporate best practices.

- Appointed Matt Maddox as CEO of Wynn Resorts.

- Commenced a **robust Board refreshment process** and, as of today, the median tenure of our eight independent directors is now less than two years. In April 2018, the Board **elected three new female directors**, resulting in a Board that is now nearly 50% women. In August 2018, the Board elected Philip

G. Satre, Richard Byrne and Matt Maddox to its Board. Mr. Satre is Chairman.

- **Ensured that any employee who was aware of allegations of sexual assault against Steve Wynn and did not investigate or report it is no longer with the company.**

- Appointed Ellen Whittemore, a recognized expert in gaming regulatory matters, as General Counsel; appointed Marilyn Spiegel, an executive with significant hospitality and human resources experience, as President of Wynn Las Vegas; and appointed Rose Huddleston, a seasoned human resources executive, to the newly created corporate position of Senior Vice President of Human Resources, North America.

Under the leadership of CEO Matt Maddox, the company has taken the following steps to further *transform its workplace environment*:

- Launched enhanced Workplace Compliance and Prevention of Sexual Harassment training for all employees, designed and delivered by a third-party expert.

- Launched a Women's Leadership Council to promote equality within the workplace. The group's first activity was to produce a speaker series, "Women Who Thrive," to educate and inspire employees through powerful female role models.

- Commissioned pay and promotion equity studies to measure pay equality among men and women in the workforce.

- Launched a new Paid Parental Leave program that provides six weeks of paid time off to new parents.

- Implemented new Diversity, Inclusion and Unconscious Bias training for all employees taught by third-party experts. Company senior executives completed an eight-hour training program.

- Launched the Great Place to Work survey and focus groups which measure employee engagement against the *Fortune* "100 Best Companies to Work For."

- Launched a new annual Wynn Employee Foundation scholarship program, which has awarded ten $7,500 college scholarships to employees and their dependents.

104

# Loss Causation

238.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Wynn, and operated as a fraud or deceit on Class-Period purchasers of such securities by misrepresenting, among other things, Wynn's legal compliance and Code of Conduct, and failing to disclose a decades-long pattern of predatory sexual misconduct by Wynn's CEO.

239.     As the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market, the price of Wynn securities fell, as the prior artificial inflation came out of their respective prices. As a result of their purchases of the securities issued by Wynn during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

# Class Action Allegations

240.     Lead Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all those who purchased or otherwise acquired the Company's securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

241.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that

1    customarily used in securities class actions.

2        242.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as

3    all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

4    federal law that is complained of herein.

5        243.    Lead Plaintiffs will fairly and adequately protect the interests of the members of

6    the Class and have retained counsel competent and experienced in class and securities litigation.

7    Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

8        244.    Common questions of law and fact exist as to all members of the Class and

9    predominate over any questions solely affecting individual members of the Class. Among the

10   questions of law and fact common to the Class are:

11           a.   Whether Defendants violated the Exchange Act;

12           b.   Whether Defendants participated in and pursued the wrongful activities

13                complained of herein;

14           c.   Whether Defendants' statements were materially false and misleading or omitted

15                to state material facts about the Company;

16           d.   Whether Defendants acted with due care in misrepresenting or omitting to state

17                material information concerning the Company; and

18           e.   The extent of damages sustained by members of the Class and the appropriate

19                measure of damages.

20       245.    A class action is superior to all other available methods for the fair and efficient

21   adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

22   the damages suffered by individual Class members may be relatively small, the expense and

23   burden of individual litigation make it impossible for members of the Class to individually

24   redress the wrongs done to them. There will be no difficulty in the management of this action as

25   a class action.

26       246.    Defendants have acted on grounds generally applicable to the Class with respect

27   to the matters complained of herein, thereby making appropriate the relief sought herein with

28   respect to the Class as a whole; and

247.     The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

# First Claim for Relief

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Against All Defendants

248.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

249.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

250.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were

designed to influence the market for the Company's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

251. By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

252. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

253. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market

for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

254.     During the Class Period, the Company's securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of the Company's securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

255.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256.     As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## Second Claim for Relief

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

257.     Lead Plaintiffs repeat and re-allege each and every allegation contained in the

109

foregoing paragraphs as if fully set forth herein.

258.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false statements.

259.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

260.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to and did control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

261.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

262.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## __Prayer for Relief__

**WHEREFORE** Lead Plaintiffs demand judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiffs as Class representatives;

B.  Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## __Jury Demand__

Plaintiffs demand trial by jury.

Dated: March 1, 2019                                        Respectfully submitted,


                                                           /s/ Andrew R. Muehlbauer
                                                           ANDREW R. MUEHLBAUER, ESQ.
                                                           Nevada Bar No. 10161
                                                           SEAN P. CONNELL, ESQ.
                                                           Nevada Bar No. 7311
                                                           **MUEHLBAUER LAW OFFICE, LTD.**
                                                           7915 West Sahara Avenue, Suite 104
                                                           Las Vegas, Nevada 89117
                                                           Telephone: 702.330.4505
                                                           Facsimile: 702.825.0141
                                                           Email: andrew@mlolegal.com
                                                                  sean@mlolegal.com


                                                           **POMERANTZ LLP**
                                                           Jeremy A. Lieberman (*pro hac vice*)
                                                           Murielle J. Steven Walsh (*pro hac vice*)
                                                           Aatif Iqbal (*pro hac vice*)
                                                           600 Third Avenue, 20th Floor
                                                           New York, New York 10016
                                                           Tel:     (212) 661-1100
                                                           Fax:     (917) 463-1044
                                                           Email: jalieberman@pomlaw.com

111

mjsteven@pomlaw.com
aiqbal@pomlaw.com

*Attorneys for Lead Plaintiffs John V. Ferris and JoAnn M. Ferris*