1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Patrick G. Byrne (Nevada Bar #7636)
Alex L. Fugazzi (Nevada Bar #9022)
V.R. Bohman (Nevada Bar #13075)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Telephone: 702.784.5200
Facsimile: 702.784.5252
Email: afugazzi@swlaw.com
         pbyrne@swlaw.com
         vbohman@swlaw.com

*Additional Counsel on Signature Block*

*Attorneys for Defendants Wynn Resorts, Ltd., Craig
Scott Billings, Matthew O. Maddox, John J.
Hagenbuch, Ray R. Irani, Robert J. Miller, Patricia
Mulroy, Clark T. Randt Jr., Alvin V. Shoemaker,
Daniel B. Wayson, Jay L. Johnson, and J. Edward
Virtue*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JOHN V. FERRIS, et al.,<br>            Plaintiff(s),<br><br>vs.<br><br>WYNN RESORTS LIMITED, et al.,<br><br>            Defendant(s). | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

Case No. 2:18-CV-00479-GMN-CWH

The Honorable Gloria M. Navarro

**DEFENDANTS WYNN RESORTS,
LIMITED, BILLINGS, MADDOX,
HAGENBUCH, IRANI, MILLER,
MULROY, RANDT, SHOEMAKER,
WAYSON, JOHNSON, AND VIRTUE'S
MOTION TO DISMISS AMENDED
CLASS ACTION COMPLAINT**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

BACKGROUND ...........................................................................................................................2

I.      The Parties. ......................................................................................................................2

II.     Allegations Relating to Mr. Wynn's Misconduct. ..........................................................3

III.    The Company's Response ................................................................................................4

IV.     The Challenged Statements ..............................................................................................4

ARGUMENT ...............................................................................................................................5

I.      Legal Standard. ................................................................................................................5

        A.      The PSLRA's Exacting Pleading Standards. ........................................................5

        B.      Sexual Misconduct Claims Under *Hewlett-Packard*. ..........................................5

II.     Defendants Had No Duty to Disclose Mr. Wynn's Alleged Misconduct. .......................7

III.    Plaintiffs Fail to Allege Actionable False Statements. .....................................................9

        A.      Code of Conduct Statements ................................................................................9

        B.      Compliance Statements ......................................................................................10

        C.      Risk Disclosure Statements ...............................................................................12

        D.      Elaine Wynn Statements. ...................................................................................13

        E.      Culture Statements. ...........................................................................................15

IV.     The Amended Complaint Does Not Adequately Plead Scienter. ....................................15

        A.      The Amended Complaint Does Not Plead Scienter as to the Directors and Officers. .......16

        B.      The Directors' and Officers' Trading Negates an Inference of Scienter. ...........18

        C.      The Exculpatory Inference Is More Compelling. ...............................................20

        D.      The Amended Complaint Does Not Plead Scienter as to the Company. .............20

V.      The Amended Complaint Does Not Adequately Allege Loss Causation. ........................20

VI.     Plaintiffs Fail to Allege That the Directors and Officers "Made" Actionable False Statements. .................................................................................................................23

VII.    The Amended Complaint Does Not Allege Violations of Section 20(a) ..........................24

CONCLUSION ..........................................................................................................................24

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................24

*In re Allied Nevada Gold Corp.*,
   2017 WL 4172611 (D. Nev. Sept. 20, 2017) ......................................................16

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007) .............................................................8, 10

*In re Apollo Grp., Inc. Sec. Litig.*,
   2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ......................................................17

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) .................................................................9

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ..............................................................................................7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................................5

*Biesenbach v. Guenther*,
   588 F.2d 400 (3d Cir. 1978) .................................................................................8

*In re BofI Holding, Inc. Sec. Litig.*,
   302 F. Supp. 3d 1128 (S.D. Cal. 2018) ..............................................................22

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ................................................................................7

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................13, 18

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ..............................................................................20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ..............................................................................12

*City of Pontiac Policemen & Firemen Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ...........................................................................9, 14

*In re Cornerstone Propane Partners, L.P.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) .............................................................14

*Curry v. Yelp*,
875 F.3d 1219 (9th Cir. 2017) ...................................................................................22

*De Sejournet v. Mohidin LLP*,
2014 WL 7723573 (C.D. Cal. May 21, 2014) ...........................................................21

*Destfino v. Reiswig*,
630 F.3d 952 (9th Cir. 2011) .......................................................................................5

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017).................................................................11

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).....................................................................................................20

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010).............................................................15

*In re Foundry Networks, Inc.*,
2003 WL 23211577 (N.D. Cal. Feb. 14, 2003) ..........................................................12

*In re FoxHollow Techs., Inc., Sec. Litig.*,
2008 WL 2220600 (N.D. Cal. May 27, 2008),
*aff'd* 359 F. App'x 802 (9th Cir. 2009)......................................................................13

*In re Galena Biopharma, Inc. Secs. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ..........................................................................10

*In re GeoPharma, Inc. Securities Litig.*,
399 F. Supp. 2d 432 (S.D.N.Y. 2005)......................................................................9, 16

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ................................................................................17, 20

*In re Glenfeld, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) .......................................................................................5

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) ......................................................................................16

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................................................16, 19, 24

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ...........................................................23

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) ...................................................................................viii

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ................................................................................8

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ...............................................................................17

*Howard v. Everex Sys. Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .............................................................................23

*In re Immersion Corp. Sec. Litig.*,
  2011 WL 6303389 (N.D. Cal. 2011) ....................................................................20

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ...........................................11, 14

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012) .................................................................15

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .............................................................................................23

*Kas v. Fin. Gen. Bankshares, Inc.*,
  796 F.2d 508 (D.C. Cir. 1986) ..............................................................................8

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ..............................................................17

*In re LeapFrog Enterps., Inc. Securities Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ..............................................................12

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .............................................................................19

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .............................................................................15

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ..........................................................................21, 22

*Mandalevy v. Bofl Holding, Inc.*,
  2018 WL 3032588 (S.D. Cal. June 19, 2018) ....................................................10

*Markette v. XOMA Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ...................................................12

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................................7

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..............................................................24

-iv-

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................ *passim*

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .................................................................................7

*In re Nat'l Century Fin. Enterprises, Inc.*,
   504 F. Supp. 2d 287 (S.D. Ohio 2007) ...............................................................23

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ..................................................................10

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) ..............................................................................20

*In re Novatel Wireless Secs. Litig.*,
   830 F. Supp. 2d 996 (S.D. Cal. 2011) .................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ........................................................................................12

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ..............................................................................22

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..............................................................5, 20, 21, 24

*Panter v. Marshall Field & Co.*,
   646 F.2d 271 (7th Cir. 1981) ................................................................................8

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ........................................................9

*In re Pfizer, Inc. Sec. Litig.*,
   538 F. Supp. 2d 621 (S.D.N.Y. 2008) ................................................................17

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ............................................................................18

*In re Quality Sys. Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..............................................................................5

*Ray v. Karris*,
   780 F.2d 636 (7th Cir. 1985) ................................................................................8

*Rembold v. Pac. First Fed. Sav. Bank*,
   798 F.2d 1307 (9th Cir. 1986) ..........................................................................2, 8

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) .................................................................. *passim*

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ............................................................. viii

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ...............................................................19

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)...........................................................................2, 8

*Sgarlata v. Paypal Holdings, Inc.*,
    2018 WL 6592771 (N.D. Cal. Dec. 13, 2018)......................................24

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) .........................................................15, 16

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...............................................................16

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) .................................................................10

*In re Teledyne Def. Contracting Deriv. Litig.*,
    849 F. Supp. 1369 (C.D. Cal. 1993) .......................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................. viii, 5, 15

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) .........................................................17, 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    258 F. Supp. 3d 1037 (N.D. Cal. 2017) ..................................................9

*WM High Yield Fund v. O'Hanlon*,
    964 F. Supp. 2d 368 (E.D. Pa. 2013) ....................................................23

*Wojtunik v. Kealy*,
    394 F. Supp. 2d 1149 (D. Ariz. 2005) ...................................................23

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .........................................................18, 19

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) .................................................14

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)................................................16, 17

*Zeid v. Kimberley*,
    930 F. Supp. 431 (N.D. Cal. 1996) ......................................................12

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..........................................................................18

**Statutes**

15 U.S.C. § 78u-4 .............................................................................................15

**Regulations**

17 C.F.R. § 229.406 ..........................................................................................10

17 C.F.R. § 240.10b-5.............................................................................. *passim*

**Rules**

Fed. R. Civ. P. 8 ..................................................................................................5

Fed. R. Civ. P. 9 ..................................................................................................5

Fed. R. Civ. P. 12 ............................................................................................. viii

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

## MOTION TO DISMISS

Defendants Wynn Resorts, Limited ("Wynn Resorts" or the "Company"); John J. Hagenbuch, Robert J. Miller, Patricia Mulroy, Clark T. Randt Jr., Alvin Shoemaker, Daniel B. Wayson, Jay L. Johnson, Ray R. Irani, and J. Edward Virtue (the "Directors"); and Matthew O. Maddox and Craig Scott Billings (the "Officers") hereby move to dismiss, pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.*, the Amended Class Action Complaint ("Amended Complaint")[1] filed against them by Lead Plaintiffs John V. Ferris and JoAnn M. Ferris ("Plaintiffs"). This motion is supported by the attached Memorandum of Points and Authorities and Appendices, the Declaration of V.R. Bohman,[2] Defendants' Request for Judicial Notice, as well as the other papers and pleadings on file herein, and any oral argument this Court may choose to consider.

DATED: April 15, 2019                    SNELL & WILMER L.L.P.

                                         */s/ V.R. Bohman*

---

[1]  Citations to "¶" are to the paragraphs of the Amended Class Action Complaint, filed March 1, 2019.

[2]  Citations to "Ex." are to the exhibits to the Declaration of V.R. Bohman, of which Defendants request the Court take judicial notice. Each Exhibit is incorporated by reference into the Amended Complaint, filed publicly with the SEC, and/or a publicly available filing or news article. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings are subject to judicial notice that the statements in them were made); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants."). Citations to "App'x" are to Appendices attached hereto.

## MEMORANDUM OF POINTS AND AUTHORITIES

This is a securities fraud action that alleges no fraud. After the media reported that Stephen A. Wynn, Wynn Resorts' former CEO and Chairman, had allegedly engaged in sexual misconduct, dozens of shareholders filed actions for breach of fiduciary duty in Nevada state and federal court. These actions allege that Mr. Wynn and others mismanaged Wynn Resorts, resulting in regulatory exposure and other harm to the Company. Rather than pursue derivative claims like the other shareholders, Plaintiffs in this action scoured Defendants' SEC filings and press releases to identify something—*anything*—that could, in hindsight, pass for an affirmative representation that Mr. Wynn did not engage in misconduct to support a claim for securities fraud. Despite hundreds of paragraphs quoting language from four years' worth of public statements, Plaintiffs' Amended Complaint comes up empty. It fails to identify a single representation about Mr. Wynn's conduct: no statements about what Mr. Wynn did (or did not do), no statements about who knew (or did not know), no statements about what was reported (or not reported), and no statements about what was investigated (or not investigated). There are no statements in the Amended Complaint that were or even could have been contradicted by the allegations against Mr. Wynn. No fraud has been alleged.

Still, Plaintiffs seek to bring claims against Wynn Resorts, Mr. Wynn, and certain of Wynn Resorts' former and current officers and directors on behalf of purchasers of Wynn Resorts securities between February 28, 2014 and February 12, 2018 ("Class Period") for purported violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 20(a) of the Exchange Act. Though Defendants never made any representations about Mr. Wynn's behavior, Plaintiffs assert that, in light of the allegations against Mr. Wynn:

- Every statement Defendants made about the Company's Code of Business Conduct and Ethics ("Code of Conduct") violated securities laws. Plaintiffs even assert that Mr. Wynn's alleged conduct somehow renders the Code of Conduct itself false;

- Every risk factor Defendants filed with the SEC warning about the possible impact of Mr. Wynn's departure was fraudulent, purportedly because Mr. Wynn's alleged conduct jeopardized his continued employment but was not disclosed; and

- Generic statements about compliance, culture, and diversity constitute actionable securities fraud, because these aspirational statements are purportedly in tension with Mr. Wynn's alleged bad behavior.

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

In a case based on similar allegations of a CEO's undisclosed sexual misconduct, the Ninth Circuit has affirmed that Plaintiffs' approach fails as a matter of law. *See generally Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017). Undisclosed executive misconduct, once revealed, does not recast generic statements about ethics, compliance, and culture into actionable securities fraud. Here, as in *Hewlett-Packard*, Wynn Resorts had no duty to disclose Mr. Wynn's alleged misconduct; statements surrounding the Code of Conduct, ethics, and compliance were "inherently aspirational" and incapable of falsity; and, even if they were false, the challenged statements were immaterial. The promotion of ethical standards is not a guarantee of compliance. "A[ny] contrary interpretation . . . is simply untenable, as it could turn all corporate wrongdoing into securities fraud." *Id.* at 1276.

Plaintiffs' claims fail for several additional reasons. *First*, Plaintiffs do not allege false statements with the particularity that is required. Rather than explain how the challenged statements were false, Plaintiffs simply conclude the statements were "false and/or misleading" because of Mr. Wynn's alleged behavior. This approach fails *de jure*. *Second*, Plaintiffs have not alleged particularized facts establishing that Defendants acted with scienter. In fact, the Directors and Officers are not alleged to have learned of Mr. Wynn's misconduct other than, like Plaintiffs and the rest of the market, through public disclosures. *Third*, Plaintiffs fail to allege loss causation. The "corrective" disclosures Plaintiffs identify are insufficient because they revealed only allegations of Mr. Wynn's misconduct, not any fraudulent practices. *Fourth*, Plaintiffs' boilerplate allegations of "authority" and "control" are insufficient to state claims for securities fraud against the Directors and Officers.

At most, Plaintiffs have alleged misconduct by Mr. Wynn and other former employees of Wynn Resorts. While these allegations might potentially support claims for breach of fiduciary duty against those individuals, they do not state claims for securities fraud. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977). Only *fraudulent* conduct violates Section 10(b) of the Exchange Act and Rule 10b-5. Because Plaintiffs have not alleged any fraud, their claims must be dismissed.

## BACKGROUND

### I.    The Parties.

Wynn Resorts is a leading developer, owner, and operator of casino resorts. ¶ 2. The Directors

are current and former directors of Wynn Resorts. ¶¶ 29-41. These Directors, who include a former

Governor of Nevada, a former Nevada Gaming Commissioner, an Ambassador to China, and a United

States Navy Admiral, brought decades of business and governance experience to Wynn Resorts. Mulroy

and Randt, who joined in October 2015, and Johnson, who joined in August 2016, are still on the Board.

¶¶ 32, 34, 36. Hagenbuch sat on the Board from 2012 to May 2018 (¶¶ 29, 219); Miller from 2002 to

May 2018 (¶¶ 33, 219); Shoemaker from 2002 to December 2018 (¶ 38); Virtue from 2012 to May 2018

(¶ 40); Wayson from 2003 to November 2018 (¶¶ 41, 220); and Irani from 2007 to March 2018 (¶ 31).[3]

Maddox joined the Company in 2002. ¶ 19. He was the Company's CFO from March 2008 to May

2014, and is its current CEO. *Id.* Billings has served as the Company's CFO since March 1, 2017. ¶ 25.

Plaintiffs are two individuals who allegedly acquired Company securities during the Class

Period. ¶ 15.

## II.   Allegations Relating to Mr. Wynn's Misconduct.

Plaintiffs allege a "decades-long pattern of sexual misconduct" by Mr. Wynn, much of which

predated the Class Period and even the founding of Wynn Resorts by many years. ¶¶ 62-69. For

example, Plaintiffs reference articles reporting alleged assaults "in the 1970s," 30 years before Wynn

Resorts was founded in 2002. ¶¶ 62-63. Plaintiffs also describe allegations of misconduct at The Mirage

and Golden Nugget, hotels Mr. Wynn developed decades before Wynn Resorts. ¶¶ 64-66. And Plaintiffs

identify claims of verbal harassment against Mr. Wynn in a 1997 lawsuit ("*Arrowsmith*")—allegations

that predate Wynn Resorts and were "public record." ¶¶ 67-69. Aside from the *Arrowsmith* case, which

was filed more than 20 years ago and is admittedly "public record," Defendants are not alleged to have

known of any historical allegations against Mr. Wynn, let alone to have misrepresented them.[4]

Plaintiffs' core allegations stem from a newspaper article published on January 26, 2018. That

article reported accusations of sexual misconduct against Mr. Wynn. ¶¶ 4, 196. The day the article was

published, "Wynn Resorts' stock price fell $20.31, or 10.12%, to close at $180.29." ¶¶ 5, 197. On

---

[3] The Amended Complaint omits the departure date for Defendant Virtue, who rotated off the Board in May 2018. *See* Ex. 2 (Apr. 17, 2018 Form 8-K).

[4] The *Arrowsmith* complaint was filed on May 23, 1997. Ex. 4 (*Arrowsmith* Complaint). As Plaintiffs acknowledge, *Arrowsmith* was "public record." ¶ 69. Its allegations were widely publicized. *See* Exs. 5, 6, 7 (June 15, 1998 *Las Vegas Review-Journal* article), (Apr. 19, 2001 *Las Vegas Sun* article), (May 7, 2003 *Las Vegas Review-Journal* article).

February 12, 2018—after the alleged 1970s assaults surfaced—the stock price fell "$3.30, or 2%."

¶ 216. The stock price, however, bounced back. By early May 2018, it was trading *higher* than before

the article. Ex. 26 (Stock Chart). For this reason, shareholders suing the Company for breach of

fiduciary duty in Nevada state court have acknowledged that continuously holding stockholders "have

absolutely no financial loss—not one red cent." Ex. 8 (Rogers Opp'n to Mot. to Consolidate) at 4-5.

Plaintiffs speculate that the allegations against Mr. Wynn could jeopardize the Company's

licenses, ¶ 95, but the licenses remain intact. The Company recently settled with the Nevada Gaming

Control Board (the "NGCB"). ¶¶ 222-23. While NGCB's complaint identifies certain members of Wynn

Resorts' management who allegedly learned of allegations against Mr. Wynn, those individuals have all

left the Company. ¶¶ 224-33. In fact, "[a]ny employee who was aware of allegations of sexual assault

against Steve Wynn and did not investigate or report it is no longer with the [C]ompany." Ex. 9 (Jan. 28,

2019 Press Release). None of the Directors or Officers are identified—much less *implicated*—in

NGCB's complaint. ¶¶ 224-33.

Nor do Plaintiffs allege any facts indicating the Directors or Officers learned of allegations

against Mr. Wynn other than through public disclosures. *See, e.g.*, ¶¶ 21, 43, 69.

**III.    The Company's Response.**

Plaintiffs acknowledge the Company responded decisively to the allegations against Mr. Wynn.

On January 26, 2018—the same day as the article—the Board formed a Special Committee of

independent directors to investigate. ¶ 199. Days later, Mr. Wynn left the Company (receiving no

separation payment). ¶ 208. In April 2018, the Company added three independent directors: Betsy

Atkins, Margaret "Dee Dee" Myers, and Winifred "Wendy" Webb. ¶ 218. In August 2018, the Company

added two more: Phil Satre, the new non-executive Chairman, and Richard Byrne. ¶¶ 220, 237.

The Company has also advanced its workplace environment, including by creating a new

department focused on diversity, gender equality, fair treatment, female leadership, and benefits. ¶ 237.

**IV.    The Challenged Statements.**

Plaintiffs do not allege that Defendants ever made any representations about Mr. Wynn's

behavior, much less any statements contradicted by the recent allegations against Mr. Wynn. Instead,

Plaintiffs challenge five categories of generic statements about the Company's ethics, compliance, and

culture: (1) aspirational statements surrounding the Code of Conduct, ¶¶ 89-90, 91-95, 107-08, 124-25, 146-47, 173-74 ("Code of Conduct Statements"); (2) aspirational statements regarding compliance, ¶¶ 101, 111, 113, 115, 117, 122, 135, 138, 143, 164-71, 175 ("Compliance Statements"); (3) risk disclosures related to Mr. Wynn and gaming laws, ¶¶ 103, 105, 109, 119, 126, 128, 130, 150, 152, 154, 177, 179, 181, 186, 183, 188, 191, 194 ("Risk Disclosure Statements"); (4) statements concerning allegations by Elaine Wynn in a stockholder dispute, ¶¶ 156-57, 161 ("Elaine Wynn Statements"); and (5) general statements about corporate culture, ¶¶ 132, 140, 158, 159 ("Culture Statements").

## ARGUMENT

**I.      Legal Standard.**

    **A.      The PSLRA's Exacting Pleading Standards.**

        To allege a claim under Section 10(b) and Rule 10b-5, plaintiffs must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Hewlett-Packard*, 845 F.3d at 1274. An "individual defendants' liability under Section 20(a) . . . is derivative of liability under Section 10(b)." *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1149 (9th Cir. 2017).

        To survive a motion to dismiss, Plaintiffs must satisfy Rules 8(a) and 9(b) as well as the "exacting pleading requirements" of the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Plaintiffs must satisfy Rule 8(a) by alleging "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And under Rule 9(b), they "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs may not "lump multiple defendants together," *Destfino v. Reiswig*, 630 F.3d 952, 959 (9th Cir. 2011), and "must set forth what is false or misleading about a statement, and why it is false." *In re Glenfeld, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994). These particularity requirements apply to "all elements" of Plaintiffs' claims. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

    **B.      Sexual Misconduct Claims Under *Hewlett-Packard*.**

        The Ninth Circuit has determined that general statements about a company's ethics, compliance,

and culture are not actionable, despite undisclosed sexual harassment and misconduct by the company's CEO. *Hewlett-Packard*, 845 F.3d at 1275-78. In *Hewlett-Packard*, the Ninth Circuit addressed "whether shareholders may bring a claim for securities fraud [under Section 10(b) and Rule 10b-5] when a CEO and Chairman violates the corporate code of ethics after publicly touting the business's high standards for ethics and compliance." *Id.* at 1271. There, as here, HP's CEO was alleged to have sexually harassed an employee and engaged in other unethical conduct. *Id.* at 1271-72.

Like here, the complaint attacked certain statements regarding HP's code of conduct, alleging they were inconsistent with the former CEO's undisclosed behavior, including statements about tolerating harassment, reporting misconduct, and cooperating with investigators. *Id.* The complaint also challenged certain of the former CEO's statements, including commitments to "ethical leadership," "doing the right thing," and meeting "high ethical standards." *Id.* at 1276.

The Ninth Circuit held the statements were inactionable, were immaterial, and triggered no duty to disclose. *Id.* at 1275-78. The court first determined that defendants "made no objectively verifiable statements during the Class Period" because "a code of conduct is inherently aspirational." *Id.* at 1276 (quotations omitted). "Such a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations." *Id.* (citations omitted). "A contrary interpretation—that statements such as, for example, the [code's] 'we make ethical decisions,' or [the CEO]'s prefatory statements, can be measured for compliance—is simply untenable, as it could turn all corporate wrongdoing into securities fraud." *Id.*

Next, the court held the statements were immaterial because "there [was] nothing unusual about the promotion of business ethics at HP," and "publication of the [code] [was] mandated by the SEC." *Id.* "It simply cannot be that a reasonable investor's decision would conceivably have been affected by HP's compliance with SEC regulations requiring publication of ethics standards." *Id.*

Finally, the court held that there was no duty to disclose the CEO's alleged misconduct. Securities laws "do not create an affirmative duty to disclose any and all material information." *Id.* at 1278. "The promotion of ethical conduct at HP did not reasonably suggest that there would be no violations of the [code] by the CEO or anyone else." *Id.* "Because the affirmative statements did not create an impression of compliance," the court held that "HP and [its CEO] had no duty to disclose [the

CEO's] misuse of CEO authority and misbehavior in violation of the [code]." *Id.*

## II.   Defendants Had No Duty to Disclose Mr. Wynn's Alleged Misconduct.

Plaintiffs' primary theory appears to be one of omission. They argue that various statements were materially misleading because Defendants failed to disclose Mr. Wynn "had engaged in a pattern of sexual misconduct," and some at the Company allegedly knew about it. *See, e.g.*, ¶¶ 3, 61, 88, 104, 106. Plaintiffs' claims fail because Defendants had no duty to disclose this information. "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). To state omission-based claims, Plaintiffs "must specify the reason or reasons why the statements made by [Defendants] were misleading or untrue, not simply why the statements were incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Here, as in *Hewlett-Packard*, Defendants had no duty to disclose because none of the challenged statements "suggest[ed] that there would be no [unethical conduct] by [Mr. Wynn] or anyone else." *Hewlett-Packard*, 845 F.3d at 1278. In fact, Plaintiffs do not identify a single statement that actually addresses Mr. Wynn's behavior. Plaintiffs instead challenge aspirational statements which, in hindsight, are purportedly in tension with Mr. Wynn's alleged misconduct. To be sure, Mr. Wynn's alleged misbehavior would violate the Company's ethical standards. But that does not "transform the misbehavior into an actionable material omission under the securities laws." *Id.* "[D]isclosure is not a right of confession or exercise of common law pleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010) (quotations omitted). Because Defendants' alleged silence "did not 'affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists,'" there was no duty to disclose, and Plaintiffs' claims should be dismissed. *Hewlett-Packard*, 845 F.3d at 1278 (quoting *Brody*, 280 F.3d at 1006).

Consider a reasonable investor's perspective prior to the January 26 article. The Company had for years said that Mr. Wynn was an "extraordinary talent" who was "key to [the Company's] continued success." ¶¶ 109, 130, 154, 181. Stockholders were warned that the Company "c[ould] not assure that Mr. Wynn will remain with Wynn Resorts," and losing Mr. Wynn "could significantly harm" and

"impair[]" the business. ¶¶ 103, 126, 150, 177. The Company adopted and disclosed a Code of Conduct with stiff penalties "up to and including discharge." ¶ 93. Public allegations regarding Mr. Wynn's conduct were less than pristine. In 1997, he was publicly accused of verbal harassment. ¶ 67. And in 2016, he was publicly accused of "serious misconduct" entailing a "multi-million dollar payment." ¶ 157. When, on January 26, 2018, a newspaper reported additional details regarding the nature of the "misconduct" and other allegations, Mr. Wynn left the Company, the market reacted, and the stock price temporarily dropped. ¶¶ 5, 197. But the Company correctly identified the risk that came to pass. No investors were or could have been misled when what the Company said *might* happen *did* happen.

Now, Plaintiffs have sued Defendants, arguing the failure to disclose the alleged misconduct violates securities laws. Plaintiffs are not the first to attempt to bootstrap allegations of executive misconduct into a federal securities action. As many courts have held, a claim for securities fraud requires more than bad behavior. It requires *fraud*. *Hewlett-Packard*, 845 F.3d at 1278.[5] "[C]ourts have consistently held that since a shareholder cannot recover under 10b-5 for a breach of fiduciary duty, neither can he 'bootstrap' such a claim into a federal securities action." *Panter*, 646 F.2d at 288. Plaintiffs allege no actionable fraud. They allege instead that Mr. Wynn was accused of misconduct and that those accusations should have been disclosed. That does not state a claim under Section 10(b).

Even assuming the Directors and Officers were aware of these accusations before the market— which Plaintiffs have not alleged—they had no duty to disclose them. "Federal securities laws do not

[5] *See, e.g.*, *Santa Fe Indus.*, 430 U.S. at 479 ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) ("[A]n allegation of mismanagement on the part of a defendant will not alone support a securities fraud claim.") (quotations and citations omitted); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981) (plaintiffs cannot "bootstrap" claims for breach of fiduciary duty "into a federal securities action"); *Rembold v. Pac. First Fed. Sav. Bank*, 798 F.2d 1307, 1313 (9th Cir. 1986) (citing *Panter* with approval for its dismissal of "bootstrap" claims); *Ray v. Karris*, 780 F.2d 636, 640 (7th Cir. 1985) ("[T]he self-interested conduct of directors in dereliction of their fiduciary duty does not implicate the interest in full disclosure underlying Section 10(b) and Rule 10b-5."); *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[A] plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty."); *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir. 1978) (allegations of breach of fiduciary duty "do not state a cause of action under Section 10(b) . . . or Rule 10b-5"); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) ("[A] plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach.").

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing.'" *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (quoting *City of Pontiac Policemen & Firemen Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 650 (S.D.N.Y. 2017) ("It is well established that companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (quotations omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. 2017) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."). Otherwise, for fear of violating *securities* laws, companies would have to acknowledge alleged violations of *other* laws, even where they do not believe any violations occurred. That is not the law. Rather, the law provides that "Defendants' culpability . . . does not become a fact that must be disclosed until it is at least charged (in which case the charge is material) or proven (in which case the proven conduct is material)." *In re Teledyne Def. Contracting Deriv. Litig.*, 849 F. Supp. 1369, 1383 (C.D. Cal. 1993); *see Volkswagen*, 2017 WL 2798525, at *5 ("At most, the disclosure obligation would arise when an investigation into the conduct began."). It is undisputed Defendants complied with this requirement.

## III.   Plaintiffs Fail to Allege Actionable False Statements.

### A.   Code of Conduct Statements.

To the extent Plaintiffs allege affirmative misrepresentations, their claims also fail. The bulk of the Amended Complaint challenges the Code of Conduct and generic statements surrounding it, such as statements acknowledging that it was adopted. These statements are "inherently aspirational" and cannot support a claim for securities fraud. *See Hewlett-Packard*, 845 F.3d at 1275-78.

At issue here are the exact kinds of statements held inactionable in *Hewlett-Packard*. For example, Plaintiffs highlight the Company's intentions to "reinforce and enhance the Company's ethical way of doing business" (¶ 89; *see Hewlett-Packard*, 845 F.3d at 1273); "strive to abide by high standards of ethical business conduct" (¶ 90; *see Hewlett-Packard*, 845 F.3d at 1271); and "prevent the occurrence of conduct not in compliance with the Code" (¶ 93; *see Hewlett-Packard*, 845 F.3d at 1273). These statements—all of which "are stated affirmatively and in the present" or even future tenses—are "inherently aspirational." *Hewlett-Packard*, 845 F.3d at 1273, 1276. The statements "express[] opinions

as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to [the Code of Conduct's] aspirations." *Id.* at 1276. These statements are inactionable. *Id.*

The challenged statements are also immaterial. *See Hewlett-Packard*, 845 F.3d at 1277-78. Like every publicly traded company, Wynn Resorts is required to "[d]isclose whether [it] has adopted a code of ethics" and, if so, publish it. 17 C.F.R. § 229.406(a), (c). "It simply cannot be that a reasonable investor's decision would conceivably have been affected by [Wynn Resorts'] compliance with SEC regulations requiring publication of ethics standards." *Hewlett-Packard*, 845 F.3d at 1277. "No reasonable investor would have construed [the statements] . . . as not just an aspirational statement of intention, but a warranty that [Mr. Wynn was] compliant." *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 977 (N.D. Cal. 2015).[6]

## B.   Compliance Statements.

Next, Plaintiffs challenge snippets from the Company's SEC filings, stating "the Company believes that it is in full compliance with all applicable laws." Through partial quotations and double emphasis, Plaintiffs seek to create the impression that Defendants certified compliance with "*all*" laws applicable to the Company. Context reveals, however, that it is not Defendants' statements but Plaintiffs' allegations that are misleading. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996) (challenged statement must be "view[ed] . . . in full and in context at the time it was made").

The statements in the Amended Complaint were selectively excerpted from lengthy disclosures regarding a dispute with Kazuo Okada, a major shareholder whose stake the Company redeemed after evidence suggested he "had provided valuable items to certain foreign gaming officials." Ex. 10 (2013 10-K). The dispute spun off into several lawsuits and investigations, including a government investigation into a donation by the Company to the University of Macau. *Id.* Read in context, the

---

[6] Several Ninth Circuit district courts have dismissed similar code-of-conduct claims as inactionable and immaterial. *See, e.g.*, *Mandalevy v. Bofl Holding, Inc.*, 2018 WL 3032588, at *7 n.4 (S.D. Cal. June 19, 2018) (noting that "the statements in the Code of Ethics and Statement of Ethical Principles" are not actionable under 10b–5 "because they are aspirational in nature and not objectively verifiable"); *Nathanson*, 87 F. Supp. 3d at 976 (holding that code of conduct statements were "inherently aspirational and hence immaterial"); *In re Galena Biopharma, Inc. Secs. Litig.*, 117 F. Supp. 3d 1145, 1182 (D. Or. 2015) ("[T]he Court finds that the statements in [defendant's] Code of Ethics are not actionable statements."); *Andropolis*, 505 F. Supp. 2d at 685-86 ("[A] code of conduct is inherently aspirational; it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code.").

Company's reference to "all applicable laws" points to laws implicated in the Okada dispute—namely, Mr. Okada's alleged violations of the Foreign Corrupt Practices Act and the DOJ's investigation into the Macau donation—not any and all laws governing the personal conduct of Company employees. Indeed, the Company explained this to investors immediately before the statements Plaintiffs challenge. *See* Ex. 10 (2013 10-K) ("The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company."); *see also* ¶¶ 122, 148, 175 (2014-16 10-Ks).

Take the language below. Plaintiffs excerpt the italicized language in the Amended Complaint, but omit the language directly above, stripping the statement of crucial context:

> In the U.S. Department of Justice's Motion to Intervene and for Temporary and Partial Stay of Discovery in the Redemption Action, the Department of Justice states in a footnote that the government also has been conducting a criminal investigation into the Company's donation to the University of Macau discussed above. The Company has not received any target letter or subpoena in connection with such an investigation. The Company intends to cooperate fully with the government in response to any inquiry related to the donation to the University of Macau.
>
> *Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company.*

Ex. 10 (2013 10-K) (excerpted at ¶ 101).[7] "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from one that actually exists.'" *Hewlett-Packard*, 845 F.3d at 1275. No reasonable investor would infer from this language a guarantee that Mr. Wynn had never mistreated employees. The statements do not even mention Mr. Wynn.

Even viewed in isolation, the challenged statements are inactionable. Plaintiffs do not allege the Company represented its conduct was, in fact, "in full compliance with all applicable laws." Merely that the Company "*believed*" that to be the case. "These statements merely express Defendants' desire to abide by laws and regulations." *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *6 (N.D. Cal. Aug. 31, 2018) (belief-oriented compliance representations were inactionable); *accord*

---

[7] Similar language appears in every SEC filing containing the compliance language Plaintiffs challenge. *See* Exs. 20, 22-23, 27-38.

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

*Hewlett-Packard*, 845 F.3d at 1275 ("'[P]uffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading."). The statements are inactionable. *See Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *11 (D. Ariz. Aug. 1, 2017) (statement that company was "committed to complying with laws" was "too vague to be actionable").

Even if these aspirational statements were actionable, Plaintiffs would need to allege particular facts showing not only "that the belief is objectively untrue," but also that Defendants "'did not hold the belief [they] professed.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)). Yet here, Plaintiffs offer little more than conclusions. *See, e.g.*, ¶ 102. The only "facts" Plaintiffs allege—themselves more conclusions than specific facts—are that (1) Mr. Wynn violated gaming regulations and (2) so did the Company. *Id.*

While these allegations may indicate Defendants' beliefs were ultimately incorrect, they do not address whether Defendants *held* those beliefs. *Omnicare*, 135 S. Ct. at 1327 (allegations that the defendant's "belief turned out to be wrong" do not establish falsity). Plaintiffs allege no facts suggesting the Company knew it was breaking laws at the time of the challenged statements, such as a criminal charge or regulatory action. To the contrary, the statements were forward-looking disclosures that regulatory actions "*could* result." *E.g.*, ¶ 101 ("[A]ny such investigations could result in actions by regulators against the Company."). And Plaintiffs concede that the only event suggesting regulatory violations—the NGCB complaint—trailed the Class Period by a year. ¶ 222. Because Plaintiffs "make[] no effort to allege that Defendants 'did not hold the belief they professed,'" they have not alleged falsity. *Markette v. XOMA Corp.*, 2017 WL 4310759, at *5 (N.D. Cal. Sept. 28, 2017).

### C.    Risk Disclosure Statements.

Plaintiffs also challenge cautionary statements about (1) Mr. Wynn, his capabilities, and how his departure might affect the Company, and (2) gaming laws. These are risk disclosures: forward-looking statements previewing potential risks for shareholders. Risk disclosures are warnings, not verifiable statements of fact. Numerous courts have held they are inactionable. *See, e.g.*, *In re LeapFrog Enterps., Inc. Securities Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) ("[C]autionary statements [] are not actionable"); *In re Foundry Networks, Inc.*, 2003 WL 23211577, at *10 (N.D. Cal. Feb. 14, 2003)

("[P]laintiffs cannot state a claim based on the disclosure of risk factors"); *Zeid v. Kimberley*, 930 F.

Supp. 431, 437 (N.D. Cal. 1996) ("[W]arnings regarding potential adverse factors are not actionable.").

More than that, courts have rejected attempts to make actionable risk disclosures almost identical to those alleged in the Amended Complaint. In the *Hewlett-Packard* case, the plaintiffs challenged statements concerning executive hiring and retention. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013). The district court dismissed the allegations because they were immaterial and inactionable. *Id.* On appeal, the Ninth Circuit acknowledged these allegations in its factual summary, *Hewlett-Packard*, 845 F.3d at 1273, but did not mention them again. Evidently the plaintiffs abandoned the argument to maintain credibility.[8]

In all events, Plaintiffs do not allege that the disclosures are false. They do not dispute that Mr. Wynn was talented and important to the Company, that "Wynn Resorts and all individual qualifiers were found suitable by the MGC" in 2013, or that certain consequences might flow from violations of gaming laws. In fact, Plaintiffs allege that the risks the Company identified were realized. ¶ 200 (describing MGC investigation); ¶¶ 202-06, 209-10 (describing Mr. Wynn's departure and its impact on the Company); ¶¶ 222-34 (describing NGCB complaint). Because Defendants' risk disclosures are neither actionable nor false, they cannot support a claim for securities fraud. *Cement & Concrete*, 964 F. Supp. 2d at 1141; *In re Foxhollow*, 2008 WL 2220600, at *18.[9]

**D.    Elaine Wynn Statements.**

Plaintiffs also challenge various statements responding to allegations leveled by Mr. Wynn's ex-

---

[8] The Risk Disclosure Statements are also protected under the PSLRA's safe harbor. *See In re Foxhollow Techs., Inc., Sec. Litig.*, 2008 WL 2220600, at *18-20 (N.D. Cal. May 27, 2008), *aff'd*, 359 F. App'x 802 (9th Cir. 2009) (holding that statements related to executive retention fell under PSLRA's safe harbor). Defendants' SEC filings explicitly identified the Risk Disclosure Statements as "forward-looking statements [ ] subject to a number of risks and uncertainties that could cause actual results to differ materially from those we express in these forward-looking statements." *See, e.g.*, Ex. 10, 20, 22-23 (10-Ks) (noting that statements regarding the Company's "dependence on Stephen A. Wynn," "pending or future legal proceedings, regulatory or enforcement actions," and the "extensive regulation of [the Company's] business" were forward-looking). This is "more than adequate to create a safe harbor under the PSLRA." *In re Foxhollow*, 2008 WL 2220600, at *20.

[9] The challenged statement by Mr. Wynn that the Company was "happy to" have its operators in Macau "get certificates of clean bill of health certificates" from the Hong Kong Police Department is similarly deficient. ¶ 188. Plaintiffs do not allege that this statement is false. Nor, for that matter, do they allege any misconduct related to Macau.

---

-13-

wife, Elaine Wynn. These include statements: (1) that the Company "prides itself on its transparency and full disclosure to regulators and shareholders" such that it "would [not] hide any relevant activities"; (2) denying "allegations that Mr. Wynn applied [C]ompany resources for personal use"; and (3) denying Elaine Wynn's "comments regarding [the Company's] Board of Directors, their independence, and their actions." ¶¶ 157-62. None of these statements is an actionable false representation.

The first category of statements is inactionable. The Company's present-tense statements that it "prides itself" on transparency and "would [not]" conceal relevant information are "inherently aspirational." *Hewlett-Packard*, 845 F.3d at 1276. "It is well-established that general statements about reputation, integrity, and compliance" are inactionable—particularly when, as here, the statements "are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of Pontiac*, 752 F.3d at 183. "These statements merely express Defendants' desire to abide by laws and regulations." *Irving*, 2018 WL 4181954, at *6 (dismissing statements "We are legal" and "We work with regulators and cities to make things work"). Defendants never said they had in fact disclosed all "relevant activities" to regulators. If Defendants' aspirational statements about disclosure were actionable, "it could turn all corporate wrongdoing into securities fraud." *Hewlett-Packard*, 845 F.3d at 1276.[10]

Nor are the challenged statements alleged to be false. Plaintiffs do not allege that Mr. Wynn misused "Company resources for personal use" or that any Directors lacked independence or acted inappropriately. Nor do Plaintiffs allege any particular facts establishing falsity as to the Company's statements concerning regulatory disclosure, such as what information was "unlawfully withheld," when, and by/from who. ¶ 159. When the Company stated that "[a]llegations made by [Elaine] Wynn that the [C]ompany would hide any relevant activities from [its] regulators are patently false," it was responding to specific "allegations made by [Elaine] Wynn." Elaine Wynn's allegations about regulatory disclosure related not to Mr. Wynn's conduct but a separate issue: the circumstances of the

---

[10] Similarly inactionable are Mr. Wynn's statements that the Company "worked very hard to compete for the right to operate in Massachusetts" and that Mr. Wynn "like[d] the direction we're in" and was "feeling comfortable about the pace of our growth." ¶¶ 119, 183. These are classic puffery. *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (claims of "industry leading growth" and "measurable progress" were inactionable); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (statements such as "we are very pleased with our progress" were puffery). Moreover, Plaintiffs do not allege the statements are false.

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

departure of Marc Schorr, the Company's former Chief Operating Officer. She alleged that in filings with the SEC, "Wynn Resorts falsely and deceptively reported that Mr. Schorr's departure from Wynn Resorts was the result of Mr. Schorr's notice to the Company of his 'intention to retire.' In fact, Mr. Schorr was terminated by Mr. Wynn because of his participation in illegal gambling." Ex. 11 (Fifth Amended Crossclaim) ¶ 56. Unlike Elaine Wynn, Plaintiffs do not contend the Company misrepresented Mr. Schorr's departure.

### E.   Culture Statements.

The Culture Statements, such as the Company's "commitment to diversity," "sense of family and community," and "job security," are similarly inactionable. ¶¶ 132, 140, 158, 159. "Statements about corporate culture and integrity are typically considered to be inactionable puffery." *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *24 (S.D.N.Y. Sept. 28, 2010). No reasonable investor would rely upon these vague pronouncements. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (company's statements that its "credit quality . . . is sound" and it had a "strong credit culture" were inactionable); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (corporate culture statements were "precisely the type of vague, boilerplate pronouncements that no reasonable investor would substantially rely upon").

If vague statements regarding corporate culture could ever be proven objectively false, Plaintiffs have not done so. Plaintiffs allege no facts suggesting the Company is not, in fact, "commit[ted] to diversity" or "job security." Nor do Plaintiffs explain how the fact that Mr. Wynn's alleged misconduct may have created a "hostile work environment" for "several" employees (¶¶ 77, 159) bears upon the environment for Wynn Resorts' remaining 25,000 employees. Because Plaintiffs have not alleged particular facts showing how these representations were false, the claims must be dismissed.

### IV.   The Amended Complaint Does Not Adequately Plead Scienter.

The Amended Complaint also fails to adequately plead scienter. To do so, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999); *see Tellabs*, 551 U.S. at 313. "[T]he court must

consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original). And an inference of malicious intent must be "at least as compelling as any opposing innocent inference." *In re Allied Nevada Gold Corp.*, 2017 WL 4172611, at *10 (D. Nev. Sept. 20, 2017).

### A.   The Amended Complaint Does Not Plead Scienter as to the Directors and Officers.

Rather than attempt to plead scienter, the Amended Complaint recycles the boilerplate allegation that Defendants "failed to disclose . . . [Defendant Wynn's] pattern of sexual misconduct." *E.g.*, ¶ 104. But a defendant must "know" in order to disclose, and Plaintiffs do not allege the Directors and Officers knew anything beyond what was already public. The only allegation that two of these Defendants—Maddox and Billings—knew undisclosed information is a conclusion: Plaintiffs assert, with no supporting facts, that the "Individual Defendants"[11] possessed "material information available to [insiders] but not to the public." ¶ 28. That comes nowhere close to adequately pleading scienter. Plaintiffs may not "base an inference of scienter on unspecified documents and conversations." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1159 (C.D. Cal. 2007). That Maddox and Billings were officers is not enough. *Metzler*, 540 F.3d at 1068 ("[M]anagement's general awareness of the day-to-day workings of the company's business does not establish scienter."). Plaintiffs must make "detailed and specific allegations about [each Defendant's] exposure to factual information within the company." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008); *see also In re Silicon*, 183 F.3d at 998 (plaintiff must allege "the who, what, when, where, and how").

Plaintiffs allege no facts at all regarding the knowledge of Billings. And the only way in which the Directors and Maddox are alleged to have learned of allegations is through *public* disclosures, which cannot support scienter. *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 519 (S.D.N.Y. 2016) ("[N]umerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent.") (quotations omitted).[12] For example, Plaintiffs concede that *Arrowsmith*—which "settled in 2003," before 6 of 10 Directors and Officers

---

[11] Defined as Mr. Wynn, Maddox, Sinatra, Cootey, and Billings. ¶ 26.

[12] *See also In re GeoPharma, Inc. Securities Litig.*, 399 F. Supp. 2d 432, 542 (S.D.N.Y. 2005) ("Plaintiffs have cited no case, and I am aware of none, where a plaintiff adequately plead scienter based solely on the contradiction between *public* information and the company's public statements.") (emphasis in original).

joined the Company—was a matter of "public record" long before the Class Period. ¶ 69. That is the only reason Plaintiffs allege the Directors "should have been aware" of it, an allegation that is itself insufficient to allege scienter. *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("inference that [defendant] should have known of [alleged] violations [is] . . . not sufficient to meet the stringent scienter pleading requirements of the PSLRA"). Moreover, in that case, Mr. Wynn was alleged only to have insulted waitresses. ¶ 67; Ex. 4 (*Arrowsmith* Complaint). While Elaine Wynn alleged unspecified "misconduct" by Mr. Wynn, she did not allege the misconduct was sexual. ¶¶ 157-62. And not only was Elaine Wynn's fifth amended crossclaim filed publicly, its allegations were aired in press releases and exhaustive media coverage. ¶¶ 161-62; Exs. 1, 3, 12-13, 39 (Press Releases & Articles). That this "information was publicly available when the [challenged] statements were made weakens any inference that [D]efendants intended to defraud the market." *Youngers*, 195 F. Supp. 3d at 519 (quoting *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008)).

        In the end, these allegations were just that—allegations. Plaintiffs allege, at most, that some Defendants knew a civil lawsuit publicly accused Mr. Wynn of verbal harassment, while another publicly accused him of unspecified "misconduct."[13] These allegations withstanding, Plaintiffs have not alleged Defendants knew any *facts* contrary to their statements. "Because allegations from [ ] complaints are unproven and contested, they do not amount to 'facts' sufficient to establish a strong inference of scienter." *In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011); *accord Youngers*, 195 F. Supp. 3d at 519 (dismissing complaint where "news articles provided [defendants] . . . with knowledge of accusations, not with <u>facts</u> contradictory to their statements") (emphasis in original).[14] Plaintiffs do not contend that any Defendant knew of Mr. Wynn's misconduct before the January 26 article, much less that he or she intended somehow to defraud investors. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (plaintiffs must "allege specific

---

[13] These allegations were never adjudicated, as both cases ended in settlement. *See* ¶ 69 ("*Arrowsmith* settled in 2003."); Ex. 46 (Apr. 16, 2018 Press Release).

[14] *See also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("Accusations differ from proof; business executives are not charged with 'knowing' the truth of" unproven assertions.); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) ("[A]llegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter.").

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood" their statements were false); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 923 (N.D. Cal. 2017) ("[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity.") (quotations omitted).

The Amended Complaint alleges, at most, mismanagement. It alleges no facts establishing that Defendants attempted to mislead investors or inflate Wynn Resorts' stock. *See Cement & Concrete*, 964 F. Supp. 2d at 1143 ("[C]onduct r[ises] to the level of securities fraud only if . . . [Defendants] intended to mislead investors or knew (or should have known) that failing to disclose [Mr. Wynn's] conduct would artificially inflate [Wynn Resorts'] stock."). The claims must be dismissed.

**B. The Directors' and Officers' Trading Negates an Inference of Scienter.**

Nor does the Amended Complaint allege any motive to commit fraud. *See Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012) (lack of motive "may significantly undermine a plaintiff's theory of fraud"). To the extent Plaintiffs intend to use the Directors' and Officers' trading as evidence of scienter, those allegations are insufficient. "Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (quotations omitted).

Plaintiffs allege *no trades* by around half the Directors and Officers—Billings, Irani, Johnson, Miller, and Virtue—and none of the facts needed to assess trading by anyone else. While Plaintiffs allege that Maddox, Hagenbuch, Mulroy, Randt, Shoemaker, and Wayson sold certain amounts of stock during the Class Period, the Amended Complaint is silent on the percentage of shares sold and Defendants' trading histories. ¶¶ 20, 30, 35, 37, 39, 42. Without this information, the Court cannot contextualize Defendants' Class Period trades and determine whether they are suspicious or merely normal. *Zucco*, 552 F.3d at 1005. Because the Amended Complaint does not provide a "meaningful trading history for purposes of comparison to the stock sales within the class period . . . no inference of scienter can be gleaned from [Plaintiffs'] stock sale assertions." *Id.* at 1005-06 (citations omitted); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1064 (9th Cir. 2014).

This omission appears to be tactical: Defendants' trading histories *negate* an inference of

scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994). Certain Defendants actually slowed their trading during the Class Period. For example, Defendant Maddox sold an average of 55,789.25 shares per year during the four-year Class Period. ¶ 20. But in the four years before the Class Period, he sold an average of 59,110. App'x B. So too with Defendant Shoemaker, who sold exponentially more shares before the Class Period than during. *Compare* ¶ 39 (selling an average 2,915.5 shares of stock per year during the Class Period) *with* App'x B (selling an average of 11,036 shares of stock per year prior to Class Period).

Every Director and Officer either gained or retained significant shares during the Class Period. App'x B; *see In re Worlds of Wonder*, 35 F.3d at 1427 (no scienter where defendants "reap[ed] the same large losses as did Plaintiffs"); *In re Hansen*, 527 F. Supp. 2d at 1160 (no scienter where most defendants "retained the majority of their stock holdings"). If the Directors and Officers did trade during the Class Period, most sold a small fraction of their holdings. For example, Hagenbuch's Class Period trades accounted for less than *ten percent* of his holdings. App'x B; Ex. 14 (Form 4). Only one Director or Officer, Shoemaker, sold more than 41 percent of his holdings during the Class Period—and he sold even more shares *before*. App'x B; Ex. 15 (Form 4s). Defendants' marginal Class Period sales negate scienter. *See Metzler*, 540 F.3d at 1067 ("Moore sold only 37% of his total stock holdings during the Class Period. We typically require larger sales amounts.").

Nor does the timing of any trading suggest fraud. Mulroy and Randt joined the Board in 2015 and held no shares before the Class Period. They sold shares during the Class Period within 24 hours of receiving them, when the stock was trading nearly $80 below its Class Period peak. Exs. 16, 17 (Form 4s). Defendants' trading clustered around the release of Wynn Resorts' quarterly results, within prescribed trading windows, when directors and officers "commonly make stock transactions." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002); *See* Ex. 25 (Code of Conduct) (prohibiting trading "at a time when you are in possession of 'material non-public information'").[15] If Defendants were looking to monetize a fraudulent scheme, they would have liquidated their holdings late in the

---

[15] For example, Maddox traded within days of the Company's announcement of its first quarter results in 2014; Shoemaker within days of the announcement of fourth quarter results in 2015; and multiple Defendants traded on the heels of announcements in 2017. *Compare* App'x B *with* Ex. 40 (May 1, 2014 Press Release), Ex. 41 (Feb. 3, 2015 Press Release); Exs. 42-45 (2017 Earnings Releases).

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

Class Period, when the stock was trading near all-time highs. *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001); *Vantive*, 283 F.3d at 1093-94. But only two of the Directors and Officers are alleged to have sold shares as late as November 2017—Maddox and Shoemaker—and they retained large stakes. App'x B; Exs. 15, 18 (Form 4s). Defendants sold low, if at all, and retained substantial holdings throughout the Class Period. Their trading suggests no fraud.

### C.    The Exculpatory Inference Is More Compelling.

The more plausible—indeed, the *only* plausible—inference to draw from Plaintiffs' allegations is that the Directors and Officers did not know of Mr. Wynn's alleged misconduct. Indeed, allegations Plaintiffs assert and incorporate in their Amended Complaint establish that the Directors and Officers were not told. ¶ 74 (alleging that Mr. Wynn "conceal[ed] the 2005 assault" by "creat[ing] a secret limited liability company"), ¶ 157 (incorporating allegations from Elaine Wynn that the Board was not told of the misconduct allegations against Mr. Wynn). These allegations defeat a strong inference of scienter. *See Glazer*, 549 F.3d at 746-47 (rejecting scienter allegations as to CEO because the "surreptitious nature" of others' alleged conduct suggested it was not disclosed); *accord In re Immersion Corp. Sec. Litig.*, 2011 WL 6303389, at *5 (N.D. Cal. 2011) ("side agreement" with customer was not "made known" because of its "surreptitious nature"). Here, the only plausible inference is exculpatory: the Directors and Officers did not disclose Mr. Wynn's misconduct because they were not aware of it.

### D.    The Amended Complaint Does Not Plead Scienter as to the Company.

The allegations as to the Company are likewise insufficient to state a "strong inference" of scienter. Because "a corporation can only act through its employees and agents," it can "only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015). Plaintiffs cannot plead scienter collectively, but rather must "allege scienter with respect to each of the individual defendants." *Apollo*, 774 F.3d at 607; *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("[T]here is no case law supporting an independent 'collective scienter' theory."). As explained above, and in the motions to dismiss filed by the other Defendants in this action, Plaintiffs have failed to allege scienter as to any Defendant. There can be no scienter on the part of the Company.

### V.    The Amended Complaint Does Not Adequately Allege Loss Causation.

As with all elements of a securities fraud action, loss causation must be pled with particularity.

*Apollo*, 774 F.3d at 605. Plaintiffs must establish "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "Price inflation alone is insufficient." *In re Novatel Wireless Secs. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). Instead, Plaintiffs must plausibly allege that "the practices the plaintiff contends are fraudulent were disclosed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063.

Plaintiffs' loss causation theory rests entirely on speculative conclusions. Only two paragraphs in the Amended Complaint are directed to this element. These paragraphs assert without factual support that Defendants' "false" statements regarding "legal compliance and [the] Code of Conduct" and "fail[ure] to disclose" Mr. Wynn's alleged misconduct inflated the Company's stock price, which fell as "the truth . . . was disclosed to the market." ¶¶ 238-39. Plaintiffs do not allege how Defendants' alleged fraud caused them to buy Wynn Resorts' stock or buy at an inflated price, what the alleged corrective disclosures were, how they relate to the alleged fraud, and how they (rather than other factors) caused Plaintiffs' alleged losses. These are the basic facts required to allege loss causation, and Plaintiffs allege none of them. *See De Sejournet v. Mohidin LLP*, 2014 WL 7723573, at *11 (C.D. Cal. May 21, 2014) ("Plaintiffs must allege how [the defendant's] misstatements or omissions . . . caused them to buy the stock, or caused them to buy stock at an inflated price."); *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (plaintiff must allege "that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors").

Plaintiffs have not even identified corrective disclosures. A securities plaintiff must "allege specific statements made by the [d]efendants that were made untrue or called into question by subsequent public disclosures." *Apollo*, 774 F.3d at 608. While Plaintiffs point to articles reporting misconduct allegations in January and February 2018 (¶¶196-97, 215-16), these articles did not reveal any fraud. Defendants never made any representations related to Mr. Wynn's behavior; consequently, allegations that Mr. Wynn engaged in misconduct did not contradict anything Defendants said before. Because Plaintiffs have not identified "which of the Defendants' statements were made untrue by" later disclosures, they have not alleged loss causation. *Id.*; *see also Loos*, 762 F.3d at 888.

The disclosures Plaintiffs allege are insufficient for an additional reason: they reported

allegations of personal misconduct rather than fraud. The Amended Complaint identifies only two disclosures that affected Wynn Resorts' stock price: (1) the January 26, 2018 article and (2) February 12, 2018 articles reporting alleged assaults in the 1970s. ¶¶ 4-5, 9, 196-97, 215-16. These disclosures did not reveal any fraud. They did not even reveal *facts*. Rather, Plaintiffs acknowledge that these reports disclosed "allegations" and "accusations," which Mr. Wynn swiftly denied.[16] Mere allegations of misconduct cannot support a claim for securities fraud. Under Ninth Circuit law, allegations "are analogous to an announcement of internal or regulatory investigations into misconduct, which have been held insufficient, on their own, to serve as corrective disclosures." *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1139 (S.D. Cal. 2018) (citing *Curry v. Yelp*, 875 F.3d 1219, 1225 (9th Cir. 2017) (2,000 complaints and news article alleging manipulation were insufficient disclosures)).

Even if Plaintiffs could identify sufficient corrective disclosures, their loss causation theory would fail because it depends on speculative and illogical inferences. *See Metzler*, 540 F.3d at 1064-65 (rejecting loss causation theory premised on "unwarranted inferences"). Plaintiffs' theory is that Wynn Resorts' stock price dropped as investors reflected upon "Defendants' prior false statements, misrepresentations, and fraudulent conduct." ¶ 239. Plaintiffs support this inference with no facts. While several paragraphs in the Amended Complaint detail the "market reaction" to the allegations against Mr. Wynn, there is no mention of any fraud. In fact, Plaintiffs affirmatively allege that investors reacted not to Defendants' alleged fraud, but the impact of Mr. Wynn's alleged misconduct, including whether the allegations could force him to step down or imperil the Company's gaming licenses. ¶¶ 202-07.

In other words, Plaintiffs allege that investors reacted to the very risks the Company had anticipated and disclosed: Mr. Wynn was integral to the Company; his departure could "harm [the] business"; and regulatory violations could entail severe repercussions. *See, e.g.*, ¶¶ 103, 105, 109, 126, 128. This is not a viable theory of loss causation. "Loss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the *practices the plaintiff contends are*

---

[16] *See, e.g.*, ¶ 198 (Mr. Wynn "denied the *accusations*" in the January 26 article), ¶ 199 (on January 26, 2018, the Board formed a Special Committee "to investigate the *allegations* in the January 2018 article"), ¶ (the Massachusetts Gaming Commission commenced an investigation "in light of the sexual misconduct *allegations* reported in the January 2018 *WSJ* Article and elsewhere"), ¶ 215 (on February 12, 2018, the Las Vegas Police Department revealed two reports "*alleging* that [Mr. Wynn] had sexually assaulted them in the 1970s") (all emphasis added).

*fraudulent*." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (emphasis added). Plaintiffs' allegations show that the market reacted to the revelation of allegations regarding Mr. Wynn's behavior, not any fraudulent practices.

## VI. Plaintiffs Fail to Allege That the Directors and Officers "Made" Actionable False Statements.

Defendants can be liable under Rule 10b-5 only for alleged misstatements they have "made." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141-44 (2011). The "maker" of a statement is the person or entity with "ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142.

Plaintiffs allege no particular facts showing any particular Director or Officer had "ultimate authority" over challenged statements. They instead take a shotgun approach, alleging the "Individual Defendants"—but *not* the Directors—had "power and authority," and "were provided with copies of the Company's SEC filings and press releases . . . and had the ability to prevent their issuance or cause them to be corrected." ¶ 28; *see also* ¶ 253. This conclusory group pleading is insufficient. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (rejecting conclusory allegations of "control and authority" nearly identical to those in the Amended Complaint).

Plaintiffs allege even less as to the Directors, outside Board members who did not participate in the Company's day-to-day management. Plaintiffs do not even *conclude* that the Directors had "authority." The sum total of facts alleged is that the Directors were on the Board and signed a handful of SEC filings.[17] But plaintiffs cannot sue outside directors for securities fraud based only on their signature. *See WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 390 (E.D. Pa. 2013) (dismissing 10(b) claims in favor of outside director who signed 10-Ks because defendant "cannot be held liable for what was said in those documents based on his signature alone"); *In re Nat'l Century Fin. Enterprises, Inc.*, 504 F. Supp. 2d 287, 297 (S.D. Ohio 2007) ("Outside directors [ ] cannot be assumed to have assisted in preparing, reviewing, or approving offering materials. This is true even when an outside director's name or signature appears in a company statement.").[18]

---

[17] *See, e.g.*, ¶¶ 29-41, 100, 121, 145, 172.

[18] *See also Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005) ("[A]n outside director's signature on an SEC-required corporate document is not enough, in and of itself, to sufficiently plead a securities fraud claim against that director."); *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1062-63 (9th

Even if the Directors' and Officers' signatures were alone enough to establish that they "made" challenged statements, they would only be potentially liable for actionable misrepresentations in documents they signed. *See* App'x A (Statements Chart). As discussed above, the statements Plaintiffs challenge are inactionable, immaterial, and not misleading. Plaintiffs' claims must be dismissed.

## VII.   The Amended Complaint Does Not Allege Violations of Section 20(a).

Because Plaintiffs have not stated a primary claim under Section 10(b), their Section 20(a) claim should also be dismissed. *Apollo*, 774 F.3d at 610. Further, Plaintiffs' Section 20(a) claims fail against the Officers because Plaintiffs allege no facts suggesting these Defendants controlled the Company's day-to-day operations during the Class Period.[19] Plaintiffs' boilerplate allegations that the Officers, lumped together as one, held "positions of control and authority" and "control[led] the content of the [Company's] statements," are insufficient. ¶ 253; *see Sgarlata v. Paypal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018) ("Plaintiffs in alleging a [S]ection 20(a) claim cannot rely on boilerplate allegations; they must provide some factual support that defendants were in a position to control a primary violator.") (quotations omitted); *Hansen*, 527 F. Supp. 2d at 1163 ("boilerplate allegation" of participation in company's operations was "insufficient to state a claim for control person liability"). Because there is no specific allegation anywhere in the Amended Complaint as to the Officers' control, the claims must be dismissed. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 952 (N.D. Cal. 2010) (dismissing Section 20(a) claim against officers and directors because plaintiffs failed to plead facts showing day-to-day control); *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *11 (N.D. Cal. Apr. 6, 2009) (dismissing Section 20(a) claim against officers and directors where plaintiffs alleged "bare legal conclusions . . . devoid of any factual underpinnings").

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Amended Complaint should be dismissed with prejudice.

---

Cir. 2000) (pre-*Janus* decision noting distinction between "an outside director" and "an inside director" with regard to "signing false statements").

[19] The Amended Complaint states a claim under Section 20(a) only against the "Individual Defendants"—i.e., Mr. Wynn, Maddox, Sinatra, Cootey, and Billings. ¶¶ 26, 257-62. The Directors are not alleged to be liable as "control persons," nor could they be. Plaintiffs make no allegations suggesting the Directors exercised "actual power or control" over any purported primary violator of Section 10(b).

1    DATED: April 15, 2019                KIRKLAND & ELLIS LLP

2
                                          */s/ V.R. Bohman*
3                                         _____
                                          Mark Holscher (*Pro Hac Vice*)
4                                         Michael J. Shipley (*Pro Hac Vice*)
                                          KIRKLAND & ELLIS LLP
5                                         333 South Hope Street
                                          Los Angeles, California 90071
6                                         Telephone: 213.680.8190
                                          Facsimile: 213.808.8097
7                                         Email: mark.holscher@kirkland.com
                                                  michael.shipley@kirkland.com
8
                                          Matthew Solum (*Pro Hac Vice*)
9                                         KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
10                                        New York, New York 10022-4611
                                          Telephone: 212.446.4688
11                                        Facsimile: 212.446.4900
                                          Email: matthew.solum@kirkland.com
12
                                          Alex L. Fugazzi (Nevada Bar #9022)
13                                        Patrick G. Byrne (Nevada Bar #007636)
                                          V.R. Bohman (Nevada Bar #13075)
14                                        SNELL & WILMER L.L.P.
                                          3883 Howard Hughes Parkway, Suite 1100
15                                        Las Vegas, Nevada 89169
                                          Telephone: 702.784.5200
16                                        Facsimile: 702.784.5252
                                          Email: afugazzi@swlaw.com
17                                                 pbyrne@swlaw.com
                                                   vbohman@swlaw.com
18
                                          *Attorneys for Defendants Wynn Resorts, Ltd.,*
19                                        *Craig Scott Billings, Matthew O. Maddox,*
                                          *John J. Hagenbuch, Ray R. Irani, Robert J.*
20                                        *Miller, Patricia Mulroy, Clark T. Randt Jr.,*
                                          *Alvin V. Shoemaker, Daniel B. Wayson, Jay*
21                                        *L. Johnson, and J. Edward Virtue*

22

23

24

25

26

27

28

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on April 15, 2019, I filed the foregoing **DEFENDANTS WYNN RESORTS,**

3 **LIMITED, BILLINGS, MADDOX, HAGENBUCH, IRANI, MILLER, MULROY, RANDT,**

4 **SHOEMAKER, WAYSON, JOHNSON, AND VIRTUE'S MOTION TO DISMISS AMENDED**

5 **CLASS ACTION COMPLAINT** to the Clerk's Office using the CM/ECF System for filing and

6 transmittal of a Notice of Electronic Filing to all parties in this matter.

7

8

            */s/ Lyndsey Luxford*

9             An employee of SNELL & WILMER L.L.P.

10 4832-4407-9252.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

**Appendix A: Bases for Dismissal with Respect to Each Allegedly False or Misleading Statement**

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| 1 | The Code of Conduct | The Company | "The purposes of the Code are not only to comply with federal securities laws and the marketplace rules of The Nasdaq Global Select Market, but also to reinforce and enhance the Company's commitment to an ethical way of doing business." <br><br> "The policies set forth here are the basis for the Company to continue a tradition of high ethical business standards." | 89 | X | X | X | |
| 2 | Code of Conduct's Letter from Stephen A. Wynn | Stephen A. Wynn | "We live in an age where legal and ethical missteps of others have resulted in the law imposing special duties on our personal and business lives. In the midst of this unfortunate environment, the good name and reputation of Wynn Resorts are a result of the dedication and hard work | 90 | X | X | X | |

1

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | of all of us. Together, we are responsible for preserving and strengthening this reputation. Our goal is not just to comply with the laws, rules and regulations that apply to our business; we also continuously strive to abide by high standards of ethical business conduct.<br><br>This booklet is not to be ignored or taken lightly. All employees, officers and directors, agents and representatives of Wynn Resorts and its affiliates must comply with the Code. Please read the Code carefully and make sure that you understand it, the consequences of non-compliance, and the Code's importance to the success of the Company. Your signature on the acknowledgement form at the conclusion of the Code certifies that you have read, | | | | | |

2

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | understood and complied with its contents." "Each of us is responsible for knowing and understanding the policies and guidelines contained in the following pages[.]" "Our conduct should reflect the Company's values, demonstrate ethical leadership, and promote a work environment that upholds the Company's reputation for integrity, ethical conduct and trust." | | | | | |
| 3 | The Code of Conduct | The Company | "The Code applies to all employees, officers, directors, agents, and representatives of the Company and its affiliates ("Covered Persons" or "you"). This Code also applies to certain independent contractors and consultants who work at the Company's facilities or on the Company's behalf." | 91 | X | X | X | |

3

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| 4 | The Code of Conduct | The Company | "The Company is an equal opportunity employer committed to complying with all state and federal fair employment practice laws, as well as maintaining a workforce that reflects the diversity of the community. The Company believes in and supports equal opportunity in employment to all persons regardless of race, color, national origin, citizenship status, sex, marital status, gender identity or expression, sexual orientation or perceived sexual orientation, age, religion, veteran status, military status, disability, history of disability or perceived disability. Harassment or discrimination of any sort will not be tolerated." | 92 | X | X | X | |

4

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| 5 | The Code of Conduct | The Company | "If you know of or suspect a violation of applicable laws, rules or regulations, the Code, or the Company's related policies, you must immediately report that information as described in Section 1.4 of this Code." "All reported violations of the Code will be taken seriously and promptly investigated . . . . The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery." | 93 | X | X | X | |
| 6 | The Code of Conduct | The Company | "The Company has additional policies that supplement the policies in this Code." | 94 | X | X | X | |

5

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| 7 | The Company's 10-Ks | <u>2013</u><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br><u>2014</u><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br><u>2015</u><br>Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, | "Consequences of Violating Gaming Laws. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable | 105, 128, 152, 179 | X | | X | X |

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
|  |  | Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br><u>2016</u><br><br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations." |  |  |  |  |  |
| 8 | The Company's 10-Ks | <u>2013</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson and Maddox signed the 10-K | "As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of | 107, 124, 146, 173 | X | X | X |  |

7

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br><u>2014</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller Shoemaker, Virtue, Wayson, Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br><u>2015</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br><u>2016</u> | the Company and its subsidiaries." | | | | | |

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| 9 | The Company's 10-Ks | 2013<br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br>2014<br><br>Mr. Wynn, Hagenbuch, Irani, | "While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company."[1] | 101, 122, 148, 175 | X | | X | X |

[1] The Amended Complaint also challenges similar statements contained within 8-Ks and 10-Qs.

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Miller, Shoemaker, Virtue, Wayson, Cootey signed the 10-K | | | | | | |
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| | | 2015 | | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | | | | | | |
| | | Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| | | 2016 | | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | | | | | | |

10

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| 10 | The Company's 10-Ks | 2013<br>Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br>2014<br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2015 | "The loss of Stephen A. Wynn could significantly harm our business." | 103, 126, 150 | X | | X | X |

11

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K  Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| 11 | The Company's 10-Ks | 2013  Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson and Maddox signed the 10-K  Mr. Wynn + Maddox signed Sarbanes-Oxley certifications  2014  Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, | "Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts." | 103, 126, 150, 177 | X | | X | X |

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Cootey signed the 10-K | | | | | | |
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| | | 2015 | | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | | | | | | |
| | | Mr. Wynn Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| | | 2016 | | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | | | | | | |

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | | |
| 12 | The Company's 10-Ks | 2013<br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shomaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br>2014<br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2015 | "We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises."<br><br>"Given his extensive design and operational experience across numerous gaming jurisdictions, we believe that Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises." | 103, 126, 150, 177 | X | | X | X |

14

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2016<br><br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed Sarbanes-Oxley certifications | | | | | | |
| 13 | The Company's Definitive Proxy Statement | The Company | "Experience, qualifications attributes and skills. Mr. Wynn is the founder and creative and organizational force of Wynn Resorts." | 109, 130, 154, 181 | X | | X | X |

15

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|-----|--------|---------------------|-----------|------|----------------------|------------|--------------|-----------------|
|  |  |  | "Mr. Wynn's 45 years of experience in the industry have contributed to his brand name status as the preeminent designer, developer and operator of destination casino resorts." |  |  |  |  |  |
|  |  |  | "Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. As founder, Chairman and Chief Executive Officer, he has a unique perspective into the operations and vision for the Company." |  |  |  |  |  |
|  |  |  | "He brings extraordinary talent to our Company that is unrivaled by others in our industry." |  |  |  |  |  |
|  |  |  | "Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success." |  |  |  |  |  |
|  |  |  | "The Compensation Committee is mindful that gaming companies have |  |  |  |  |  |

16

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands…" | | | | | |
| 14 | The Company's 10-Ks | 2014 Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, Cootey signed the 10-K Mr. Wynn + Cootey signed Sarbanes-Oxley certifications 2015 Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and | "Wynn Resorts and all individual qualifiers were found suitable by the MGC[.]" "Consequences of Violating Gaming Laws. If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming | 128, 152, 179 | X | | | X |

17

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2016<br><br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Wynn + Cootey signed Sarbanes-Oxley certifications | license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts Gaming operations."<br><br>"Consequences of Violating Gaming Laws. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license." | | | | | |
| 15 | The Company's Press Release | The Company | "Ms. Wynn's latest allegations regarding our Board, its composition and its independence are simply not true and are rehashed from her previous, | 158 | X | X | X | |

18

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | unfounded statements made during her proxy campaign." | | | | | |
| | | | "Her allegations regarding the use of company assets are without merit." | | | | | |
| | | | "The use of company assets is governed by many internal policies and is closely supervised both by the Audit Committee, which is comprised solely of independent directors, and our external auditors." | | | | | |
| | | | "As a leader in a highly regulated industry, Wynn Resorts prides itself on its transparency and full disclosure to regulations and shareholders." | | | | | |
| | | | "None of what Wynn Resorts has accomplished would be possible without its extraordinary employees and the sense of family and community that Mr. Wynn has created. Ms. Wynn's actions today run counter to | | | | | |

19

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | the culture of everything Mr. Wynn has worked so hard to create." | | | | | |
| 16 | The Company's Definitive Proxy Statement | The Company | "Wynn Resorts has a track record of promoting diversity." <br><br> "Wynn Resorts' commitment to diversity is reflected by the number of women in senior leadership roles throughout the Company." <br><br> "Importantly, the Nominating and Corporate Governance Committee recognizes that gender diversity is important for the Board, not only to make sure that the Board and the Company benefit from diverse perspectives, but also to set the right 'tone at the top.'" | 132 | X | X | X | |
| 17 | The Company's | Stephen A. Wynn | "In 45 years, I've never had a layoff. I think we once dropped 100 people in this | 140 | X | X | X | |

20

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | Earnings Call | | company. 45 years. We don't do layoffs. People come to work for us. They get job security. And I've never broken a promise about job security to my employees in my entire career, and I don't like facing that possibility one bit." | | | | | |
| 18 | The Company's Press Release | The Company | "Ms. Wynn's comments regarding our Board of Directors, their independence and their actions in this matter are false."<br><br>Ms. Wynn's "previous allegations that Mr. Wynn applied company resources for personal use are false[.]" | 161 | X | | | |
| 19 | The Company's Earnings Call | Stephen A. Wynn | "And every one of our operators went instantly and did it without hesitation. And that impressed the folks in Boston. We were happy to do it because we wouldn't want | 188 | X | X | X | |

21

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | to do business with anybody that couldn't pass such an examination.<br><br>So, the regulatory issue is the one that I think is at stake here[.]" | | | | | |
| 20 | The Company's Earnings Call | Stephen A. Wynn | "[T]hen we're going to open this place in Boston in two dozen months, and we're going to have a case study of how a grand hotel, built in a major metropolitan city, can change the neighborhood for the better. And be the largest private investment in the Commonwealth of Massachusetts and the second largest employer in the Commonwealth of Massachusetts, behind Mass General Hospital.<br><br>So I'd like the direction we're in and I'm feeling comfortable about the pace of our growth. And, you know, I don't feel like anybody's after us. I think we're moving along exactly the way we | 183 | X | X | X | X |

22

KE 60492575.6

| No. | Source | Alleged Attribution | Statement | AC ¶¶ | Not False/ Misleading | Immaterial | Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|---|
| | | | should be. And my colleagues join me in that confidence." | | | | | |
| 21 | The Company's Earnings Call | Stephen A. Wynn | "We worked very hard to compete for the right to operate in Massachusetts, as you know, and it was expensive to do that process, and time-consuming." "We've got a serious presence there in Massachusetts. And we're delighted to have that position and we finished the design of the hotel. And I think it's – along with the Palace, the best work we've ever done, based upon 40 years of experience. Best of all, with the same group of executives that have learned from all of our past experiences and projects, and hopefully, our next stuff that comes up will reflect the evolution and the enlightenment that we've been able to achieve because of those experiences…." | 119 | X | X | X | X |

23

KE 60492575.6

**Appendix B[1]**

*Matt Maddox*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Pre-Class Period Sales** | | | |
| 11/28/2006 | 8,000 | 15,500 | 51.6% |
| 5/4/2010 | 83,000 | 163,000 | 50.9% |
| 8/26/2010 | 30,000 | 110,000 | 27.2% |
| 11/24/2010 | 37,000 | 97,000 | 38.1% |
| 5/25/2011 | 30,000 | 90,000 | 33.3% |
| 5/6/2013 | 18,600 | 116,355 | 16.0% |
| 2/3/2014 | 30,000 | 103,560 | 28.0% |
| **Total Pre-Class Period Shares Sold** | **236,600** | | |
| **Alleged Class Period Sales** | | | |
| 5/12/2014 | 16,688 | 103,560 | 16.1% |
| 4/27/2017 | 60,000 | 354,895 | 16.9% |
| 6/16/2017 | 44,309 | 344,895 | 12.8% |
| 9/15/2017 | 42,900 | 350,586 | 12.2% |
| 11/13/2017 | 59,260 | 387,686 | 15.3% |
| **Total Class Period Shares Sold** | **223,157** | | |
| **Total Class Period Shares Held** | **329,428** | | |

---

[1] Listed herein is trading data for the Director and Officer Defendants alleged to have traded during the Class Period. Plaintiffs do not allege any Class Period sales for Defendants Billings, Irani, Miller, Johnson, or Virtue. Data for pre-Class Period sales is reflected in Defendants Form 4s. *See* Exs. 14-19.

*Alvin V. Shoemaker*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Pre-Class Period Sales** | | | |
| 9/13/2010 | 5,000 | 17,500 | 28.6% |
| 3/2/2011 | 5,000 | 12,500 | 40% |
| 6/5/2012 | 10,000 | 17,500 | 57.1% |
| 5/8/2013 | 5,000 | 7,500 | 66.6% |
| 2/6/2014 | 10,000 | 12,500 | 80% |
| **Total Pre-Class Period Shares Sold** | **35,000** | | |
| **Alleged Class Period Sales** | | | |
| 2/13/2015 | 10,000 | 12,500 | 80% |
| 11/8/2017 | 15,000 | 24,162 | 62.1% |
| **Total Class Period Shares Sold** | **25,000** | | |
| **Total Class Period Shares Held** | **9,162** | | |

*Patricia Mulroy*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 5/16/2017 | 2,226 | 8,011 | 27.8% |
| **Total Class Period Shares Sold** | **2,226** | | |
| **Total Class Period Shares Held** | **5,785** | | |

*John J. Hagenbuch*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 5/16/2017 | 1,100 | 12,812 | 8.6% |
| 5/17/2017 | 50 | 11,212 | 0.4% |
| **Total Class Period Shares Sold** | **1,150** | | |
| **Total Class Period Shares Held** | **11,662** | | |

*Clark T. Randt*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 7/31/2017 | 3,000 | 7,711 | 38.9% |
| **Total Class Period Shares Sold** | **3,000** | | |
| **Total Class Period Shares Held** | **4,711** | | |

*D. Boone Wayson*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 11/9/2016 | 37,500 | 92,010 | 40.8% |
| **Total Class Period Shares Sold** | **37,500** | | |
| **Total Class Period Shares Held** | **54,510** | | |

4831-1005-8132.1