ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Eric D. Gottlieb (*pro hac vice* forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:     (212) 661-1100
Fax:     (917) 463-1044
Email: jalieberman@pomlaw.com
        mjsteven@pomlaw.com
        egottlieb@pomlaw.com

*Attorneys for Lead Plaintiffs John V. and JoAnn M. Ferris*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JOHN V. FERRIS and JOANN M. FERRIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>WYNN RESORTS LIMITED, STEPHEN A. WYNN, CRAIG SCOTT BILLINGS, STEPHEN COOTEY, MATTHEW O. MADDOX, JOHN J. HAGENBUCH, ROBERT J. MILLER, PATRICIA MULROY, CLARK T. RANDT JR., ALVIN V. SHOEMAKER, KIMMARIE SINATRA, DANIEL B. WAYSON, JAY L. JOHNSON, RAY R. IRANI, and J. EDWARD VIRTUE, | Case No. 2:18-CV-00479-GMN-CWH<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Defendants.

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ......................................................................... 1

II.  JURISDICTION AND VENUE ....................................................................... 4

III.  PARTIES ......................................................................................................... 4

   A.  Plaintiffs ..................................................................................................... 4

   B.  Defendants ................................................................................................... 5

      1.  Individual Defendants ....................................................................... 5

      2.  Director Defendants .......................................................................... 8

IV.  FACTUAL BACKGROUND ......................................................................... 12

   A.  Casino Regulation ..................................................................................... 12

      1.  Nevada ............................................................................................. 12

      2.  Massachusetts ................................................................................. 16

   B.  Defendant Wynn's "Decades-Long Pattern of Sexual Misconduct" ..................................19

      1.  Defendants Ignore Red Flags About Defendant Wynn's Alleged Misconduct before Wynn Resorts ............................................................. 20

      2.  Defendant Wynn's Pattern of Sexual Harassment at Wynn Resorts ....................... 22

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ......................................................................... 36

   A.  Wynn Resorts' Code of Conduct ............................................................. 36

   B.  The 2013 10-K .......................................................................................... 50

   C.  The 2014 Proxy Statement ....................................................................... 56

   D.  Misrepresentations in 2014 about Compliance ........................................ 59

   E.  Misrepresentations about the Massachusetts License and Resort .............. 65

   F.  The 2014 10-K .......................................................................................... 68

   G.  2015 .......................................................................................................... 73

   H.  The 2015 10-K .......................................................................................... 82

   I.  2016 .......................................................................................................... 87

      1.  2016 Proxy Statement ..................................................................... 87

      2.  Elaine Wynn's Counterclaim and the Company's Responses ........ 90

      3.  Other False and Misleading Statements in 2016 .......................... 102

   J.  The 2016 10-K ........................................................................................ 104

   K.  2017 ........................................................................................................ 110

VI.  THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD INVESTORS AND THE PUBLIC ......................................... 117

i

A.   The January 2018 WSJ Article ........................................................**117**

B.   The Company's and Defendant Wynn's Responses to the WSJ article .........................**118**

VII.   THE TRUTH CONTINUES TO EMERGE ...................................... 121

A.   Investigations Ensue ...............................................................**121**

B.   Market Reaction ....................................................................**122**

C.   Defendant Wynn Resigns ..........................................................**126**

D.   More Accusations of Sexual Assault .............................................**129**

E.   Executive and Board Reshuffling ................................................**130**

F.   Nevada Gaming Control Board Settlement and Fine ...........................**133**

G.   The Company Admits How Badly It Had Failed In the Past ...................**140**

H.   The MGC Decision and Order .....................................................**142**

I.   The Nevada Gaming Control Board Revokes Defendant Wynn's Suitability ...............**152**

VIII.   EACH DEFENDANT'S ROLE IN THE FRAUD ........................... 154

A.   Individual Defendants .............................................................**155**
   1.   Defendant Wynn ............................................................ 155
   2.   Defendant Sinatra .......................................................... 158
   3.   Defendant Maddox .......................................................... 162
   4.   Defendant Cootey ........................................................... 165
   5.   Defendant Billings .......................................................... 166

B.   Director Defendants ...............................................................**168**
   1.   Defendant Hagenbuch ...................................................... 168
   2.   Defendant Irani ............................................................. 170
   3.   Defendant Johnson .......................................................... 171
   4.   Defendant Miller ............................................................ 173
   5.   Defendant Mulroy ........................................................... 175
   6.   Defendant Randt ............................................................ 177
   7.   Defendant Shoemaker ....................................................... 179
   8.   Defendant Virtue ............................................................ 181
   9.   Defendant Wayson .......................................................... 182

C.   Corporate  Scienter Allegations .................................................**184**

D.   Additional Scienter Allegations ..................................................**186**

IX.   LOSS CAUSATION ................................................................. 187

X.   CLASS ACTION ALLEGATIONS ................................................ 188

XI.   FIRST CLAIM FOR RELIEF ..................................................... 189

XII.   SECOND CLAIM FOR RELIEF .................................................. 192

XIII.   PRAYER FOR RELIEF ........................................................... 193

XIV.   JURY DEMAND ................................................................... 193

Lead Plaintiffs John V. Ferris and JoAnn M. Ferris and Named Plaintiff Jeffrey Larsen, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, *inter alia*, SEC filings by Wynn Resorts Limited ("Wynn" or the "Company"), press releases and other public statements by Defendants, conference calls and announcements made by Defendants, media and analyst reports and advisories about the Company, regulatory filings, and other public information. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  PRELIMINARY STATEMENT

1.      This is a federal securities class action, against the Company and certain of its directors and executive officers, on behalf of all persons who purchased or otherwise acquired the Company's securities between February 28, 2014 and February 12, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Wynn Resorts is a leading developer, owner, and operator of destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, distinctive entertainment theaters, and large meeting complexes. It owns and operates Wynn Las Vegas and Encore in Las Vegas, Nevada, Wynn Macau and Wynn Palace in Macau, China, and Encore Boston Harbor (f/k/a Wynn Boston Harbor) in Everett, Massachusetts.

3.      This case arises out of a decades-long pattern of sexual abuse and harassment by Defendant Stephen Wynn that remained unchecked, tacitly permitted, and eventually covered up by Defendants. During the Class Period, Defendants misrepresented to investors their "full" compliance with applicable laws and touted their Code of Conduct as part of the Company's purported commitment to "continually strive to abide by high standards of ethical business conduct." Further, when claims of sexual misconduct were raised against the Company and

1

Defendant Wynn, Defendants responded by issuing unequivocal, strongly worded denials. But while making such statements, Defendants concealed the fact that (a) Defendant Wynn had engaged in a pattern of sexual misconduct that included alleged instances of rape and other sexual assault and led to several multi-million-dollar settlements with Wynn Resorts employees, and (b) discovery of this misconduct would necessarily jeopardize Wynn's tenure at the Company and subject the Company to significant legal liability and heightened regulatory scrutiny.  In fact, the Company has since been forced to admit that it failed to investigate actual reports of misconduct lodged against Defendant Wynn, including an allegation of criminal rape, in violation of Company policy and gaming regulations.

4.       On January 26, 2018, the *Wall Street Journal* published an article titled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn" (the "January 2018 *WSJ* Article" or "*WSJ article*"), revealing detailed accounts that Wynn had coerced and pressured several Wynn Resorts employees to perform sex acts. According to the *Wall Street Journal*, "dozens of people … who have worked at Mr. Wynn's casinos told of behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn." It was further revealed that Wynn had paid a Wynn Resorts employee $7.5 million after being accused of forcing the employee to have sex with him—that is, rape.

5.       In a written statement, Defendant Wynn immediately denied the allegations, stating that, "[t]he idea that I ever assaulted any woman is preposterous."  The Company issued a similar statement denying the allegations against Wynn and claiming that the allegations were fabricated by Defendant Wynn's ex-wife, Elaine Wynn.

6.       In response to this stunning news, Wynn Resorts' stock price fell $20.31, or 10.12%, to close at $180.29 on January 26, 2018.

7.       In response to these revelations, the Nevada Gaming Commission ("NGC") and Nevada Gaming Control Board ("NGCB"), and the Massachusetts Gaming Commission ("MGC") (where Wynn had recently obtained a lucrative license to open a new casino), promptly began investigating the Company over the sexual misconduct allegations reported by the Wall Street Journal, raising the specter that Wynn might be stripped of its gaming licenses in

these lucrative markets. As alleged in further detail below, on January 29, 2019, the NGCB filed its disciplinary complaint (the "NGCB Complaint"),[1] against the Company and its subsidiary, Wynn Las Vegas, LLC (d/b/a Wynn Las Vegas) Nevada Gaming Control Board ("NGCB"), and the Company admitted to virtually all of the allegations and violations in the NGCB's disciplinary complaint.[2] In light of the NGCB Complaint's findings and the Company's related admissions, the Company was fined $20,000,000 for the Company's and its senior executives, including Defendant Sinatra's, failure to investigate numerous allegations of sexual misconduct, including a rape allegation, made against Defendant Wynn. Soon after the NGCB Complaint was filed, on April 30, 2019, the MGC issued its decision and Order in *In the Matter of Wynn MA, LLC* (the "MGC Decision and Order"), which corroborated and expanded on the allegations made in the WSJ Article and the NGCB Complaint.[3]  The MGC Decision and Order issued a $35,000,000 fine to the Company and a $500,000 to Defendant Maddox, due to their numerous violations, which are addressed in more detail herein.

8.      The Company's Board of Directors also announced that a Special Committee would conduct an internal investigation of the *WSJ* allegations.

9.      On February 6, 2018, Defendant Wynn resigned as CEO and Chairman of the Board, effective immediately.

10.     On February 13, 2018, media outlets reported that two women had filed new sexual misconduct reports concerning Wynn with the Las Vegas Metropolitan Police Department, alleging that Wynn had sexually assaulted them in the 1970s. One woman reported that Wynn assaulted her in Las Vegas and the other said she was assaulted in Chicago, the Las

---

[1] *Nev. Gaming Control Bd. v. Wynn Las Vegas, LLC,* No. NGC 18-15 (Nev. Gaming Comm'n Jan. 25, 2019).

[2]  As alleged in greater detail below, on October 14, 2019, the NGCB filed a disciplinary complaint (the "NGCB Wynn Complaint") revoking his suitability. *See Nev. Gaming Control Bd. v. Stephen Alan Wynn,* No. NGC 19-03 (Nev. Gaming Comm'n Oct. 14, 2019).

[3] The MGC Decision and Order was based on the accompanying comprehensive report issued by the Massachusetts Investigations and Enforcement Bureau ("IEB"), dated March 15, 2019 (the "IEB Report"), which totaled approximately 200 pages.

Vegas Metropolitan Police Department said in a statement. Following this news, Wynn Resorts' share price closed at $164.16 on February 14, 2018—a decline of $36.44, or 18.16%, compared to its January 25, 2018 closing price.

11.     As a result of Defendants' false and misleading and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.  JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as the Company is headquartered in this District and a significant portion of Defendants' actions took place in this District.

15.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  PARTIES

### A.  **Plaintiffs**

16.     **Lead Plaintiffs John V. Ferris** and **JoAnn M. Ferris** acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

17.     **Named Plaintiff Jeffrey Larsen** acquired the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

4

**B. Defendants**

18.     **Defendant Wynn Resorts, Limited** ("Wynn Resorts" or the "Company") is a Nevada corporation with principal executive offices at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109. Its securities trade on NASDAQ under the ticker symbol "WYNN." As alleged below, each of the materially false or misleading statements and omissions challenged herein, including those alleged below in Sections V and VI(B), were made by, or are attributable to, the Company because they were issued in the Company's name, frequently in the Company's SEC Filings or press releases, or were made by Company executives or board members while acting within the scope of their authority, including but not limited to Defendant Wynn.

### *1. Individual Defendants*

19.     **Defendant Stephen A. Wynn**, a Nevada citizen, founded the Company and served as its CEO and Chairman from June 2002 until his resignation on February 6, 2018. He was also Chairman of the Board of Directors and Chief Executive Officer for several of the Company's subsidiaries, including Wynn Macau, Limited and Wynn Resorts (Macau) S.A. Before founding Wynn Resorts, Defendant Wynn was Chairman and CEO of Mirage Resorts, where he developed and operated The Mirage, Treasure Island and Bellagio in 1989, 1993 and 1998, respectively. He was also named the Finance Chairman of the Republican National Committee in February 2017. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 105, 112-15, 129, 139, 141, 145, 149, 155-56, 158-59. 162-63, 166, 172-73, 175, 178, 180, 183, 185-89, 191-92, 194-95, 197, 200-01, 203-04, 206, 208, 210, 212-13, 217, 225, 227-28, 230-32, 233-34, 236-37, 239, 241, 243, 247, 249, 251-52, 254, 256-57, 259-60, 265, and 267, were made by or are attributable to Wynn.

20.     **Defendant Matthew O. Maddox** joined the Company in 2002 and has served as its President since November 2013 and its CEO since February 2018. He also served as its CFO and Principal Accounting Officer from March 2008 until May 2014. Before 2008, he served in a variety of roles including Senior Vice President of Business Development and Treasurer, and

Treasurer and Vice President-Investor Relations. He has also held positions at the Company's subsidiaries, including Senior Vice President of Business Development for Wynn Las Vegas; CFO of Wynn Resorts (Macau); and Non-Executive Director of Wynn Macau, Limited. Before joining the Company, he graduated with a B.B.A. in finance from Southern Methodist University and worked as an M&A banker at Bank of America Securities and in Corporate Finance at Caesars Entertainment, Inc. (formerly Park Place Entertainment, Inc.). As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 105, 112-15, 129, 139, 141, 145, 149, 155-56, 158-59. 162-63, 172-73, 175, 178, 180, 183, 185-89, 191-92, 194-95, 200-01, 203-04, 206, 208, 210, 212-13, 217, 225, 227-28, 230-32, 233-34, 236-37, 239, 241, 243, 247, 251-52, 256-57, 259-60, 265, and 267, were made by or are attributable to Maddox.

21.     **Defendant Kimmarie Sinatra** served as Executive Vice President, General Counsel and Secretary of the Company from February 2006 until her resignation on July 15, 2018. She joined the Company in January 2004 as Senior Vice President and General Counsel of its development activities. Before joining Wynn Resorts, she was Executive Vice President and Chief Legal Officer of Caesars Entertainment, Inc.; General Counsel for Merv Griffin's investment management company, the Griffin Group, Inc.; and a partner of the law firm Gibson, Dunn & Crutcher LLP.  As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 105, 112-15, 129, 139, 141, 145, 149, 155-56, 158-59. 162-63, 172-73, 175, 178, 180, 183, 185-89, 191-92, 194-95, 200-01, 203-04, 206, 208, 210, 212-13, 217, 225, 227-28, 230-32, 233-34, 236-37, 239, 241, 243, 247, 251-52, 256-57, 259-60, 265, and 267, were made by or are attributable to Sinatra.

22.     **Defendant Stephen Cootey** served as the Company's Chief Financial Officer, Senior Vice President, and Treasurer from March 16, 2014 to March 1, 2017. He has also served as Treasurer and Senior Vice President-Finance for the Company. Before joining Wynn Resorts, he served as Senior Vice President-Corporate Finance for Las Vegas Sands Corp. and as Partner and Senior Research Analyst with Prides Capital, LLC. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 158-59. 162-63, 172-

73, 175, 178, 180, 183, 185-89, 191-92, 194-95, 200-01, 203-04, 206, 208, 210, 212-13, 217, 225, 227-28, 230-32, 233-34, 236-37, 239, 241, 243, and 247, were made by or are attributable to Cootey.

23.     **Defendant Craig S. Billings** has served as the Company's CFO, Principal Accounting Officer and Treasurer since March 1, 2017. The Company's March 10, 2017 Definitive Proxy Statement described his past work experience as follows:

> Prior to joining the Company, he was an independent advisor and investor to the gaming industry from November 2015 through February 2017. From July 2012 to November 2015, Mr. Billings served in various roles at Aristocrat Leisure Ltd, including Chief Digital Officer and Managing Director of Strategy & Business Development. Before joining Aristocrat, Mr. Billings served as the Chief Executive Officer and President of ZEN Entertainment, Inc. from March 2011 to June 2012. He served in various senior roles at International Game Technology from March 2009 to October 2010 and also worked in the Investment Banking Division of Goldman Sachs, most recently as a Vice President in the London office. He began his career in the audit practice of Deloitte & Touche. Mr. Billings serves as a Director of NYX Gaming Group Limited.

24.     As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 251-52, 256-57, 259-60, 265, and 267were made by or are attributable to Billings.

25.     Together, Defendants Wynn, Maddox, Sinatra, Cootey, and Billings are referred to herein as the "Individual Defendants."

26.     The following table summarizes the Individual Defendants' executive compensation, according to the Company's March 4, 2016 and April 18, 2018 Definitive Proxy Statements:

| Name | Total Compensation Received | | | | |
|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Stephen Wynn** | $19,790,059 | $25,396,896 | $20,680,391 | $28,156,985 | $34,522,695 |
| **Matt Maddox** | $5,059,294 | $4,814,400 | $4,078,932 | $4,614,703 | $24,816,633 |

| Kim Sinatra | $2,580,881 | $4,325,954 | $2,339,156 | $2,638,740 | $13,294,043 |
| Stephen Cootey | - | $5,296,853 | $1,186,406 | $1,299,115 | $175,481 |
| Craig Billings | - | - | - | - | $5,632,293 |

27.     The Individual Defendants possessed the power and authority to control the contents of Wynn's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public (as further detailed herein), the Individual Defendants knew that the adverse facts about Defendant Wynn's misconduct specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

### 2. *Director Defendants*

28.     **Defendant John J. Hagenbuch** is a citizen of Idaho and has served as a director of the Company from December 2012 through the end of the Class Period. In, May 2018, the Company announced that Hagenbuch would not stand for reelection at the annual shareholder's meeting on May 16, 2018. Defendant Hagenbuch served as the Chairman of the Audit Committee and as a member of the Compensation Committee. During fiscal years 2012 through 2016, Wynn Resorts paid Defendant Hagenbuch $1,904,619 in total compensation. As of March 2017, Defendant Hagenbuch held 27,535 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 129, 139, 141, 145, 172-72, 175, 178, 180, 183, 185-89, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Hagenbuch.

29.     **Defendant Dr. Ray R. Irani** is a citizen of California and served as a director of the Company from October 2007 through March 5, 2018, when he abruptly resigned as a

Director. Defendant Irani served as a member of the Corporate Governance Committee. During fiscal years 2012 through 2016, Wynn Resorts paid Defendant Irani $1,864,963 in total compensation. According to the Company's Proxy Statement filed on March 24, 2008, Defendant Irani was nominated as a potential director by Defendant Wynn himself. As of March 2017, Defendant Irani held 91,137 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 129, 139, 141, 145, 172-72, 175, 178, 180, 183, 185-89, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Irani.

30.     **Defendant Jay L. Johnson** is a citizen of Idaho and has served as a director of the Company since August 2016. Defendant Johnson serves as a member of the Compensation Committee. In 2016, Wynn Resorts paid Defendant Johnson $380,935 in total compensation. As of March 2017, Defendant Johnson held 10,000 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 236-37, 239, 241, 243, and 247, were made by or are attributable to Johnson.

31.     **Defendant Robert J. Miller** is a citizen of Nevada and has served as a director of the Company from October 2002 until he abruptly resigned as a Director. Defendant Miller served as the Company's Lead Independent Director, Chairman of the Corporate Governance Committee, and as a member of the Audit Committee. Defendant Miller was also the Chairman of the Company's Compliance Committee and served as the Company's Compliance Director. On February 27, 2014, the Board acted to combine these roles under the Chairman of the Company's Compliance Committee. Previously, Defendant Miller served as President and then Counselor to the International Association of Gaming Advisors from 1999-2012. Upon information and belief, and at all times relevant herein, Defendant Miller is a resident of Clark County, Nevada. During fiscal years 2012 through 2016, Wynn Resorts paid Defendant Miller $2,448,794 in total compensation. As of March 2017, Defendant Miller held 38,637 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 129, 139, 141, 145, 172-72, 175, 178, 180, 183, 185-89, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are

9

attributable to Miller.

32.      **Defendant Patricia Mulroy** is a citizen of Nevada and has served as a director of the Company since October 15, 2015. Defendant Mulroy serves as a member of the Corporate Governance Committee and a member of the Company's Compliance Committee. From July 2014 through October 2015, Defendant Mulroy served on the Nevada Gaming Commission. Upon information and belief, and at all times relevant herein, Defendant Mulroy is a resident of Clark County, Nevada. During fiscal years 2015 and 2016, Wynn Resorts paid Defendant Mulroy $617,577 in total compensation. As of March 2017, Defendant Mulroy held 12,559 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Mulroy.

33.      **Defendant Clark T. Randt, Jr.** is a citizen of Utah and has served as a director of the Company since October 2015. Randt received a $600,000 consulting agreement in 2015 before his appointment to the Board. The Company admits that Defendant Randt is not independent under NASDAQ independence criteria. During fiscal years 2015 and 2016, Wynn Resorts paid Randt $564,545 in total compensation. As of March 2017, Defendant Randt held 12,559 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Randt.

34.      **Defendant Alvin V. Shoemaker** is a citizen of Idaho and has served as a director of the Company from December 2002 until he resigned abruptly in December 2018. Defendant Shoemaker served as a member of the Compensation Committee and as a member of the Audit Committee. During fiscal years 2012 through 2016, Wynn Resorts paid Defendant Shoemaker $1,911,836 in total compensation. As of March 2017, Defendant Shoemaker held 38,637 shares of Wynn Resorts stock and options. On March 7, 2018, Wynn Resorts announced that Defendant Shoemaker would not stand for re-election in 2019, when his term is due to expire, but that he would serve out the remainder of his term. However, the Company announced on December 21, 2018 that Shoemaker will be leaving the Company effective

10

December 31, 2018. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 129, 139, 141, 145, 172-72, 175, 178, 180, 183, 185-89, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Shoemaker.

35.     **Defendant J. Edward Virtue** is a citizen of Florida and has served as a director of the Company from November 2012 until he did not stand for reelection at the March 16, 2018 shareholders meeting. Virtue served as Chairman of the Compensation Committee and as a member of the Corporate Governance Committee. Virtue managed the Wynn family's money prior to his appointment to the Board in 2012. During fiscal years 2012 through 2016, Wynn Resorts paid Defendant Virtue $1,921,313 in total compensation. As of March 2017, Defendant Virtue held 21,385 shares of Wynn Resorts stock and options. As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 129, 139, 141, 145, 172-72, 175, 178, 180, 183, 185-89, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Virtue.

36.     **Defendant D. Boone Wayson** is a citizen of Maryland and has served as a director of the Company from August 2003 until he resigned, effective November 6, 2018. Wayson serves as a member of the Audit Committee and as a member of the Corporate Governance Committee. On February 6, 2018, Defendant Wayson was named the Non-Executive Chairman of the Board. During fiscal years 2012 through 2016, Wynn Resorts paid Defendant Wayson $1,969,086 in total compensation. As of March 2017, Defendant Wayson held 123,637 shares of Wynn Resorts stock and options.  As alleged below, the misrepresentations challenged herein, including those alleged below in ¶¶ 112-15, 129, 139, 141, 145, 172-72, 175, 178, 180, 183, 185-89, 203-04, 206, 208, 210, 212-13, 236-37, 239, 241, 243, and 247, were made by or are attributable to Wayson.[4]

---

[4] Together, Defendants Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, and Wayson are referred to herein as the "Director Defendants." The Company, the Individual Defendants, and the Director Defendants are collectively referred to herein as "Defendants."

## IV.  FACTUAL BACKGROUND

37.     Founded in 2002 by Defendant Wynn, Wynn Resorts is a leading developer, owner, and operator of destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, distinctive entertainment theaters, and large meeting complexes. It owns and operates Wynn Las Vegas and Encore in Las Vegas, Nevada, Wynn Macau and Wynn Palace in Macau, China, and Wynn Boston Harbor (k/n/a Encore Boston Harbor) in Everett, Massachusetts.

### A.  **Casino Regulation**

38.     Wynn Resorts is subject to the gaming laws of each jurisdiction where it does business. During the Class Period, the Company operated gaming establishments in Nevada and Macau and was actively developing a new gaming property in Massachusetts, which opened on June 23, 2019.

39.     All of these jurisdictions impose comprehensive regulatory requirements upon gaming licensees in order to ensure that they—as well as their officers, directors, and employees—have the necessary character, qualifications, and integrity to be suitable to hold that privilege so as not to pose a threat to the public interest or the integrity of the regulation and control of gaming. A violation of such regulations could result in the loss of gaming licenses critical to the Company's success.

### 1.  *Nevada*

40.     The Nevada Gaming Control Act, Nev. Rev. Stat. §§ 463.010 *et seq.*, mandates the "strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments" in order to maintain "public confidence and trust that licensed gaming is conducted honestly and competitively … and that gaming is free from criminal and corruptive elements." Nev. Rev. Stat. § 463.0129.

41.     As noted in the Company's own 2014 10-K, one of the most significant public policy concerns underlying Nevada gaming law is "preventing unsavory or unsuitable persons from being directly or indirectly involved with gaming at any time or in any capacity." Nevada

Gaming Commission Regulation 5.040 also explicitly states that a "gaming license is a revocable privilege."

42.    To that end, the NGC and Nevada Gaming Control Board ("NGCB") are "charged with the awesome responsibility of regulating the gaming industry in Nevada and keeping undesirable elements out of the gaming industry." *Rosenthal v. Nev.*, 514 F. Supp. 907, 914 (D. Nev. 1981). Together, they "determine which people will or will not be 'players' in" the "highly regulated gaming industry in Nevada." *Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir. 1999). The ability to operate a casino in Nevada is **entirely** dependent on the approval of the NGC and NGCB. *See Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980) (no "protectible property interest" in being able to operate a casino in Nevada).

43.    Any applicant for a gaming license must submit to the NGC an "application to … be found suitable" to participate in Nevada gaming. Nev. Rev. Stat. § 463.170. The NGC has "full and absolute power and authority to deny any application for **any cause deemed reasonable**." Nev. Rev. Stat. § 463.220(6). Moreover, the NGC cannot grant such an application unless it is "satisfied" that the applicant is:

> (a) A person of good character, honesty and integrity;
>
> (b) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming …; and
>
> (c) In all other respects qualified to be licensed or found suitable consistently with the declared policy of the state.

Nev. Rev. Stat. § 463.170.

44.    Nevada law also imposes a continuing obligation on all licensees to ensure that "all establishments wherein gaming is conducted in this state be operated in a manner **suitable** to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada." Nevada Gaming Commission Regulation 5.010.

45.    Nevada Gaming Commission Regulation 5.030 provides as follows:

> Violation of any provision of the Nevada Gaming Control Act or of these regulations by a licensee, the licensee's agent or employee shall

13

be deemed contrary to the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and grounds for suspension or revocation of a license. Acceptance of a state gaming license or renewal thereof by a licensee constitutes an agreement on the part of the licensee to be bound by all of the regulations of the Commission as the same now are or may hereafter be amended or promulgated. It is the responsibility of the licensee to keep informed of the content of all such regulations, and ignorance thereof will not excuse violations.

46.   To that end, the NGCB is "charged by law with the duty of observing the conduct of all licensees to the end that licenses shall not be held by unqualified or disqualified persons or unsuitable persons or persons whose operations are conducted in an unsuitable manner." Nevada Gaming Commission Regulation 5.040.

47.   Moreover, "**any activity on the part of any licensee, the licensee's agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada**, or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry" is considered "**to be an unsuitable method of operation and shall be grounds for disciplinary action**." Examples of such "unsuitable methods of operation" include, among other things, "Failure to exercise discretion and sound judgment to prevent incidents which might reflect on the repute of the State of Nevada and act as a detriment to the development of the industry" and "Failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry." Nevada Gaming Commission Regulation 5.011.

**48.**   Nevada also imposes special requirements on publicly-traded companies involved in gaming. Nevada Gaming Commission Regulation 16.440 provides as follows:

**16.440 Proscribed activities with respect to "unsuitable" persons.**

1. If a person required by the Commission to apply for a finding of suitability fails, refuses or neglects to apply for a finding of suitability or a license within 30 days after the Commission orders that such

14

application be made, the Commission may find such person to be unsuitable.

2. The Commission may determine a publicly traded corporation registered with the Commission to be unsuitable, or take other disciplinary action, if the publicly traded corporation, after the Commission serves notice to the publicly traded corporation that a person is unsuitable to be a stockholder or to have any other relationship or involvement with such publicly traded corporation or with a corporate licensee or any other affiliated company:

> (a) Pays to any person found to be unsuitable any dividend or interest upon any voting securities or any payment or distribution of any kind whatsoever except as permitted by paragraph (d) of this regulation;

> (b) Recognizes the exercise by any such unsuitable person, directly or indirectly, or through any proxy, trustee or nominee, of any voting right conferred by any securities or interest in any securities referred to in NRS 463.643;

> (c) Pays to any such unsuitable person any remuneration in any form for services rendered or otherwise except as permitted pursuant to NRS 463.645; or

> (d) Fails to pursue all lawful efforts to require such unsuitable person to relinquish his or her voting securities including, if necessary, the immediate purchase of said voting securities by the publicly traded corporation for cash at fair market value.

49. Nevada takes compliance with these requirements very seriously—in particular, with the requirement that all affiliated persons always remain "suitable." The 2014 10-K summarized the consequences of being found unsuitable as follows:

> ***Individual Licensing Requirements.*** No person may become a more than 5% stockholder or member of, or receive any percentage of the profits of, an intermediary company or company licensee without first obtaining licenses and approvals from the Nevada Gaming Authorities. **The Nevada Gaming Authorities may investigate any individual who has a material relationship to or material involvement with us to determine whether the individual is suitable** or should be licensed as a business associate of a gaming licensee. Certain of our officers, directors and key employees have been or may be required to

15

file applications with the Nevada Gaming Authorities and are or may be required to be licensed or found suitable by the Nevada Gaming Authorities. All applications required as of the date of this report have been filed. However, the Nevada Gaming Authorities may require additional applications and may also deny an application for licensing for any reason which they deem appropriate. **A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation**….in addition to their authority to deny an application for a finding of suitability or licensing, the Nevada Gaming Authorities have the jurisdiction to disapprove a change in a corporate position.

**If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person**. In addition, the Nevada Gaming Commission may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

\* \* \*

*Consequences of Violating Gaming Laws.* If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

### 2. Massachusetts

50.     During the Class Period, Wynn Resorts was in the process of building a new

16

"integrated resort containing a hotel, restaurants, casino, spa, premium retail offerings, meeting and convention space and a waterfront boardwalk" in Everett, Massachusetts. That property, which is now known as Encore Boston Harbor, and was previously referred to as Wynn Everett and Wynn Boston Harbor, opened on June 23, 2019.

51.     Massachusetts law imposes comprehensive regulatory requirements upon gaming licensees, including requiring that all those associated with the licensee possess the necessary character, qualifications, and integrity to be suitable to hold that privilege so as to not pose a threat to the public interest or the integrity of the regulation and control of gaming.

52.     Before issuing a gaming license, the Massachusetts Gaming Commission must "consider the overall reputation" and "the integrity, honesty, good character and reputation of the applicant." M.G.L. c. 23K § 12. It must "deny an application for a gaming license" if, among other things, the application "contains false or misleading information" or the applicant "committed prior acts which have not been prosecuted or in which the applicant was not convicted but form a pattern of misconduct that makes the applicant unsuitable for a license." *Id.* § 16.

53.     As the explained in the MGC Decision and Order, the importance of this suitability determination "cannot be understated in light of the paramount policy objective of M.L. c. 23K concerning the integrity of the licensing process," noting that:

> The rationale for such an emphasis on integrity stems from the historical association of gaming with organized crime, dishonesty, and vice and the corresponding lack of faith brought along with those associations that the public may acquire relative to the fairness of the actual casino games, the honest collection of revenues and payment of taxes by the property owners and operators, and the overall unsavory reputation that may hover over such an operation - all of which put at risk not only the interests of the state, but also the welfare and well-being of casino patrons and employees. The integrity component of the suitability evaluation thus examines the honesty, good character, and reputation of an applicant.

MGC Decision and Order at 14.

54.     The 2014 10-K summarized Massachusetts gambling law as follows:

*Company Registration Requirements.* In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. Wynn Resorts and all individual qualifiers were found suitable by the MGC…. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation….

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

*Consequences of Violating Gaming Laws.* If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

55.     The import of these regulations was not lost on Defendants. According to the March 15, 2019 IEB Report underlying the MGC Decision and Order:

Gaming licensees understand that the gaming license itself is a valuable asset that must be safeguarded. Holders of these privileged gaming licenses are expected to be active participants in their own compliance and governance. Voluntary compliance and routine self-reporting to the Commission regarding certain events, including the self-disclosure to the Commission of potential violations of the gaming law or regulations, are conditions of licensure.

***

The executives and board members at the Company are well aware of the requirements for self-disclosure. For example, in his sworn interview with the IEB, Matthew Maddox, current president and CEO of Wynn Resorts, acknowledged that the licensee "should really over disclose and just put it out there about what's going on and what potentially could happen and what [the licensee] think[s] about it." Board member Jay Johnson recognized that the licensee's "relationship with the regulators has to be transparent. . . . [W]hen in doubt, there is no doubt; call a regulator ... Nobody, nobody likes to get surprised ... So it gets back to communications and transparency ...." Board member Patricia Mulroy recognized that the IEB's "expectation is no different from Nevada's Gaming Control Board[] regulators' expectations. The burden is not on the regulator to investigate. The burden is on [the licensee] to disclose." Former Wynn Resorts general counsel Marc Rubinstein told the IEB investigators, "You don't want the regulators to find out about something serious from the third party .... That's gaming law 101."

IEB Report at 6-7.

## B. Defendant Wynn's "Decades-Long Pattern of Sexual Misconduct"

56.    Even as Defendants aggressively touted Defendant Wynn's experience and skills and reputation to investors throughout the Class Period, assured compliance with policies relating to sexual harassment, relationships between employees, related board communications, among others—which were key to the suitability determinations on which the Company's and its executives' gaming licenses depended— and issued full-throated denials of any sexual misconduct by Wynn, they utterly failed to disclose anything about what the *Wall Street Journal* would later describe as "a **decades-long pattern of sexual misconduct by Mr. Wynn**" that started as early as the 1970s and continued until very recently, or that the MGC would describe as Defendants' "**systemic failures and pervasive culture of non-disclosure**[,]" and noted "**the corporate culture of the founder-led organization led to disparate treatment of the CEO in ways that left the most vulnerable at grave risk.**"

### 1. Defendants Ignore Red Flags About Defendant Wynn's Alleged Misconduct before Wynn Resorts

57.     The alleged sexual misconduct by Defendant Wynn began in the 1970s.

58.     On February 12, 2018, the Las Vegas police announced that two women had filed police reports alleging that Defendant Wynn had sexually assaulted them in the 1970s. A February 27, 2018 *Associated Press* report[5] detailed the alleged assaults as follows:

> One police report shows a woman told officers that Wynn raped her at least three times around 1973 and 1974 at her Chicago apartment. She reported she got pregnant and gave birth to a girl in a gas station restroom.

> In one instance, the woman claimed that Wynn pinned her against the refrigerator and raped her. She said he then made a phone call, kissed her on the cheek and left. The report does not explain how Wynn is alleged to have entered the apartment or if they knew each other. The woman claimed she did not give him a key.

> The second police report shows a woman told police she had consensual sex with Wynn "several times" while she worked as a dealer at the downtown Las Vegas casino-hotel Golden Nugget, but "felt coerced to perform the acts." She reported she was forced to resign when she turned him down.

> "In the Summer of 1976, Wynn approached her in the back hall and wanted her to go with him," according to the report filed Jan. 29. "(S)he told him, "no", she was done and had someone she was seeing. She was soon after accused of stealing $40.00 and forced to resign."

59.     According to the *Wall Street Journal,* in the early 1990s, Dennis Gomes, an executive at Golden Nugget (one of Defendant Wynn's casinos at the time), described a "*disgraceful pattern of personal and professional conduct*" by Wynn and testified that he "routinely received complaints from various department heads regarding *Wynn's chronic sexual harassment of female employees.*"

---

[5] https://nypost.com/2018/02/27/woman-tells-police-she-gave-birth-to-child-after-steve-wynn-raped-her/

20

60.     According to the *Nevada Forward*, a former cocktail waitress at the Golden Nugget described predatory behavior in the 1980s by Defendant Wynn. The former cocktail waitress told the *Nevada Forward* that "Steve Wynn, whom she had never met, showed up unannounced at her home three weeks into her tenure at the hotel in May of 1988 …. 'I was able to get away that time, but not at work ….'" According to the former waitress, Wynn was "forceful and aggressive" and his "favorite location for trysts was the new tower at the Golden Nugget." She claimed that Wynn "shoved a banana at [her] and said '[let me see how you eat this banana!'" She continued: "Did I want to have sex with him? No. He signed my checks. I had two little kids, and no child support. He made a habit of going after single moms who were scared and couldn't afford to lose their jobs." She added that "'I never told anyone but they all knew' …, referring to Golden Nugget executives." It was only when the Mirage opened that "Wynn's unwanted attention came to an end" as "'he had new candy[.]"

61.     Another set of allegations that date back to the late 1980s involve Defendant Wynn sexually harassing waitresses at The Mirage, which Defendant Wynn owned at the time. The *Las Vegas Review-Journal* reports that Defendant Wynn allegedly had sex with one of the waitresses he harassed – a grandmother – who asked Defendant Wynn, "Why don't you just leave me alone?" Defendant Wynn reportedly responded that he had "never had [sex with] a grandmother before" and wanted "to see how it feels."

62.     In 1997, eleven waitresses at the Wynn-owned Mirage filed suit alleging a culture of harassment, coerced sexual relations, and misconduct by Wynn. *See Arrowsmith, et al. v. Mirage Casino-Hotel*, No. 97-cv-00638-RLH-LRL (D. Nev. May 23, 1997). According to the *Las Vegas Review-Journal*, the lawsuit contained allegations that supervisors did not protect women from gamblers who harassed them, and that waitresses were sent to sexually "accommodate" high rollers at the resort through the 1990s. The suit also alleged that Defendant Wynn told the waitresses they had "fat asses" and did not look good in their uniforms, and that the waitresses were required to maintain their weight at the time they were hired throughout their employment. Specifically, in 1995, Defendant Wynn required the cocktail waitresses to meet with him in the Mirage's executive offices to tell them they had "fat asses" and unless they

lost weight, he would transfer them to different departments. A few days later, the cocktail waitresses had to be weighed and measured and were forced to sign a document stating that if they gained six pounds or more, they would be put on probation.

63.    In February 2018, after additional allegations of sexual misconduct came to light, one of the *Arrowsmith* plaintiffs told the *Nevada Forward* that: "It was common knowledge. Back at the Nugget he would call down to (the) Pit and tell them to close a certain game and send the dealer to his office .... [T]he employees' allegations were reported to Human Resources and ignored."

64.    In 1998, two of the plaintiffs in *Arrowsmith* spoke with *Las Vegas Review-Journal* reporter Carri Geer. As she was preparing the story, Geer was called into a meeting with Wynn's attorneys. After subjecting the plaintiffs to polygraph examinations, the newspaper killed the publication of the story, and ordered Geer to delete it from the newspaper's computer system, demonstrating Defendant Wynn's extraordinary power and influence.

65.    *Arrowsmith* settled in 2003. Because the case is public record and involved Wynn Resorts' CEO and Chairman, all of Wynn Resorts' Board members, particularly Defendants Shoemaker, Wayson, and Miller, who were directors in 2003, should have been aware of the litigation and of Wynn's propensity for sexually predatory conduct that could jeopardize the Company, its relationships with necessary regulators, and its gaming licenses. In addition, Defendant Wayson was a director of Mirage Resorts, Inc. from 1997 to 2000 while *Arrowsmith* was being litigated, and thus can be presumed to have knowledge of the plaintiffs' allegations regarding Defendant Wynn. As detailed below, however, the Board failed to heed the warnings from *Arrowsmith*, and instead allowed Defendant Wynn to continue his pattern of sexual harassment and abuse at Wynn Resorts.

### 2.    *Defendant Wynn's Pattern of Sexual Harassment at Wynn Resorts*

66.    After Wynn Resorts was founded in 2002—and especially after it opened its flagship resort Wynn Las Vegas in 2005—numerous sexual harassment claims were made against Defendant Wynn by Wynn Resorts employees. The public only became aware of these

claims—and of the extent of the alleged sexual misconduct by Defendant Wynn—as a result of the January 2018 *WSJ* Article and other corrective disclosures.

67.     After publication of the January 2018 *WSJ* Article, the Nevada Gaming Commission began an investigation into the Company, pursuant to which the Company recently admitted to the fact that there were eight sexual harassment claims by employees against Defendant Wynn that were not investigated by the Company.

68.     The NGCB investigation confirmed and corroborated the pattern of sexual misconduct by Defendant Wynn, as well as extensive failures on the part of senior Wynn management to investigate.  In the January 25, 2019 NGCB Complaint,[6] the NGCB listed eight instances of sexual harassment claims by employees against Defendant Wynn that were not investigated by the Company, and further stated that at least seven former executives knew of sexual harassment allegations made by female employees and did not investigate. Moreover, pursuant to the accompanying Stipulation For Settlement and Order ("NGCB Stipulation" or "NGCB Settlement"), which was signed by Defendant Maddox, the Company "admit[ted] each and every allegation set forth in the Complaint … except that RESPONDENTS [Wynn Las Vegas, LLC, d/b/a Wynn Las Vegas and Wynn Resorts, Ltd.] neither admit[ted] nor den[ied] paragraphs 72 - 73 of the Complaint and that portion of paragraph 57 of the Complaint that alleges Maurice Wooden was aware of the allegations of sexual misconduct."[7]

69.     The MGC also investigated the Company.  On  April 30, 2019, the MGC issued its Decision and Order, based on the accompanying IEB Report, and testimony provided during an April 2-4, 2019 adjudicatory hearing, detailing Defendant Wynn's sexual misconduct, the

---

[6] *Nev. Gaming Control Bd. v. Wynn Las Vegas, LLC,* No. NGC 18-15 (Nev. Gaming Comm'n Jan. 25, 2019).

[7] Additional detail concerning the NGCB Complaint can be found below, including in Sections VII(F), (I).

corporate culture that allowed it to fester and proceed unabated, and Defendants' awareness of Wynn's misconduct and misuse of corporate funds to cover it up.[8]

70.    The MGC Decision and Order, among other things, noted that the IEB investigation "[discovered] no less than nine additional allegations of inappropriate behavior/sexual misconduct by Mr. Wynn relating to current or past employees of the Company that went without required investigation[,]" and the IEB investigation "confirmed the existence of more than two dozen women alleged to have been subjected to some form of sexual misconduct by Wynn."  Additionally, as noted in the IEB Report, the following "consistent themes arose from the Period of Mr. Wynn's tenure at the Company," which are relevant to the ongoing suitability of the Company and its relevant officers and directors:

► Failure to apply certain of the Company's own policies and procedures to Mr. Wynn, the highest ranking employee at the Company. Of particular concern is that certain high-ranking Company executives who knew about allegations lodged against Mr. Wynn by employees failed to follow Company policy mandating an investigation.

► Failure to train Mr. Wynn on the Company's "zero tolerance" sexual harassment policy.

► Failure to document and record sexual misconduct allegations made against Mr. Wynn in a personnel or other centralized file.

► Failure of the Company to require an evaluation of whether outside counsel could simultaneously represent the legal interests of both the Company and Mr. Wynn, in circumstances where Mr. Wynn was alleged to have engaged in sexual misconduct with employees. A fair and objective investigation into the allegations would have informed the Company whether its interests with Mr. Wynn aligned or diverged.

► Failure by certain executives with knowledge of allegations of sexual misconduct by Mr. Wynn to make reports to the Company's board of directors, or to the board's audit or compliance committees.

---

[8] Additional detail concerning the MGC Decision and Order and IEB Report, can be found below, including in Sections V(A), and VII(H).

► The apparent existence of a culture at the Company where employees hesitated to report allegations of sexual misconduct against Mr. Wynn to management, with employees fearful of employment-related consequences, or believing that reporting to management would be futile.

► Failures at the Company potentially diminished the Company's ability to safeguard the well-being of its employees.

IEB Report at 22-23.

71.    Perhaps the most troubling instance involved a $7.5 million settlement in 2005 in connection with an accusation of rape by Defendant Wynn (the "2005 Settlement"). According to the NGCB Complaint, and as the Company has admitted in the NGCB Settlement, a manicurist who worked at the Wynn Las Vegas told several colleagues in 2005 "that she had been raped by Mr. Wynn and that she became pregnant as a result." NGCB ¶ 36. Her allegations were reported to the HR department, and "Marc Schorr, former WYNN President and RESORTS Chief Operating Officer; Doreen Whennen, former WYNN Vice President of Hotel Operations; and Arte Nathan, former WYNN Senior Vice President and Chief Human Resources Officer" learned of the allegations "at or around the time the allegations were made," but the Company failed to investigate as its policies required. *Id.* at ¶¶ 37-38. According to the MGC Decision and Order, "Mr. Schorr (then-President and CEO of Wynn Las Vegas and COO of Wynn Resorts) personally met with the alleged victim and told her there would be an investigation." MGC Decision and Order at 5. "Within days," Defendant Wynn reached a settlement, which was signed on July 22, 2005. *Id.* He "reached a private, confidential settlement with Employee 1 in which she and her husband were paid $7.5 million through a separate legal entity funded personally by Mr. Wynn." NGCB Compl. ¶40; *see also, e.g.*, MGC Decision and Order at 5, 20.

72.    Ms. Whennen worked as the Vice President of Hotel Operations at Wynn Las Vegas until 2007, when she was transferred to Wynn Macau where she acted as Executive Vice President until she retired in 2014. In Las Vegas, Ms. Whennen participated in interviews and investigations with employees who worked in non-gaming divisions at Wynn-affiliated

properties. Upon retiring, she entered into a Resignation and Release Agreement with Wynn Resorts. As set forth above, Ms. Whennen contacted the manicurist with whom Mr. Wynn paid a $7.5 million settlement. During the course of the *Okada* litigation described herein, Ms. Whennen was deposed on July 14, 2017, at which deposition, Ms. Whennen revealed that she retained certain notes from the 2005 investigation into the manicurist's allegations of sexual assault. On December 8, 2017, in a further effort by Defendants to keep Defendant Wynn's sexual misconduct under wraps, Worldwide Wynn LLC, a subsidiary of Wynn Resorts, sued Ms. Whennen for misappropriating and wrongfully retaining the notes from the investigation into the manicurist's allegations. According to the lawsuit, Ms. Whennen has repeatedly refused to turn over her notes to Wynn Resorts, claiming that they are her personal property.

73.    In an effort to conceal the 2005 assault, Defendant Wynn, and attorneys Frank Schreck and James Pisanelli (then of Schreck & Brignone PC), created a secret limited liability company, Entity Y, in 2005 to make the $7.5 million settlement payment, according to the *WSJ article*, NGCB Complaint, and MGC Decision and Order, and as the Company admitted. Entity Y's manager is James Pisanelli, a lawyer who has served as Wynn Resorts' outside counsel for years.

74.    According to the MGC's Decision and Order, the then Wynn Resorts General Counsel, Marc Rubinstein, only learned of the 2005 Settlement after he "discovered an entry on an invoice after the settlement had been executed and questioned the entry." Decision and Order at 5. After being "rebuffed by Mr. Schorr[,] … [Rubinstein] sought separate advice from other outside counsel, Attorney Jerome Coben of Skadden, Arps, Slate, Meagher & Flom LLP[,] … pushed for details and was informed that Mr. Wynn engaged in consensual sexual activity with an employee, resulting in the $7.5 million settlement." *Id.*

75.    The MGC Decision and Order found that "[t]he Company [and its executives] did not document or investigate the allegation [giving rise to the 2005 Settlement] as required by the Company's human resources policies." *Id.*

76.    According to the MGC Decision and Order, in April 2009, while Elaine Wynn was a member of the Board of Directors, she "learned of the 2005 rape allegation as well as the

related settlement" and spoke with and reported the 2005 Settlement and underlying allegations to a number of individuals, including Defendant Sinatra in "her role as general counsel for Wynn Resorts and secretary for the Board of Directors" who did not make any disclosure to the Board at that time. The Decision and Order found that "[t]he Company did not document or investigate the 2005 allegation and settlement after Ms. Wynn reported them to Ms. Sinatra [in 2009] as required by the Company's human resources policies." Decision and Order at 6-7.

77.    On March 28, 2016, after failing to gain re-election to the Board, Elaine Wynn filed a cross claim in the *Okada* litigation, alleging that Defendant "Wynn had engaged in 'reckless risk-taking behavior' and [making] reference to the existence of a prior settlement in 2005," according to the MGC's Decision and Order. That Decision and Order explained that:

> **The Board of Directors learned of the cross-claim and the Independent Board members then became aware that the conduct referenced in the cross-claim was of a sexual nature**. Ms. Sinatra engaged outside counsel Jonathan Layne from Gibson Dunn Crutcher LLP … to provide guidance on the cross-claim. **Mr. Layne asked Ms. Sinatra about the 2005 settlement reference and she informed him that it was essentially 'old and cold' and a 'one-off.' She did not tell him or the Independent Directors about any other allegations or settlements.**
>
> The Independent Directors engaged Attorney Barry Langberg to assess a defamation action against Ms. Wynn. Mr. Langberg interviewed Mr. Wynn and Mr. Schreck to complete his defamation analysis. No one conducted an investigation. The Independent Directors considered the information initially presented to them and ultimately concluded that no further action was required.
>
> **Mr. Maddox learned of the 2005 settlement shortly after the cross-claim was filed** but did not pursue the matter beyond obtaining Ms. Sinatra's summary of the facts.
>
> However, as a result of the allegation, the Independent Directors adopted a Communications Protocol applicable to all executive managers. On August 2, 2016, then General Counsel Sinatra disseminated the protocol via email to all relevant managers, including then-President Mr. Maddox, and copied the Board members.

> On March 24, 2016, four days prior to the filing of the amended cross-claim, Mr. Tomek spoke with Chair A.G. Burnett of the Nevada Gaming Control Board about the amended crossclaim.

MGC Decision and Order at 9.

78.     While the ink on the 2005 Settlement Agreement was still fresh, Defendant Wynn was accused of sexual misconduct by yet another employee. According to the MGC Decision and Order (at 5), "[i]n 2006, a former cocktail server at Wynn Las Vegas made a complaint to Mr. Nathan [(then-Chief Human Resources Officer Wynn Las Vegas)] that she had been 'wrongfully engaged in a sexual relationship' with Mr. Wynn." Nathan reported this serious allegation to the then-Vice President and General Counsel for Wynn Las Vegas, Kevin Tourek. *Id.* at 5.

79.     Defendant Wynn and the cocktail server reached a confidential settlement in the amount of $975,000, which was signed on December 7, 2006 on behalf of Defendant Wynn (the "2006 Settlement"). NGCB Compl. ¶¶ 47-51; MGC Decision and Order at 5-6. "Similar to the 2005 [S]ettlement, it included a confidentiality provision, a release of claims against Mr. Wynn and the Company, a non-disparagement clause, and a no-admission clause." MGC Decision and Order at 5.

80.     According to the MGC Decision and Order, "Mr. Wynn, Mr. Nathan, and Mr. Tourek knew of the allegation of a wrongful sexual relationship [giving rise to the 2006 Settlement;]" Tourek also intended to inform Schorr, although it is unclear whether that occurred. Decision and Order at 6. The Company admitted in the NGCB Settlement that Schorr, Nathan, and Tourek "knew about [this employee's] allegations of sexual misconduct against Mr. Wynn in 2006," and at least three former executives of the Company failed to conduct an investigation in violation of the Company's policies and procedures. NGCB Compl. ¶¶ 49-51; *see also* MGC Decision and Order at 6 ("The Company [and its executives] did not document or investigate the allegation as required by the Company's human resources policies.").

81.     According to a lawsuit filed on February 28, 2018, Defendant Wynn began assaulting another Wynn Resorts employee, a masseuse, in or around 2006. The complaint

details that in or around 2006, after his first or second massage, Defendant Wynn made unwanted sexual advances that included forcing the masseuse to perform various sexual acts with him, and demanded oral sex **more than fifty times** over the course of two to three years. The lawsuit alleged that Wynn manipulated her into performing sexual acts on him by exploiting her financial dependency on her job, even though she "consistently objected" to the advances. Following the sessions, Defendant Wynn would leave her a "tip" of $400. Significantly, the lawsuit also alleges that the Wynn board of directors was aware of Defendant Wynn's "predatory behaviors" and that the Board failed to prevent harm to her.

82.    Defendant Wynn's predilection for engaging in inappropriate sexual conduct with cocktail servers emerged again in 2008, before it was quickly swept under the rug by Wynn Resorts, Defendant Wynn, and his enablers. According to the MGC Decision and Order, Wynn Las Vegas and "a previously terminated employee from the cocktail services department at Wynn Las Vegas" reached a $700,000 settlement, to resolve allegations that "among other things, [] she had a previous 'intimate relationship' with Mr. Wynn when she was his subordinate at Mirage Resorts." Decision and Order at 6. The Company paid that settlement (the "2008 Settlement") with corporate funds, according to the MGC Decision and Order. *Id.* at 6.

83.    According to the MGC Decision and Order, "[b]illing records from [outside counsel] indicate that attorneys Kamer, Scott Abbott, Slotnick, Tourek and Ms. Sinatra (then-Wynn Resorts General Counsel) were present at two meetings on this matter." *Id.*[9] The MGC Decision and Order concluded that Wynn and Tourek "knew of the allegation and settlement[,]" and outside counsel (Abbot, Kamer, and Slotnick) "were aware of the allegation and settlement." *Id.*

84.    The MGC Decision and Order found that, like the prior allegations of misconduct leading to the 2005 Settlement and 2006 Settlement, "[t]he Company did not document or

─────────────────────

[9] Although the Decision and Order noted that Sinatra denied knowledge of the allegation, participants at the meetings were unable to confirm her absences from the meetings when the allegations and settlement were discussed, and Sinatra's denial is seemingly contradicted by billing records.

investigate the allegation [leading to the 2008 Settlement]." *Id.* The Decision and Order also noted that "[w]hile the complainant had been terminated and the alleged misconduct occurred at a different establishment, the allegation against the then-CEO and Chair of the Board warranted further inquiry." *Id.*

85.    Although "[n]o one informed the Board of Directors of the allegation" leading to the 2008 Settlement, "Tourek did enter the $700,000 settlement on a quarterly disbursement memo statement to the Compliance Committee of the Board on April 28, 2009[,]" according to the Decision and Order (at 6). "He identified it as a legal settlement payable to the 'vendor' G. Dallas Horton & Associates." *Id.* The entry caught the eye of Defendant "Maddox (then-CFO of Wynn Las Vegas)[, who] asked about the entry and [did not pursue the matter further after he] was told that Mr. Wynn and his then wife, Elaine Wynn, wanted to help out a struggling employee." *Id.*

86.    According to the Decision and Order, another disturbing charge arose in July 2014 when a terminated cocktail server at Wynn Las Vegas "alleged to the Company's outside counsel that Mr. Wynn raped her in 2005." *Id.* at 7. A memo drafted by outside counsel summarizing the allegation was emailed to Tourek who forwarded it to attorney Don Campbell (who Defendant Wynn claimed represented him individually, not the Company), who emailed it to Defendant Sinatra at her Company email address. The Company ultimately reached a $9,000 settlement with the former employee, which it paid using Company funds. The MGC Decision found that "[t]he Company did not document or investigate the allegation of rape as required by the Company's human resources policies." *Id.* at 8.

87.    It did not take long for yet additional allegations of misconduct to arise. The MGC Decision and Order found that "[o]ver a six month period commencing in 2014 and carrying into 2015, two massage therapists complained three times of alleged inappropriate conduct by Mr. Wynn." MGC Decision and Order at 8. As the Decision and Order found:

> The first allegation was that Mr. Wynn was inappropriate in his wishes on covering himself during a massage. The spa director who initially received the complaint forwarded the matter to Blake Feeny (then-Executive Director of Spa Operations, Wynn Las Vegas) who, in turn,

notified Brian Gullbrants (then-Executive VP and General Manager of Wynn Las Vegas).

Mr. Gullbrants then notified Mr. Wooden (then-President of Wynn Las Vegas).

There is no evidence any investigation of the allegation occurred.

Within months, the same massage therapist lodged another complaint concerning Mr. Wynn's behavior in asking for a "sensual massage" during a couple's massage with his wife. The director again notified Mr. Gullbrants, who then notified Mr. Wooden.

Mr. Wooden reported this complaint to Mr. Maddox (then-President of Wynn Resorts). Mr. Maddox instructed Mr. Wooden to tell Mr. Wynn to 'knock it off.' Mr. Maddox did not document the conversation or instruct Mr. Wooden to conduct an investigation.

At the end of this approximately six month period, the spa director received another complaint from a massage therapist concerning Mr. Wynn's inappropriate behavior. The allegation concerned another instance of Mr. Wynn insisting on inappropriate draping during a massage that made the therapist uncomfortable.

The then-Director of the Spa felt that this allegation was 'the last straw' and reported it to

Mr. Gullbrants, but did not document it. Mr. Gullbrants forwarded the allegation to Mr. Wooden.

The Company did not document or investigate these complaints as required by the Company's human resources policies.

Ultimately, Mr. Wynn reached a settlement with the latter massage therapist. Neither the Company nor the IEB are aware of the details of the settlement aside from a provision releasing the Company from all claims.

*Id.* at 8-9; *see also* NGCB Compl. ¶¶ 64-69.

88.     Defendant Wynn's sexual harassment and assault of masseuses was a pattern. Indeed, another massage therapist filed suit against Defendant Wynn and the Wynn Resorts' Board on March 1, 2018. She alleges that in or around 2011, Defendant Wynn began making appointments for massages with her. The massages took place in Defendant Wynn's office at Wynn Resorts, while the door to his office was locked and security personnel, and dogs, which

Defendant Wynn said would attack on command, were outside the door. According to her complaint, after the first two massages, Defendant Wynn discovered that she was going through a divorce and relied on her salary at Wynn Resorts to support her children. Defendant Wynn soon began a pattern of sexually abusive behavior towards the employee, including exposing himself to her, touching her inappropriately, repeatedly propositioning her for sex, and instructing her to massage his penis, which she did approximately a dozen times over the year because she feared for her physical and financial security. The woman repeatedly told him she did not want to have sex with him, to perform sexual acts on him, or to see him naked. After these sessions, Defendant Wynn routinely "tipped" the woman $1,000.

89.     In addition to these assaults, Defendant Wynn created a hostile working environment, where female employees were constantly uncomfortable. For example, several former Wynn Las Vegas employees recalled that Defendant Wynn often walked around areas of the Wynn Las Vegas in short shorts without underwear, and that he would get pedicures at the salon and sit in a way so as to expose himself.

90.     The MGC Decision and Order found for example:

> On October 27, 2016, Cindy Mitchum, Mr. Wynn's executive assistant, received an email from a former employee including a five page attachment. Ms. Mitchum forwarded the email to Ms. Sinatra and Ms. Stacie Michaels (then-General Counsel for Wynn Las Vegas).
>
> Ms. Michaels spoke with Ms. Sinatra, who informed her that she would handle it. **Within days, Ms. Sinatra met with Mr. Wynn and began reading the attachment, which included a series of allegations including those of sexual harassment and creating a hostile work environment**.
>
> No one conducted an investigation of the allegations or informed the Board of Directors.

*Id.* at 10.

91.     The *WSJ Article*, which the MGC Decision and Order found the Company learned was being worked on in December 2017 into January 2018, reports that one former employee said Defendant Wynn asked if he could kiss her, and sexually propositioned her. On

another occasion, as she was leaving his office, he grabbed her waist as she stood against a wall and told her to kiss him. She slipped out of his hold and left. After two weeks of pursuit, he stopped. The employee's supervisor and another colleague confirmed being told of these advances at the time, but sought to "manage" the situation rather than report it for fear of repercussions.

92.     The *WSJ Article* further reported that one former massage therapist said that several years ago Defendant Wynn booked multiple appointments a week with her in the private massage room in his office suite. He continually adjusted a towel to expose himself, and ultimately instructed her to perform sexual acts on him. The therapist felt obligated to agree to his requests because he was her boss. She said this type of behavior became a frequent part of the massage sessions for several months. In subsequent sessions, Defendant Wynn asked her to perform oral sex on him. She refused this request and told a colleague that Defendant Wynn had generally been inappropriate with her. That colleague told the *WSJ* that Wynn also made advances toward her while she massaged him in his office's private massage room.

93.     Former employees told the *WSJ* that they sometimes entered fake appointments in the books to help other women workers get around a request for services in Defendant Wynn's office or arranged for others to pose as assistants so they would not be alone with him.

94.     Former employees also told of female employees hiding in the bathroom or back rooms when they heard Defendant Wynn was on the way to the salon. "Everybody was petrified," said Jorgen Nielsen, a former artistic director at the salon. Nielsen said he and others repeatedly told high-level company executives Defendant Wynn's sexual advances were causing a problem, but "nobody was there to help us."

95.     On March 6, 2018, a Wynn Resorts manicurist filed yet another lawsuit against Defendant Wynn and the Director Defendants alleging sexual assault by Defendant Wynn, this time beginning in or around 2015. The manicurist alleged that Defendant Wynn would demand that the manicurist sit so close to Defendant Wynn that her knee was touching his crotch. Further, he would place his hand being manicured over his genitals necessitating her to touch them in order to perform her work. If she objected to this physical contact, Defendant Wynn

became angry and agitated. The employee complained to her supervisor and management at Wynn Resorts and, despite being taken to the highest level at Wynn Resorts, was told that nothing would be done to change Defendant Wynn's misbehavior. Moreover, in complaining to her co-workers, she learned that they had many similar stories of sexual advances during the manicures and pedicures that they provided. The employee and her colleagues tried to avoid taking appointments with Defendant Wynn. The employee alleges that Wynn Resorts' management never contacted her to investigate her claim.

96.    Even after the *WSJ Article*, the Board continued to allow Defendant Wynn free reign to intimidate salon employees by permitting him to demand that they publicly disavow his misconduct. As detailed in the manicurist's complaint, described in the prior paragraph, the manicurist alleged that on January 31, 2018, Defendant Wynn accompanied by Wynn Resorts' executives, came into the Claude Baruk Salon at Wynn Las Vegas (the "Salon") and, in a group setting, instructed anyone who had ever felt assaulted or abused by Defendant Wynn to raise their hands. The next day, on or about February 1, 2018, Defendant Wynn returned to the Salon with audio-video personnel and demanded that all employees record a video in which they stated that Defendant Wynn had never assaulted them.[10]

97.    The MGC Decision and Order likewise corroborated and expanded on these claims. For example, it noted with respect to Defendant' Wynn's request that "employees [] raise their hand if they thought he had been harassing them," that "[s]uch an inquiry (and the meetings altogether, for that matter) was, of course, insensitive and inappropriate." The Decision and Order also faulted Defendant Maddox for his role and involvement (or lack thereof in certain respects) in those meetings, finding that:

> All the while, Mr. Maddox went about his business without suggesting to Mr. Wynn that the meetings should not be conducted. To the extent that he actually thought they were a good idea and important for employee relations, it is notable that Mr. Maddox, as the president of the Company, only attended one of the many such meetings. He did not

---

[10] https://www.reviewjournal.com/local/local-las-vegas/lawsuit-wynn-told-employees-to-say-he-never-assaulted-them/

> take the leadership opportunity to appear before all of the employees as a
> steadying hand while the Company was in crisis. Also striking was his
> failure to recognize the inherent coerciveness of those meetings until
> questioned about them at the [MGC's] adjudicatory hearing.

*Id.* at 27-28.

98.    According to deposition testimony revealed in court on March 9, 2018, Defendant Wynn testified that he skipped a mandatory sexual harassment training for all Wynn Resorts employees, including company executives. When asked if he had attended the training, Defendant Wynn responded, "No. I don't need it."

99.    After the publication of the *WSJ article*, Defendants Maddox and Sinatra "approved the request of James Stem, (then-Executive Vice President of Corporate Security and Investigations) to conduct undercover surveillance of the named source in the WSJ article."[11] Decision and Order at 11.

100.    In the wake of the *WSJ article*, the Nevada Gaming Control Board received numerous reports about Defendant Wynn, and the volume of calls it received prompted it to introduce a new online system for the public to send in confidential complaints and tips.

101.    According to CNN, National Labor Relations Board ("NLRB") records also document Defendant Wynn's flagrant misogyny and abusive treatment of his female employees. In late 2006, Defendant Wynn was involved in proceedings before Judge Burton Litvack of the NLRB stemming from a labor dispute with his employees in which Defendant Wynn called some employees, among other things, "muggers and thieves." In ruling against Defendant Wynn, Judge Litvack wrote that Defendant Wynn's "statements and actions during the meeting [with employees] must be viewed in the context of his desire to frighten and intimidate" them. The Judge told CNN that he "came out of his chair" listening to Defendant Wynn make "very disparaging comments about the women who were at the [employee] meeting, particularly some of them that . . . were crying."

102.    On March 19, 2018, it was further reported by the *WSJ* that Defendant Wynn had

---

[11] According to the Decision and Order, "[t]hey [only] ceased those efforts after the IEB expressed concern over the possible chilling effect on witnesses." *Id.* at 11.

paid a settlement to a second Wynn Resorts employee in 2006 relating to sexual misconduct allegations. When she informed Defendant Wynn that she wanted to publicly disclose the details of the event following the January 26, 2018 *WSJ article*, his attorneys contacted the FBI asking the agency to investigate her for extortion. The former employee only sought the ability to reveal information underlying her settlement; no money was ever demanded. The FBI closed the investigation two weeks later.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A. <u>Wynn Resorts' Code of Conduct</u>

103.    Throughout the Class Period, Defendants not only failed to disclose Defendant Wynn's alleged misconduct and actively sought to conceal it, but also consistently assured investors that the Company adhered to rigorous standards of ethics. In particular, up to and throughout the Class Period, Wynn Resorts repeatedly made available to investors, and touted, its Code of Business Conduct and Ethics (the "Code of Conduct").[12]

104.    The Code of Conduct's stated purposes were "to **comply with federal securities laws**" and "to **reinforce and enhance the Company's commitment to an ethical way of doing business**." It described itself as "a statement of policies for the individual and business

---

[12] All citations to the Code of Conduct herein are to the Code of Conduct as amended on August 1, 2016.  Unless otherwise noted, all emphasis in Sections V and VI has been added.

The Company made minor changes to the Code of Conduct on August 1, 2016 in order "to clarify the persons covered by the policy and to update certain contact information." *See* https://web.archive.org/web/20170510184605/http://phx.corporate-ir.net/phoenix.zhtml?c=132059&p=amendmentcodeofconduct. The August 1, 2016 changes were minor and not material here. Otherwise, the Code of Conduct remained the same throughout the Class Period.

After the Class Period, however, the Company was forced to make much more substantial changes to its Code of Conduct. The August 3, 2018 amendments "among other things: (i) reiterated the Company's commitment to maintaining a professional workplace free from discrimination; (ii) provided clarification on where employees can seek guidance or report complaints; and (iii) clarified permitted disclosures." https://wynnresortslimited.gcs-web.com/amendments-code-conduct (last visited Mar. 1, 2019).

conduct" and "the basis for the Company to **continue a tradition of high ethical business standards**." Defendant Wynn's letter that opened the Code of Conduct also recognized "**the Code's importance to the success of the Company**."

105.    The Code of Conduct opened with a letter *from Defendant Wynn*, stating in relevant part:

> We live in an age where legal and ethical missteps of others have resulted in the law imposing **special duties on our personal and business lives**. In the midst of this unfortunate environment, the good name and reputation of Wynn Resorts are a result of the dedication and hard work of all of us. **Together, we are responsible for preserving and strengthening this reputation. Our goal is not just to comply with the laws, rules and regulations that apply to our business; we also continuously strive to abide by high standards of ethical business conduct.**
>
> **This booklet is not to be ignored or taken lightly. All employees, officers and directors, agents and representatives of Wynn Resorts and its affiliates must comply with the Code.** Please read the Code carefully and make sure that you understand it, the consequences of non-compliance **and the Code's importance to the success of the Company**. Your signature on the acknowledgement form at the conclusion of the Code certifies that you have read, understood and complied with its contents.

106.    The statements in the preceding paragraph, which were made by Defendant Wynn and are attributable to the Company and its senior executives who were involved in its day-to-day affairs, including the Individual Defendants, were materially false and/or misleading for a variety of reasons, including the following. First, the statements that "all employees, officers, directors and officers, agents and representatives of the Wynn Resorts and its affiliates must comply with the Code" and it "is not to be ignored or taken lightly" were materially false and misleading because, instead of applying the Code of Conduct to Defendant Wynn, Wynn conducted himself as if the Code did not apply to him, and Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees, including allegations of criminal rape and unlawful assault, as detailed in the *WSJ article*,

NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).  For example, the MGC Decision and Order found that, by no later than December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and settlements, Defendant Sinatra was aware of at least the 2005 Settlement and likely aware of others (including the 2008 Settlement), and other senior executives of the Company, including Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of allegations of sexual misconduct against Defendant Wynn.

107.    Additionally, as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she attended two meetings relating to the 2008 Settlement that was paid with Company funds, and was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying rape allegation.  The Company has also since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41.  Also, the MGC Decision and Order indicates with respect to Maddox that in 2008 or 2009 he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and lacked an adequate explanation), in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents, in violation of the company's Code and other policies (instead, Maddox simply told Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017 before the *WSJ article* was published.

108.    Second, those statements were materially false and/or misleading because they misrepresented and failed to disclose that Defendants ignored Defendant Wynn's pervasive sexual misconduct, including allegations of rape, in violation of the Code.  In other words, inappropriate sexual conduct by Defendant Wynn was tolerated and condoned at the highest levels of management, and he was never disciplined until the January 2018 *WSJ* Article revealed the extent of his egregious conduct and forced his ouster from the Company.  Furthermore,

1  those statements—including the claim that "[o]ur goal is not just to comply with the laws, rules

2  and regulations that apply to our business"—were materially false and/or misleading because

3  they misrepresented and failed to disclose that, as detailed in the *WSJ article*, NGCB complaints

4  against the Company and Defendant Wynn, and in the MGC Decision and Order (as

5  summarized herein), and as the Company has since admitted in the NGCB Settlement,

6  Defendants failed to investigate the alleged sexual misconduct, and also failed to report these

7  incidents to the applicable gaming regulators, as required by law, thus jeopardizing the

8  Company's critically needed gaming licenses.

9       109.   Third, contrary to his statement that the "Code was important to the success of

10  the Company," in fact, as he has admitted and detailed below, Defendant Wynn considered the

11  Code "counterintuitive" to "good management" of his Company.  In truth, Defendant Wynn

12  considered the Code a joke, overlooked its application to sexual harassment and the sexual

13  conduct he frequently engaged in, viewed it as inapplicable to him, and sought it to be changed

14  to allow relationships between supervisors and employees—as demonstrated by testimony

15  obtained in the *Okada* litigation.

16       110.   For example, Defendant Wynn testified in that case, according to the IEB report:

17            [I]f I knew about this [Zero Tolerance Policy] before today, it
              wouldn't exist in its present form for five minutes.

18

19                                    ***

20            I've known we've had a Code of Conduct from the very time we
              became a public company, but I heard things in this reading that were

21            counterintuitive to what I would consider to be good management of
              the company.

22

23                                    ***

24            I would suspect that if it's a Code of Conduct, that it's distributed. I
              doubt if anybody could have read the detail of that very legalese …. I

25            **confess that I had never read the whole thing.** and I mistakenly
              assumed that if we had a Code of Conduct, it was one that my

26            employees could understand and live with, but not that document.
              There have been revisions. There will be more revisions, I assure you,

27            to try and get it to a point where it meets the standard of this company.

28

39

I'm going to bring it up to the board at our meeting in November, straightaway, because what I heard is counterintuitive to good management and violates our most fundamental principles of good communication with our employees. **The fundamental idea that we don't allow harassment or discrimination based upon sexual preference, skin color, religion, that goes without saying**. That's common sense and that's good management. But that document, which took 15 or 20 minutes to read, sounded like boilerplate from some lawyer. How it got through and hasn't been revised, I confess to you, … it surprises me. But I'll attend to it with the board straightaway, and I'm going to have to let the board hear this in its entirety and reveal to the board its fundamental weaknesses in so many areas that don't protect employees but, on the other hand, contribute to confusion, false accusations and mass confusion. Yeah, not a good -- not a good document. And so we're not perfect. We try and get better. We'll work on it, see if we can improve that.

IEB Report at 135-137.

111.     Additionally, the General Counsel of Wynn Las Vegas testified to IEB investigators according to the IEB report that:

[Michaels]: In October of 2017, Mr. Wynn had his deposition taken in the *Okada* case at some point in the month and was asked a question about the sexual harassment policy. And his lawyers asked to have the sexual harassment policy read into the record so that he could understand what he was being questioned on. And my understanding of how that deposition went was he was surprised by what the sexual harassment policy said, just from what's been reported to me. I've never seen his deposition. So Kim [Sinatra] called me up and rips into me about how stupid the sexual harassment policy was. It's hard to understand. It's too long. It needed to be rewritten and I was like, Kim, the policy's totally legit. It's what the law requires. It matches the EEOC checklist of what a policy needs to have. We've used it in litigation numerous times and it's stood up and done its job and defended the company.

*** 

[Michaels]: There were a few meetings [about the sexual harassment policy and Steve Wynn and potentially Kim Sinatra wanting changes to the policy].

***

[Michaels]: Yes[, Steve Wynn wanted to change the policy with respect to being able to have relationships or date, whatever, with employees].

***

[Question]: And how did, how did he express that?

[Michaels]: He said, "This policy is stupid. You can't prohibit consenting adults from having relationships."

[Question]: And why was that in your opinion, [be]cause you said the policy was good the way it was. Why was his recommendation not appropriate under the law?

[Michaels]: Well, there's obviously s-, a supervisor and non-, you know, and the person that reports to them can never have a relationship, that's totally inappropriate. There were other things with the policy. I think his phrase was, "You've deputized every supervisor in my building to be a nar[c] about what they see," because there's the witnessing obligation that if you witness ...

[Question]: You have to tell.

[Michaels]: …you have to report. And he was like, "That's the dumbest thing I've ever heard. " And he Bryan [Cohen] and I initially spent 45 minutes to an hour with Steve, trying to explain to him the law ... and why the policy was the law requires and he said, "That's stupid. We should fight it."

[Question]: And what approach did Kim Sinatra take to this policy change?

[Michaels]: Initially, she sided with Mr. Wynn.

[Question]: Okay. Anything else on that you think we should know?

[Michaels]: Eventually [in early November 2017], we educated Kim on the law and she came around to understanding why the policy was written the way it was and she ultimately, was with us when we went in to talk to Mr. Wynn about why he can't just gut the policy the way he wants to.

IEB Report at 138-39.

112.   With respect to the Code of Conduct, it purported to apply to "all employees,

41

officers, directors, agents, and representatives of the Company and its affiliates ('Covered

Persons')" as well as "certain independent contractors and consultants who work at the

Company's facilities or on the Company's behalf." It emphasized that "[e]ach of us is

responsible for knowing and understanding the policies and guidelines contained in the

following pages" and that "[o]ur conduct should reflect the Company's values, demonstrate

ethical leadership, and promote a work environment that upholds the Company's reputation for

integrity, ethical conduct and trust."

113.    The Code of Conduct described the responsibilities of all Covered Persons as

including the following:

> ### 2.2 Promoting a Diverse and Productive Workforce
>
> The Company is an equal opportunity employer committed to
> complying with all state and federal fair employment practice laws, as
> well as maintaining a workforce that reflects the diversity of the
> community. The Company believes in and supports equal opportunity
> in employment to all persons regardless of race, color, national origin,
> citizenship status, sex, marital status, gender identity or expression,
> sexual orientation or perceived sexual orientation, age, religion,
> veteran status, military status, disability, history of disability or
> perceived disability. **Harassment or discrimination of any sort will
> not be tolerated.**

114.    The Code of Conduct also included a number of implementation and

enforcement provisions. Among other things, it created a "Compliance Officer" who was

"responsible for overseeing and monitoring compliance with this Code" and required all

Covered Persons to report any known or suspected "violation of applicable laws, rules or

regulations, the Code, or the Company's related policies" to the Compliance Officer. It also

stated the following:

> ### 7. IMPLEMENTATION OF THE CODE
>
> ### 7.1 Responsibilities
>
> While each of us is individually responsible for putting the Code to
> work, we need not go it alone. The Company has a number of
> resources, people and processes in place to answer our questions and

guide us through difficult decisions. Copies of this Code are available from the Compliance Officer and on the Company's website. This Code will be distributed annually to all Covered Persons and other individuals to whom it applies who will be asked to certify that they have read and understand the Code and that they have complied and will comply with its terms. **If you know of or suspect a violation of applicable laws, rules or regulations, the Code, or the Company's related policies, you must immediately report that information** as described in Section 1.4 of this Code.

### 7.2 Investigations of Suspected Violations

**All reported violations of the Code will be taken seriously and promptly investigated**. All reports will be treated confidentially to the extent reasonably possible. It is the Company's policy that no one will be subject to retaliation or adverse employment action because of a good faith report of suspected misconduct or for assisting in any investigation of suspected misconduct. It is imperative that reporting persons not conduct their own preliminary investigations. Investigations of alleged violations may involve complex legal issues, and acting on your own may compromise the integrity of an investigation and adversely affect both you and the Company.

### 7.3 Discipline for Violations

**The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible** after its discovery. Subject to applicable law and agreements, Covered Persons who violate this Code and other Company policies and procedures may be subject to disciplinary action, up to and including discharge.

115. The Code of Conduct further noted that the "Company has additional policies that supplement the policies in this Code." Some of these policies, as relevant to this Action, were summarized as follows in the NGCB Complaint:

27. During all times relevant to this Complaint, RESPONDENTS maintained a policy concerning sexual harassment. RESPONDENTS' harassment policy was "to prohibit any conduct, whether intentional or unintentional which results in the harassment or discrimination of employees . . . . " RESPONDENTS' harassment policy specifically defined one type of harassment to be sexual harassment.

43

28. RESPONDENTS' harassment policy defined sexual harassment as "any unwelcomed sexual advances, request for sexual favors, or other conduct of a sexual nature either verbal or physical . . . . "

29. RESPONDENTS' harassment policy set out that an employee who experiences or witnesses sexual harassment "should immediately report the conduct to: 1. The Employee Relations Department; 2. The Vice President of Human Resources, the Legal department, or your particular Divisional Vice President; 3. Any other member of management with whom [the employee] feel[s] comfortable. "

30. RESPONDENTS' harassment policy set out that supervisors who observe or become aware of harassment must immediately report such harassment "to the Employee Relations department and take appropriate steps to stop the offending behavior. "

31. During all times relevant to this Complaint, RESPONDENTS maintained a personal relationships policy. This policy discouraged "romantic or intimate relationships involving a direct or indirect supervisory relationship between employees regardless of whether the relationship is voluntary and/or welcomed by both parties. "

32. RESPONDENTS' personal relationships policy also set out "Department managers are responsible for conducting themselves in a professional manner and strictly maintaining professional relationships with their employees at all times."

33. During all times relevant to this Complaint, RESPONDENTS maintained a policy setting out how the Employee Relations Department (ER) should investigate alleged workplace conduct violations. Specifically: 1. Obtain verbal and written statements from all parties involved, including the complainant and accused. 2. Take photographs/video of any injury or damage (if applicable). 3. Preserve all evidence, and secure the evidence in a locked location. Document all evidence obtained. 4. Determine if there is a potential for risk occurrence. If there is a potential, take all measures appropriate to protect employees. 5. Complete an investigation report and provide all relevant and necessary information, including findings.

34. RESPONDENTS' investigations policy also set out that the ER should make and document findings as "violation found," "no violation found," or "inconclusive investigation. "

116.   The Code of Conduct statements set forth above in paragraphs 112–115, which

are attributable to each of the Defendants, given their involvement in the Company's day-to-day affairs and/or serving as member of the Board of Directors that approved the Code, were materially false and misleading for the reasons set forth above in paragraphs 106–111, and for other reasons as well, including the following.  First, statements guaranteeing that equal application of the Code to all employees, addressing its implementation, and disclosing there was a zero tolerance policy for harassment—such as the Code applies to "all employees, officers, directors and officers, agents and representatives of the Company," "[a]ll reported violations of the Code will be taken seriously and promptly investigated," and "[h]arassment or discrimination of any sort will not be tolerated"—were materially false and/or misleading because, instead of applying the Code of Conduct equally to Defendant Wynn, taking all violations seriously and promptly investigating them, and not tolerating any kind of harassment, Wynn conducted himself as if the Code did not apply to him, and Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees, including allegations of criminal rape and unlawful assault, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).  Indeed, the Company has admitted in the NGCB Settlement that it failed to conduct investigations of allegations of sexual misconduct against Defendant Wynn, including the rape allegation leading to the 2005 Settlement and allegations leading to the 2006 Settlement, in violation of the Company's policies.  Likewise, the MGC Decision and Order found that, by at least December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and settlements, Defendant Sinatra was aware of at least the 2005 Settlement and underlying rape allegation and likely aware of others (including the 2008 Settlement), and other senior executives of the Company, including Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of allegations of sexual misconduct, including harassment, against Defendant Wynn.

117.     Additionally, as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she attended two meetings relating to the 2008 Settlement that was

paid with Company funds, and was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying rape allegation. The Company has also since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41. Also, the MGC Decision and Order indicates with respect to Maddox that in 2008 or 2009 he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and that lacked an adequate explanation), in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents, in violation of the company's Code and other policies (instead, Maddox simply told Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017 before the *WSJ article* was published.

118.    Additionally, those statements, as well as those concerning the implementation of the Code emphasized above, were materially false and/or misleading because they misrepresented and failed to disclose that Defendants ignored Defendant Wynn's pervasive sexual misconduct, including allegations of rape, in violation of the Code.  In other words, conduct by Defendant Wynn was tolerated and condoned at the highest levels of management, and he was never disciplined until the January 2018 *WSJ* Article revealed the extent of his egregious conduct and forced his ouster from the Company.  Furthermore, those statements were materially false and/or misleading because they misrepresented and failed to disclose that, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), and as the Company has since admitted in the NGCB Settlement, Defendants failed to investigate the alleged sexual misconduct, and also failed to report these incidents to the applicable gaming regulators, as required by law, thus jeopardizing the Company's critically needed gaming licenses.

119.    Moreover, rather than seeking to "halt any such conduct [violating the Code] that may occur as soon as reasonably possible after its discovery," Defendants allowed Defendant Wynn's violations to continue, in violation of the law and Company policy, and went to great

lengths to conceal it from those outside of the Company, including regulators and investors. Likewise, contrary to the statement that "[a]ll reported violations of the Code will be taken seriously and promptly investigated," in fact, Defendants failed to investigate the alleged sexual misconduct, and also failed to report these incidents to the applicable gaming regulators, as required by law, thus jeopardizing the Company's critically needed gaming licenses.

120.    Additionally, contrary to the Code's statement that "[h]arassment" and "discrimination of any sort will not be tolerated" and its requirement that violators will be disciplined, in fact such conduct by Defendant Wynn was tolerated and condoned at the highest levels of management, and he was never disciplined until the January 2018 *WSJ* Article revealed the extent of his egregious conduct and forced his ouster from the Company.

121.    Further, the Defendants' Code of Conduct statements set forth above in paragraphs 105, and 112–115 were materially false and misleading because they omitted: (i) as the Company admitted in the NGCB Settlement, the Company and certain of its senior executives, including Defendants Wynn and Sinatra, as well as Kevin Tourek, failed to conduct an investigation into allegations of sexual misconduct against Defendant Wynn after obtaining knowledge of such allegations; and (ii) as the MGC Decision and Order explained, "there is substantial evidence that the Company neglected to follow its own corporate policies [including the Code of Conduct] on a number of occasions." The MGC Decision and Order found for example:

> 1. In 2014, top company executives learned that an employee alleged that Mr. Wynn had raped her. The allegation was not reported to the Employee Relations Department and no investigation was conducted by the Company. This failure violated the sexual harassment policy, the zero tolerance policy, and the business conduct policy.
>
> 2. In 2014-15, top Company executives were made aware of complaints involving Mr. Wynn's behavior towards employees of the spa. The allegation was not reported to the Employee Relations Department and no investigation was conducted by the Company. This failure violated the sexual harassment policy, the zero tolerance policy, and the business conduct policy.

47

3. In 2016, upon the filing of the amended cross-claim by Ms. Wynn as part of *Okada* litigation, top Company executives were effectively made aware of the existence of the 2005 settlement. The allegations that led to the settlement were not reported to the Employee Relations Department and no investigation was conducted by the Company. The fact that a settlement had been reached and a retraction signed is of no import. This failure violated the sexual harassment policy, the zero tolerance policy, and the business conduct policy.

4. In 2017, Mr. Wynn and Ms. Whennen were deposed as part of the *Okada* litigation. Notably, the Company's general counsel, Ms. Sinatra, was present for their depositions. At each deposition, the testimony indicated that the 2005 matter originated with a rape allegation against Mr. Wynn. Ms. Sinatra never reported this information to the Employee Relations Department, and no investigation was conducted by the Company in the wake of receiving this information. This failure violated the sexual harassment policy, the zero tolerance policy, and the business conduct policy.

5. In 2017, during preparation for his deposition as part of the Okada litigation, Mr. Maddox was informed, essentially, that he may be asked about an assault having taken place as part of the 2005 matter. Though he was previously aware of the 2005 matter via the 2016 amended cross-claim, now he had a heightened awareness. Nevertheless, he did not report the matter to the Employee Relations Department and no investigation was conducted by the Company at this point. This failure violated the sexual harassment policy, the zero tolerance policy, and the business conduct policy.

MGC Decision and Order at 46.

122.   The MGC added that:

The fact that many of the allegations and settlements were characterized as "consensual" is of no import. The fact that those in positions of authority actually repeatedly accepted such characterization reflects a complete lack of understanding of the applicable principles of law. The fact that a high ranking corporate executive is of the belief that a lower ranking employee is consenting to a sexual relationship, *i.e.*, that it appears to be voluntary, does not mean that the relationship was welcome by the employee.

*Id.* at 46-47.

48

123.    The Code of Conduct played a very significant role in a major lawsuit involving the Company and some of its largest shareholders that began in 2012 and continued until after the Class Period. The lawsuit was styled *Wynn Resorts, Ltd. v. Kazuo Okada, et al.*, No. A-12-656710-B, in the Eighth Judicial District Court in Clark County, Nevada (the "*Okada Litigation*" or "*Okada*").

124.    Among other things, the *Okada* Litigation made clear that the Code of Conduct was not "just a document [the Company] wrote to fulfill a corporate obligation." The *Okada* Litigation arose out of the fact that the Company used the Code of Conduct to "find Kazuo Okada—an early investor and formerly the largest single shareholder of Wynn Resorts—unsuitable to be a shareholder in the company, which ultimately led to not only his ouster from the Board of Directors but Wynn Resorts redeeming his shares."[13]

125.    Throughout the *Okada* Litigation, the Company consistently made clear that it considered a violation of the Code of Conduct not just a violation of internal Company policy, but **sufficient to render someone "unsuitable" under Nevada law**.

126.    The 2014 10-K explained the Company's determination to forcibly redeem Okada's Wynn securities, pursuant to the Company's articles of incorporation, after having concluded that Okada was an "unsuitable" individual. These actions underscored to investors the significance of the "suitability" requirement under Nevada law and also demonstrated the very severe consequences of failing to meet that requirement:

> ***Redemption of Securities Owned By an Unsuitable Person.*** The Company's articles of incorporation provide that, to the extent required by the gaming authority making the determination of unsuitability or to the extent the Board of Directors determines, in its sole discretion, that a person is likely to jeopardize the Company's or any affiliate's application for, receipt of, approval for, right to the use of, or entitlement to, any gaming license, shares of Wynn Resorts' capital stock that are owned or controlled by an unsuitable person or its affiliates are subject to redemption by Wynn Resorts.

---

[13] https://finance.yahoo.com/news/steve-wynn-allegations-could-mean-143700942.html

49

* * *

Based on the Freeh Report, the Board of Directors of Wynn Resorts determined that the Okada Parties are "unsuitable persons" under Article VII of the Company's articles of incorporation. The Board of Directors was unanimous (other than Mr. Okada) in its determination. After authorizing the redemption of the Aruze shares, as discussed below, the Board of Directors took certain actions to protect the Company and its operations from any influence of an unsuitable person, including placing limitations on the provision of certain operating information to unsuitable persons and formation of an Executive Committee of the Board to manage the business and affairs of the Company during the period between each annual meeting….

On February 18, 2012, Mr. Okada was removed from the Board of Directors of Wynn Las Vegas Capital Corp., an indirect wholly owned subsidiary of Wynn Resorts. On February 24, 2012, Mr. Okada was removed from the Board of Directors of Wynn Macau, Limited and on February 22, 2013, he was removed from the Board of Directors of Wynn Resorts by a stockholder vote in which 99.6% of the over 86 million shares voted were cast in favor of removal. Mr. Okada resigned from the Board of Directors of Wynn Resorts on February 21, 2013. Although the Company has retained the structure of the Executive Committee, the Board has resumed its past role in managing the business and affairs of the Company.

Based on the Board of Directors' finding of "unsuitability," on February 18, 2012, Wynn Resorts redeemed and canceled Aruze's 24,549,222 shares of Wynn Resorts' common stock….

**B.  The 2013 10-K**

127.    On February 28, 2014, Wynn Resorts filed an annual report on Form 10-K for 2013 (the "2013 10-K").

128.    The 2013 10-K was signed, and the statements therein were thus made by, Elaine Wynn and Defendants Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Maddox. The 2013 10-K contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Defendants Wynn and Maddox, stating that the information contained in the 2013 10-K "fairly present in all material respects the financial condition, results of operations

and cash flows of the registrant as of, and for, the periods presented in this report."

129.    The 2013 10-K contained the following false and misleading statement:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While **the Company believes that it is in full compliance with all applicable laws**, any such investigations could result in actions by regulators against the Company.

130.    The italicized text in the paragraph above—"the Company believes that it is in full compliance with all applicable laws"—was materially false and/or misleading for a variety of reasons, including because: (i) it misrepresented and failed to disclose that Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees, including allegations of criminal rape and unlawful assault, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein); (ii) the Company has since admitted in the NGCB Settlement that it failed to investigate multiple, actual reports of sexual misconduct, including rape, by Defendant Wynn in violation of applicable gaming laws; (iii) Defendants' statement created a false impression that Defendants were "in full compliance with all applicable laws"— particularly those that could impact suitability or its important gaming licenses—when the opposite was true, given that by February 2014, allegations of unlawful or inappropriate sexual misconduct against Defendant Wynn by at least three different employees (at least one of whom accused him of rape) had been confidentially settled but were not reported to the MGC as required by Massachusetts gaming laws.

131.    For example, the MGC Decision and Order found that, by no later than December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and settlements, Defendant Sinatra was aware of at least the 2005 Settlement and likely aware of others (including the 2008 Settlement), and other senior executives of the Company, including Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin

Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of allegations of sexual misconduct, including harassment, against Defendant Wynn. Additionally, as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she attended two meetings relating to the 2008 Settlement that was paid with Company funds, and was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying rape allegation.  The Company has also since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41.  With respect to Maddox, the MGC Decision and Order indicates that in 2008 or 2009 he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and that lacked an adequate explanation), in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents, in violation of the company's Code and other policies (instead, Maddox simply told Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017, before the *WSJ article* was published.

132.  Also, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), and as the Company has since admitted in the NGCB Settlement, Defendants' statements misrepresented and omitted that they failed to investigate and document the alleged sexual misconduct, and also failed to report these incidents to the applicable gaming regulators, as required by law, thus jeopardizing the Company's critically needed gaming licenses.

133.  Additionally, as detailed in the MGC Decision and Order (as summarized herein), the Company misappropriated and misclassified funds in order to pay certain settlements arising from allegations of sexual misconduct by Defendant Wynn.

134.  The statement that "the Company believes that it is in full compliance with all applicable laws" was also materially false and/or misleading given that it omitted facts undermining the basis for Defendants' belief, including that Defendant Wynn had been accused of rape and other sexual misconduct on a number of occasions, and Defendants were aware of

such allegations or one or more settlements arising therefrom, as alleged herein.

135.   The 2013 10-K contained the following false and/or misleading statements:

We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. **Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises**.

\* \* \*

**The loss of Stephen A. Wynn could significantly harm our business.**

**Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts**. Mr. Wynn's employment agreement expires in October 2020. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts, Limited**. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired**.

136.   This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn's involvement provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants misrepresented and failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein). As a result, the Company was at grave risk of losing Wynn as Chief Executive Officer.

137.   Further, rather than providing the Company with a "distinct advantage over other gaming enterprises," Defendant Wynn's involvement posed a massive liability and ticking time-

bomb given that he engaged in an egregious pattern of predatory sexual conduct on the

Company's own employees, including alleged criminal rape and unlawful assault, as detailed in

the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC

Decision and Order (as summarized herein).

138.    For example, the MGC Decision and Order found that, by no later than

December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and

settlements, Defendant Sinatra was aware of at least the 2005 Settlement and likely aware of

others (including the 2008 Settlement), and other senior executives of the Company, including

Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin

Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of

allegations of sexual misconduct, including harassment, against Defendant Wynn. Additionally,

as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she

attended two meetings relating to the 2008 Settlement that was paid with Company funds, and

was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying

rape allegation.  The Company has also since admitted in the NGCB Settlement that Sinatra was

aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41.  With respect to

Defendant Maddox, the MGC Decision and Order indicates that in 2008 or 2009 he learned of,

but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using

company funds and that lacked an adequate explanation), in or around 2014 he learned of

Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the

incidents, in violation of the company's Code and other policies (instead, Maddox simply told

Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing

involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and

became more fully aware of the details in December 2017 before the *WSJ article* was published.

139.    The 2013 10-K contained the following false and/or misleading statement:

> ***Consequences of Violating Gaming Laws.*** If the Nevada Gaming
> Commission determines that we have violated the Nevada Gaming
> Control Act or any of its regulations, it could limit, condition, suspend
> or revoke our registrations and gaming license. In addition, we and the

persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

140.   This statement was materially false and/or misleading because, while warning investors generally of the consequences of violating gaming laws, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein). As a result, the Company was at grave risk of losing Wynn as Chief Executive Officer. As a result, the Company was at grave risk of losing its critical gaming licenses and incurring substantial fines—fines which were ultimately imposed by the NGCB and MGC against the Company and Defendant Maddox as alleged herein.

141.   The 2013 10-K also contained the following false and/or misleading statement referring to Wynn Resorts' Code of Conduct:

> **As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees** of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. **In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers** on our website at http://www.wynnresorts.com under the heading "Corporate

Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

142. This reference to the Code of Conduct was materially false and/or misleading for the reasons set forth above in section V(A), particularly paragraphs 106–11 and 116 –22, including, because, among other things, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of Conduct to Defendant Wynn, the Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees. Thus, contrary to its public representations, the Company did not have a "commitment to integrity."

143. Further, the claim that "waivers" to the code of ethics would be disclosed on the Company's website was false and misleading because it failed to disclose that its provisions were not being applied to—and were effectively waived with respect to—Defendant Wynn.

## C. The 2014 Proxy Statement

144. On March 31, 2014, the Company filed its 2014 Definitive Proxy Statement ("2014 Proxy Statement"). Defendant Sinatra signed the Notice of Annual Meeting accompanying the 2014 Proxy Statement, "by order of the Board of Directors."  The 2014 Proxy Statement was furnished to the Company's stockholders in connection with the solicitation by its Board of Directors for proxies for its 2014 Annual Meeting.

145. The 2014 Proxy Statement described Defendant Wynn as the "**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our brand." It touted his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

***Experience, qualifications attributes and skills.*** Mr. Wynn is the ***founder and creative and organizational force of Wynn Resorts***. Mr. Wynn's 45 years of experience in the industry have contributed to his brand name status as the ***preeminent designer, developer and operator of destination casino resorts***. Mr. Wynn's involvement with our casino resorts provides a ***distinct advantage over other gaming enterprises***. As founder, Chairman and Chief Executive Officer, he has a ***unique perspective into the operations and vision for the Company.***

***Chairman and CEO.*** Mr. Wynn currently serves as the Chairman and CEO of the Company. Mr. Wynn has served in these roles since the Company's inception in 2002 and during that period, has delivered ***exceptional value*** to our stockholders. Under Mr. Wynn's leadership our stockholders have received approximately $5.4 billion, or $48.75 per share, through the payment of dividends and seen a compounded annual total stockholder return (including reinvestment of dividends) of 32% from our initial public offering in 2002 through the end of 2013. Mr. Wynn is the founder, creator and name behind our brand. He brings ***extraordinary talent to our Company*** that is unrivaled by others in our industry. In addition, the Board believes that Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts.

\* \* \*

***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and during that period, has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership our stockholders have received approximately $5.4 billion, or $48.75 per share, through the payment of dividends as well as seen a compounded annual total stockholder return (including reinvestment of dividends) of 32% from our initial public offering in 2002 through the end of 2013. Mr. Wynn is the founder, creator and name behind our brand. He brings ***extraordinary talent to our Company that is unrivaled*** in our industry….

***Other Key Considerations.*** Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success and provided the context for determining Mr. Wynn's compensation for 2013. The Compensation Committee is mindful that gaming

companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the *unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands*…

146.    This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn's involvement provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants misrepresented and failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein). As a result, the Company was at grave risk of losing Wynn as Chief Executive Officer.

147.    Further, rather than providing the Company with a "distinct advantage over other gaming enterprises," Defendant Wynn's involvement posed a massive liability and ticking time-bomb given that he engaged in an egregious pattern of predatory sexual conduct on the Company's own employees, including alleged criminal rape and unlawful assault, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).

148.    For example, the MGC Decision and Order found that, by no later than December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and settlements, Defendant Sinatra was aware of at least the 2005 Settlement and likely aware of others (including the 2008 Settlement), and other senior executives of the Company, including Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of allegations of sexual misconduct, including harassment, against Defendant Wynn. Additionally,

as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she attended two meetings relating to the 2008 Settlement that was paid with Company funds, and was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying rape allegation.  The Company has also since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41. With respect to Defendant Maddox, the MGC Decision and Order indicates he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and that lacked an adequate explanation), in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents, in violation of the company's Code and other policies (instead, Maddox simply told Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017, before the *WSJ article* was published.

### D.  Misrepresentations in 2014 about Compliance

149.    On April 22, 2014, Wynn Resorts filed a Form 8-K, signed by Defendant Maddox, attaching as an exhibit the Annual Report of Wynn Macau, Ltd. for 2013 (the "2013 Wynn Macau Annual Report"). The 2013 Wynn Macau Annual Report stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into Wynn Resorts' compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with Wynn Resorts' donation to the University of Macau. While ***Wynn Resorts believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against Wynn Resorts.

150.    The italicized text in the paragraph above—"the Company believes that it is in full compliance with all applicable laws"—which is attributable to the Company and Defendants Wynn, Maddox and Sinatra, was materially false and/or misleading for a variety of

reasons, including the reasons set forth above in paragraphs 130-34, as well as the following. First, it misrepresented and failed to disclose that Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees, including allegations of criminal rape and unlawful assault, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein). Defendants' statement also created a false impression that Defendants were "in full compliance with all applicable laws"—particularly those that could impact suitability or its important gaming licenses, when the opposite was true. In fact, by April 2014, allegations of unlawful or inappropriate sexual misconduct against Defendant Wynn by at least three different employees (at least one of whom accused him of rape) had been confidentially settled.

151. For example, the MGC Decision and Order found that, by no later than December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and settlements, Defendant Sinatra was aware of at least the 2005 Settlement and likely aware of others (including the 2008 Settlement), and other senior executives of the Company, including Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of allegations of sexual misconduct, including harassment, against Defendant Wynn. Additionally, as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she attended two meetings relating to the 2008 Settlement that was paid with Company funds and was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying rape allegation.  The Company has also since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41. With respect to Defendant Maddox, the MGC Decision and Order indicates that in 2008 or 2009 he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and that lacked an adequate explanation), in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents, in violation of the company's Code and other policies (instead, Maddox simply told Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing

involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017, before the *WSJ article* was published.

152.     Additionally, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), and as the Company has since admitted in the NGCB Settlement, Defendants' statement misrepresented and omitted that they failed to investigate and document the alleged sexual misconduct, and also failed to report these incidents to the applicable gaming regulators, as required by law, thus jeopardizing the Company's critically needed gaming licenses.

153.     Additionally, as detailed in the MGC Decision and Order (as summarized herein), the Company misappropriated and misclassified funds in order to pay certain settlements arising from allegations of sexual misconduct by Defendant Wynn.

154.     The statement that "the Company believes that it is in full compliance with all applicable laws" was also materially false and/or misleading given that it omitted facts undermining the basis for Defendants' belief, including that Defendant Wynn had been accused of rape and other sexual misconduct on a number of occasions, and Defendants were aware of such allegations or one or more settlements arising therefrom, as alleged herein.

155.     On May 9, 2014, Wynn Resorts filed a quarterly report on Form 10-Q for the first quarter of 2014 (the "2014 Q1 10-Q"). The 2014 Q1 10-Q was signed by Defendant Maddox and also contained signed SOX certifications by Defendants Wynn and Maddox, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." The statements in this SEC filing, as well as each of those alleged below, are attributable to Defendants Wynn, Maddox, and Sinatra given that they signed or certified the accuracy of the relevant filings and/or in light of their day-to-day involvement in the Company's affairs at the time the

statements were made, reflecting their ultimate authority over the statements therein.

156.    The 2014 Q1 10-Q stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

157.    The italicized text in the above-quoted excerpts in paragraphs 155–56  was materially false and/or misleading for the reasons set forth above in paragraphs 130–34, 140, and142. For example, Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada and Massachusetts gaming regulations by failing to report the incidents involving Defendant Wynn to regulators, as required. Additionally, the statement that "the Company believes that it is in full compliance with all applicable laws" was materially false and/or misleading given that it omitted facts undermining the basis for Defendants' belief, including that Defendant Wynn had been accused of rape and other sexual misconduct on a number of occasions, and Defendants were aware of such allegations or one or more settlements arising therefrom.  Given the report contained those material misstatements and omissions, the certifications signed by Defendants Wynn and Maddox listed above attesting to the accuracy of the statements therein were false and misleading.

158.    On August 8, 2014, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2014 (the "2014 Q2 10-Q"). The 2014 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a***

*material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*" and the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

159. The 2014 Q2 10-Q stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

160. The italicized text in the above-quoted excerpts in paragraphs 158–59 was materially false and/or misleading for the reasons set forth above in paragraphs 130–34, 140, and 142, including because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada and Massachusetts gaming regulations by failing to report the incidents involving Defendant Wynn to regulators, as required. Additionally, the statement that "the Company believes that it is in full compliance with all applicable laws" was materially false and/or misleading given that it omitted facts undermining the basis for Defendants' belief, including that Defendant Wynn had been accused of rape and other sexual misconduct on a number of occasions, and Defendants were aware of such allegations or one or more settlements arising therefrom.

161. Given the 2014 Q2 10-Q report contained those material misstatements and omissions, the certifications signed by Defendant Wynn and Cootey listed above attesting to the accuracy of the statements therein were also false and misleading.

162.     On November 7, 2014, Wynn Resorts filed a quarterly report on Form 10-Q for the third quarter of 2014 (the "2014 Q3 10-Q"). The 2014 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

163.     The 2014 Q3 10-Q stated, in relevant part, as follows:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

164.     The italicized text in the above-quoted excerpts in paragraphs 162–63 was materially false and/or misleading for the reasons set forth above in paragraph 160, including because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada and Massachusetts gaming regulations by failing to report the incidents involving Defendant Wynn to regulators, as required. Additionally, the statement was materially false and/or misleading given that it omitted facts undermining the basis for Defendants' belief, including that Defendant Wynn had been accused of rape and other sexual misconduct on a number of occasions, and Defendants were aware of such allegations or one or more settlements arising therefrom.

165.     Given the 2014 Q3 10-Q contained those material misstatements and omissions, the certifications signed by Defendant Wynn and Cootey listed above attesting to the accuracy of the statements therein were also false and misleading.

**E.  Misrepresentations about the Massachusetts License and Resort**

166.     The Company held an earnings call on February 3, 2015. On that call, Defendant Wynn made the following false and misleading statement on behalf of himself and the Company:

> We worked very hard to compete for the right to operate in Massachusetts, as you know, and it was expensive to do that process, and time-consuming. We had an 1,800 pound application, when we finally finished. We spent $25 million just to get to the end of the game, in terms of local elections and requirements with related communities. You know that we had $130 million in infrastructure that we had to agree to, and then there was another $100 million in the cost of the license, other miscellaneous stuff. We're in $230 million of our budget already.
>
> Our promises for that, that are separate and apart from the construction and that project budget. We are going to be the one of the top five private employers in the history of the State of Massachusetts. We're going to be responsible for $50 million a month in revenue for the state, probably another $50 million in related revenues to all the surrounding communities. We're going to employ thousands and thousands of people. It's the largest construction budget in recent history in Massachusetts, maybe forever.
>
> We've got a serious presence there in Massachusetts. And we're delighted to have that position and we finished the design of the hotel. And I think it's – along with the Palace, the best work we've ever done, based upon 40 years of experience. Best of all, with the same group of executives that have learned from all of our past experiences and projects, and hopefully, our next stuff that comes up will reflect the evolution and the enlightenment that we've been able to achieve because of those experiences….
>
> So, all-in-all, the setup is just right for Massachusetts, and as we wind our way through the complexities of the agent situation, our setup is

65

just right to keep our promise to our employees and to the government in China.

167.    These statements were materially false and/or misleading because, while touting their newly earned right to operate in Massachusetts, the Company and Defendant Wynn failed to disclose that Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to Massachusetts regulators when applying for the license, although required to do so under gaming regulations. As a result, the Company was at grave risk of losing the Massachusetts gaming license.

168.    For example, the MGC Decision and Order found that, by no later than December 2013 (and likely prior to then), Defendant Wynn was aware of all allegations and settlements, Defendant Sinatra was aware of at least the 2005 Settlement and likely aware of others (including the 2008 Settlement), and other senior executives of the Company, including Defendant Maddox, Nathan (then-Chief Human Resources Officer Wynn Las Vegas) and Kevin Tourek (then Vice President and General counsel for Wynn Las Vegas) were also aware of allegations of sexual misconduct, including harassment, against Defendant Wynn. Additionally, as to Defendant Sinatra, the MGC Decision and Order found evidence supporting that she attended two meetings relating to the 2008 Settlement that was paid with Company funds, and was informed in or around April 2009 by Elaine Wynn of the 2005 Settlement and underlying rape allegation.  The Company has also since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest. NGCB Compl. ¶41. With respect to Defendant Maddox, the MGC Decision and Order indicates that in 2008 or 2009 he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and that lacked an adequate explanation), in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents, in violation of the company's Code and other policies (instead, Maddox simply told Defendant Wynn to "knock it off"), knew about the settlements or allegations of wrongdoing

involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017, before the *WSJ article* was published.

169.    In fact, the MGC Decision and Order found:

> [I]t is difficult to fathom why the existence of the allegations and settlements was not disclosed to the Commission in 2013 and 2014 during the RFA-1 and RFA-2 reviews [and licensing process in 2013 to obtain a Massachusetts gaming license].[15] It is arguably understandable why there would be a preference on the part of the Company not to publicly disclose the existence of the settlements, particularly if they believed them to be based on false allegations. It strains the conscience, though, to understand why they were not disclosed to the IEB, particularly if the Company was confident that the allegations were false.

> [15] The 2014 Abbott memo is dated June 27, 2014. The vote to award the Category 1 license in Region A to Wynn MA, LLC took place on September 16, 2014. Ms. Sinatra, who was intimately involved with the licensing process, denied being aware of the allegations contained in the Abbott memo despite being forwarded a copy to her Company email address and having responded to that email. The Commission notes that the IEB did not receive this email chain to or from Ms. Sinatra until September 28, 2018, after her departure, due to an e-discovery issue, as explained by the Company. The Commission is inclined to conclude that her denial was motivated by self-preservation given the proximity of the issuance of the memo to the licensing decision. The Commission found nothing in the record to support Sinatra's denial and was unable to elicit further explanation from her given that she declined to appear at the hearing despite receiving a subpoena and declined the Commission's follow-up request to appear following the conclusion of the adjudicatory hearing.

MGC Decision and Order at 19.

170.    Additionally, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants' statement misrepresented and omitted that they failed to investigate and document the alleged sexual misconduct, and also failed to report these incidents to the applicable gaming

67

regulators, as required by law, thus jeopardizing the Company's critically needed gaming licenses.

171.    Also, as detailed in the MGC Decision and Order (as summarized herein), the Company misappropriated and misclassified funds in order to pay certain settlements arising from allegations of sexual misconduct by Defendant Wynn, which placed its Massachusetts gaming license at risk.

## F.   The 2014 10-K

172.    On March 2, 2015, Wynn Resorts filed an annual report on Form 10-K for 2014 (the "2014 10-K"). The 2014 10-K was signed by Elaine Wynn and Defendants Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey. It also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "*this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

173.    The 2014 10-K stated, in relevant part, as follows:

> On February 18, 2012, the Board of Directors of Wynn Resorts
> received a report from Freeh, Sporkin & Sullivan, LLP detailing
> numerous instances of conduct constituting prima facie violations of
> the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada
> (formerly the largest beneficial owner of our shares) and certain of his
> affiliates. . . . . The Company has provided the Freeh Report to
> applicable regulators and has been cooperating with related
> investigations of such regulators. The conduct of Mr. Okada and his
> affiliates and the outcome of any resulting regulatory findings could
> have adverse consequences to the Company. A finding by regulatory
> authorities that Mr. Okada violated the FCPA on Company property
> and/or otherwise involved the Company in criminal or civil violations
> could result in actions by regulatory authorities against the Company.
> Relatedly, regulators have and may pursue separate investigations into
> the Company's compliance with applicable laws in connection with

the Okada matter . . . . While **the Company believes that it is in full compliance with all applicable laws**, any such investigations could result in actions by regulators against the Company, which could negatively affect the Company's financial condition or results of operations.

* * *

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While **the Company believes that it is in full compliance with all applicable laws**, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

174.  The italicized text in the above-quoted excerpts in paragraphs 172–73 was materially false and/or misleading for the reasons set forth above in paragraphs 130-34, 140, and 142, including because Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada and Massachusetts gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required. Additionally, the statement that "the Company believes that it is in full compliance with all applicable laws" was materially false and/or misleading given that it omitted facts undermining the basis for Defendants' belief, including that Defendant Wynn had been accused of rape and other sexual misconduct on a number of occasions, and Defendants were aware of such allegations or one or more settlements arising therefrom.  Indeed, as the Company admitted in the NGCB Settlement, by the time the 2014 10-K was issued, the Company and its senior executives, including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Nevada law.

69

175.    The 2014 10-K referred to Wynn Resorts' Code of Conduct as follows:

**As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees** of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. **In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website** at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

176.    This reference to the Code of Conduct was false and/or misleading for the reasons set forth above in paragraphs 106–11, 116-22 and 174. For example, among other things, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of Conduct to Defendant Wynn, Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees. Accordingly, the Company did not have a "commitment to integrity."  Indeed, as the Company admitted in the NGCB Settlement, by the time the 2014 10-K was issued, the Company and its senior executives, including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Nevada law.

177.    Further, the claim that "waivers" to the code of ethics would be disclosed on the Company's website was false and misleading because it failed to disclose that its provisions were not being applied to Defendant Wynn.

178.    The 2014 10-K contained the following false and/or misleading statement:

We believe that Stephen A. Wynn is the ***preeminent designer, developer and operator of destination casino resorts*** and has developed brand name status. Mr. Wynn's involvement with our resorts provides a ***distinct advantage over other gaming enterprises***.

\* \* \*

**The loss of Stephen A. Wynn could significantly harm our business.**

70

> Our ability to maintain our competitive position is dependent to a large
> degree on the efforts, skills and reputation of Stephen A. Wynn, the
> Chairman of the Board, Chief Executive Officer and one of the
> principal stockholders of Wynn Resorts. Mr. Wynn's employment
> agreement expires in October 2022. However, we cannot assure you
> that Mr. Wynn will remain with Wynn Resorts. If we lose the services
> of Mr. Wynn, or if he is unable to devote sufficient attention to our
> operations for any other reason, our business may be significantly
> impaired.

179.    This statement was materially false and/or misleading for the reasons set forth above, including in paragraphs 146-48. For example, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of significant harm from losing Defendant Wynn as Chief Executive Officer.

180.    The 2014 10-K contained the following false and/or misleading statement:

> ***Consequences of Violating Gaming Laws***. If the Nevada Gaming
> Commission determines that we have violated the Nevada Gaming
> Control Act or any of its regulations, it could limit, condition, suspend
> or revoke our registrations and gaming license. In addition, we and the
> persons involved could be subject to substantial fines for each separate
> violation of the Nevada Gaming Control Act, or of the regulations of
> the Nevada Gaming Commission, at the discretion of the Nevada
> Gaming Commission. Further, the Nevada Gaming Commission could
> appoint a supervisor to operate our Las Vegas Operations and, under
> specified circumstances, earnings generated during the supervisor's
> appointment (except for the reasonable rental value of the premises)
> could be forfeited to the State of Nevada. Limitation, conditioning or
> suspension of any of our gaming licenses and the appointment of a
> supervisor could, and revocation of any gaming license would, have a
> significant negative effect on our gaming operations.

71

* * *

***Consequences of Being Found Unsuitable.*** Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities, including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

* * *

***Company Registration Requirements.*** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. ***Wynn Resorts and all individual qualifiers were found suitable by the MGC***….A finding of suitability is comparable to licensing, and both require submission of

72

detailed personal and financial information followed by a thorough investigation….

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

***Consequences of Violating Gaming Laws.*** If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

181. This statement was false and/or misleading for the reasons set forth above, including in paragraph 140, as well as because, while telling investors that Defendant Wynn and all "individual qualifiers" had been found suitable, and while warning investors generally of the consequences of violating gaming laws, it failed to disclose that Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to the Massachusetts Gaming Commission during the license application process although required to do so under gaming regulations. As a result, the Company was at grave risk of losing its Massachusetts license.

### G. **2015**

182. On March 16, 2015, the Company filed its 2015 Definitive Proxy Statement ("2015 Proxy Statement"). Defendant Sinatra signed the Notice of Annual Meeting accompanying the 2015 Proxy Statement, "by order of the Board of Directors." The 2015 Proxy Statement was furnished to the Company's stockholders in connection with the solicitation by

its Board of Directors for proxies for its 2015 Annual Meeting.

183.    The Company's 2015 Proxy Statement described Defendant Wynn as the "**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our brand." It touted his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

> *Experience, qualifications, attributes and skills.* Mr. Wynn is the founder and creative and organizational force of Wynn Resorts. Mr. Wynn's 45 years of experience in the industry have contributed to his brand name status as the preeminent designer, developer and operator of destination casino resorts. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. As founder, Chairman and Chief Executive Officer, he has a unique perspective into the operations and vision for the Company.

> *Chairman and CEO.* Mr. Wynn currently serves as the Chairman and CEO of the Company. Mr. Wynn has served in these roles since the Company's inception in 2002 and during that period, has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2014, we have paid approximately $5.9 billion, or $53.75 per share, in dividends to our stockholders, and our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 27% over that same timeframe. Mr. Wynn is the founder, creator and name behind our brand. He brings extraordinary talent to our Company that is unrivaled by others in our industry. In addition, the Board believes that Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts.

\* \* \*

> ***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and during that period, has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2014, we have paid approximately $5.9 billion, or $53.75 per share, in dividends to our stockholders, and our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 27% over that same timeframe. Mr. Wynn is the founder, creator and name behind our brand. He brings extraordinary talent to our Company that is unrivaled in our industry….

> ***Other Key Considerations. Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success and provided the context for determining Mr. Wynn's compensation for 2014. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands….***

184. The statements in paragraph 183 were materially false and/or misleading for the reasons set forth above, including in paragraphs 146-48. For example, while touting the "distinct advantage" Defendant Wynn provided, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

185. On March 24, 2015, the Company filed a Schedule 14A attaching a presentation from the Board to the Company's shareholders. On the same day, the Company also filed a Schedule 14A attaching a letter from the Board to the Company's shareholders, signed by Defendant Miller.

186.    The presentation argued that Elaine Wynn should not be retained as a director because she "has placed her individual interests ahead of her director duties" and her ongoing dispute with Defendant Wynn has "reduced the effectiveness of her participation on the Board." The letter likewise noted "the independent directors' view is that over the past three years Ms. Wynn's personal goals have interfered with her effectiveness as a director."

187.    The presentation also contained the following language defending the Board's purported commitment to diversity:

**WYNN RESORTS HAS A TRACK RECORD OF PROMOTING DIVERSITY**

Wynn Resorts' commitment to diversity is reflected by the number of women in senior leadership roles throughout the Company.

In fact, 34% of employees at the Vice President and above level and 38% of employees at the Executive Director or Assistant Vice President level are women.

Key leadership positions held by women at Wynn Resorts include:

– Linda Chen, Director on the Board of Wynn Macau, Ltd.; Chief Operating Officer of Wynn Macau, Ltd; President, Wynn International Marketing Ltd.

– Kim Sinatra, Executive Vice President, General Counsel and Secretary, Wynn Resorts Ltd.

– Teri Peers, Chief Accounting Officer, Wynn Resorts, Ltd.

– Debra Nutton, Executive Vice President of Gaming Operations, Wynn/Encore Las Vegas

– Chris Flatt, Executive Vice President of Hotel Sales and Marketing, Wynn/Encore Las Vegas

– Carrie Messina, Senior Vice President of Human Resources, Wynn/Encore Las Vegas

– Stacie Michaels, General Counsel, Wynn/Encore Las Vegas

Importantly, the Nominating and Corporate Governance Committee recognizes that gender diversity is important for the Board, not only to make sure that the Board and the Company benefit from diverse perspectives, but also to set the right "tone at the top."

188.     The letter included similar assertions related to diversity, stating under the heading "WYNN RESORTS HAS A STRONG TRACK RECORD OF PROMOTING DIVERSITY AND IS COMMITTED TO IMPROVING DIVERSITY ON THE BOARD OF DIRECTORS" that:

> Wynn Resorts is proud of its commitment to diversity. This commitment is reflected by the number of women in senior leadership roles throughout the Company, which includes 34% of employees at the level of Vice President or above and 38% of employees at the levels of Executive Director or Assistant Vice President. The Corporate Governance Committee evaluates diversity on many levels, including breadth of experience and the ability to bring new and different perspectives to the Board. However, the Corporate Governance Committee and the Board also recognize that gender diversity is important for the Board, not only to make sure that the Board and the Company benefit from diverse perspectives, but also to set the right "tone at the top."

189.     The statements in paragraphs 186–88 were false and misleading for the reasons set forth above, including because while boasting about the Company's "track record" and "commitment" to diversity, Defendants failed to disclose that Defendant Wynn had created a hostile work environment for Wynn's female employees, which was known to, and condoned by, senior management, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).  The statements were also misleading because Defendant Wynn had placed his own interests ahead of his duty to the Board by repeatedly violating company policy and Nevada law.

190.     Further, the statement about setting "the right 'tone at the top'" was materially false and misleading because it created the impression that the Company had a "tone at the top" that did not engage in or enable sexual misconduct, but the opposite was true, as the MGC Decision and Order and NGCB found.  For example, the MGC Decision and Order noted that "[t]he evidence presented depicts a culture within the formerly founder-led Company wherein executives deferred to the whims of the CEO and founder, failed to hold that founder to the requisite code of conduct, and repeatedly failed to protect a class of its employees." *Id.* at 38.

Also, the MGC Decision and Order added while discussing the Company's efforts to transform itself following the publication of the *WSJ article*: "To the extent that past examples of the tone at the top are predictive of future performance, there is cause for concern." *Id.* at 28.

191.    On May 8, 2015, Wynn Resorts filed a quarterly report on Form 10-Q for the first quarter of 2015 (the "2015 Q1 10-Q"). The 2015 Q1 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

192.    The 2015 Q1 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

193.    The italicized text above was materially false and/or misleading for the reasons set forth above, including in paragraphs 130-34, 140, 142, 160, and 174. For example, Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required. Indeed, as the Company admitted in the NGCB Settlement, by the time the 2015 Q1 10-Q was issued, the Company and its senior executives,

including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Nevada law.

194.    On August 7, 2015, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2015 (the "2015 Q2 10-Q"). The 2015 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

195.    The 2015 Q2 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

196.    The italicized text above was materially false and/or misleading for the reasons set forth above, including in paragraphs 130-34, 140, 142, 160, and 174.  For example, Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required. Indeed, as the Company admitted in the NGCB Settlement, by the time the 2015 Q2 10-Q was issued, the Company and its senior executives,

including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Nevada law.

197.    On October 15, 2015, the Company held an earnings call. During that call, Defendant Wynn stated:

> In 45 years, I've never had a layoff. I think we once dropped 100 people in this company. 45 years. We don't do layoffs. People come to work for us. They get job security. And I've never broken a promise about job security to my employees in my entire career, and I don't like facing that possibility one bit.

198.    This statement made by Defendant Wynn and attributable to him and the Company was false and/or misleading because it failed to disclose that Defendant Wynn had engaged in a pattern of sexual misconduct towards female Wynn employees which created a hostile work environment and undermined their job security, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).

199.    Further, that statement—including the claim that "[w]e don't do layoffs" and "[our employees] get job security"—was also materially false and misleading because the Company has allegedly laid off at least one employee in retaliation for reporting the rape allegation leading to the 2005 Settlement, and there were at least six more incidents of sexual harassment involving Defendant Wynn. More specifically, according to the IEB report and a wrongful termination suit filed against the Company and Defendant Wynn by Angelica Limcaco, after Ms. Limcaco submitted a report of the rape allegation leading to the 2005 Settlement that was based on her conversations with the complainant to the HR Department in 2005, Whennen reprimanded the manager "within about 24 hours" of the report being forwarded, telling her that "all reports go to Ms. Whennen first, 'especially anything concerning Steve Wynn,'" and "instructing … [her] to never speak about the alleged rape incident again." After the manager reported six more incidents of sexual harassment by Defendant Wynn to Whennen, and Whennen failed to take action, the manager brought her concerns to Andrew

Pascal (then COO of Wynn Las Vegas), who was also Elaine Wynn's nephew, telling him of the "numerous sexual assault allegations against Mr. Wynn and the lack of proper response by Ms. Whennen." "Within a few weeks, Ms. Limcaco was abruptly terminated"—allegedly to "disguise[] the Wynn's true intent, which was to conceal and facilitate Mr. Wynn's rampant sexual abuse and corruption of power."

200.    On November 6, 2015, Wynn Resorts filed a quarterly report on Form 10-Q for the third quarter of 2015 (the "2015 Q3 10-Q"). The 2015 Q3 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

201.    The 2015 Q3 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

202.    The italicized text above in paragraphs 200-01 was materially false and/or misleading for the reasons set forth above, including in paragraphs 130-34, 140, 142, and 174. For example, Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Defendant Wynn's misconduct and failing to report the

incidents involving Defendant Wynn to regulators, as required. Indeed, as the Company admitted in the NGCB Settlement, by the time the 2015 Q3 10-Q was issued, the Company and its senior executives, including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Nevada law.

## H. **The 2015 10-K**

203.    On February 29, 2016, Wynn Resorts filed an annual report on Form 10-K for 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey, and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

204.    The 2015 10-K referred to Wynn Resorts' Code of Conduct as follows:

> **As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company** and its subsidiaries. This Code is periodically reviewed by the Board of Directors. **In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers** on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

205.    This reference to the Code of Conduct was false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 142, and 174. For example, the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of conduct to Defendant Wynn,

Defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own employees. Indeed, as the Company admitted in the NGCB Settlement, by the time the 2015 10-K was issued, the Company and its senior executives, including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Nevada law.

206.   The 2015 10-K stated, in relevant part, as follows:

**<u>Potential violations of law by Mr. Okada (former director and formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.</u>**

The Freeh Report detailed numerous instances of conduct constituting prima facie violations of the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada (formerly the largest beneficial owner of our shares) and certain of his affiliates. . . . . The Company has provided the Freeh Report to applicable regulators and has been cooperating with related investigations of such regulators. The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators have and may pursue separate investigations into the Company's compliance with applicable laws in connection with the Okada matter, as discussed in Item 8—"Financial Statements and Supplementary Data," Note 17 "Commitments and Contingencies." While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company, which could negatively affect the Company's financial condition or results of operations.

\* \* \*

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the

University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

207.  The italicized text above was materially false and/or misleading for the reasons set forth above, including in paragraphs 130-34, 140, 142, 174 and 205.  For example, Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

208.  The 2015 10-K contained the following false and/or misleading statement:

The Company's integrated resort business model, pioneered by Chairman and Chief Executive Officer Stephen A. Wynn, integrates luxury hotel rooms, high-end retail, an array of dining and entertainment options, meeting space, and gaming, all supported by superior levels of customer service. Given his extensive design and operational experience across numerous gaming jurisdictions, we believe that ***Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises.***

\* \* \*

**The loss of Stephen A. Wynn could significantly harm our business.**

Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2022. However, we cannot assure you that Mr. Wynn will remain with Wynn Resorts. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

209.  This statement was materially false and/or misleading for the reasons set forth

above, including in paragraphs 146-48 and 184-89. For example, while touting the "distinct

advantage" Defendant Wynn's involvement provided and warning investors generally of the

risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that

at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual

misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing

the Company's critical gaming licenses), and that senior Wynn Resorts management was aware

of this conduct yet failed to report this misconduct to regulators as required under gaming

regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief

Executive Officer.

210.   The 2015 10-K contained the following false and/or misleading statement:

*Consequences of Violating Gaming Laws*. If the Nevada Gaming
Commission determines that we have violated the Nevada Gaming
Control Act or any of its regulations, it could limit, condition, suspend
or revoke our registrations and gaming license. In addition, we and the
persons involved could be subject to substantial fines for each separate
violation of the Nevada Gaming Control Act, or of the regulations of
the Nevada Gaming Commission, at the discretion of the Nevada
Gaming Commission. Further, the Nevada Gaming Commission could
appoint a supervisor to operate our Las Vegas Operations and, under
specified circumstances, earnings generated during the supervisor's
appointment (except for the reasonable rental value of the premises)
could be forfeited to the State of Nevada. Limitation, conditioning or
suspension of any of our gaming licenses and the appointment of a
supervisor could, and revocation of any gaming license would, have a
significant negative effect on our gaming operations.

\* \* \*

*Consequences of Being Found Unsuitable.* Any person who fails or
refuses to apply for a finding of suitability or a license within 30 days
after being ordered to do so by the Nevada Gaming Commission or by
the Chairman of the Nevada Gaming Control Board, or who refuses or
fails to pay the investigative costs incurred by the Nevada Gaming
Authorities in connection with the investigation of its application, may
be found unsuitable. The same restrictions apply to a record owner if
the record owner, after request, fails to identify the beneficial owner.
Any person found unsuitable and who holds, directly or indirectly, any

beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities, including, if necessary, the immediate purchase of the voting securities for cash at fair market value.

\* \* \*

***Company Registration Requirements.*** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. ***Wynn Resorts and all individual qualifiers were found suitable by the MGC***….A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation….

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

*Consequences of Violating Gaming Laws.* If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

211.    This statement was materially false and/or misleading for the reasons set forth above, including in paragraphs 146-48, 184-89, and 209.   For example, while telling investors that Defendant Wynn and all "individual qualifiers" had been found suitable, and while warning investors generally of the consequences of violating gaming laws, it failed to disclose that Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn Resorts management was aware of this conduct yet failed to adequately investigate or report this misconduct to the Massachusetts Gaming Commission during the license application process although required to do so under gaming regulations. As a result, the Company was at grave risk of losing its Massachusetts license. Indeed, by the time the 2015 Proxy was issued, and as the MGC Decision and Order found, the Company and its senior executives, including Defendants Wynn and Maddox, had failed to conduct investigations into numerous allegations of sexual misconduct against Defendant Wynn in violation of the Company's policies and Massachusetts law, and had failed to disclose the 2005 Settlement to the MGC as required by Massachusetts law.

## I.   **2016**

### 1.  *2016 Proxy Statement*

212.    On March 4, 2016, the Company filed its 2016 Definitive Proxy Statement ("2016 Proxy Statement"). Defendant Sinatra signed the Notice of Annual Meeting accompanying the 2016 Proxy Statement, "by order of the Board of Directors."  The 2016 Proxy Statement was furnished to the Company's stockholders in connection with the solicitation by

its Board of Directors for proxies for its 2016 Annual Meeting.

213.    The Company's 2016 Proxy Statement—which asked shareholders to vote for Defendant Wynn's re-election as Chairman of the Board, as well as Irani and Shumaker's reelection, and to approve Wynn's proposed compensation as CEO—described Defendant Wynn as the "**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our brand." It touted his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

> *Experience, qualifications, attributes and skills.* Mr. Wynn is the **founder and creative and organizational force** of Wynn Resorts. Mr. Wynn's over 46 years of experience in the industry have contributed to his brand name status as the **preeminent designer, developer and operator of destination casino resorts**. Mr. Wynn's involvement with our casino resorts provides a **distinct advantage** over other gaming enterprises. As founder, Chairman and Chief Executive Officer, he has a **unique perspective into the operations and vision for the Company.**
>
> *Chairman and CEO.* Mr. Wynn currently serves as the Chairman and CEO of the Company. Mr. Wynn has served in these roles since the Company's inception in 2002. We believe that during his tenure, Mr. Wynn has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2015, we have paid approximately $6.2 billion, or $56.75 per share, in dividends to our stockholders. Our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 18% over the same timeframe. Mr. Wynn is the founder, creator and name behind our brand. We believe he brings **extraordinary talent to our Company that is unrivaled** by others in our industry. In addition, the Board believes that Mr. Wynn's

combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts.

\* \* \*

***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and we believe that during that period he has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2015, we have paid approximately $6.2 billion, or $56.75 per share, in dividends to our stockholders. Our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 18% over the same timeframe. Mr. Wynn is the founder, creator and name behind our brand. We believe that he brings **extraordinary talent to our Company that is unrivaled** in our industry….

***Other Key Considerations.*** We believe **that Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success** and these considerations provided the context for determining Mr. Wynn's compensation for 2015. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the **unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands**….

214.    This statement was materially false and/or misleading for the reasons set forth above, including in paragraphs 146-48, 184-89, 209 and 211.  For example, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under

gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

### 2.   Elaine Wynn's Counterclaim and the Company's Responses

215.   On March 28, 2016, Elaine Wynn filed the *First Amended Answer of Elaine P. Wynn to Aruze and Universal's Fourth Amended Counterclaim; Fifth Amended Counterclaim and Crossclaim of Elaine P. Wynn* (the "Elaine Wynn Counterclaim") in the *Okada* Litigation.

216.   The Elaine Wynn Counterclaim described a "multi-million-dollar payment" by Defendant Wynn following allegations that he engaged in "serious misconduct" "on company property against an employee." It also detailed a "pattern of reckless risk-taking" behavior by Defendant Wynn that "left the directors and the Company vulnerable to potential liability and regulatory exposure." Specifically, it stated in relevant part:

> 2. Ms. Wynn raises these issues reluctantly: she had hoped, for the sake of her family and of the Company she helped to build, that the issues plaguing the operation of Wynn Resorts and the ***reckless risk-taking of its Chairman and CEO Mr. Wynn*** could be addressed through proper corporate processes and channels. They cannot be. ***Mr. Wynn has intentionally kept the Wynn Resorts Board in the dark and has turned the General Counsel of the Company into his co-conspirator. He has engaged in reckless, risk-taking behavior, leaving himself vulnerable to allegations of serious wrongdoing— that he made a multi-million dollar payment and used Company resources to silence*** and that he did not properly disclose to the Board of Directors. This and other such decisions have left the directors and the Company ***vulnerable to potential liability and regulatory exposure***.
>
> 3. Every time Elaine Wynn sought information, as a director should, she confronted a ***"tone at the top" that punished inquiry, even by her***, a major shareholder, director and co-founder of Wynn Resorts. ***Mr. Wynn operates the Company without the effective checks and balances that the law requires***, beginning with independent and effective Board members. Ms. Wynn and her fellow Board members were ***intentionally fed misinformation by Mr. Wynn and Kimmarie Sinatra, the Company's General Counsel, a process that depended on the deficiencies in the internal controls and their intentional***

*circumvention with regard to the decisions of the Chairman and CEO.* Although bound by the January 2010 Stockholders Agreement to support Elaine Wynn's director candidacy, Mr. Wynn instead engineered her removal from the Board in retaliation for her challenging his decisions and questioning his judgment. Ms. Wynn cannot sit by idly and accept punishment for doing what is right and daring even to inquire about Mr. Wynn's reckless operation of the Company.

\* \* \*

8. Neither Mr. Wynn nor Ms. Sinatra made any effort to hide their antipathy for Ms. Wynn's insistence on carrying out her duties as a director. For her part, ***Ms. Wynn became increasingly concerned about the pattern of reckless risk-taking by the Chairman and CEO, unconstrained by proper internal controls; the "tone at the top" that discouraged any challenge to Mr. Wynn***; the fact that Mr. Wynn and Ms. Sinatra decided what would and would not be disclosed to the Board; and the fact that they made decisions based not on what was best for the shareholders, but what was best for management, specifically the Chairman and CEO. No other plausible explanation could justify ***the decision to keep secret from the Board and other Company counsel besides Ms. Sinatra the fact that the Chairman and CEO had engaged in alleged misconduct on Company property against at least one Company employee serious enough to warrant a multimillion dollar payment*** and thereby to expose the Company and other directors to liability without their knowledge or consent.

\* \* \*

## F. Mr. Wynn's Abandonment of His Promises to Ms. Wynn and Pattern of Reckless Behavior

51. Working very long days, and trusting that (whatever Mr. Wynn might do in his personal life) Mr. Wynn would not put the Company they had co-founded and so painstakingly worked to build at risk, Ms. Wynn cannot say with any certainty when Mr. Wynn's reckless risk-taking began or accelerated. But beginning at the time of her divorce, and for obvious reasons, Ms. Wynn began examining the extent to which Mr. Wynn was withholding information from the Board on critical issues and using a public company to fund his lavish lifestyle and personal politics. ***Mr. Wynn, along with Ms. Sinatra, effectively undermined the role and proper decision-making authority of the Board by withholding information from or affirmatively misleading***

91

***the Board, including on matters that indisputably should have been reported by the Board, and by retaliating against Ms. Wynn for raising proper inquiries into the conduct of the Company, including by Mr. Wynn.***

52. Among other things, Ms. Wynn learned that Mr. Wynn, using the services of a private criminal defense attorney and a private gaming attorney, ***had previously made a multimillion dollar payment after apparently being threatened with allegations of serious misconduct occurring on Company property against a Wynn Resorts employee***. When Ms. Wynn made inquiries of Ms. Sinatra, the Company's General Counsel, ***Ms. Sinatra stated that Mr. Wynn had decided that the matter should not be disclosed to the Board or other Company counsel—even though Mr. Wynn, as the Chairman and CEO o f a public company, had exposed himself to sufficiently serious allegations of wrongdoing that he had been forced to pay millions of dollars and had used Company resources to conceal the allegations***.

\* \* \*

57. Both Wynn Resorts and Mr. Wynn entertain lavishly, which is common in the gaming industry. The dollar volume of such entertaining, not to mention the costs of a fleet of jets, and the overlap between what is personal and what should be a business expense, demand effective internal controls including careful review by the Audit Committee. ***Mr. Wynn misused Company resources to support his legendary lifestyle***. There was no effective protocol, or at least none approved by the Board, to oversee entertainment and travel expenditures, and Ms. Wynn's inquiries were rebuffed. On information and belief, ***on no occasion did the Audit Committee of the Board ever investigate or even conduct an in-depth review of the Company's internal controls governing such large expenditures***; certainly, no such reports have been produced, and there is evidence of regular shredding of audit committee materials and notes. The tone at the top of senior management, in particular Mr. Wynn and Ms. Sinatra, was to discourage even Board members from questioning the unilateral apportionment decisions of Mr. Wynn. Again, Ms. Wynn's efforts to act as a truly independent director were stonewalled: she was specifically barred from sitting in on a meeting of the Audit Committee.

\* \* \*

59. ***Mr. Wynn has exerted, and continues to exert, control over his Board, including by exercising control over their access to information and by retaliating against Ms. Wynn for her proper inquiries into Company matters***, as described previously. All Wynn Resorts directors who have ever served on the Board have been, without exception, selected by Mr. Wynn. In only three instances in the history of the Company - with one of them being Ms. Wynn's renomination (where the board was following Mr. Wynn's signals but not his vote) and the other two being lone dissenting votes from Ms. Wynn on one occasion and Mr. Okada on the other - has a director voted against Mr. Wynn's intentions at any time or on any subject.

## G. Mr. Wynn's Disregard of His Agreement and of His Repeated Assurances to Engineer Elaine Wynn's Removal from the Board of the Company She Built

60. On information and belief, ***Mr. Wynn and Ms. Sinatra,*** including by using the Nominating and Governance Committee, ***engineered the 2015 removal of Elaine Wynn from the Board of the Company*** she co-founded, worked tirelessly to create, and in which she owns a significant shareholder stake. Doing so violated both the written and oral agreements between the Wynns. It was ***Ms. Wynn's punishment for asking too many questions that Mr. Wynn and Ms. Sinatra did not want to answer***. Mr. Wynn no longer wanted Ms. Wynn's participation, despite his obligations under the January 2010 Stockholders Agreement and even as he insisted on his absolute right to control her property.

\* \* \*

64. ***Mr. Wynn and Ms. Sinatra wanted Ms. Wynn expelled from the Board in retaliation for her proper inquiries into Company activities, including without limitation those involving Mr. Wynn as described above***. Indeed, in the entire history of the Company, Ms. Wynn was the only director who wanted to stay on the Board who was not renominated and reelected.

217. On March 28, 2016, Wynn Resorts issued a press release titled "Statement from Wynn Resorts in Response to Elaine Wynn's Recent Filing" stating in relevant part:

> ***Ms. Wynn's latest allegations regarding our Board, its composition and its independence are simply not true*** and are rehashed from her previous, unfounded statements made during her proxy campaign. Our

company has nine distinguished directors, seven of whom are independent under NASDAQ standards.

Throughout her campaign, in which she directly communicated with shareholders via numerous personal letters, she never once raised the new allegations set forth in her recent complaint. *Her allegations regarding the use of company assets are without merit*. The use of company assets is governed by many internal policies and is *closely supervised both by the Audit Committee*, which is comprised solely of independent directors, *and our external auditors*. As outlined in recent proxy statements, Mr. Wynn reimburses the Company for his accommodations at the hotel, his personal use of corporate aircraft and all other company assets subject to company policy. These policies and any perquisites he receives have always been set forth in our proxy statements.

*As a leader in a highly regulated industry, Wynn Resorts prides itself on its transparency and full disclosure to regulators and shareholders. Allegations made by Ms. Wynn that the company would hide any relevant activities from our regulators are patently false.*

By any measure, Wynn Resorts has ascended to a position of unrivaled stature and it is a symbol of unquestioned excellence and quality the world over. None of what Wynn Resorts has accomplished would be possible without its extraordinary employees and *the sense of family and community that Mr. Wynn has created*. Ms. Wynn's actions today run counter to *the culture of everything Mr. Wynn has worked so hard to create*.

218.  This statement, which is attributable to the Company, and Defendants Wynn, Maddox, Sinatra, and Cootey—who were each officers of the Company directly involved in its day-to-day affairs at the time it was issued—was false and misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205 and 211, as well as additional reasons. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), (i) the Company was not, in fact, transparent with regulators and had unlawfully withheld from them material information regarding serious allegations of sexual misconduct by Defendant Wynn; and (ii) Defendant Wynn had not created a "sense of family

and community at Wynn Resorts," but in fact had created a coercive and hostile work environment for Wynn's female employees by engaging in his egregious pattern of predatory sexual behavior towards them. Wynn's conduct violated the Company's Code of Conduct and exposed the Company to substantial legal liability.

219. Further, the statement denying as "patently false" the allegation that the Company would withhold information from regulators was materially false or misleading because it misrepresented or failed to disclose that by March 28, 2016, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), senior Wynn management, including Defendants, was aware of or recklessly disregarded, but failed to investigate the following reports of misconduct: (i) a rape allegation leading to the 2005 Settlement had been made against Defendant Wynn; (ii) an allegation of an improper sexual relationship leading to the 2006 Settlement had been made against Defendant Wynn; (iii)  another allegation of an inappropriate intimate relationship leading to the 2008 Settlement (paid with corporate funds) had been made against Defendant Wynn and Defendant Maddox had discovered a reference to the settlement on a memo to a committee of the Company's Board of Directors; (iv) in 2009, after learning of the 2005 rape allegation and related settlement, Elaine Wynn had, according to her sworn testimony, spoken with a number of individuals about the rape allegation an settlement, including Defendant Wynn, Defendant Sinatra "in her role as general counsel for Wynn Resorts and secretary of the Board of Directors," and other current or former Wynn executives, including one former board member; (v) during a six month period in 2014 through 2015, two massage therapists complained that Defendant Wynn engaged in inappropriate and unlawful sexual harassment three times, which—like the prior instances—were not documented or investigated in violation of the Company's Code; (vi) Defendant Maddox, when informed of one of the massage therapists' complaints by Wooden (then-President of Wynn Las Vegas), instructed Wooden to tell Mr. Wynn to "knock it off"  2014 and 2015, two massage therapists; (vii) in 2014, Defendant Sinatra, along with Tourek and others, including Don Campbell, who Defendant Wynn "alleged…represented him individually rather than the  Company," Decision

and Order at 8, was forwarded a copy of the Abbott Memorandum, dated June 27, 2014, summarizing a terminated cocktail waitress's allegation that "Mr. Wynn raped her in 2005"(*id.* at 7); (viii) upon the filing of Elaine Wynn's cross claim, "[t]he Board of Directors learned of the cross-claim and the Independent Board members then became aware that the conduct referenced in the cross-claim was of a sexual nature" (*id.* at 9); and (ix) by no later than shortly after Ms. Wynn filed her cross-claim, Defendant Maddox learned of the 2005 Settlement "but did not pursue the matter beyond obtaining Ms. Sinatra's summary of the facts" (*id.*), which she previously described to the outside counsel engaged to provide guidance on the cross-claim  a "essentially 'old and cold' and a 'one-off.'" *Id.* Indeed, the Company has also since admitted in the NGCB Settlement that senior Company executives, including Defendant Sinatra, was aware of the 2005 Settlement by January 2012 at the latest, which thus confirms that it was false and misleading for Defendants to characterize Ms. Wynn's allegations as "not true." *See, e.g.*, NGCB Compl. ¶41

220.    In addition, the Company's denial of Ms. Wynn's allegation that Mr. Wynn had misused corporate assets was false and misleading because Defendant Wynn had, in fact, improperly misused corporate assets by using corporate funds to settle allegations of sexual misconduct in connection with the 2008 Settlement.  According to the MGC Decision and Order, Defendant Wynn and Tourek "knew of the 2008 allegation and settlement" in or around 2008. MGC Decision and Order at 6. Additionally, uncontroverted evidence indicated that Sinatra attended at least two meetings with outside counsel on the matter and thus was aware of or recklessly disregarded the 2008 Settlement. Further, as alleged in more detail herein, according to the MGC Decision and Order, in 2009, Defendant Maddox became aware of or recklessly disregarded the settlement and that it was paid using corporate funds after Tourek entered it on a memo to the Board. When Defendant Maddox asked Tourek about the entry, he was told that Defendant Wynn and his then-wife "wanted to help a struggling employee." *Id.*

221.    Moreover, the statement that "[a]llegations made by Ms. Wynn that the company would hide any relevant activities from our regulators are patently false" was false and misleading because, as detailed in the *WSJ article*, NGCB complaints against the Company and

Defendant Wynn, and in the MGC Decision and Order (as summarized herein), the Company and Defendants Wynn, Sinatra and Maddox failed to properly investigate or inform the MGC of the rape allegation or related 2005 Settlement during the application process for its Massachusetts gaming license, and failed to inform the IEB or MGC about Ms. Wynn's amended cross claim. By March 2016, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein): (i) a rape allegation leading to the 2005 Settlement had been made against Defendant Wynn; (ii) an allegation of an improper sexual relationship leading to the 2006 Settlement had been made against Defendant Wynn; (iii) another allegation of an inappropriate intimate relationship leading to the 2008 Settlement (paid with corporate funds) had been made against Defendant Wynn and Defendant Maddox had discovered a reference to the settlement on a memo to a committee of the Company's Board of Directors; (iv) in 2009, after learning of the 2005 rape allegation and related settlement, had spoken with a number of individuals about the rape allegation an settlement, including Defendant Wynn, Defendant Sinatra "in her role as general counsel for Wynn Resorts and secretary of the Board of Directors" (Decision and Order at 7), and other current or former Wynn executives, including one former board member; (v) during a six month period in 2014 through 2015, two massage therapists complained that Defendant Wynn engaged in inappropriate and unlawful sexual harassment three times, which—like the prior instances—were not documented or investigated in violation of the Company's Code; (vi) Defendant Maddox, when informed of one of the massage therapists' complaints by Wooden (then-President of Wynn Las Vegas), instructed Wooden to tell Mr. Wynn to "knock it off"  (*id.* at 8) ; (vii) in 2014, Defendant Sinatra, along with Tourek and others, including Don Campbell, who Defendant Wynn "alleged…represented him individually rather than the  Company, was forwarded a copy of the Abbott Memorandum, dated June 27, 2014, summarizing a terminated cocktail waitress's allegation that "Mr. Wynn raped her in 2005" (*id.* at 7); (viii) upon the filing of Elaine Wynn's cross claim, "[t]he Board of Directors learned of the cross-claim and the Independent Board members then became aware that the conduct referenced in the cross-claim was of a sexual nature" (*id.* at 9); and (ix) by no later than

shortly after Ms. Wynn filed her cross-claim, Defendant Maddox learned of the 2005 Settlement "but did not pursue the matter beyond obtaining Ms. Sinatra's summary of the facts" (*id.*), which she previously described to the outside counsel engaged to provide guidance on the cross-claim a "essentially 'old and cold' and a 'one-off.'" *Id.* The failure to investigate and report these events was a violation of the Company's policies, including its Code of Conduct, and of gaming regulations. For example, the MGC Decision and Order found that "[t]he disregard by the Company for its own policies cannot be tolerated and warrants a sanction in accordance with G.L. c. 23k §4(15) and 25." *Id.* at 47. It also found that submission of policies during the licensing process that were not abided by "constitutes a violation of G.L. c. 23K, §21 (a)(1) further supporting disciplinary measures." *Id.* Likewise, the Company admitted, and the NGCB found, that its "actions and failures [that occurred prior to March 2016] … violated NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011."

222.    Further, the MGC Decision and Order specifically notes that MGC requested information of Defendant Sinatra during the licensing process that "provided an opening for Ms. Sinatra to disclose what she and others at the Company knew about the allegations and settlements" and noted that "we are troubled that information pertaining to the allegations and settlements which was known at the time was not provided at that juncture." *Id.* at 19. The MGC Decision and Order also added:

> [I]t is difficult to fathom why the existence of the allegations and settlements was not disclosed to the Commission in 2013 and 2014 during the RFA-1 and RFA-2 reviews. It is arguably understandable why there would be a preference on the part of the Company not to publicly disclose the existence of the settlements, particularly if they believed them to be based on false allegations. It strains the conscience, though, to understand why they were not disclosed to the IEB, particularly if the Company was confident that the allegations were false.

*Id.*

223.    At the time the March 28, 2016 Press Release was issued, Defendants were aware of, or recklessly disregarded, its falsity for the reasons alleged herein, including above at

paragraphs 218-22, and based on the following:  In 2009, after learning of the 2005 rape allegation and related settlement, Elaine Wynn had spoken with a number of individuals about the rape allegation an settlement, including Defendant Wynn, Defendant Sinatra "in her role as general counsel for Wynn Resorts and secretary of the Board of Directors" (*id.* at 7), and other current or former Wynn executives, including one former board member. Moreover, the Company has since admitted in the NGCB Settlement that Sinatra was aware of the 2005 Settlement by January 2012 at the latest (NGCB Compl. ¶41), as well as other allegations of sexual misconduct against Defendant Wynn, including allegations leading to the 2008 Settlement. In addition, Defendant Maddox was informed of one of the massage therapists' 2014-2015 complaints by Wooden (then-President of Wynn Las Vegas), but instead of ordering a proper investigation, merely instructed Wooden to simply tell Mr. Wynn to "knock it off." MGC Decision and Order at 8.  Further, in 2014, Defendant Sinatra, along with Tourek and others, including Don Campbell, who Defendant Wynn "alleged…represented him individually rather than the Company" (*id.*), were forwarded a copy of the Abbott Memorandum, dated June 27, 2014, summarizing a terminated cocktail waitress's allegation that "Mr. Wynn raped her in 2005." *Id.* at 7. Upon the filing of Elaine Wynn's cross claim, "[t]he Board of Directors learned of the cross-claim and the Independent Board members then became aware that the conduct referenced in the cross-claim was of a sexual nature" (*id.* at 9); and, by no later than shortly after Ms. Wynn filed her cross-claim, Defendant Maddox learned of the 2005 Settlement "but did not pursue the matter beyond obtaining Ms. Sinatra's summary of the facts" (*id.*), which she previously described to the outside counsel engaged to provide guidance on the cross-claim  a "essentially 'old and cold' and a 'one-off.'" *Id.* The omission of those contradictory and material facts also rendered Defendants' statements false and misleading and undermined the basis for the statements in the March 28, 2016 press release.

224.    On April 4, 2016, Elaine Wynn issued a press release titled "Additional Documents Filed in Nevada Court in Conjunction with Elaine Wynn's Amended Complaint Charging Wynn Resorts Chairman and CEO Stephen Wynn, Aided by General Counsel Kimmarie Sinatra, with Putting Wynn Resorts at Risk by Engaging in Unchecked Business

1  Activities and Reckless Behavior," which stated in relevant part:

> Supporting documents have been filed with the Nevada Clark County Court on behalf of Elaine Wynn, co-founder of Wynn Resorts (NASDAQ: WYNN) (the "Company") and one of the Company's largest shareholders, in conjunction with her amended complaint against Stephen Wynn, the Company's Chairman and CEO, Kimmarie Sinatra, the Company's General Counsel, and Wynn Resorts, Limited. The amended complaint charges ***Mr. Wynn, aided and abetted by Ms. Sinatra, set a tone at the top of the Company that has given rise to years of unchecked business activities and reckless behavior within the Company***. The amended complaint asserts that the Board of Directors was intentionally kept in the dark by Mr. Wynn and Ms. Sinatra and, as a result, ***failed consistently to apply appropriate corporate governance standards***. Only once - in all of its meetings over a 14 year period -- did the Wynn Resort's Board reject Mr. Wynn's so called recommendation, and that was when he engineered Elaine Wynn's ouster from the Board.

> The supporting documents include sworn deposition testimony by certain Wynn Resorts Directors, filed but with redactions pursuant to the Court's Protective Order. Among the redacted excerpts of deposition testimony filed are those of Wynn Resorts directors Governor Robert J. Miller, D. Boone Wayson and Dr. Ray R. Irani.

> As noted in Ms. Wynn's motion for leave to amend filed in conjunction with these supporting documents, "...depositions that have been taken in recent weeks--consisting mostly of Wynn Resorts Directors--revealed new facts that were not previously disclosed to Ms. Wynn...And while Ms. Wynn did not have access to those facts until the other Directors recently were deposed, no one on Mr. Wynn's side can claim to be surprised by Ms. Wynn's amended allegations; ***Mr. Wynn and Wynn Resorts are far more familiar with the threat the Company faces from the pattern of misconduct detailed in the amended pleading*** than Ms. Wynn...who was ousted from her Director position for asking too many questions about the Company's governance and losing the favor of the controlling shareholder."

> * * *

> As the amended complaint explains, Ms. Wynn had believed that "the issues plaguing the operation of Wynn Resorts and the reckless risk-

100

taking of its Chairman and CEO Mr. Wynn could be addressed through proper corporate processes and channels."

The amended complaint continues: "Mr. Wynn has intentionally kept the Wynn Resorts Board in the dark and has turned the General Counsel of the Company into his co-conspirator. *He has engaged in reckless, risk-taking behavior, leaving himself vulnerable to allegations of serious wrongdoing - that he made a multi-million dollar payment and used Company resources to silence* and that he did not properly disclose to the Board of Directors. This and other such decisions have *left the directors and the Company vulnerable to potential liability and regulatory exposure*."

225. On April 5, 2016, Wynn Resorts issued a press release titled "Statement from Wynn Resorts in response to Elaine Wynn's news release of April 4, 2016," once again denying Elaine Wynn's allegations:

Elaine Wynn continues to rehash the same accusations she has made, accusations which will be fully adjudicated when heard by the court early next year. Neither her nor the company's recent filings contain any new facts or revelations, as she so passionately claims. *Ms. Wynn's comments regarding our Board of Directors, their independence and their actions in this matter are false*. Our company has nine distinguished directors, seven of whom are independent under NASDAQ standards, each deeply committed to the best interests of our shareholders.

Ms. Wynn's allegations about Mr. Schorr's departure from the company are not true. Her *previous allegations that Mr. Wynn applied company resources for personal use are false*; Mr. Wynn's use of company assets is fully audited by both the Board and our external auditors, as well as completely outlined in our proxy statements.

226. This statement, which is attributable to the Company, as well as Defendants Wynn, Sinatra, Cootey, and Maddox, given their involvement in the Company's day to day affairs and the fact it responded to claims made about Defendants Wynn and Sinatra, was materially false and misleading for the reasons set forth above, including in paragraphs 218-23. It was also materially false and misleading because it implied that Elaine Wynn's allegations

regarding Defendant Wynn were not credible and were motivated by improper reasons.

### 3. Other False and Misleading Statements in 2016

227. On May 6, 2016, Wynn Resorts filed a quarterly report on Form 10-Q for the first quarter of 2016 (the "2016 Q1 10-Q"). The 2016 Q1 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

228. The 2016 Q1 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

229. The italicized text above in paragraphs 227-28 was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, and 226. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

230.     On August 9, 2016, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2016 (the "2016 Q2 10-Q"). The 2016 Q2 10-Q was signed by Defendant Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

231.     The 2016 Q2 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

232.     The italicized text above in paragraphs 230-31 was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, and 226. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

233.     On November 4, 2016, Wynn Resorts filed a quarterly report on Form 10-Q for the third quarter of 2016 (the "2016 Q3 10-Q"). The 2016 Q3 10-Q was signed by Defendant

Cootey and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

234.    The 2016 Q3 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

235.    The italicized text above in paragraphs 233-34 was materially false and/or misleading for the reasons set forth above in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, and 226. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

## J.   The 2016 10-K

236.    On February 24, 2017, Wynn Resorts filed an annual report on Form 10-K for 2016 (the "2016 10-K"). The Company's 2016 10-K was signed by Defendant Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson and Cootey,

and also contained signed SOX certifications by Defendants Wynn and Cootey, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

237.    The 2016 10-K referred to Wynn Resorts' Code of Conduct as follows:

> **As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics** applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. **In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers** on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

238.    This reference to the Code of Conduct was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 218-23, and 226. For example, among other things, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), the Code was not, in reality, applied to "all employees, officers, directors and officers, agents and representatives of the Company." Instead of applying the Code of conduct to Defendant Wynn, the Wynn defendants turned a blind eye to Defendant Wynn's egregious pattern of predatory sexual conduct on their own Wynn employees.

239.    The 2016 10-K stated, in relevant part, as follows:

> <u>**Potential violations of law by Mr. Okada (former director and formerly the largest beneficial owner of our shares) and his affiliates could have adverse consequences to the Company.**</u>
>
> The Freeh Reported detailed numerous instances of conduct constituting prima facie violations of the Foreign Corrupt Practices Act (the "FCPA") by Kazuo Okada (formerly the largest beneficial

owner of our shares) and certain of his affiliates. . . . . The Company has provided the Freeh Report to applicable regulators and has been cooperating with related investigations of such regulators. The conduct of Mr. Okada and his affiliates and the outcome of any resulting regulatory findings could have adverse consequences to the Company. A finding by regulatory authorities that Mr. Okada violated the FCPA on Company property and/or otherwise involved the Company in criminal or civil violations could result in actions by regulatory authorities against the Company. Relatedly, regulators have and may pursue separate investigations into the Company's compliance with applicable laws in connection with the Okada matter, as discussed in Item 8—"Financial Statements and Supplementary Data," Note 17 "Commitments and Contingencies." While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company, which could negatively affect the Company's financial condition or results of operations.

* * *

Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While *the Company believes that it is in full compliance with all applicable laws*, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

240.   The italicized text above was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 174, 218-23, and 226. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn

to regulators, as required.

241.    The Company's 2016 10-K stated the following:

The Company's **integrated resort business model, pioneered by Chairman and Chief Executive Officer Stephen A. Wynn**, integrates luxury hotel rooms, high-end retail, an array of dining and entertainment options, meeting space, and gaming, all supported by superior levels of customer service. Given his **extensive design and operational experience** across numerous gaming jurisdictions, ***we believe that Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises***.

* * *

**Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn**, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts. Mr. Wynn's employment agreement expires in October 2022; however, we cannot assure you that Mr. Wynn will remain with Wynn Resorts. If we lose the services of Mr. Wynn, or if he is unable to devote sufficient attention to our operations for any other reason, our business may be significantly impaired.

242.    This statement was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, and 226.  For example, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

243.    The 2016 10-K contained the following false and/or misleading statement:

***Consequences of Violating Gaming Laws***. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming

Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations.

* * *

***Consequences of Being Found Unsuitable.*** Any person who fails or refuses to apply for a finding of suitability or a license within 30 days after being ordered to do so by the Nevada Gaming Commission or by the Chairman of the Nevada Gaming Control Board, or who refuses or fails to pay the investigative costs incurred by the Nevada Gaming Authorities in connection with the investigation of its application, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any person found unsuitable and who holds, directly or indirectly, any beneficial ownership of any voting security or debt security of a registered company beyond the period of time as may be prescribed by the Nevada Gaming Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to hold an equity interest or to have any other relationship with us, we:

- pay that person any dividend or interest upon any voting securities;

- allow that person to exercise, directly or indirectly, any voting right held by that person relating to Wynn Resorts;

- pay remuneration in any form to that person for services rendered or otherwise; or

- fail to pursue all lawful efforts to require the unsuitable person to relinquish such person's voting securities, including, if

108

necessary, the immediate purchase of the voting securities for cash at fair market value.

* * *

**Company Registration Requirements.** In addition, pursuant to the Phase 1 regulations, the following entities and person are deemed to be "qualifiers" subject to investigation: all members, transferees of a member's interest, directors and managers of the licensee and, in the judgment of the MGC, each lender, each holder of indebtedness, each underwriter, each close associate, each executive and each agent. As a result, Wynn Resorts, its key employees and its directors were therefore subject to a suitability investigation. ***Wynn Resorts and all individual qualifiers were found suitable by the MGC.*** As our progress in Massachusetts continues, additional entities and key employees may be required to file applications with the MGC and are or may be required to be licensed or found suitable by the MGC. Following Wynn America, LLC ("Wynn America"), an indirect wholly owned subsidiary of Wynn Resorts, Limited, entering into a senior secured credit facility in November 2014, the MGC has requested additional applications, which are pending. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. An applicant for licensing or an applicant for a finding of suitability must pay or must cause to be paid all the costs of the investigation. Changes in licensed positions must be reported to the MGC.

If the MGC were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, we would have to sever all relationships with that person. In addition, the MGC may require us to terminate the employment of any person who refuses to file appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review.

**Consequences of Violating Gaming Laws.** If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or

suspension of our gaming license would have a significant negative effect on our Massachusetts gaming operations.

244.    This statement was materially false and/or misleading for the reasons set forth above, including in 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, and 226. For example, while warning investors generally of the consequences of violating gaming laws, it failed to disclose that at the time this statement was made, the Company's top officer, Defendant Wynn, had engaged in a pattern of sexual misconduct, that senior Wynn management was aware of this conduct, yet failed to report this misconduct to regulators although it was required to do so under applicable gaming regulations, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).

245.    Further, the statement that "Wynn Resorts and all individual qualifiers were found suitable by the MGC" was materially false and/or misleading because it created the false impression that the Company and its executives, including Defendants Wynn in Sinatra, had not repeatedly violated the Company's policies requiring investigations into allegations of sexual assault made against Wynn, did not have a corporate culture of not applying the Company's relevant policies to Defendant Wynn, and had no knowledge of any allegations of sexual misconduct made against Defendant Wynn or any related settlements, including the rape allegation giving rise to the 2005 Settlement, when the opposite was true, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).

**K. 2017**

246.    On March 10, 2017 the Company filed its 2017 Definitive Proxy Statement ("2017 Proxy Statement"). Defendant Sinatra signed the Notice of Annual Meeting accompanying the 2017 Proxy Statement, "by order of the Board of Directors."  The 2017 Proxy Statement was furnished to the Company's stockholders in connection with the solicitation by its Board of Directors for proxies for its 2017 Annual Meeting.

247.    The Company's 2017 Proxy Statement described Defendant Wynn as the

110

"**founder and creative and organizational force** of Wynn Resorts" and "the founder, creator and name behind our brand." It touted his "over 47 years of experience in the industry" and his "brand name status as the preeminent designer, developer and operator of destination casino resorts." It told investors that "Wynn's involvement with our casino resorts **provides a distinct advantage over other gaming enterprises**" and "brings extraordinary talent to our Company that is unrivaled in our industry." It told investors to re-elect him as Chairman of the Board because "Mr. Wynn's combined role as Chairman and CEO promotes unified leadership and direction for the Board and management, and provides focused leadership for the Company's operational and strategic efforts." It also stated the following with respect to his proposed compensation:

> **Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success**. Mr. Wynn has served as our Chairman and CEO since the Company's inception in 2002, and we believe that during that period he has delivered exceptional value to our stockholders. Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2016, we have paid approximately $6.4 billion, or $58.75 per share, in dividends to our stockholders. Our stockholders have seen a compounded annual total stockholder return (including reinvestment of dividends) of 19% over the same timeframe. Mr. Wynn is the founder, creator and name behind our brand. We believe that he brings extraordinary talent to our Company that is unrivaled in our industry. The Compensation Committee believes that Mr. Wynn's contributions to our longstanding, consistent achievement over the last decade have been, and continue to be, instrumental in creating significant long-term value for our stockholders. These factors were key in the determination of Mr. Wynn's compensation during fiscal 2016.
>
> * * *
>
> We believe that Mr. Wynn's aesthetic vision, direction, and the public's association of his name and likeness with our casino resorts and services are unique and integral components of our success and these considerations provided the context for determining Mr. Wynn's compensation for 2016. The Compensation Committee is mindful that gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming

counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands. In addition, the Company's operations in widely separated international locations, has required that NEOs provide extraordinary levels of commitment and financial, development and operating expertise. In fulfilling the Company's goal of attracting and retaining high-quality and experienced executives, the Compensation Committee considers these factors in its determination of total compensation for the NEOs.

248.     The statements in the preceding paragraphs were materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, 226 and 245. This statement was false and/or misleading because, while touting the "distinct advantage" Defendant Wynn provided and warning investors generally of the risks to the Company of the possible loss of Defendant Wynn, Defendants failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing Defendant Wynn as Chief Executive Officer.

249.     On April 25, 2017, the Company held an earnings call. During that call, Defendant Wynn stated on behalf of himself and the Company:

> [T]hen we're going to open this place in Boston in two dozen months, and we're going to have a case study of how a grand hotel, built in a major metropolitan city, can change the neighborhood for the better. And be the largest private investment in the Commonwealth of Massachusetts and the second largest employer in the Commonwealth of Massachusetts, behind Mass General Hospital.

> So I'd like the direction we're in and I'm feeling comfortable about the pace of our growth. And, you know, I don't feel like anybody's after us. I think we're moving along exactly the way we should be. And my colleagues join me in that confidence.

250.     This statement made by Defendant Wynn and attributable to the Company was

materially false and/or misleading for the reasons set forth above in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, and 226.  For example, it failed to disclose that at the time this statement was made, Defendant Wynn had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein).  As a result, the Company was at grave risk of losing its critical gaming licenses and incurring substantial fines.

251.    On May 4, 2017, Wynn Resorts filed a quarterly report on Form 10-Q for the first quarter of 2017 (the "2017 Q1 10-Q"). The 2017 Q1 10-Q was signed by Defendant Billings and also contained signed SOX certifications by Defendants Wynn and Billings, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

252.    The 2017 Q1 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

253.    The italicized text above was materially false and/or misleading for the reasons

set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89, 205, 211, 218-23, 226 and 245. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Defendant Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

254.    On July 25, 2017, the Company held an earnings call. During that call, Defendant Wynn stated:

> The regulatory agency has tightened its controls and supervision of the junket operators. I think that's the form of expression that has been adopted and we don't know of any arbitrary number that is in government thinking on this subject. Only thing we do know is that they wanted to improve the standards of probity and investigative activity, and they have done that. And the main operators sailed right through, as they always have.
>
> I remember when we were being licensed to Massachusetts, the question was, well, Macau has a reputation that may be questionable in some quarters, especially in Massachusetts. And I remember that we said, wait a minute, let's put this matter to rest. We told each of our operators that, in addition to being licensed in Macau, they had to go to the organized crime criminal division of the Hong Kong Police Department and get certificates of clean bill of health certificates.
>
> They actually would investigate someone and then come to a conclusion and make a statement in writing that that person was free of any criminal association. And ***every one of our operators went instantly and did it without hesitation***. And that impressed the folks in Boston. ***We were happy to do it because we wouldn't want to do business with anybody that couldn't pass such an examination.***
>
> ***So, the regulatory issue is the one that I think is at stake here***. I don't know that anybody has an arbitrary number about growth rates.

255.    This statement made by Defendant Wynn and the Company was materially false

114

and/or misleading for the reasons set forth above, including in paragraph 245, as well as because, while implying that the Company wouldn't do business with any unsuitable operators or individuals, it failed to disclose that at the time this statement was made, Defendant Wynn himself had engaged in a pattern of sexual misconduct (rendering him "unsuitable" under applicable gaming regulations and jeopardizing the Company's critical gaming licenses), and that senior Wynn management was aware of this conduct yet failed to adequately investigate or report this misconduct to regulators although required to do so under gaming regulations. As a result, the Company was at grave risk of losing its critical gaming licenses and incurring substantial fines.

256.   On August 4, 2017, Wynn Resorts filed a quarterly report on Form 10-Q for the second quarter of 2017 (the "2017 Q2 10-Q"). The 2017 Q2 10-Q was signed by Defendant Billings and also contained signed SOX certifications by Defendants Wynn and Billings, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

257.   The 2017 Q2 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

258.   The italicized text above was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 146-48, 174, 184-89,

205, 211, 218-23, 226 and 245.  For example, as detailed in the *WSJ article*, NGCB complains against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants knew that the Company was not, in fact, "in full compliance with all applicable laws" at the time because, among other things, Defendant Wynn was in violation of gaming regulations due to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn to regulators, as required.

259.    On November 8, 2017, Wynn Resorts filed a quarterly report on Form 10-Q for the third quarter of 2017 (the "2017 Q3 10-Q"). The 2017 Q3 10-Q was signed by Defendant Billings and also contained signed SOX certifications by Defendants Wynn and Billings, stating that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that the information contained therein "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

260.    The 2017 Q3 10-Q stated in relevant part:

> Other regulators may pursue separate investigations into the Company's compliance with applicable laws arising from the allegations in the matters described above and in response to the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with the Company's donation to the University of Macau. While ***the Company believes that it is in full compliance with all applicable laws***, any such investigations could result in actions by regulators against the Company. Prior investigations by the Nevada Gaming Control Board and SEC were closed with no actions taken.

261.    The italicized text above was materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 174, 218-23, 226 and 245. For example, as detailed in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order (as summarized herein), Defendants

116

knew that the Company was not, in fact, "in full compliance with all applicable laws" at the

time because, among other things, Defendant Wynn was in violation of gaming regulations due

to his "unsuitability," and in turn, the Company had violated Nevada gaming regulations by

covering up Wynn's misconduct and failing to report the incidents involving Defendant Wynn

to regulators, as required.

## VI.   THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD INVESTORS AND THE PUBLIC

### A.   The January 2018 *WSJ* Article

262.   On January 26, 2018, the *Wall Street Journal* published an article titled "Dozens

of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn" (the

"January 2018 *WSJ* Article"), revealing detailed accounts that Defendant Wynn had coerced and

pressured several Wynn Resorts employees to perform sex acts. According to the *Wall Street

Journal*, "dozens of people… who have worked at Mr. Wynn's casinos told of behavior that

cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn." It

was further revealed that Defendant Wynn had paid a Wynn Resorts employee $7.5 million after

being accused of forcing the employee to have sex with him. The article stated, in relevant part:

> "Everybody was petrified," said Jorgen Nielsen, a former artistic
> director at the salon. Mr. Nielsen said he and others repeatedly told
> high-level company executives Mr. Wynn's sexual advances were
> causing a problem, but "nobody was there to help us."
>
> ***
>
> Dennis Gomes, who was an executive at the Golden Nugget in Las
> Vegas when Mr. Wynn was running that casino decades ago, said in a
> deposition in an early 1990s lawsuit that Mr. Gomes "routinely
> received complaints from various department heads regarding Wynn's
> chronic sexual harassment of female employees," according to a court
> filing that summarized his testimony.
>
> In the suit over Mr. Gomes's departure to work for a Trump casino,
> Mr. Gomes described what he called a "disgraceful pattern of personal
> and professional conduct" that he said included Mr. Wynn's directing
> him to get the home phone numbers of casino cocktail waitresses.

263.     On this news, Wynn Resorts' share price fell $20.31, or 10.12%, to close at $180.29 on January 26, 2018. The stock's high trading volume and price decline continued for several days, and the stock closed at $163.48 on January 29.

**B.  The Company's and Defendant Wynn's Responses to the *WSJ article***

264.     According to the IEB report, "the Company provided the *WSJ* with a statement from the Company and a statement from Mr. Wynn" that responded to the *WSJ article* in advance of its publication, and "[e]mail correspondence indicates that" Defendant Sinatra (along with the Company's chief marketing officer, Michael Weaver, and another attorney) "actively participated in the drafting of the statements to the WSJ." IEB Report at 142.

265.     In response to the January 26, 2018 *WSJ article* revealing detailed accounts of Defendant Wynn's sexual misconduct with several Wynn Resorts employees, Defendant Wynn immediately denied the accusations. In his written denial,[14] he asserted:

> The idea that I ever assaulted any woman is preposterous. We find ourselves in a world where people can make allegations, regardless of the truth, and a person is left with the choice of weathering insulting publicity or engaging in multi-year lawsuits. It is deplorable for anyone to find themselves in this situation.

> The instigation of these accusations is the continued work of my ex-wife Elaine Wynn, with whom I am involved in a terrible and nasty lawsuit in which she is seeking a revised divorce settlement …. In response, I remain focused on Wynn Resorts, our employees and our shareholders and will not be distracted from those efforts.

266.     The statements in the preceding paragraph were materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 174, 218-23, 226 and 245, as well as a number of other reasons.  For example, the

---

[14] Excerpts of his denial, as well as excerpts of the Company's response, were included in the *WSJ article*. They were, however, published in full by CNN, among others. *See, e.g.*, "Steve Wynn allegations: Here's his response," CNN.com, (Jan. 26, 2018), https://money.cnn.com/2018/01/26/news/companies/steve-wynn-allegations-response/index.html.

statements in the preceding paragraph made by Defendant Wynn, which are also attributable to Company, as well as Defendants Sinatra and Maddox given their day-to-day involvement in managing the Company and Sinatra's role in drafting the statements (as stated in the IEB Report)—including that "the idea that I ever assaulted any woman is preposterous," claiming that the allegations were instigated by Elaine Wynn, and professing Defendant Wynn's innocence—were materially false and/or misleading because, (i) as shown by the *WSJ article*, and as found by the MGC and NGCB, Defendant Wynn was accused of sexual assault, including rape, by dozens of women who worked with him at Wynn Resorts; and, (ii) as documented in the NGCB investigation and MGC investigation—and as the Company has since admitted (including in connection with NGCB Settlement)—senior Wynn management had been informed of, but failed to investigate, numerous reports of sexual misconduct allegations against Wynn, including the rape allegation that had led to the 2005 Settlement, as well as those that had led to the 2006 Settlement and 2008 Settlement.  Thus, the allegation that Defendant Wynn assaulted a woman was, in fact, neither "preposterous," nor fabricated by Elaine Wynn, but was based on extensive factual allegations—including allegations that the Company (through Defendant Maddox) has since admitted.

267.    In response to the *WSJ article* the Company issued an additional written statement denying the allegations therein, which contains similar sentiments to those expressed by Defendant Wynn in response to the article. The Company, similar to Defendant Wynn, claimed that Ms. Wynn instigated the accusations in the article, stating:

> The recent allegations about Mr. Wynn reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with him and the company. It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him.
>
> It is noteworthy that although Ms. Wynn says she knew about the 2005 allegations involving Mr. Wynn in 2009, she never made them known to the board of directors, of which she was then a member, and she did

not raise them until after Mr. Wynn remarried and the shareholders of Wynn Resorts voted not to elect her to the board.

The Company also added:

Wynn Resorts is committed to operating with the highest ethical standards and maintaining a safe and respectful culture that has made Wynn Resorts the employer of choice for 23,000 employees worldwide. ***The Company requires all employees to receive annual anti-harassment training and offers an independent hotline that any employee can use anonymously, without fear of retaliation. Since the inception of the company, not one complaint was made to that hotline regarding Mr. Wynn***.

268.  The Company's statements in the preceding paragraph repudiating the allegations, blaming Elaine Wynn for their instigation, and regarding the Company's hotline, were materially false and/or misleading for the reasons set forth above, including in paragraphs 106-11, 116-22, 130-34, 140, 142, 174, 218-23, 226, 245 and 266, as well as a number of other reasons.  For example, the statements in the preceding paragraph, which were made by the Company and are also attributable to Defendants Wynn and Sinatra, and Maddox as alleged herein, were materially false and/or misleading because: (i) the allegations had not been fabricated by Elaine Wynn, but were grounded in actual reports of sexual misconduct allegations that, while ignored by the Company, were ultimately investigated by gaming regulators and  documented in the NGCB investigation and MGC investigation, including in the NGCB Complaint to which the Company admitted and the MGC Decision and Order and IEB Report; (ii) senior Wynn management had been informed of, but failed to investigate, numerous reports of sexual misconduct allegations against Wynn, including the rape allegation that had led to the 2005 Settlement, as well as those that had led to the 2006 Settlement and 2008 Settlement; (iii) the Company was not committed to maintaining  "a safe and respectful culture;" (iv) senior management permitted Defendant Wynn to create a hostile work environment for Wynn female employees through his pattern of  sexual misconduct, including by failing to properly document and investigate them in violation of the Company's policies and Nevada and Massachusetts gaming regulations, and (iv) the Company's funds had been used to

1    pay settlements and cover up allegations of Defendant Wynn's sexual assaults.

2        269.    Additionally, the claim that "[s]ince the inception of the company, not one

3    complaint was made to that hotline regarding Mr. Wynn," which followed immediately after the

4    Company's statement that it conducted "anti-harassment training," was also materially false

5    and/or misleading because it created the misimpression that the Company had a specific

6    mechanism for reporting harassment complaints (the alleged "hotline") and that  employees had

7    been directed to use the hotline to report sexual harassment since the inception of the Company.

8    This statement was made to lead investors into believing that because the Company's alleged

9    "hotline" had received no sexual harassment complaints, then no such reports had been made

10   since the inception of the Company.

11       270.    In fact, however, as the Company has admitted, and as documented in the MGC

12   Decision and Order and accompanying IEB Report, it had received numerous sexual harassment

13   complaints made against Defendant Wynn, including a rape allegation leading to the 2005

14   Settlement, and Company funds had been used to pay settlements arising from allegations of

15   sexual misconduct against Defendant Wynn, including the 2008 Settlement.  Further, as

16   documented in the IEB Report, while "[t]he Company has always had a hotline where

17   employees could report things anonymously[,]  [u]p ***until recently, the instructions for the***

18   ***hotline focused on the reporting of financial and accounting misinformation and misconduct***

19   ***under the Sarbanes-Oxley Act, and did not direct employees to utilize the hotline for reports***

20   ***of sexual harassment***." IEB Report at 116 n. 470. It was only "[a]fter the publication of the

21   WSJ article, the Company re-wrote the instructions for the hotline to include instructions for the

22   reporting of sexual harassment." *Id*.

23   **VII.   THE TRUTH CONTINUES TO EMERGE**

24       A.   <u>**Investigations Ensue**</u>

25

26       271.    On January 26, 2018, the Company's Board of Directors announced the

27   formation of a "Special Committee of the Board comprised solely of independent directors to

28   investigate" the allegations in the January 2018 *WSJ* Article, chaired by "Ms. Patricia Mulroy, a

member of the Board's Corporate Governance and Compliance Committees and a former member of the Nevada Gaming Commission." On February 2, the Special Committee announced that it had hired O'Melveny & Myers LLP to investigate the allegations against Defendant Wynn.

272.     Around January 31, 2018, the Massachusetts Gaming Commission's Investigations and Enforcement Bureau commenced an investigation to determine whether Wynn Resorts was qualified to hold a gaming license under Massachusetts law in light of the sexual misconduct allegations reported in the January 2018 *WSJ* Article and elsewhere.[15] The Nevada Gaming Control Board (the "NGCB") also began its own investigation.

**B.   <u>Market Reaction</u>**

273.     Media outlets quickly started to emphasize how devastating the new revelations, and the resulting investigations were for the Company. In particular, analysts quickly recognized that Defendant Wynn would likely have to step down as Chairman and CEO, and that the Company's future development and growth would suffer as a result.

274.     A January 31, 2018 *Motley Fool* article emphasized that Defendant Wynn was the "vision and driving force behind [the Company's] strategy and execution" and "[m]ore than most CEOs… a large part of why the company is as valuable as it is." Among other problems, "Massachusetts and Nevada regulators…could force Steve Wynn out as the operator and major shareholder of the company if they deem him unfit to hold a gaming license." Moreover, "the

---

[15] Previously, in December 2013, the Massachusetts Gaming Commission had found Wynn had passed a "suitability" test that measured his "integrity, honesty, good character and reputation," concluding that "[a]s a result of the comprehensive background investigation, a lengthy adjudicatory proceeding and an intensive deliberation conducted by the five-member gaming commission, the commission finds by a unanimous vote that (Wynn Resorts) has met its burden of proof and accordingly is issued a positive determination of suitability." Since then, the Company had been in the process of "building a $2.4 billion hotel casino on the Mystic River in Everett, the only resort casino permitted in Greater Boston." https://www.bostonglobe.com/metro/2018/01/31/gaming-commission-launches-review-into-whether-wynn-resorts-suitable-keep-license/jEDQ8gel8OcA0llDbAlnxH/story.html; *see also* http://massgaming.com/wp-content/uploads/IEB-Report-Wynn-MA-LLC.pdf

corporate repercussions could be severe for both Steve Wynn and Wynn Resorts if the inquiry into these allegations turns up serious wrongdoing" because Defendant Wynn's alleged actions "would have *violated Wynn Resorts' Code of Business Conduct And Ethics*"—which the Company had repeatedly touted publicly and even relied upon "to find Kazuo Okada—an early investor and formerly the largest single shareholder of Wynn Resorts—unsuitable to be a shareholder in the company, which ultimately led to not only his ouster from the Board of Directors but Wynn Resorts redeeming his shares."[16]

275.     *Jefferies* noted that the "revocation of licenses has been rare but not unprecedented" and recognized that, in light of the "profound nature of the press reports on 1/26 regarding Steve Wynn," there was now a very real risk that "Steve Wynn could be forced to step aside as Chairman and CEO" due to "pressure from gaming regulators… as well as from investors."

276.     *Barclays*, in a January 29, 2018 report titled "Wynn Resorts Ltd. Assessing the Risk, " emphasized that "[t]**o many investors, if Steve goes, the quality of the company goes with him**,"—in fact, the top risk factor in the Company's own SEC filings was "our dependence on Stephen A. Wynn"—and that the "main risk" to the Company following the revelations was the fact "that **Steve Wynn is the vision behind this company and there is no clear succession plan.**" It also stated that "the future development driven growth and a part of the brand cachet that are likely impaired if Mr. Wynn leaves the company."

277.     Analysts also focused on the fact that Defendant Wynn's misconduct jeopardized the Company's licenses in both Nevada and Massachusetts, the site of the Company's new touted casino. *JP Morgan*, in a January 26, 2018 report titled "Thoughts Post Negative Reaction to WSJ CEO Sexual Harassment Allegations," wrote that the potential consequences "could be very serious," threatening not only the Company's future growth prospects but even its gaming licenses in Nevada, Massachusetts, and Macau. It also reiterated that Wynn Resorts had "the single largest individual CEO dependency versus any of the other 30 gaming and lodging

---

[16] https://finance.yahoo.com/news/steve-wynn-allegations-could-mean-143700942.html

companies [in] our coverage universe" and predicted that the Company would "likely sees some valuation multiple contraction" if Defendant Wynn were forced to step down. It concluded:

> We think the news reports alleging sexual harassment by Steve Wynn creates a sizable overhang in the shares and see value that compensates investors for risk related to these allegations at the ~$150 level, versus the ~$180 level it last traded on Friday.
>
> * * *
>
> First off, we think these allegations could be very serious for WYNN, given that (1) the gaming industry is a highly regulated business and individual gaming licenses have character clauses in these licenses (of note, on Friday, Nevada and Massachusetts gaming commission each announced that they were launching reviews), (2) Steve's name is on each one of his resorts in Las Vegas and Macau and therefore they are potentially susceptible to downward swings in patronage, and (3) such allegations can't be helpful to WYNN in competitive integrated resort licenses/development globally (e.g., Japan) and/or in gaming license renewals (Macau, Nevada).
>
> * * *
>
> A scenario where WYNN doesn't have Steve as a CEO is not good for the company. We have always held the belief that WYNN possesses the single largest individual CEO dependency versus any of the other 30 gaming and lodging companies our coverage universe (well, maybe LVS with CEO Sheldon Adelson is tie with WYNN). We also have always held the belief that Steve Wynn, given his long history of creating shareholder value going back to his Mirage Resorts days, has received a premium multiple for his hands-on involvement. A WYNN without Steve likely sees some valuation multiple contraction, and obviously, some of this was factored into the stock price on Friday. If a change in WYNN CEO were to happen and the valuation suffers, we can't help but also think this may attract the attention of other gaming operators since the industry has been in consolidation mode of sorts for a while now and looking to grow free cash flow per share through consolidation. Who could find WYNN appealing and has the size and financial wherewithal to do so? In our view, there a number of global large cap operators, also gaming REITS, and gaming licensed private equity firms.

278. The *Boston Globe*[17] insisted that the Company remove Defendant Wynn as CEO "and take his name off the casino that's rising along the Mystic River in Everett"—and suggested further that the Massachusetts Gaming Commission needed to investigate not just the new allegations against Defendant Wynn, but also needed to investigate the Massachusetts Gaming Commission's own finding in December 2013 that Defendant Wynn was "suitable":

> To get the go-ahead in Massachusetts, Wynn passed a "suitability" test that measured his "integrity, honesty, good character and reputation." Wynn's now-acknowledged failure to tell gaming commission investigators about a $7.5 million settlement to a Las Vegas manicurist who accused him of forcing her into sex is ***clear evidence of dishonesty***. The Journal report that revealed the settlement, along with allegations that Wynn pressured other employees into sex, also ***raises serious questions about Wynn's integrity, good character, and reputation***.
>
>             \* \* \*
>
> Wynn Resorts can and should fire Wynn. But that doesn't resolve the matter of whether Massachusetts wants to do business with a casino company that still bears Wynn's name, even if he's no longer officially associated with it. To determine that, ***the gaming commission needs to determine who else in Wynn's company knew about the $7.5 million settlement and was involved in the decision to cover it up. If Wynn Resorts perpetuated a fraud on Massachusetts, the company, not just Wynn, flunks the suitability test***.
>
> The gaming commission should also explore how a supposedly ***exhaustive*** investigation into Wynn and his company failed to turn up any information about the allegations reported by the Journal. Karen Wells, director of the commission's enforcement arm, told commissioners it was a private agreement "and steps were taken to keep it from the public domain." Yet, according to the Journal, the manicurist who made the charges against Wynn informed a supervisor, who filed a detailed report to the casino's human resources department.

---

[17] https://www.bostonglobe.com/opinion/editorials/2018/02/05/steve-wynn-not-suitable/oDYSFttvkM5UyXsPe9dnzK/story.html

125

According to page 94 of the gaming commission's suitability report on Wynn, investigators "reviewed the Wynn Resorts' Code of Business Conduct and Ethics Policy, with which all employees, officers and directors of Wynn Resorts and its subsidiaries are expected to comply." Apparently, ***no one checked to see if the CEO was complying with them***. If that written report still exists, it would document a losing hand when it comes to Wynn's suitability.

279.   Indeed, only months later, in April 2018, "Wynn Resorts [] renamed the $2.5 billion casino it's building outside of Boston to Encore Boston Harbor, as the company continues to take steps to distance itself from founder Steve Wynn after sexual misconduct allegations."[18]

## C.  **Defendant Wynn Resigns**

280.   On February 6, 2018, the Company announced that Defendant Wynn had resigned as CEO and Chairman of the Board, effective immediately. In his place, the Board had appointed Defendant Maddox to serve as CEO and D. Boone Wayson to serve as Non-Executive Chairman. The Company issued a press release titled "Wynn Resorts CEO Steps Down," which stated in relevant part:

The Board of Directors of Wynn Resorts reluctantly announced today that it accepted the resignation of Steve Wynn as CEO and Chairman of the Board of Directors. The board has appointed Matt Maddox, currently President of the Company, as its CEO, and Boone Wayson as Non-Executive Chairman of the Board of Directors, effective immediately.

"It is with a collective heavy heart, that the board of directors of Wynn Resorts today accepted the resignation of our founder, CEO and friend Steve Wynn," said Non-Executive Chairman of the Board Boone Wayson. "Steve Wynn is an industry giant. He is a philanthropist and a beloved leader and visionary. He played the pivotal role in transforming Las Vegas into the entertainment destination it is today. He also assembled a world-class team of executives that will continue

---

[18] https://www.nbcboston.com/news/local/gaming-commission-meeting-on-everett-casino-name/54141/

126

to meet the high standards of excellence that Steve Wynn created and the Wynn brand has come to represent."

Steve Wynn created modern Las Vegas. He transformed the city into an economic powerhouse by making it a world-wide tourist destination. He designed, built and operated the most iconic resorts on the Las Vegas strip, beginning with the Mirage, then Treasure Island, the Bellagio, Wynn Las Vegas and Encore at Wynn Las Vegas. Wynn Macau, Mr. Wynn's first resort in the SAR of Macau in China, was designated by Forbes Travel Guide as the best resort in the world. Along with Wynn Palace in Cotai, the company built by Steve Wynn has been recognized as having more Five Star awards than any independent hotel company in the world.

Wynn Resorts remains as committed as ever to upholding the highest standards and being an inclusive and supportive employer. In fact, more than 40 percent of all Wynn Las Vegas management are women; the highest in the gaming industry. The company will continue to fully focus on its operations at Wynn Macau, Wynn Palace and Wynn Las Vegas; the development and opening of the first phase of Wynn Paradise Park, currently under construction on the former Wynn golf course; as well as the construction of Wynn Boston Harbor, which will open in June 2019.

281.   Media outlets continued to emphasize the negative repercussions for the Company. A February 11, 2018 *New York Times* article[19] noted in relevant part:

> The ***repercussions for the Wynn brand could cut far deeper and last far longer*** than they have for other companies that have faced harassment allegations in recent months, such as NBC, which fired Matt Lauer, and Fox, which let Bill O'Reilly go.
>
>  "Steve Wynn is arguably the father of modern-day Las Vegas," said Aaron Perlut, founder and managing partner of Elasticity, a brand consulting firm. "The fact that ***his name is, in and of itself, the brand*** makes it far more complicated, in a similar way that Harvey Weinstein's personal brand was also the name of his company."
>
> * * *
>
> "If you find that it was not only occurring with Steve Wynn but on level after level of his organization, then I think ***it could be***

---

[19] https://www.nytimes.com/2018/02/11/business/media/steve-wynn-advertising.html

127

*devastating to the brand*," Mr. Perlut said. He added that the company would then likely need to be sold or change its name.

282.     *Barclays* commented, in a February 7, 2018 report titled "Wynn Resorts Ltd.: As Clear As Mud," that the Company was "not out of the woods" yet because "many questions remain regarding the future of this company without Steve Wynn at the helm and the outcome of suitability investigations in Vegas and Massachusetts," and the "Board remains liable, in our view, until the independent investigations are complete."

283.     On February 9, 2018, the Cornell University School of Hotel Administration, which in 2017 had awarded Defendant Wynn its 9th Cornell Hospitality Icon award, announced that it had "decided to rescind the award, as we can no longer consider Mr. Wynn to be an exemplary role model for the industry and, more importantly, for our students. We have read with dismay the reports of his sexual misconduct, including the high incidence within his organization. Service employees are particularly vulnerable, and hospitality leaders have a keen responsibility to ensure that they provide a safe working environment for their employees, free from harassment of any kind."

284.     Following Defendant Wynn's resignation, the Company's Special Committee initially announced that it "no longer requires the services" of O'Melveny & Myers LLP, which it had hired on February 2. The dismissal of O'Melveny & Myers LLP was heavily criticized. For example, "John C. Coffee Jr., a Columbia Law School professor and the director of its Center on Corporate Governance, said the board's decision to cut ties with the outside counsel is 'a strong signal that not much has changed in the culture of the board.'"[20]

285.     Accordingly, shortly afterwards, on February 12, 2018, the Company issued a press release titled "Special Committee of Wynn Resorts Board of Directors Retains Gibson, Dunn & Crutcher LLP, Expands Review Nominating and Corporate Governance Committee to Evaluate Board Enhancement," stating that the Special Committee had "retained Gibson, Dunn & Crutcher LLP as outside counsel to assist with its review" and "will conduct an *expanded*

---

[20] https://www.wsj.com/articles/wynn-resorts-board-cancels-outside-investigation-of-steve-wynns-conduct-1518218666

*and comprehensive review of Wynn Resorts' internal policies and procedures* with the goal of ensuring the Company employs best practices to maintain a safe and respectful workplace for all employees."

286.   On February 12, 2018, the NGCB opened an "online portal" for people to submit voluntary, confidential statements regarding any publicly announced investigation, including the investigation into allegations of sexual misconduct against Defendant Wynn. According to the *Nevada Independent*, "Board chairwoman Becky Harris said the volume of phone calls into the board's offices in Las Vegas and Carson City in the wake of the Wynn allegations was 'disruptive' and the board needed a new mechanism for the public to communicate information."[21]

**D.   More Accusations of Sexual Assault**

287.   On February 12, 2018, the Las Vegas Metropolitan Police Department revealed that two women had filed sexual misconduct reports against Defendant Wynn alleging that he had sexually assaulted them in the 1970s. One woman reported that Wynn assaulted her in Las Vegas and the other said she was assaulted in Chicago. The alleged victims contacted the Las Vegas Metropolitan Police Department on January 29 and February 5, respectively—only days after the January 2018 *WSJ* Article.

288.   On this news, Wynn Resorts' share price closed at $162.92 on February 12, 2018. Compared to the February 9 closing price ($166.22), this was a drop of $3.30, or 2%. Compared to its January 25 closing price ($200.60), this was a drop of $37.68, or 18.8%.

289.   A February 27, 2018 *Associated Press* report[22] provided additional details about the allegations:

> One police report shows a woman told officers that Wynn raped her at least three times around 1973 and 1974 at her Chicago apartment. She

---

[21] https://thenevadaindependent.com/article/las-vegas-police-receive-two-reports-about-wynn-in-wake-of-sexual-misconduct-allegations

[22] https://nypost.com/2018/02/27/woman-tells-police-she-gave-birth-to-child-after-steve-wynn-raped-her/

reported she got pregnant and gave birth to a girl in a gas station restroom.

In one instance, the woman claimed that Wynn pinned her against the refrigerator and raped her. She said he then made a phone call, kissed her on the cheek and left. The report does not explain how Wynn is alleged to have entered the apartment or if they knew each other. The woman claimed she did not give him a key.

The second police report shows a woman told police she had consensual sex with Wynn "several times" while she worked as a dealer at the downtown Las Vegas casino-hotel Golden Nugget, but "felt coerced to perform the acts." She reported she was forced to resign when she turned him down.

"In the Summer of 1976, Wynn approached her in the back hall and wanted her to go with him," according to the report filed Jan. 29. "(S)he told him, "no", she was done and had someone she was seeing. She was soon after accused of stealing $40.00 and forced to resign."

## E.   **Executive and Board Reshuffling**

290.    On April 18, 2018, the Company announced that it had "expanded its board to 11 members, with the appointment of Betsy Atkins, Dee Dee Myers and Wendy Webb as independent directors, effective immediately."

291.    On May 14, 2018, the Company announced that director Robert J. Miller was resigning from the Board and that director John J. Hagenbuch had decided not to run for re-election. The Company's press release noted that these "departures, along with the previously announced departures of directors Steve Wynn, Ray Irani, and Ted Virtue, and the upcoming departure of director Alvin Shoemaker in 2019, represent 60% of the Board that was serving at the beginning of the year."

292.    On November 7, 2018, the Company announced that D. Boone Wayson was retiring as Chairman of the Board and that Philip G. Satre, "an independent director who joined the Board in August 2018 as Vice Chairman," would replace him.

293.    On December 14, 2018, the Company issued a press release titled "Wynn Resorts Announces Changes to Executive Team" which announced "several changes to its senior

executive team, including the return of experienced resort executive Marilyn Spiegel as the President of Wynn Las Vegas." It went on to state, in relevant part:

> Ms. Spiegel previously served as president of the Las Vegas resort from 2010 to 2013. She will replace Maurice Wooden, who has elected to step down as the resort's president at year-end.
>
> "I am very pleased that Marilyn will return to lead the team at Wynn Las Vegas and Encore," said Wynn Resorts CEO Matt Maddox. "Our company's legendary service and guest experiences call for someone who truly understands our brand and appreciates what it means to our guests and employees. Marilyn not only shares that understanding, she helped to create it. Her deep experience in Human Resources and knowledge of what it takes to deliver the Wynn promise, make her the ideal person to lead Wynn Las Vegas into the future."
>
> Ms. Spiegel's career has included leadership in Human Resources, development, marketing and operations. Before joining Wynn Las Vegas for the first time in 2010, Ms. Spiegel served as President of five different Caesars Entertainment-owned resort brands in Las Vegas. She also served as corporate Senior Vice President of Human Resources for Harrah's Entertainment from 1999 to 2003. Most recently, Ms. Spiegel served on the Board of Directors of Caesars Entertainment and consulted in Human Resource matters for emerging technology companies.
>
> "Wynn Las Vegas and Encore are recognized globally for creating outstanding guest experiences," said Marilyn Spiegel. "Without question, that success is driven by the employees. The Wynn team is the most talented in our industry – I eagerly look forward to working with them again."
>
> Maurice Wooden, who has been President of Wynn Las Vegas since 2013, announced he was stepping down from his current position. Mr. Wooden led numerous resorts and departments during the course of a nearly 30-year career in the industry. Under Mr. Wooden's leadership, Wynn Las Vegas and Encore continued to set the highest standards for guest service, including maintaining its luxury rating of Five Stars from Forbes Travel Guide, and setting records for profitability among casino resorts in North America.
>
> In addition, the company has appointed Scott Moore as Chief Marketing Officer. Mr. Moore comes to the company with extensive

experience in digital marketing, omni-channel consumer engagement, brand development and accelerating growth. Previously, Mr. Moore served as a Chief Marketing Officer at Best Buy where he led marketing activities for the company across all brands, categories, and channels. He began his marketing career at Fallon, producing award winning work for brands such as Time Magazine, PBS, and The Coca Cola Company. Most recently, he was the Chief Operating Officer at Augeo which delivers loyalty and engagement solutions for customers, employees, and membership organizations.

Additionally, Michael Weaver, has been appointed Chief Communications Officer. Mr. Weaver has been with Wynn Resorts since 2011, having served in various leadership positions in marketing, branding, communications and development.

The appointments of Ms. Spiegel, Mr. Moore and Mr. Weaver will become effective January 2, 2019.

Wynn Resorts has also recently made leadership changes to its Legal and Human Resources departments:

- Ellen Whittemore was recently named General Counsel of Wynn Resorts. Ms. Whittemore has more than 30 years of experience in gaming law in Nevada, previously representing gaming companies as outside counsel for numerous regulatory, acquisition and development matters.

- Rose Huddleston recently joined Wynn Resorts as Senior Vice President of Human Resources, North America, a new position. Ms. Huddleston has more than 25 years of experience in luxury hospitality and spent the past 18 years with Ritz-Carlton/Marriott International as Regional Director of Human Resources, where she oversaw 18,000 employees and 78 hotels.

Said CEO Matt Maddox, "I am excited to begin 2019 with such strong enhancements to our executive team, each of whom brings a unique skill set and deep expertise to Wynn Resorts. Combined with the steadfast leadership of Ian Coughlan and Linda Chen in Macau, Wynn Resorts is well positioned to achieve the growth and development goals we envision for our company both in 2019 and longer term."

**F.   Nevada Gaming Control Board Settlement and Fine**

294.    On January 25, 2019, the NGCB filed the NGCB Complaint[23] and accompanying settlement against the Company and Wynn Las Vegas, LLC, relating to the NGCB's investigation of the response by Wynn management to sexual misconduct allegations against Defendant Wynn.

295.    The NGCB Complaint further confirmed and elaborated upon the allegations of the January 2018 WSJ Article. Specifically, it listed eight instances of sexual harassment claims by employees against Defendant Wynn that were not investigated by the Company, and further stated that at least seven former executives knew of sexual harassment allegations made by female employees and did not investigate. Moreover, pursuant to the accompanying NGCB Settlement, which was signed by Defendant Maddox, "RESPONDENTS [Wynn Las Vegas, LLC, d/b/a Wynn Las Vegas and Wynn Resorts, Ltd.] admit each and every allegation set forth in the [NGCB] Complaint, NGC Case No. 18-15, except that RESPONDENTS neither admit nor deny paragraphs 72 - 73 of the Complaint and that portion of paragraph 57 of the Complaint that alleges Maurice Wooden was aware of the allegations of sexual misconduct." NGCB Stip. ¶ 1.[24]

296.    Count One of the NGCB Complaint summarized the 2005 settlement. Specifically, the Complaint alleged that in 2005, "Employee 1", employed in the Wynn Salon, alleged to various people at Wynn that she had been raped by Defendant Wynn and that she became pregnant as a result. *Id.* ¶ 36.  The salon managers, in turn reported the allegations to Wynn's Human Resources department, as required under Company policy. Around the time the

---

[23] *Nev. Gaming Control Bd. v. Wynn Las Vegas, LLC,* No. NGC 18-15 (Nev. Gaming Comm'n Jan. 25, 2019).

[24] The Company admitted the NGCB Complaint allegations discussed and summarized below. Aside from the discrete allegation relating to Wooden's knowledge of an allegation of sexual misconduct in 2014 (*see* NGCB Compl. ¶57), the only allegations that the Company did not admit related to allegations of sexual misconduct made in 2016 against Wynn by a flight attendant employed by a subsidiary of the Company in Count Five (*see id.* ¶¶72-73).

report was made, Marc Schorr, former Wynn President and Resorts Chief Operating Officer; Doreen Whennen, former Wynn Vice President of Hotel Operations, and Arte Nathan, former Wynn Senior Vice President and Chief Human Resources Officer were all apprised of the allegations.  Yet they all failed to initiate or conduct any investigation into Employee l's allegations of sexual misconduct, "in violation of [the Company's] policies and procedures."  *Id.* ¶ 39.

297.    Instead, according to the NGCB Complaint, Defendant Wynn "reached a private, confidential settlement with Employee 1 in which she and her husband were paid $7.5 million through a separate legal entity funded personally by Mr. Wynn (2005 Settlement)." *Id.* ¶ 40. The NGCB Complaint further alleged—and the Company admitted— that Defendant Sinatra learned of the 2005 Settlement by January 2012, "at the latest," Sinatra also knew "[b]y July 2017, at the latest," that Employee 1 had said Defendant Wynn raped her. *Id.* ¶ 41.

298.    In addition, the NGCB Complaint alleged—and the Company admitted—that "[a]t least four (4) former executives of [the Company] failed to initiate and/or conduct an investigation after obtaining knowledge of allegations of sexual misconduct against Mr. Wynn as required by [the Company's] policies and procedures."  *Id.* ¶ 43.

299.    Count Two of the NGCB Complaint detailed the 2006 Settlement. Specifically, according to the Complaint, and as the Company has admitted, Employee 2, a cocktail server at the Company, accused Defendant Wynn of pressuring her into a nonconsensual sexual relationship that lasted from 2005 through her departure from Wynn in in 2006, and that he entered into a private settlement with her and her parents in the amount of $975,000 on December 6, 2006. *Id.* ¶ 48.

300.    Mr. Schorr, Mr. Nathan, and Mr. Tourek knew about Employee 2's allegations of sexual misconduct against Mr. Wynn in 2006. Yet they all failed to initiate an ER investigation into Employee 2's allegations of sexual misconduct, in violation of the Company's policies and procedures.  *Id.* ¶ 49.

301.    Count Three of the NGCB Complaint summarized another instance of alleged sexual misconduct by Defendant Wynn in 2005. Specifically, the Complaint alleged—and the

Company admitted—that in 2014, Employee 3, a former Wynn Las Vegas cocktail server and flight attendant, claimed that Mr. Wynn engaged in sexual misconduct against her in 2005. *Id.* ¶ 56. The Company has admitted, as alleged in the complaint, that Mr. Tourek was aware of the allegations of sexual misconduct made by Employee 3. *Id.* ¶ 57. The Complaint further alleges that Mr. Wooden was also aware of these allegations. *Id.* Neither of them initiated an HR investigation into Employee 3's allegations of sexual misconduct. *Id.* ¶ 58. The Company admitted that failure "to initiate and/or conduct an investigation" was a "violation of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10)" and "an unsuitable method of operation and is grounds for disciplinary action against [the Company]." *Id.* ¶¶ 60-62.

302.     Count Four of the NGCB Complaint summarized three additional separate instances of alleged sexual misconduct by Defendant Wynn in 2014—all of which the Company admitted to in the accompanying NGCB Settlement.  Specifically, Employee 4, Employee 5, and Employee 6, each of whom worked at Wynn's Encore Spa alleged that Mr. Wynn had sexually harassed them during massages that were performed on him in 2014.  *Id.* ¶ 64. These employees reported the alleged sexual harassment by Mr. Wynn to Wynn management, which was communicated to other management but never reported to Human Resources, nor did anyone try to ensure that the allegations had been reported in compliance with the Company's policies and procedures so that HR could conduct an investigation. *Id.* ¶ 65.

303.     Count Five of the NGCB Complaint summarized alleged sexual misconduct by Defendant Wynn against multiple flight attendants.  Specifically, "Employee 7", who was a flight attendant with LV Jet, LLC (LV Jet), a wholly owned Wynn subsidiary, wrote a letter to Defendant Wynn dated October 27, 2016, in which she made allegations that he had Wynn engaged in sexual harassment with multiple LV Jet flight attendants. *Id.* ¶ 71. The letter was forwarded to Defendant Sinatra and to Stacie Michaels, former Wynn General Counsel, by Defendant Wynn's personal assistant. *Id.* ¶ 72. Neither of them reported the allegations to HR, or otherwise ensure that the allegations had been reported, as required under Wynn's policies and procedures in effect at the time, so that HR could investigate them.  *Id.*

304.    Count Six of the NGCB Complaint summarized alleged sexual misconduct by Defendant Wynn against cocktail servers.  Specifically, the Complaint referenced multiple allegations, made by various individuals, that "Employee 8" had facilitated sexual relationships between Defendant Wynn and Wynn cocktail servers. *Id.* ¶ 78.  Although Mr. Nathan was aware of rumors to this effect, he did not investigate them, as required by Wynn's policies and procedures. *Id.* ¶ 79.

305.    Count Seven of the NGCB Complaint alleged that Mr. Tourek received an e-mail in 2007 alleging that a former executive "loves sleeping with cocktail servers," but did not initiate any investigation into these allegations.  *Id.* ¶¶ 84-85.

306.    As a result of the conduct alleged in Counts One through Seven of the NGCB Complaint, the NGCB found—***and the Company has admitted***—that:

- The Company's and its executives' failure to initiate and/or conduct an investigation "constitute violations of NRS 463. 170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and 5.011(10)" and that "*[e]ach separate occasion* when RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to initiate and/or conduct an investigation as described herein *constitutes a separate violation of the Gaming Control Act and Regulations of the Commission*, as herein specified, for purposes of NRS 463.3 10(4)(d)(2)."

- These failures also constituted "an unsuitable method of operation" and were "grounds for disciplinary action against [the Company]."

*Id.* ¶¶44-46 (Count 1), 52-54 (Count 2), 60-62 (Count 3), 67-69 (Count 4), 74-76 (Count 5), 80-82 (Count 6), 86-88 (Count 7) (emphasis added).

307.    Count Eight of the NGCB Complaint (*id.* ¶¶90-96) summarized Wynn's overall repeated failures to comply with the Company's policies and procedures:

- "[P]olicies and procedures requiring employee attendance at annual compliance training were not applied to Mr. Wynn."

- "[P]olicies and procedures pertaining to WYNN spas were not applied to Mr. Wynn.

- "[P]olicies and procedures pertaining to conflicts of interest were not followed for several settlements, including, but not limited to, the 2005 Settlement, and the 2006 Settlement."

- "[T]he ability of former WYNN executives to operate outside of Company policies and procedures, contributed to the internal control breakdowns that occurred in relation to the allegations of misconduct as described in this Complaint."

- "RESPONDENTS' [including the Company's] failure to ensure compliance with RESPONDENTS' policies and procedures, as described herein, in whole or in part, constitutes a violation of NRS 463.170 (8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10)."

- "Each separate occasion when RESPONDENTS, RESPONDENTS' former agents, and/or RESPONDENTS' former employees failed to ensure compliance with RESPONDENTS' policies and procedures, as described herein, constitutes a separate violation of the Gaming Control Act and Regulations of the Commission, as herein specified, for purposes of NRS 463.310(4)(d)(2)."

- The failure of RESPONDENTS to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10) is an unsuitable method of operation and is grounds for disciplinary action against RESPONDENTS.

308.    Count Nine of the NGCB Complaint (*id.* ¶¶99-102), which the Company also admitted to in the NGCB Settlement, summarized Defendants' additional failures to comply with the Company's policies and procedures, which constituted "violations of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and/or 5.011(10)" and an "unsuitable method of operation" providing "grounds for disciplinary action against [the Company]," as follows:

- Defendant Wynn had "engaged in intimate and sexual conduct with WYNN employees."

- Defendant Mr. Wynn "failed to comply with [the Company's] policies that he maintain a professional work environment

137

and/or failed to comply with the spirit of [the Company's] policies that discouraged intimate relationships between himself and employees.

- Regardless of whether Wynn's conduct expressly violated any Company policies, his conduct was "inappropriate and unsuitable" given his position and the inherent disparity in power between himself and non-management employees.

309.    In the NGCB Settlement, the Company also admitted to Count Ten of the NGCB Complaint (*id.* ¶¶109-16), which summarized Defendants' failure to comply with the Company's policies and procedures as follows:

- The Company and its management "did not enforce their policies and procedures with regard to their executives and other high level employees following the reporting procedures for sexual harassment and related matters."

- The Company's past failures to enforce its policies and procedures led to the multiple instances, including the ones set forth in the NGCB Complaint where sexual harassment allegations about Wynn executives were not investigated or appropriately addressed.

- The Company's "past failures to appropriately address allegations of sexual harassment by [its] executives and high level employees … resulted in negative articles published in widely disseminated media publications, including, but not limited to, the Wall Street Journal."

- Wynn employees' failures to follow and enforce Wynn's policies and procedures constituted violations of NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011.

- Wynn employees' failures to comply with NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011 constituted an "unsuitable method of operation" which was "grounds for disciplinary action" against the Company.

310.    On February 26, 2019, the Company was fined "a record $20 million by Nevada gambling regulators … for failing to investigate claims of sexual misconduct" against

Defendant Wynn. An *Associated Press* report describing the fine[25] continued:

> The penalty against Wynn Resorts Ltd. ends an investigation that began after The Wall Street Journal reported that several women said the company founder harassed or assaulted them.
>
> Wynn Resorts will keep its gambling license under the Nevada Gaming Commission settlement approved by four commissioners who set the fine.
>
> "It's not about one man," said Commissioner Philip Pro, a former federal court judge. "It's about a failure of a corporate culture to effectively govern itself as it should."
>
> * * *
>
> The previous highest fine in state history was $5.5 million in 2014 against the sports betting and mobile gambling system company now known as CG Technology….
>
> Chairman Tony Alamo said $20 million "makes it clear to all licensees that this culture cannot be tolerated," while also letting the publicly traded company "heal."
>
> * * *
>
> Details about the investigation and its findings were not made public.
>
> But Wynn Resorts acknowledged in settlement documents that several former board members and executives knew about but failed to investigate after Wynn paid $7.5 million in 2005 to a former salon employee who alleged he raped her and that she became pregnant as a result.
>
> "Mr. Wynn ... engaged in intimate and sexual conduct with (company) employees," the settlement documents said.
>
> The company also failed to investigate a cocktail server's allegation that from 2005 to 2006 Wynn pressured her into a nonconsensual sexual relationship, the documents said. Wynn paid a $975,000 private settlement to that woman and her parents, the settlement said….
>
> "The company's initial response during this period was driven by Mr. Wynn's adamant denial of all allegations," said a statement from

---

[25] https://www.washingtonpost.com/business/regulators-fine-wynn-resorts-20m-over-sex-allegations/2019/02/26/9927ae84-3a14-11e9-b10b-f05a22e75865_story.html.

Wynn Resorts spokesman Michael Weaver. It acknowledged a "short-sighted focus on initially defending Mr. Wynn, rather than reassuring employees of the company's commitment to a safe and respectful work environment."

### G. **The Company Admits How Badly It Had Failed In the Past**

311.    The Company issued two press releases in response to the news of the NGCB disciplinary complaint and fine: one titled "Nevada Gaming Control Board and Wynn Resorts Agree to Settlement" on January 28, 2019, and another titled "Nevada Regulatory Process Completed for Wynn Resorts" on February 26, 2019. Although those two press releases tried to spin a record-breaking $20 million fine as somehow positive, they ultimately only underscored just how badly the Company had failed during the Class Period and how thoroughly the Company had had to "transform[]" itself in order to bring its policies and procedures into compliance with the law.

312.    For example, the January 28, 2019 press release stated in relevant part:

"The completion of the NGCB's investigation of the response of certain employees to allegations against our founder and previous CEO Steve Wynn is an important remedial step. We have fully cooperated and been transparent with the Board in this in-depth investigation. We look forward to appearing before the Nevada Gaming Commission to review the settlement and establish the final resolution of the investigation.

"Upon learning of the extent of the allegations, the new leadership of Wynn Resorts took immediate actions to ensure an open and safe work environment for all employees and **made dramatic changes at every level of key decision-making in the Company**. As an example, any employee mentioned in the NGCB report who was aware of allegations of sexual assault against the company's former chairman and did not investigate or report it is no longer with the company.

"We have **undergone an extensive self-examination over the last 12 months, intended to reinvigorate and implement meaningful change across all levels of the organization, cultivate a safe, healthy and supportive workplace culture**, and build on our core values of respecting our employees, corporate responsibility and citizenship, and service to the community."

140

Philip G. Satre, Chairman of the Board of Wynn Resorts, issued the following statement:

"In my extensive experience working in the highly-regulated gaming industry I have never seen a company take **action that was as swift and comprehensive** as the executive team at Wynn Resorts. Much of that occurred before I joined the Board in August 2018, however I believe our board's follow-up and reaction to the regulatory investigations has been just as **thorough and decisive**."

313.   Similarly, the February 26, 2019 press release stated in relevant part:

"This brings to a conclusion the Nevada gaming regulators review of who in the Company was aware of allegations against the Company's founder and former CEO.

"We are pleased that the Nevada Gaming Commission has recognized the **company's transformation and 'refreshed culture' over the course of the last twelve months** and acknowledged **the 'paradigm shift' that has occurred within the company.**

"The completion of the review by Nevada regulators is an important step forward, and we deeply appreciate the trust and confidence they have placed in the new leadership of Wynn Resorts to 'grow and prosper.'"

Over the past year, **the Company has taken many remedial actions**, several of which were recognized by the Commission during the hearing:

- Executed a separation agreement with founder Steve Wynn that paid him no severance and arranged for liquidation of all his Wynn Resorts shares.

- Separated the roles of CEO and Chairman of the Board, consistent with current corporate best practices.

- Appointed Matt Maddox as CEO of Wynn Resorts.

- Commenced a **robust Board refreshment process** and, as of today, the median tenure of our eight independent directors is now less than two years. In April 2018, the Board **elected three new female directors**, resulting in a Board that is now nearly 50% women. In August 2018, the Board elected Philip G. Satre, Richard Byrne and Matt Maddox to its Board. Mr. Satre is Chairman.

141

- **Ensured that any employee who was aware of allegations of sexual assault against Steve Wynn and did not investigate or report it is no longer with the company.**

- Appointed Ellen Whittemore, a recognized expert in gaming regulatory matters, as General Counsel; appointed Marilyn Spiegel, an executive with significant hospitality and human resources experience, as President of Wynn Las Vegas; and appointed Rose Huddleston, a seasoned human resources executive, to the newly created corporate position of Senior Vice President of Human Resources, North America.

Under the leadership of CEO Matt Maddox, the company has taken … steps to further *transform its workplace environment*:

### H. The MGC Decision and Order

314.     On April 30, 2019, as alleged above, the MGC issued its Decision and Order in *In the Matter of Wynn MA, LLC*, relating to the MGC's investigation into the suitability of Wynn MA, LLC, and its qualifiers, including Wynn Resorts, Defendant Maddox, and Defendant Mulroy. In light of the pervasive violations and misconduct addressed in the MGC Decision and Order and accompanying IEB report, the MGC fined Wynn Resorts $35 million and Defendant Maddox $500,000. Many of the key findings in the MGC Decision and Order, which the Company did not appeal, have been addressed above.

315.     Additionally, the Decision and Order found based on the evidence before it that:

[G]iven systemic corporate failures, the truth may never been uncovered, which troubled us most.

* * *

We note the artificial lines drawn by the license in this matter, attempting to distinguish sexual assault and misconduct from acts where power is so unequally distributed that individual choice is inherently absent.

* * *

The evidence establishes that, at that point [in December 2013], Mr. Wynn was aware of all of the allegations and settlements, and Ms. Wynn and Ms. Sinatra were aware at least the existences of the 2005 settlement, if not all of its detail.

142

* * *

[I]t is difficult to fathom why the existence of the allegations and settlements was not disclosed to the Commission in 2013 and 2014 during the RFA-1 and RFA-2 reviews. It is arguably understandable why there would be a preference on the part of the Company not to publicly disclose the existence of the settlements, particularly if they believed them to be based on false allegations. It strains the conscience, though, to understand why they were not disclosed to the IEB, particularly if the Company was confident that the allegations were false.

* * *

The 2014 Abbott memo is dated June 27, 2014. The vote to award the Category 1 license in Region A to Wynn MA, LLC took place on September 16, 2014. Ms. Sinatra, who was intimately involved with the licensing process, denied being aware of the allegations contained in the Abbott memo despite being forwarded a copy to her Company email address and having responded to that email. The Commission notes that the IEB did not receive this email chain to or from Ms. Sinatra until September 28, 2018, after her departure, due to an e-discovery issue, as explained by the Company. The Commission is inclined to conclude that her denial was motivated by self-preservation given the proximity of the issuance of the memo to the licensing decision. The Commission found nothing in the record to support Sinatra's denial and was unable to elicit further explanation from her given that she declined to appear at the hearing despite receiving a subpoena and declined the Commission's follow-up request to appear following the conclusion of the adjudicatory hearing.

* * *

One of the troublesome undercurrents driving this matter is that disclosure of information was often withheld reportedly on the advice of legal counsel, both in-house and outside. All persons involved should have known better. This serves as a prime example of why it is important to ensure that an attorney is not conflicted by representation of multiple clients in the same matter. In the situation now before us, the interests of Mr. Wynn and the Company were clearly not always aligned. While it may have been in the Company's interests to disclose the existence of the allegations and settlements to the Commission, it was arguably not in Mr. Wynn's personal interest to do so. One needs look no further than the cleansing process that took place in the

143

Company's executive ranks after the publication of the WSJ article to understand this divergence in interests. Though there appear to be blurred lines as to who represented whom, the same attorneys seem to be representing both parties at times and ultimately advising that certain of the allegations and settlements need not be disclosed to regulators. Had separate counsel been in place for each party, it is easy to envision that a different result may have been achieved.

Not only were the allegations and settlements not voluntarily disclosed, but in some instances, affirmative steps were taken which allowed Mr. Wynn to complete the forms without disclosure. The creation of Entity Y, in particular, stands out as a prime example of a concerted effort to ensure that the 2005 settlement would not be discovered by, among others, regulators.

*Id.* at 1, 17, 19-20 & n.15.

316.    The MGC Decision and Order discussed Defendant Maddox's suitability, and also the knowledge and involvement of Defendants Wynn and Sinatra, among other senior executives of Defendant Wynn Resorts:

There is no substantial evidence that Mr. Maddox definitively knew about any of the settlements or fully knew about the allegations of wrongdoing involving Mr. Wynn until 2016 after Ms. Wynn filed her amended cross-claim in the Okada litigation. Mr. Maddox became more fully aware of the details of the allegations in December 2017 leading up to the publication of the WSJ article in 2018. Mr. Maddox was able to remain largely uninformed despite the fact that many of the highest ranking executives in the Company (Ms. Sinatra, Mr. Tourek, and Mr. Wooden), with whom he regularly communicated and shared office space, had varying degrees of knowledge of the allegations or settlements. The fact that these executives either failed to provide him with the whole story or failed to tell him at all about these critical events suggests a failure of leadership on his part. In any event, when Mr. Maddox did gain knowledge, his response was at all times underwhelming in both substance and appearance.

* * *

In the wake of the filing of the amended cross-claim in 2016, Mr. Maddox set out to gain a better understanding as to whether the details of the reported settlement were true or just a litigation tactic being employed by an aggressive attorney. This led him to ask Ms. Sinatra

144

for a briefing on the situation. She informed him that there was a consensual event that occurred between Mr. Wynn and a Company employee around the opening of the Wynn Las Vegas and that the matter, which had been overseen by the prior general counsel and by outside counsel, had been settled. In response, Mr. Maddox never initiated any sort of investigation or even asked Mr. Wynn himself for an explanation. Even if viewed with reference to the distracting circumstances of the time and his testimony that he suspected that the matter may have revolved more around extortion than truth, Mr. Maddox's response as President of the Company is difficult to comprehend.

* * *

Not long before the filing of the 2016 amended cross-claim, an incident that should have warranted diligent review was similarly misunderstood and mishandled by Mr. Maddox in violation of the Company's human resources policies. In 2014 or 2015, Mr. Wooden, then President of Wynn Las Vegas and a direct report to Mr. Maddox, told Mr. Maddox that employees in the spa were uncomfortable by a request from Mr. Wynn for a sensual massage. The request was supposedly made in the lead-up to a couple's massage planned for Mr. Wynn and his wife, Andrea. Upon learning of the concerns from Mr. Wooden, Mr. Maddox's response was one of confusion in that he did not know the meaning of "sensual massage". Given that it was requested in the context of a couple's massage and Mr. Wynn and his wife shared a close relationship, Mr. Maddox never imagined that any sort of misconduct could be involved. Accordingly, he directed Mr. Wooden to speak to Mr. Wynn about the matter directly, and to tell him that people were uncomfortable so "knock it off."

Here, the Commission finds that Mr. Maddox failed to comply with the Company's existing human resources policies and procedures and did not adequately address the safety and well-being of the Company's employees. Upon learning that an employee working in the sensitive and vulnerable environment of the spa complained that she had been made uncomfortable by comments made by the CEO, Mr. Maddox did not take appropriate or sufficient action. While Mr. Maddox may have been accustomed to people complaining that Mr. Wynn was a tough boss, mean, or a bully, this was not that situation. First, the Commission finds that the employee's complaint was reported through appropriate channels. She appropriately directed her complaint to her

145

supervisor, who then reported it to her supervisor, Mr. Gullbrants, who then reported it to his supervisor, Mr. Wooden, who then reported it to his supervisor, Mr. Maddox, who held the top position just below the CEO, Mr. Wynn - the subject of the complaint. This complaint demanded an investigation pursuant to the Company's human resources policies. It is not for the recipient of such a complaint to immediately determine its veracity or merit; that is the purpose of investigations. Regardless of the perceived merit or perception that it may just be a misunderstanding, this complaint raised potential harassment issues which required a thorough investigation by individuals knowledgeable in handling such matters. Rather than initiating that investigation, Mr. Maddox simply directed his underling to talk to the alleged perpetrator. Had Mr. Maddox taken appropriate action at this time in 2014, the earlier failures to investigate past allegations may have been brought to light, possibly sparing the Company and all of its assets, including its employees, ongoing risk. It is of further note that Mr. Maddox acknowledged that he still has not personally met with spa employees regarding the Company's commitment to change.

Mr. Maddox also inadequately addressed other serious matters, showing a concerning lack of diligence and attention to detail. In 2008, when Mr. Maddox was CFO, he learned of a $700,000 entry entitled "legal settlement," which was recorded on the quarterly disbursement report provided to the compliance committee. The entry indicated that payment had been made using Company funds. When Mr. Maddox asked Mr. Schorr, he was told that the payment was paid to a former employee who had fallen on hard times and whom Steve and Elaine Wynn wanted to help. Reasonable as it may seem that they may have wanted to help someone, and permissible as the authorization of a payment of that size may have been by the property president or CFO, as corporate CFO of a publicly traded company, it seems that once told about the purpose of the payment, the CFO would have inquired as to why Company funds would be used for such a purpose. Further, if that were the explanation, the CFO may rightfully question why it would be labeled on the disbursement report as a "legal settlement." Had he done so, Mr. Maddox may have determined the true purpose of the payment, which was in actuality a legal settlement of a claim of sexual misconduct …. If he had conducted a more diligent inquiry, though, he may have acquired a critical piece of information that would have added context to the previously described 2016 and 2014-15 events.

When viewed collectively, his knowledge of the 2008 $700,000 "legal settlement," the 2014 spa incident involving the "sensual massage," and the amended 2016 cross-claim information, we observe a colossal missed opportunity by the president of the Company to have detected what others may have known, which was that there was a critical problem brewing. Had Mr. Maddox taken steps to investigate these issues, he would have been more informed and more apt to conduct an additional investigation when, in 2017, in preparation for his deposition as part of the Okada litigation, he learned that a separate matter in 2005 may have involved some type of assault. Instead, he concluded that this characterization was likely just an aggressive litigation tactic.

* * *

To the extent that past examples of the tone at the top are predictive of future performance, there is cause for concern. We first note a general lack of understanding by Mr. Maddox, the person at the top of the Company, when it comes to reporting matters to the Board of Directors, achieving regulatory compliance, and reporting obligations to regulators. While we credit him with hiring a seasoned general counsel who is well-versed in such obligations, it is imperative that he at least have a working understanding of such responsibilities. His explanation as to why he was unaware of the Communications Protocol implemented by the Board of Directors in 2016 upon first learning of the 2005 settlement (i.e., that he did not read the email transmission of the policy) does not instill great confidence. To the contrary, his explanation for failing to even read the email forwarding the Communications Protocol was offensive to the principles of corporate compliance. Similarly, while he would not be expected to have memorized the entire enhanced harassment policy, it was worrisome that when asked at the adjudicatory hearing to name a few areas that had been updated, or even hazard an educated guess, he was unable to do so.

*Id.* at 23-28.

317.    Additionally, according to the MGC Decision and Order, Maddox learned in 2016 that Defendant Irani, a long-serving member of the Company's Board and qualifier for the Massachusetts gaming license, had been accused in a civil complaint of human trafficking, among other serious wrongdoing. *Id.* at 10, 48.  Notwithstanding Maddox's, the Company's,

147

and the Board's, knowledge of these serious allegations, Defendant Irani remained on the Company's Board for nearly two years, and the matter was not reported to the MGC. *Id.* at 10, 25-26, 48. The MGC Decision and Order found that Defendant Maddox bore "responsibility for this … as President of the Company" and "should have…, at the very least, pursued further investigation." Defendants' failure to report these serious allegations to the MGC violated the MGC's statute and regulations. *Id.* at 39, 41, 48.

318. The MGC also took issue with Maddox's handling of Defendant Sinatra's termination and Wooden's departure from the Company, finding:

> In a similar vein, there are a number of instances in which Mr. Maddox more recently exercised questionable judgment. The Commission is troubled by the manner in which Ms. Sinatra's employment with the Company was terminated. Ms. Sinatra was a longtime employee who Mr. Maddox knew, or should have reasonably known, by this time (i) had knowledge of certain allegations and settlements against Mr. Wynn that went without timely report and investigation, (ii) lacked competency in regulatory compliance even though compliance was one of two principal responsibilities under her employment contract, and (iii) failed persistently to advise Mr. Maddox and others as to the scope or substance of risks to the Company with the diligence and understanding of detail reasonably expected of a general counsel of a publicly traded company. Mr. Maddox ultimately did recognize that Ms. Sinatra was no longer the right person to fill the general counsel position and stated that a decision needed to be made as to whether she should be terminated for cause and how that would impact any severance. Yet, at that time, he was still considering whether to find another role for her within the Company. While he may not have had access yet to the Investigative Report of the special committee or the IEB Report, it is not unreasonable to conclude, given his role and tenure at the Company, that he sensed at that time the extent of corporate failure in the handling of complaints against Mr. Wynn and other compliance matters dating back years - matters for which Ms. Sinatra would have been directly responsible. That he would consider moving Ms. Sinatra elsewhere evidences loyalty over the best interests of the Company and, in the eyes of some Commissioners, over integrity. Further, when the Company had an opportunity to publicly demonstrate that it takes

148

its transformation seriously by considering terminating Ms. Sinatra's employment for cause based on her role in that corporate failure, it instead elected to pay her nearly $10 million in exchange for her removal from the Company. Mr. Maddox stated that he followed the advice of newly retained counsel (and outside consultants) and agreed to execute a severance agreement for Ms. Sinatra without urging a close examination of her role in the situation, and without demanding that a claw-back provision be included in the event that such role were established in the future.

Mr. Maddox's involvement in the handling of Mr. Wooden's employment was similarly disappointing. When it became clear that Mr. Wooden had been aware of allegations involving Mr. Wynn and failed to take appropriate action, he was allowed to remain as the president of Wynn Las Vegas on a six month term of probation with hopes of rehabilitating his relationship with the "pockets" of employees of whom he had lost trust. This was contrary to the recommendation of the special committee, which recommended his outright termination. The decision at the Board's level to allow Mr. Wooden to remain was not unanimous. There was, accordingly, an opening for Mr. Maddox to make a show of leadership and put the principles of a transforming Company on display. Instead, again, rather than acting decisively to remove someone who covered up the allegations, he supported the decision to keep Mr. Wooden in his position; a decision which proved to be short-lived. Once it was clear that Mr. Wooden had lost the confidence of regulators and that he represented a threat to the Company, he resigned.

*Id.* at 26-27.

319.   The MGC Decision and Order also expressed concern over Defendant Maddox's role in the Company's "undercover operation" targeting alleged victims of Defendant Wynn's sexual misconduct, finding:

The manner in which the undercover operation by James Stem was conducted is also of concern. Mr. Maddox paid little attention to the consequences of authorizing the operation where such action had the potential to jeopardize the ongoing investigations then being conducted by the Commission and special committee. Mr. Maddox's authorization of the operation was careless and exposed the investigation to risk by shaking the trust of critical witnesses who were in the process of being interviewed.

149

*Id.* at 27.

320.   The MGC Decision and Order also found that Defendant Mulroy, along with the other Director Defendants, knew of the 2005 Settlement arising from the rape allegation in 2016. *E.g.*, *id.* at 31-32.

321.   The IEB Report also expanded on and provided further evidence of sexual misconduct against Defendant Wynn that were known to Defendants, but were not investigated as required by the Company's policies or disclosed to the MGC, as required by law. For example, an April 2, 2019 Boston Herald article addressing the IEB report identified the following "key excerpts" from the IEB report:[26]

- "The significant changes in leadership, policies, structure, and internal controls at the Company do not erase the fact that the corporate failures revealed in this investigation are significant, repetitive, and reflective of the Company's historical governance practices."

- "The IEB investigation shows that over a course of years, a limited group of executives and employees in positions of authority at the Company, including in the legal division, were aware of certain allegations of sexual misconduct against Mr. Wynn involving employees, but they disregarded Company policies when it came to handling those allegations."

- "Inaction and failure on the part of the identified former executives at this publicly-traded Company, which was led by its founder at the time, appear to have contributed to a culture where employees were reluctant to report allegations against Mr. Wynn to management."

- "At no time in the course of the 2013 suitability investigation was the existence of any allegations of sexual misconduct involving Mr. Wynn disclosed to the investigators."

- "The investigation also shows that certain executives, with the assistance of outside counsel, took measures to conceal allegations against Mr. Wynn that came to their attention."

- "Their efforts at secrecy made it exceedingly difficult, if not impossible, for gaming regulators to detect this potentially derogatory information

---

[26] https://www.bostonherald.com/2019/04/02/excerpts-from-gaming-commissions-investigative-report/.

through typical regulatory means which rely heavily on robust self-disclosures by the applicant/licensee."

322.    The WSJ also reported on the MGC's adjudicatory hearing and IEB Report, stating in an article entitled *Wynn Aides Are Accused Of Cover Up*, published on April 3, 2019, that:

> Wynn Resorts Ltd. executives ran a longstanding, sophisticated coverup to protect founder Steve Wynn from allegations by employees that he had engaged in sexual misconduct against them, according to an investigation by Massachusetts regulators.
>
> Investigators also revealed Mr. Wynn, once one of the world's most powerful casino magnates and a prominent Republican fundraiser, has entered into six settlement agreements since publication of an article in The Wall Street Journal that sparked their probe.
>
> * * *
>
> In an opening statement to a crowd inside Boston's main convention center, Mr. Maddox said that while he and others were in denial after the first Journal story ran, he changed his mind as investigators began looking into the allegations. "I began to realize that there were many victims -- and those victims felt powerless. For that I am deeply remorseful."
>
> The company, in a statement, said that anyone who received information about the allegations and then didn't investigate or report them is no longer there. It said it has implemented enhanced sexual-harassment training for all employees, among other policy changes, in transforming itself into a more transparent company.
>
> Karen Wells, who led Massachusetts' investigation, ran through a litany of allegations and settlements in an hour-long presentation, focusing on the response from current and former company executives to each. While many problematic executives have since left the company, Ms. Wells said that does "not erase the fact that the corporate failures revealed in this investigation were significant. They were repetitive."

151

### I.  The Nevada Gaming Control Board Revokes Defendant Wynn's Suitability

323.    On October 14, 2019, the NGCB filed a disciplinary complaint[27] (the "NGCB Wynn Complaint") against Defendant Wynn, relating to the NGCB's investigation of the response to sexual misconduct allegations against Defendant Wynn, which revoked his suitability.

324.    The Complaint asserted, among other things:

> 2.    From its initial licensure in 2005, Wynn Resorts, Ltd. (Wynn Resorts and/or Wynn Company) was led by Mr. Wynn, who was-until his recent resignation-its Chairman, Chief Executive Officer (CEO), and controlling shareholder. During this time, multiple women in employment positions that were subordinate to Mr. Wynn reported that Mr. Wynn subjected them to unwanted sexual advances. Mr. Wynn never reported these allegations to the appropriate individuals or departments, but instead, concealed at least some of them through nondisclosure agreements and various other means. When some of Mr. Wynn's alleged misconduct became public in 2018, it resulted in negative reporting that was widely disseminated in media outlets around the world ….

> 3.    As the Wynn Company admitted in its 2019 Settlement with the Gaming Control Board, (1) it did not enforce its policies and procedures with regard to Mr. Wynn following the reporting procedures for sexual harassment and related matters; (2) its past failures to enforce its policies and procedures have led to multiple instances where sexual harassment allegations concerning Mr. Wynn were not investigated; and (3) its past failures to enforce its policies and procedures have led to multiple instances where allegations of sexual harassment by Mr. Wynn were not appropriately addressed by the Wynn Company.

> 4.    Given the Wynn Company's failure to properly monitor and investigate Mr. Wynn's conduct, the Gaming Control Board was obligated to undertake its own investigation into Mr. Wynn's conduct. That investigation revealed numerous potential instances of unwelcome sexual conduct by Mr. Wynn. Multiple female employees

---

[27] *Nev. Gaming Control Bd. v. Stephen Alan Wynn,* No. NGC 19-03 (Nev. Gaming Comm'n Oct. 14, 2019).

152

stated they experienced unwelcome sexual conduct by Mr. Wynn, including exposing himself, inappropriate comments and touching, coerced sex, and requests for oral and vaginal sex acts. Investigators identified individuals who asserted they witnessed Mr. Wynn engage in a series of encounters with subordinate female employees. These subordinate employees were vulnerable to Mr. Wynn's conduct due to their financial dependence on continued employment at resorts controlled and managed by him.

5.      In his capacity as a (if not the) key executive of a major casino, Mr. Wynn's conduct was inimical to the public health, safety, morals, good order, and general welfare of the people of the State of Nevada. He failed to exercise discretion and sound judgment to prevent incidents, which negatively reflected on the repute of the State of Nevada and acted as a detriment to the development of the gaming industry. In short, he brought discredit upon the State of Nevada and its gaming industry. And when the Board sought his testimony in response to these issues, Mr. Wynn failed to appear-despite knowing that doing so constituted grounds for the revocation of his Findings of Suitability.

* * *

36.     Through its seven-month investigation, the Gaming Control Board found evidence of sexual conduct by Mr. Wynn involving subordinate female employees, which Mr. Wynn conducted in disregard of the Wynn Company policy and procedure.

37.     The evidence from the investigation demonstrates a pattern of Mr. Wynn recklessly engaging in sexual conduct with subordinate employees, which even if it was consensual as maintained by Mr. Wynn, is oblivious to the significant power imbalance between the CEO of a major gaming company and subordinate employees dependent upon Mr. Wynn's approval for continued employment.

40.     Although Mr. Wynn has indicated elsewhere that all sexual conduct at issue was consensual, Mr. Wynn thwarted any investigation of such conduct between himself and a subordinate employee through his personal use of non-disclosure agreements.

* * *

49.     In the 2019 Settlement Stipulation, the Wynn Company admitted to nearly 12  all of the allegations in the Wynn Company Complaint, including that:

a. Mr. Wynn, while Chairman of the Board of Directors and Chief Executive Officer of Wynn Resorts, engaged in intimate and sexual conduct with employees.

b. Mr. Wynn failed to comply with the Wynn Company's policies that he maintain a professional work environment and/or failed to comply with the spirit of Wynn Resorts' policies that discouraged intimate relationships between himself and employees.

c. Mr. Wynn's conduct is inappropriate and unsuitable given his position as head of the Wynn Company and given the inherent disparity in power between himself and non-management employees.

d. The Wynn Company did not enforce its policies and procedures with regard to Mr. Wynn following the reporting procedures for sexual harassment and related matters.

e. The Wynn Company's past failures to enforce its policies and procedures have led to multiple instances where sexual harassment allegations concerning Mr. Wynn were not investigated.

f. The Wynn Company's past failures to enforce its policies and procedures have led to multiple instances where allegations of sexual harassment by Mr. Wynn were not appropriately addressed by the Wynn Company.

g. The Wynn Company's past failures to appropriately address allegations of sexual harassment by Mr. Wynn resulted in negative articles published in widely disseminated media publications, including, but not limited to, the Wall Street Journal.

h. Through these actions and failures, the Wynn Company violated NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010 and/or 5.011.

50. Mr. Wynn, as the former Chairman of the Board of Directors and Chief Executive Officer of Wynn Resorts, is ultimately responsible for the failures alleged in the Wynn Company Complaint.

## VIII.   EACH DEFENDANT'S ROLE IN THE FRAUD

325.    While Defendants' respective roles in the fraud is alleged in detail above, the

following summarizes and expands on those allegations.

**A.   <u>Individual Defendants</u>**

### 1. *Defendant Wynn*

326.   Defendant Wynn's role in the alleged fraud cannot be overstated. As alleged above, he co-founded the Company, which bears his name, with his ex-wife Elaine Wynn, and led it as CEO and Chairman of the Board prior to, and during nearly all of, the Class Period— including at the time each of the challenged misstatements and omissions were issued.

327.   He had direct involvement in the Company's day-to-day affairs, and each of the challenged misstatements and omissions are attributable to him as the being the maker of, and having ultimate authority over, those statements. For example, Defendant Wynn signed the 2013 through 2016 10-Ks, certified the accuracy of the statements in each of the Company's 10-Q filings during the Class Period, and issued press releases, other written statements, and earnings call statements in his own name (and on behalf of the Company), including the responses to and denials of Elaine Wynn's 2016 cross-claims on Mach 28 and April 5, 2016 and the *WSJ article* on January 26, 2018. He was also Chairman of the Board of Directors, which issued the 2014 – 2017 proxy statements soliciting investors' proxies in favor of electing him and the other Director Defendants to the Board, and approving his executive compensation. He had ultimate authority over, and was the maker of, the statements in the 2014 through 2017 Proxy Statements filed with the SEC, as they were issued on behalf of the Company's Board of Directors while he was its Chairman (as well as its CEO).  As the MGC Decision and Order noted, "Wynn Resorts was a founder-led company [until Wynn's resignation,]" which further demonstrates his ultimate authority over the challenged misstatements and omissions.  MGC Decision and Order at 23.

328.   As CEO and Chairman of the Board directly involved in the Company's day-to-day affairs, Defendant Wynn had ultimate authority over the statements issued by him and the Company during the Class Period and that are alleged above and at issue here, including the March and April 2016 press releases issued by the Company, and the responses to the *WSJ*

*article*.

329.    As described in detail in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order, including the accompanying IEB report (as summarized herein), Defendant Wynn was aware of all of the allegations of sexual misconduct against him and settlements related thereto and knew of or recklessly disregarded that (i) his conduct violated the Company's Code of Conduct; (ii) his conduct violated relevant gaming regulations concerning suitability, including that the Company's disregard of its own policies, failure to investigate allegations of sexual misconduct against Wynn, and submission of policies during the Massachusetts licensing process that were not abided by, was an unsuitable method of business operation and warranted sanctions under, and constituted violations of Massachusetts and/or Nevada gaming regulations, including (a) G.L. c. 23k § 4(15), § 21 (a)(1), and/or 25, and (b) NRS 463.170(8) and Nevada Gaming Commission Regulations 5.010 and/or 5.01; and (iii) he and the Company did not investigate allegations of the alleged misconduct and instead went to great lengths to conceal them.

330.    Defendant Wynn was aware of the settlements and allegations at the time the challenged misstatements and omissions attributable to him were made. First, as an initial matter, Wynn was the perpetrator of the alleged misconduct and was obviously aware of his own conduct when he committed it. Further, Wynn was aware of the settlements at issue because he was directly involved in them—in many cases using his personal funds, often through the assistance of his purported outside/personal counsel, and through an entity he created to make payments in connection with the 2005 Settlement of the rape allegation—which confirms he was aware of, or recklessly disregarded, the allegations and settlements beginning in 2005.[28] Indeed, as the Company has admitted in the NGCB Settlement, after "Employee 1" alleged in 2005 that Defendant Wynn had raped her "and that she became pregnant as a result," Defendant "Wynn reached a private, confidential settlement with Employee 1[i.e., the 2005

---

[28] Further, in many instances, instead of asserting that Wynn has never engaged in sexual conduct with the alleged victims who were his low-level employees, he has conceded that he engaged in sexual conduct with junior employees, but claimed the relationships were consensual.

Settlement] in which she and her husband were paid $7.5 million through a separate legal entity funded personally by Mr. Wynn." NGCB Compl. ¶¶ 36, 40. Thus, **in 2005**, Defendant Wynn was aware of or recklessly disregarded the 2005 Settlement and underlying rape allegation. Additionally, the IEB Report noted that "[t]he investigation has revealed that [Defendant Wynn himself was one of the] Company executives [who] were aware **in 2006** that" a former employee had alleged she had been "'wrongfully engaged in a sexual relationship' with Mr. Wynn." IEB Report at 62 (emphasis in original). According to the MGC Decision and Order, **in 2008**, Defendant Wynn knew that a "previously terminated employee from the cocktail services department" made allegations of sexual misconduct against him, which resulted in the 2008 Settlement that was paid with the Company's funds. MGC Decision and Order at 6. Then, **in 2009**, Elaine Wynn had spoken with Defendant Wynn after learning of the 2005 rape allegation and settlement related thereto, according to the MGC Decision and Order. Further, the MGC Decision and Order, including the accompanying IEB report, confirms that by no later than 2013—and thus when each of the challenged misstatements and omissions were made—Wynn "was aware of all the allegations and settlements." *Id.* at 17.

331.    That Defendant Wynn and his outside counsel "Created Entity Y, a limited Liability Company" and Defendant Wynn's own funds were used to make the settlement payments over "ten years in order to conceal the source and reason for the payments made under the settlement" provides further evidence of scienter. MGC Decision and Order at 5; *see also* NGCB Compl. ¶40. Further, as alleged above, when confronted with the Code of Conduct and polices related to sexual harassment and relationships with employees during a deposition in the *Okada* litigation in 2017, Wynn believed these policies were actually bad management and expressed disdain for them, confirmed he had not even read them, and then sought to change them so that  they would no longer prohibit relationships between him and junior employees. Thus, Wynn knew that his statements professing the importance of the Code of Conduct in the letter accompanying it were false or misleading.

332.    That Defendant Wynn refused to cooperate with the NGCB or MGC/IEB investigations into his misconduct, and failed to appear before the NGCB at its proceeding to

evaluate his suitability, also evidences his scienter.

333.    Wynn's abrupt resignation from the Company in the wake of the *WSJ article* is further evidence of his scienter.

334.    Defendant Wynn's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against him and related settlements. As, CEO and Chairman of the Board, who was involved in the Company's day-to-day affairs, Wynn had the opportunity to engage in fraud. He was motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that he engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits against him, news articles exposing his conduct, damage to his personal reputation, and Massachusetts and Nevada gaming regulators finding him unsuitable and effectively forcing his ouster from the Company; (ii) obtain advantages in divorce proceedings with his now ex-wife Elaine Wynn and other litigation, including the *Okada* matter; and (iii) to continue engaging in sexual misconduct with his employees.

### 2.   *Defendant Sinatra*

335.    Defendant Sinatra also played a key role in the alleged fraud. She joined the Company in 2004, and served as its Executive Vice President, General Counsel and Secretary of the Board from February 2006 until her resignation on July 15, 2018—including at the time the challenged misstatements and omissions were issued.

336.    She had direct involvement in the Company's day-to-day affairs, and each of the challenged misstatements and omissions (except those that Defendant Wynn made during earnings calls) are attributable to her as the maker of those statements. For example, she signed the cover letters accompanying the 2014 – 2017 proxy statements soliciting investors' proxies that contained the false and misleading statements regarding the unique advantages Defendant Wynn provided, and his importance, to the Company. She also played a key role in drafting other written statements issued in the name of the Company and Defendant Wynn, including the

responses to and denials of Elaine Wynn's cross-claims in 2016 and the *WSJ article* in 2018. For example, according to the IEB report, she "actively participated in the drafting of the statements to the *WSJ*" responding to the *WSJ article*. IEB Report at 142.

337.    As the Company's Executive Vice President and General Counsel directly involved in the Company's day-to-day affairs, Defendant Sinatra had ultimate authority over the statements issued by the Company during the Class Period and that are alleged above and at issue here, including the March and April 2016 press releases issued by the Company, and the responses to the *WSJ article*.

338.    As alleged further above, the *WSJ article*, the NGCB complaints against the Company and Defendant Wynn, and the MGC Decision and Order, including the accompanying IEB report (as summarized herein), show that, at the time of making the challenged misstatements and omissions, Defendant Sinatra was aware of or recklessly disregarded numerous allegations of sexual misconduct against Defendant Wynn and settlements related thereto, and knew of or recklessly disregarded that his (and her own) violations of the Company's Code of Conduct, which jeopardized the Company's gaming licenses and negatively reflected on Defendant Wynn's suitability. That Sinatra was involved in concealing such allegations, settlements and violations of the code provides additional evidence of her scienter.

339.    For example, according to the IEB Report, while Tourek "had no specific recollection of reporting" the 2006 allegation by a former employee that she and Wynn had been "wrongfully engaged in a sexual relationship" to Sinatra, "he indicated that in the normal course, he would have reported up the chain of command" such that Sinatra would have been aware of it. IEB Report at 62.  Additionally, according to the MGC Decision and Order, its investigation found evidence indicating that prior to the Class Period, in 2008, Sinatra attended two meetings relating to the 2008 Settlement arising from allegations made by a terminated Wynn Las Vegas employee that Wynn had an "intimate relationship" with a subordinate while she was his subordinate at Mirage Resorts. Further, Elaine Wynn maintains that she reported "the 2005 [rape] allegation and settlement to Ms. Sinatra in her role as general counsel for Wynn Resorts and secretary for the Board of Directors" in 2009, according to the MGC

Decision and Order (at 7). In connection with the *Okada* litigation, Elaine Wynn testified that, "[in 2009,] I told Ms. Sinatra that I had received information alleging that Mr. Wynn had raped an employee of the hotel in 2005." During the hearing at which Ms. Wynn provided that testimony, the Court noted that Defendant Sinatra's testimony "indicat[ed] she received information from Ms. Wynn [relating to the 2005 rape allegation]."  Transcript of Proceedings at 19, 38, *Wynn Resorts Ltd. v. Okada,* No. A-12-656710-B (Nev. Dist. Ct. Mar. 28, 2018).

340.   Further, according to the NGCB Complaint, and as the Company has since admitted through Defendant Maddox in the NGCB Settlement, Defendant Sinatra learned of the 2005 Settlement "[i]n January 2012, at the latest[.] NGCP Compl. ¶41.

341.   Additionally, in 2014, Sinatra was forwarded a copy of the Abbott Memorandum, dated June 27, 2014, summarizing a terminated cocktail waitress's allegation that "Mr. Wynn raped her in 2005." Although Sinatra denied being aware of the allegations in the memorandum in connection with the MGC/IEB investigation, the MGC Decision and Order found her denial to be incredible. It noted that the "Commission is inclined to conclude that her denial was motivated by self-preservation given the proximity of the issuance of the memo to the licensing decision[,]" continuing:

> The Commission found nothing in the record to support Sinatra's denial and was unable to elicit further explanation from her given that she declined to appear at the hearing despite receiving a subpoena and declined the Commission's follow-up request to appear following the conclusion of the adjudicatory hearing.

*Id.* at 19 n.15.

342.   According to the MGC Decision and Order, Sinatra and Defendant Wynn received a document provided by a former employee containing additional allegations of sexual harassment and creating a hostile work environment in October 27, 2016, but no investigation was conducted in violation of Company policy. *Id.* at 10.

343.   Further, Sinatra's failure to disclose what she knew or recklessly disregarded to the MGC during the licensing process, as alleged herein and detailed in the MGC Decision and Order, also evidences her scienter.

344.     Sinatra's failure to appear at the MGC adjudicatory hearing (despite receiving a subpoena) and declining a follow up request to appear further evidences her scienter.

345.     Sinatra's scienter is also evidenced by her trading of Wynn securities while in possession of material non-public information, which resulted in proceeds of over $16 million. Between 2014 and 2017, Defendant Sinatra sold 121,235 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $16,173,959:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/9/2014 | $198.74 | 13,907 | $2,763,877 |
| 5/9/2014 | $199.20 | 100 | $19,920 |
| 11/29/2016 | $99.76 | 41,743 | $4,164,282 |
| 11/29/2016 | $100.22 | 600 | $60,132 |
| 6/9/2017 | $129.12 | 22,624 | $2,921,211 |
| 9/15/2017 | $143.62 | 21,451 | $3,080,793 |
| 11/8/2017 | $152.03 | 20,795 | $3,161,464 |
| 11/9/2017 | $152.07 | 15 | $2,281 |
| Totals: | | 121,235 | $16,173,959 |

346.     Defendant Sinatra's scienter is also evidenced by her motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, the Company's General Counsel, who was involved in the Company's day-to-day affairs and also served as secretary of the Board, Sinatra had the opportunity to engage in fraud. She was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against her, news articles exposing her role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to her personal reputation, and Massachusetts and Nevada gaming regulators finding her unsuitable and effectively forcing her ouster from the Company; (ii) defeat claims asserted against her and the Company in the *Okada* matter; and (iii) to preserve

her position at the Company and the valuable compensation and other benefits it afforded her.

### 3. *Defendant Maddox*

347.   Defendant Maddox also played a key role in the alleged fraud. Throughout the Class Period, he served as President of Wynn Resorts. He also served as the Company's CFO from 2008 until 2014. After Defendant Wynn left from the Company, Maddox took over as CEO and joined the Company's Board of Directors.

348.   During the Class Period, he was directly involved in the Company's day-to-day affairs, and each of the challenged misstatements and omissions (except those that Defendant Wynn made during earnings calls) are attributable to him as the maker of those statements. For example, Maddox signed the 2013 10-K, the April 22, 2014 8-K, the 2013 Wynn Macau Annual Report, and the 2014 Q1 10-Q.  As President of the Company, it is reasonable to infer that he also had authority over, and made, the other written statements issued on behalf of Company and Defendant Wynn, including the responses to and denials of Elaine Wynn's cross-claims in 2016 and the *WSJ article* in 2018.

349.   As the President of the Company throughout the Class Period, and the Company's CFO for a portion of it, directly involved in the Company's day-to-day affairs, Defendant Maddox had ultimate authority over the statements issued by the Company during the Class Period and that are alleged above and at issue here, including the March and April 2016 press releases issued by the Company, and the responses to the *WSJ article*.

350.   At the time the alleged false and misleading statements were made, Maddox knew of, or recklessly disregarded, facts concerning the settlements and other allegations of misconduct whose omission rendered these statements false and misleading.

351.   As alleged further above, the *WSJ article*, the NGCB complaints against the Company and Defendant Wynn, and the MGC Decision and Order, including the accompanying IEB report (as summarized herein), show that, at the time of making the challenged misstatements and omissions, Defendant Maddox was aware of or recklessly disregarded numerous allegations of sexual misconduct against Defendant Wynn and settlements related

thereto, and knew of or recklessly disregarded that Wynn's (and Maddox's own) violations of the Company's Code of Conduct, which jeopardized the Company's gaming licenses and negatively reflected on Defendant Wynn's suitability. For example, the MGC Decision and Order indicates with respect to Maddox that: (i) in 2008 or 2009 he learned of, but recklessly disregarded, a red flag (the 2008 Settlement/"legal settlement" paid using company funds and that lacked an adequate explanation); (ii) in or around 2014 he learned of Defendant Wynn's sexual harassment of spa employees, but failed to investigate or report the incidents in violation of the Company's Code and other policies (instead he simply told Defendant Wynn to "knock it off"); and (iii) Maddox knew about the settlements or allegations of wrongdoing involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* in 2016, and became more fully aware of the details in December 2017 before the *WSJ article* was published.

352.   Defendant Maddox has admitted he knew of the 2005 sexual misconduct allegations involving Defendant Wynn no later than March 28, 2016, when Elaine Wynn filed court documents revealing the alleged assault and the "pattern of reckless risk-taking" behavior by Defendant Wynn that "left the directors and the Company vulnerable to potential liability and regulatory exposure."[29] Maddox's subsequent denial of any knowledge of Defendant Wynn's pervasive pattern of sexual misconduct cannot be reconciled with his awareness of Elaine Wynn's March 28, 2016, court filing.

353.   The MGC Decision and Order demonstrates that Maddox was aware of or recklessly disregarded a number of red flags—including relating to the 2008 Settlement in 2008 or 2009, and allegations of misconduct in 2014, which he failed to report in violation of the Company's policies, as further alleged herein. Maddox's knowledge or reckless disregard of those red flags, and violations of the Company's policies, provides additional evidence of his scienter.   Although, according to the MGC Decision and Order, "Maddox learned of the 2005 settlement [of the rape allegation] shortly after the cross-claim was filed" (*id.* at 9), and despite

---

[29] Richard N. Velotta, *Call from Steve Wynn led Maddox to career in casino work,* Las Vegas Review-Journal, Feb. 20 2018, https://www.reviewjournal.com/business/casinos-gaming/call-from-steve-wynn-led-maddox-to-career-in-casino-work/

the other red flags outlined herein that he was aware of at that point, he allowed the Company—and its CEO—to issue full throated denial of those allegations, as well as the claims made in the *WSJ article*.

354.   Defendant Maddox's awareness of the disclosure requirements, as alleged above and laid out in the IEB report, which were violated by him and the Company, also demonstrates his scienter.

355.   Maddox's scienter is further evidenced by his trading in Wynn securities while in possession of material non-public information, which resulted in proceeds of over $32 million. Between 2014 and 2017, Defendant Maddox sold 223,157 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $32,162,053:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/12/14 | $204.02 | 12,697 | $2,590,442 |
| 5/12/14 | $204.88 | 3,991 | $817,676 |
| 4/27/17 | $124.25 | 60,000 | $7,455,000 |
| 6/16/17 | $134.35 | 44,309 | $5,952,914 |
| 9/15/17 | $143.41 | 40,833 | $5,855,861 |
| 9/15/17 | $144.03 | 2,067 | $297,710 |
| 11/13/17 | $155.11 | 58,258 | $9,036,398 |
| 11/13/17 | $155.74 | 1,002 | $156,051 |
| Totals: | | 223,157 | $32,162,053 |

356.   Defendant Maddox's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As the Company's President thorough the Class Period and CFO for a portion of it, who was involved in the Company's day-to-day affairs, Maddox had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual

misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find him and/or Defendant Wynn unsuitable and effectively forcing their  ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position at the Company and the valuable compensation and other benefits it afforded to him.

### *4.  Defendant Cootey*

357.    Defendant Cootey also played a key role in the alleged fraud. He was the Company's Chief Financial Officer, Senior Vice President, and Treasurer from March 16, 2014 to March 1, 2017.

358.    During the Class Period, while he was the Company's CFO, Senior Vice President, and Treasurer from March 16, 2014 to March 1, 2017, he was directly involved in the Company's day-to-day affairs, and each of the challenged misstatements and omissions (except those that Defendant Wynn made during earnings calls) issued between March 16, 2015 to March 1, 2017 are attributable to him as the maker of those statements. For example, Cootey signed the following SEC filings, including the accompanying SOX certifications: 2014 Q2 10-Q,  2014 Q3 10-Q, 2014 10-K, 2015 Q1 10-Q, 2015 Q2 10-Q, 2015 10-K, 2016 Q1 10-Q, 2016 Q2 10-Q, 2016 Q3 10-Q, and the 2016 10-K.  As CFO of the Company, it is reasonable to infer that he also had authority over, and made, the other written statements issued in the name of the Company and Defendant Wynn, including the March and April 2016 statements responding to and denying Elaine Wynn's cross-claims.

359.    As the Company's CFO, Senior Vice President, and Treasurer between March 16, 2014 to March 1, 2017 directly involved in the Company's day-to-day affairs, Defendant Cootey had ultimate authority over the statements issued by the Company during the Class Period and that are alleged above and at issue here, including the March and April 2016 press releases issued by the Company.

360.     Defendant Cootey's scienter is evidenced by, among other things, and as detailed in the MGC Decision and Order; (i) the fact that numerous incidents of sexual assault against Defendant Wynn were alleged prior to and while Cootey was employed at the Company, including as CFO; (ii) the fact that the July 2014 matter in which a "cocktail server alleged … that Mr. Wynn raped her in 2005" resulted in a settlement paid with corporate funds, for which he bears responsibility in his role as CFO and Treasurer; and (iii) Cootey knew about or recklessly disregarded the settlements or allegations of wrongdoing involving Defendant Wynn upon Elaine Wynn filing her cross-claim in *Okada* on March 28, 2016.

361.     Defendant Cootey's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, the Company's CFO between March 16, 2014 to March 1, 2017, who was involved in the Company's day-to-day affairs, Cootey had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, and/or Maddox unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position at the Company and the valuable compensation and other benefits it afforded to him.

### 5.   *Defendant Billings*

362.     Defendant Billings also played a role in the alleged fraud. He served as the Company's CFO, Principal Accounting Officer and Treasurer since March 1, 2017, and he reports to Defendant Maddox. According to the MGC Decision and Order, "[a]s CFO and Treasurer, he is the senior executive responsible for managing the financial health of the

166

Company, including management of the Company's accounting and treasury functions."

363.    During the Class Period, while serving as CFO, Principal Accounting Officer and Treasurer since March 1, 2017, he was directly involved in the Company's day-to-day affairs, and each of the challenged misstatements and omissions (except those that Defendant Wynn made during earnings calls) issued from March 1, 2017 until the end of the Class Period are attributable to him as the maker of those statements. For example, Billings signed the following SEC filings, including the accompanying SOX certifications: 2017 Q1 10-Q, 2017 Q2 10-Q, and the 2017 Q3 10-Q. As CFO, Principal Accounting Officer and Treasurer of the Company since March 1, 2017, it is reasonable to infer that he also had authority over, and made, the other written statements issued in the name of the Company and Defendant Wynn, including the statements responding to and denying the claims in the *WSJ article*.

364.    As the Company's CFO, Principal Accounting Officer and Treasurer since March 1, 2017, directly involved in the Company's day-to-day affairs, Defendant Billings had ultimate authority over the statements issued by the Company from March 1, 2017 through the end of the Class Period and that are alleged above and at issue here, including the statements responding to and denying the claims in the *WSJ article*.

365.    Defendant Billing's scienter is evidenced by, among other things, and as detailed in the MGC Decision and Order: (i) the fact that numerous incidents of sexual assault against Defendant Wynn were alleged prior to and while Billings was employed at the Company as its CFO, Principal Accounting Officer and Treasurer; (ii) the fact that, according to the MGC Decision and Order, word that the WSJ was working on the *WSJ article* had reached the Company in December 2017 into January 2018, prior to its publication, as alleged above; and, (iii) according to the MGC Decision and Order, during the course of discovery in the *Okada* matter in 2017, "the Company learned of the 2005 [rape] allegation and settlement" but failed to document or investigate the allocation in violation of the Company's Code of Conduct.

366.    Defendant Billing's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, the Company's CFO,

Principal Accounting Officer, and Treasurer since March 1, 2017, who was involved in the Company's day-to-day affairs, Billings had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, and/or Maddox unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position at the Company and the valuable compensation and other benefits it afforded to him.

## B. **Director Defendants**

### 1. *Defendant Hagenbuch*

367.   Defendant Hagenbuch served as a director at the Company from 2012 through the end of the Class Period.

368.   During the Class Period, while serving as Director, he signed the following SEC filings: 2013 10-K, 2014 10-K, 2015 10-K, and 2016 10-K. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2014 Proxy Statement, 2015 Proxy Statement, the March 24, 2015 presentation and letter, 2016 Proxy Statement, and 2017 Proxy Statement.   Given that Hagenbuch signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

369.   In addition to the allegations above and below, Hagenbuch's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the

2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

370.    Defendant Hagenbuch's scienter is further evidenced by his decision to not seek reelection to the Board, which was abruptly announced in May 2018, as well as his failure to cooperate with the IEB.

371.    Hagenbuch's scienter is further evidenced by his trading in Wynn securities while in possession of material non-public information, which resulted in proceeds of nearly $150,000. In 2017, Defendant Hagenbuch sold 1,150 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $147,662:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/16/2017 | $128.50 | 1,100 | $141,350 |
| 5/17/2017 | $126.23 | 50 | $6,312 |
| Totals: | | 1,150 | $147,662 |

372.    Defendant Hagenbuch's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company since 2012, he had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant

Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company and the valuable compensation, prestige, and other benefits it afforded to him.

### 2. *Defendant Irani*

373.    Defendant Irani served as a director at the Company from October 2007 through March 5, 2018, when he abruptly resigned as a Director.

374.    During the Class Period, while serving as Director, he signed the following SEC filings and accordingly made the statements therein: 2013 10-K, 2014 10-K, 2015 10-K, and 2016 10-K. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2014 Proxy Statement, 2015 Proxy Statement, the March 24, 2015 presentation and letter, 2016 Proxy Statement, and 2017 Proxy Statement. Given that Irani signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

375.    In addition to the allegations above and below, Irani's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim,

170

Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

376.    Irani's scienter is further evidenced by his abrupt resignation, his failure to cooperate with the MGC/IEB investigation, and his failure to notify the IEB or MGC about the human trafficking allegations asserted against him as required, although was a qualifier on the Company's Massachusetts gaming license, as detailed in the MGC Decision and Order.

377.    Defendant Irani's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company throughout the Class Period, he had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers, including Irani himself, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company—for which Defendant Wynn personally nominated him—and the valuable compensation, prestige, and other benefits it afforded to him.

### 3. Defendant Johnson

378.    Defendant Johnson has served as a director of the Company since August 2016.

379.    During the Class Period, while serving as Director, he signed the Company's

2016 10-K and accordingly made the statements therein. He also had ultimate authority over the statements in the Company's 2017 Proxy Statement, which was issued on behalf of the Board of Directors while he was a director. Given that Johnson signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

380.   In addition to the allegations above and below, Defendant Billing's scienter is evidenced by, among other things, and as detailed in the MGC Decision and Order: (i) the fact that numerous incidents of sexual assault against Defendant Wynn were alleged prior to and while Johnson was a director of the Company; (ii) the fact that, according to the MGC Decision and Order, word that the WSJ was working on the *WSJ article* had reached the Company in December 2017 into January 2018, prior to its publication, as alleged above; and, (iii) according to the MGC Decision and Order, during the course of discovery in the *Okada* matter in 2017, "the Company learned of the 2005 [rape] allegation and settlement" but failed to document or investigate the allocation in violation of the Company's Code of Conduct.

381.   His scienter is also evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

382.   Further, Johnson's awareness of the disclosure requirements, as alleged above

172

and laid out in the IEB report, which were violated by him and the Company, also demonstrates his scienter.

383.    Defendant Johnson's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company from August 2016 through the end of the Class Period, he had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company and the valuable compensation, prestige, and other benefits it afforded to him.

### 4.    *Defendant Miller*

384.    Defendant Miller served as a director at the Company from October 2002 through May 15, 2018, when he abruptly resigned as a Director.

385.    During the Class Period, while serving as Director, he signed the following SEC filings and accordingly made the statements therein: 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and the March 24, 2015 letter to shareholders issued in connection with the 2015 Proxy Statement and attached to Schedule 14A. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2014 Proxy Statement, 2015 Proxy Statement, the March 24, 2015 presentation and letter, 2016 Proxy Statement, and 2017 Proxy Statement. Given that Miller signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents

1    of those documents.

2       386.    In addition to the allegations above and below, Miller's scienter is evidenced by

3 the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of

4 the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then

5 became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii)

6 according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in

7 2016, it questioned whether there had been additional allegations or settlements, but failed to

8 investigate the admitted sexual contact of the Company CEO with a subordinate as well as open

9 a wider investigation into what they should have seen could be a pattern of misconduct"; (iii)

10 according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim,

11 Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the

12 independent directors and provide them with advice regarding a response to the crossclaim";

13 and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's

14 discovery of the 2005 allegation and settlement is the fact that the Board recognized the

15 importance of this issue and demonstrated that awareness by reporting the cross-claim to the

16 Nevada regulators, but failed to report it to the [MGC]."

17       387.    Miller's scienter is further evidenced by his abrupt resignation, and his failure to

18 cooperate with the MGC/IEB investigation, as detailed in the MGC Decision and Order.

19       388.    Defendant Miller's scienter is also evidenced by his motive and opportunity to

20 engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and

21 sexual harassment—against Defendant Wynn and related settlements. As, a director of the

22 Company throughout the Class Period, he had the opportunity to engage in fraud. He was also

23 motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that

24 Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual

25 misconduct that, if discovered, could lead to criminal investigations, civil suits and claims

26 against him, news articles exposing his role in enabling, concealing, and failing to report

27 conduct and violations of Company policy, damage to his personal reputation, and the risk that

28 Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox

and/or other qualifiers, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company, and the valuable compensation, prestige, and other benefits it afforded to him.

### 5. *Defendant Mulroy*

389.    Defendant Mulroy has served as a director at the Company since October 2015.

390.    During the Class Period, while serving as Director, she signed the following SEC filings and accordingly made the statements therein: 2015 10-K and 2016 10-K. She also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while she was a director:  2016 Proxy Statement and 2017 Proxy Statement. Given that Mulroy signed or issued those SEC filings, it is reasonable to infer that she also had ultimate authority over the contents of those documents.

391.    In addition to the allegations above and below, Mulroy's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

175

392. Further, the MGC Decision and Order found, as follows with respect to Mulroy specifically, which evidences her scienter:

> Despite her role as a new Board member, the Commission finds it troubling that Ms. Mulroy failed to recognize the potentially coercive nature of a consensual relationship occurring between the Company's CEO and a low-level employee …. The issue of consent was further highlighted when Ms. Mulroy and the Board were told that the settlement contained retraction language, which she understood applied to an allegation that the incident had been non-consensual. Despite this understanding in 2016, Ms. Mulroy did not pursue an investigation.

> * * *

> Ms. Mulroy was credible and candid in her testimony at the adjudicatory hearing where she acknowledged that both she and the Board had failed to fully investigate the 2005 incident and failed to consider the interests of the employee involved in the event.

> * * *

> While the Commission questioned Ms. Mulroy's decision to retain Mr. Wooden for an attempted rehabilitation of his image, this decision reflects on Ms. Mulroy's judgment and does not speak to her suitability. Further, Ms. Mulroy's failure to recommend an investigation of the 2005 incident when she learned about it in 2016 may call into question her competency/efficacy as a board member, but this failure does not rise to the level of substantial evidence of a lack of clear and convincing evidence of suitability as an individual qualifier.

393. Further, Mulroy's awareness of the disclosure requirements, as alleged above and laid out in the IEB report, which were violated by her and the Company, also demonstrates her scienter. For example, according to the IEB report, "Patricia Mulroy recognized that the IEB's 'expectation is no different from Nevada's Gaming Control Board[] regulators' expectations. The burden is not on the regulator to investigate. The burden is on [the licensee] to disclose."

394. Mulroy's scienter is further evidenced by her trading in Wynn securities while in possession of material non-public information, which resulted in proceeds of more than $285,000. In 2017 Defendant Mulroy sold 2,226 shares of Wynn Resorts common stock while

176

in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $285,106:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 5/16/2017 | $128.08 | 2,226 | $285,106 |
| Totals: | | 2,226 | $285,106 |

395.    Defendant Mulroy also had motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As a director of the Company from October 2015 through the end of the Class Period, she had the opportunity to engage in fraud. She was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against her, news articles exposing her role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to her personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve her position as a Director at the Company, and the valuable compensation, prestige, and other benefits it afforded to her.

### 6. *Defendant Randt*

396.    Defendant Randt has served as a director at the Company since October 2015.

397.    During the Class Period, while serving as Director, he signed the following SEC filings and accordingly made the statements therein: 2015 10-K and 2016 10-K. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2016 Proxy Statement and 2017 Proxy Statement. Given that Randt signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

398.     In addition to the allegations above and below, Randt's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

399.     Randt's scienter is further evidenced by his trading in Wynn securities while in possession of material non-public information. In 2017, Defendant Randt sold 3,000 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $387,000:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|-----------|-------|-------------|------------------|
| 7/31/2017 | $129.00 | 3,000 | $387,000 |
| Totals: | | 3,000 | $387,000 |

400.     Defendant Randt's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company from October 2015 through the end of the Class Period, he had the opportunity to

engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company, and the valuable compensation, prestige, and other benefits it afforded to him.

### 7.  *Defendant Shoemaker*

401.    Defendant Shoemaker served as a director at the Company from October 2002 until resigned in December 2018.

402.    During the Class Period, while serving as Director, he signed the following SEC filings and accordingly made the statements therein: 2013 10-K, 2014 10-K, 2015 10-K, and the 2016 10-K. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2014 Proxy Statement, 2015 Proxy Statement, the March 24, 2015 presentation and letter, 2016 Proxy Statement, and 2017 Proxy Statement. Given that Shoemaker signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

403.    In addition to the allegations above and below, Shoemaker's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or

settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

404.    Shoemaker's scienter is further evidenced by his abrupt decision to resign from the Board in December 2018 (despite the Company previously announcing in March 2018 that Shoemaker would not seek reelection to the Board when his term expired in mid-2019), as well as his trading in Wynn securities while in possession of material non-public information. Between 2015 and 2017, Defendant Shoemaker sold 25,000 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's longstanding pattern of sexual abuse and harassment, for proceeds of $3,866,100:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 2/13/15 | $159.00 | 10,000 | $1,159,000 |
| 11/8/2017 | $151.74 | 15,000 | $2,276,100 |
| Totals: | | 25,000 | $3,866,100 |

405.    Shoemaker's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company throughout the Class Period, he had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news

articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company, and the valuable compensation, prestige, and other benefits it afforded to him.

### 8. *Defendant Virtue*

406.     Defendant Virtue served as a director at the Company from November 2012 until he did not stand for reelection at the May 2018 shareholder's meeting.

407.     During the Class Period, while serving as Director, he signed the following SEC filings and accordingly made the statements therein: 2013 10-K, 2014 10-K, 2015 10-K, and the 2016 10-K. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2014 Proxy Statement, 2015 Proxy Statement, the March 24, 2015 presentation and letter, 2016 Proxy Statement, and 2017 Proxy Statement. Given that Virtue signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

408.     In addition to the allegations above and below, Virtue's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim";

and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."

409.   Virtue's scienter is further evidenced by his decision to not stand for reelection to the Board, as well as his failure to cooperate with the MGC/IEB investigation, as detailed in the MGC Decision and Order.

410.   Virtue's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company throughout the Class Period, he had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company, and the valuable compensation, prestige, and other benefits it afforded to him.

### *9.  Defendant Wayson*

411.   Defendant Wayson served as a director at the Company from August 2003 until his abrupt resignation defective November 6, 2018.

412.   During the Class Period, while serving as Director, he signed the following SEC filings and accordingly made the statements therein: 2013 10-K, 2014 10-K, 2015 10-K, and the 2016 10-K. He also had ultimate authority over the statements in the following SEC Filings, as they were issued on behalf of the Board of Directors while he was a director:  2014 Proxy

Statement, 2015 Proxy Statement, the March 24, 2015 presentation and letter, 2016 Proxy Statement, and 2017 Proxy Statement. Given that Virtue signed or issued those SEC filings, it is reasonable to infer that he also had ultimate authority over the contents of those documents.

413.    In addition to the allegations above and below, Wayson's scienter is evidenced by the following: (i) as the MGC Decision and Order found, "[t]he Board of Directors learned of the [March 28, 2016] cross-clam [by Ms. Wynn] and the Independent Board Members then became aware that the conduct referenced in the cross-claim was of a sexual nature"; (ii) according to the MGC Decision and Order, "[w]hen the Board learned of the 2005 allegation in 2016, it questioned whether there had been additional allegations or settlements, but failed to investigate the admitted sexual contact of the Company CEO with a subordinate as well as open a wider investigation into what they should have seen could be a pattern of misconduct"; (iii) according to the IEB report, "[a]fter receiving draft versions of the fifth amended crossclaim, Attorney Sinatra brought in Attorney Jonathan Layne from Gibson Dunn to guide the independent directors and provide them with advice regarding a response to the crossclaim"; and (iv) according to the MGC Decision and Order, "[a]lso troubling with respect to the Board's discovery of the 2005 allegation and settlement is the fact that the Board recognized the importance of this issue and demonstrated that awareness by reporting the cross-claim to the Nevada regulators, but failed to report it to the [MGC]."  Additionally, Wayson has known of Defendant Wynn's history of sexual misconduct since at least 1997, when eleven waitresses at the Wynn-owned Mirage (where Wayson was then a current director) filed suit alleging a culture of harassment, coerced sexual relations, and misconduct by Defendant Wynn.[30]

414.    Wayson's scienter is further evidenced by his resignation from the Board in 2018, as well as his trading in Wynn securities while in possession of material non-public information. In 2016, Defendant Wayson sold 37,500 shares of Wynn Resorts common stock while in possession of material non-public information concerning Defendant Wynn's

---

[30] The case, captioned *Arrowsmith, et al. v. Mirage Casino-Hotel*, No. 97-cv-00638-RLH-LRL (D. Nev. 1997), settled in 2003.

longstanding pattern of sexual abuse and harassment, for proceeds of $3,267,000:

| Sell Date | Price | Shares Sold | Selling Proceeds |
|---|---|---|---|
| 11/9/2016 | $87.12 | 37,500 | $3,267,000 |
| Totals: | | 37,500 | $3,267,000 |

415.   Further, Wayson has known of Defendant Wynn's history of sexual misconduct since at least 1997, when eleven waitresses at the Wynn-owned Mirage (where Wayson was then a current director) filed suit alleging a culture of harassment, coerced sexual relations, and misconduct by Defendant Wynn. Wayson thus was, or should have been, highly attuned to any allegation of sexual misconduct involving Defendant Wynn. When confronted with the more recent allegations of misconduct prior to and during the Class Period, including the 2005 rape allegation leading to the 2005 Settlement, it was at least reckless for him to not investigate further.

416.   Wayson's scienter is also evidenced by his motive and opportunity to engage in fraud and conceal the allegations of sexual misconduct—including unlawful rape and sexual harassment—against Defendant Wynn and related settlements. As, a director of the Company throughout the Class Period, he had the opportunity to engage in fraud. He was also motivated to engage in fraud for a variety of reasons, including: (i) to conceal allegations that Defendant Wynn engaged in deliberately unlawful behavior—such as rape—and sexual misconduct that, if discovered, could lead to criminal investigations, civil suits and claims against him, news articles exposing his role in enabling, concealing, and failing to report conduct and violations of Company policy, damage to his personal reputation, and the risk that Massachusetts and Nevada gaming regulators would find Defendants Wynn, Sinatra, Maddox and/or other qualifiers, unsuitable and effectively force their ouster from the Company; (ii) defeat claims asserted against the Company in the *Okada* matter; and (iii) to preserve his position as a Director at the Company, and the valuable compensation, prestige, and other benefits it afforded to him.

**C.   Corporate Scienter Allegations**

417.   Since the Company acts through its employees, the scienter of the Individual and

184

Director Defendants, including their motive and opportunity, is directly imputable to the Company.

418.     The scienter of senior Wynn executives, officers and directors who are not currently named as Defendants in this action but had at least some (and in many cases substantial) knowledge of the allegations of rape and other sexual misconduct and related settlements prior to the Class Period—including Elaine Wynn, Kevin Tourek, Maurice Wooden,[31] Marc Shorr, Marc Rubinstein, Arthur Nathan, Doreen Whennen, Stacie Michaels, and Andrew Pascal, among others—is also attributable to the Company. For example, the MGC Decision and Order found that:

> In terms of failures within the Company, the Commission is disturbed by repeated failures to document and investigate allegations of sexual harassment and assault, failures by certain executives and qualifiers with knowledge of accusations of sexual misconduct to report to the Company's Board and appropriate committees as well as failure to notify the Commission, seeming attempts to cover up allegations through private settlements, and general failures by qualifiers and executives to comply with the Company's human resources policies and to adequately safeguard the workplace for a class of employees. With respect to the 2005 rape allegation and settlement, individuals who had knowledge of the allegation in 2005 failed to investigate the matter as required by the Company's human resources policies, and it seems evident to the Commission that Mr. Wynn established Entity Y to process the 2005 settlement payment and remove any connection to him in order to conceal the payment from discovery which assured, among other things, that it would not be required to be disclosed to regulators. Some individuals at the Company were aware of the 2006 allegation, and the Company was undoubtedly aware of sexual harassment and assault allegations in 2008 and 2014-15, where Company funds were used to pay settlements to the alleged victims, but in each instance failed to investigate the allegations.

* * *

---

[31] The MGC Decision and Order referred to Tourek and Wooden, along with Defendant Sinatra, as among "the highest ranking executives in the Company." *Id.* at 23.

> [S]everal of the instances noted above do reflect on the Company's honest, integrity, and good character ….

> \* \* \*

> The Company has replaced executives who had knowledge of the sexual assault and/or harassment allegations against Mr. Wynn and failed to document, investigate, and/or notify the Board and/or regulators.

*Id.* at 38, 40.

419.    Further, many of the public statements disseminated in the name of the Company, including statements denying the allegations in Elaine Wynn's cross claim and Ms. Wynn's public statements related thereto, as well as statements responding to the *WSJ article*, were based on information provided by, or known by, Defendants, including Defendants Wynn, Sinatra, Maddox, and Mulroy.

### D.  Additional Scienter Allegations

420.    In addition to the many scienter facts alleged above, the fraud alleged herein relates to the Company's then-CEO and founder and the core business of the Company, so knowledge of the fraud may be imputed to each of the Individual and Director Defendants. Given the Individual and Director Defendants' knowledge or conscious disregard of allegations of rape and other sexual misconduct against Defendant Wynn, and the failure of at least certain Defendants (including Defendants Wynn, Sinatra, and Maddox) to investigate or report those allegations in violation of the Company's Code of Conduct, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

421.    Further, given that the gaming industry is highly regulated and requires licensees and their officers and directors to have integrity, honesty, good character and a positive reputation and maintain their suitability, including by complying with the Company's Code of Conduct and other related policies pertaining to sexual harassment, Defendants necessarily were highly attuned to evidence, such as allegations of rape and other sexual misconduct against Defendant Wynn and any red flags bearing on his character, that may impact suitability and imperil the Company's gaming licenses.  As such, it is significant that a number of events

served as red flags to Defendants that Defendant Wynn had been accused of criminal rape and other forms of sexual misconduct, including harassment, prior to and during the Class Period and there was a culture of failing to report, document, and investigate those allegations as required by the Company's policies, including its Code of Conduct. Defendants' awareness or reckless disregard of these red flags is alleged herein, and also described in detail in the *WSJ article*, NGCB complaints against the Company and Defendant Wynn, and in the MGC Decision and Order, including the accompanying IEB report (as summarized herein).

422.    The scienter of the Company and Defendants Wynn, Maddox, and Cootey is underscored by their Sarbanes-Oxley mandated certifications, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about the Company was made known to them and that the Company's disclosure related controls were operating effectively.

423.    The resignations and departures of many of the Individual and Director Defendants (other than Defendants Maddox and Mulroy) provide additional evidence of scienter as well.

## IX. LOSS CAUSATION

424.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Wynn, and operated as a fraud or deceit on Class-Period purchasers of such securities by misrepresenting, among other things, Wynn's legal compliance and Code of Conduct, and failing to disclose a decades-long pattern of predatory sexual misconduct by Wynn's CEO.

425.    As the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market and the undisclosed risks materialized, the price of Wynn securities fell, as the prior artificial inflation came out of their respective prices. As a result of their purchases of the securities issued by Wynn during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## X.  CLASS ACTION ALLEGATIONS

426.  Lead Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all those who purchased or otherwise acquired the Company's securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

427.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

428.  Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

429.  Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

430.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  Whether Defendants violated the Exchange Act;

    b.  Whether Defendants participated in and pursued the wrongful activities complained of herein;

    c.  Whether Defendants' statements were materially false and misleading or omitted

to state material facts about the Company;

    d.   Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning the Company; and

    e.   The extent of damages sustained by members of the Class and the appropriate measure of damages.

431.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

432.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

433.    The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

## XI.  FIRST CLAIM FOR RELIEF

<u>**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**</u>

<u>**Against All Defendants**</u>

434.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

435.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to

189

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

436.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

437.   By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

438.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the

1    Company's internal affairs.

2        439.    The Individual Defendants are liable both directly and indirectly for the wrongs

3    complained of herein. Because of their positions of control and authority, the Individual

4    Defendants were able to and did, directly or indirectly, control the content of the statements of

5    the Company. As officers and/or directors of a publicly-held company, the Individual

6    Defendants had a duty to disseminate timely, accurate, and truthful information with respect to

7    the Company's businesses, operations, future financial condition and future prospects. As a

8    result of the dissemination of the aforementioned false and misleading reports, releases and

9    public statements, the market price of the Company's securities was artificially inflated

10   throughout the Class Period. In ignorance of the adverse facts concerning the Company's

11   business and financial condition which were concealed by defendants, Lead Plaintiffs and the

12   other members of the Class purchased or otherwise acquired the Company's securities at

13   artificially inflated prices and relied upon the price of the securities, the integrity of the market

14   for the securities and/or upon statements disseminated by defendants, and were damaged

15   thereby.

16       440.    During the Class Period, the Company's securities were traded on an active and

17   efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially

18   false and misleading statements described herein, which the defendants made, issued or caused

19   to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired

20   shares of the Company's securities at prices artificially inflated by defendants' wrongful

21   conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would

22   not have purchased or otherwise acquired said securities, or would not have purchased or

23   otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or

24   acquisitions by Lead Plaintiffs and the Class, the true value of the Company's securities was

25   substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.

26   The market price of the Company's securities declined sharply upon public disclosure of the

27   facts alleged herein to the injury of Lead Plaintiffs and Class members.

28       441.    By reason of the conduct alleged herein, defendants knowingly or recklessly,

directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

442.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XII.  SECOND CLAIM FOR RELIEF

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

443.    Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

444.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false statements.

445.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

446.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to and did control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

192

participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

447.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

448.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE** Lead Plaintiffs demand judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiffs as Class representatives;

B.  Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs demand trial by jury.

Dated: July 1, 2020

Respectfully submitted,

**MUEHLBAUER LAW OFFICE, LTD.**

*/s/ Andrew R. Muehlbauer*
ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Eric D. Gottlieb (*pro hac vice* forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:     (212) 661-1100
Fax:     (917) 463-1044
Email: jalieberman@pomlaw.com
          mjsteven@pomlaw.com
          egottlieb@pomlaw.com

*Attorneys for Lead Plaintiffs John V. Ferris
and JoAnn M. Ferris*