Patrick G. Byrne (Nevada Bar #007636)
Alex L. Fugazzi (Nevada Bar #9022)
V.R. Bohman (Nevada Bar #13075)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
Telephone: 702.784.5200
Facsimile: 702.784.5252
Email: pbyrne@swlaw.com
      afugazzi@swlaw.com
      vbohman@swlaw.com

*Additional Counsel on Signature Block*

*Attorneys for Defendants Wynn Resorts, Ltd., Craig Scott Billings, Matthew O. Maddox, John J. Hagenbuch, Robert J. Miller, Ray R. Irani, Patricia Mulroy, Clark T. Randt Jr., Alvin V. Shoemaker, Daniel B. Wayson, Jay L. Johnson, and J. Edward Virtue*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JOHN V. FERRIS, et al.,<br>           Plaintiff(s),<br><br>vs.<br><br>WYNN RESORTS LIMITED, et al.,<br><br>         Defendant(s). | Case No. 2:18-CV-00479-GMN-DJA<br><br>The Honorable Gloria M. Navarro<br><br>**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED** |

## <u>TABLE OF CONTENTS</u>

**Page**

**INTRODUCTION**................................................................................................... 1

**BACKGROUND** ................................................................................................... 2

    I.    The Parties. ............................................................................................... 2

    II.    Allegations Relating to Mr. Wynn's Sexual Misconduct. ........................... 2

    III.    The Court Dismisses the FAC. ................................................................. 4

    IV.    Plaintiffs File the SAC. ............................................................................ 5

**ARGUMENT**........................................................................................................ 5

    I.    The Challenged Statements the Court Already Dismissed Remain Inactionable......... 5

    II.    Plaintiffs Fail to Allege Falsity with Respect to the Remaining Statements. ............... 9

        A.    Press Releases Regarding Allegations by Elaine Wynn Are Inactionable. ....... 9

        B.    Statements After the January 26 Article Are Not Actionable. ........................ 11

    III.    The SAC Fails to Allege Scienter. .......................................................... 13

        A.    The SAC Does Not Plead Scienter as to the Directors and Officers. ............. 13

        B.    The Directors' and Officers' Trading Negates an Inference of Scienter. ........ 17

        C.    The Exculpatory Inference Is More Compelling. ........................................... 19

        D.    The SAC Does Not Plead Scienter as to the Company.................................. 19

    IV.    The SAC's Loss Causation Allegations Are Insufficient. .......................................... 20

    V.    The SAC Fails to Attribute Actionable Statements to the Directors and Officers. .... 23

    VI.    The SAC Fails to Make Out a Section 20(a) Claim against the Officers. ................. 24

**CONCLUSION** ................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ...................................................................24

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007) .......................................................................6

*In re Apollo Grp., Inc. Sec. Litig.*,
2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ..........................................................14

*In re Arrowhead Research Corp. Sec. Litig.*,
2016 WL 6681180 (C.D. Cal. Aug. 18, 2016), *aff'd*, 711 F. App'x 434 (9th Cir. 2018) ...................15

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999) ...............................................................................12

*In re BofI Holding, Inc. Sec. Litig.*,
302 F. Supp. 3d 1128 (S.D. Cal. 2018) ..................................................................21

*Brown v. Kinross Gold, U.S.A.*,
343 F. Supp. 2d 957 (D. Nev. 2004) ......................................................................17

*Bruce v. Suntech Power Holdings Co.*,
2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ..................................................8, 24

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) .................................................................................19

*City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Edison Int'l*,
786 F. App'x 685 (9th Cir. 2019) ..........................................................................21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................................16

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ................................................................................6, 9

*City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*,
2009 WL 942182 (N.D. Cal. Apr. 6, 2009) ...........................................................24

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) .....................................................................1

*Curry v. Yelp*,
875 F.3d 1219 (9th Cir. 2017) ...............................................................................21

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) .......................................................................................8

*De Sejournet v. Mohidin LLP*,
    2014 WL 7723573 (C.D. Cal. May 21, 2014) ...............................................................20

*Dura Pharm, Inc. v. Broudo*,
    544 U.S. 336 (2005) .....................................................................................................20

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) ..............................................................7, 9, 11

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ................................................................8

*Fries v. N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018) ........................................................................1, 8

*Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*,
    2020 WL 611506 (S.D.N.Y. Feb. 7, 2020) ..............................................................23, 24

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ...............................................................................16, 20

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) .........................................................................................8

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) .......................................................................................13

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................................18, 24

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ...............................................................24

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) .......................................................................................14

*Inchen Huang v. Higgins*,
    2020 WL 1450520 (N.D. Cal. Mar. 11, 2020)...............................................................22

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).................................................................................................23, 24

*Karam v. Corinthian Colleges, Inc.*,
    2012 WL 8499135 (C.D. Cal. Aug. 20, 2012)................................................................9

*Kyung Cho v. UCBH Holdings, Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012) ........................................................................14

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

*Levine v. Diamanthuset, Inc.*,
   950 F.2d 1478 (9th Cir. 1991) ....................................................................12

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ....................................................................18

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ....................................................................22

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   2017 WL 633148 (D. Ariz. Feb. 16, 2017)...................................................9

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ......................................................................21

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)...........................................................................23, 24

*In re Maxwell Techs. Inc., Sec. Litig.*,
   18 F. Supp. 3d 1023 (S.D. Cal. 2014).........................................................20

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ....................................................................5

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ......................................................24

*Neborsky v. Valley Forge Composite Techs., Inc.*,
   2014 WL 1705522 (S.D. Cal. Apr. 28, 2014)..............................................24

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ......................................................................13

*In re Novatel Wireless Secs. Litig.*,
   830 F. Supp. 2d 996 (S.D. Cal. 2011).........................................................20

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
   2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .............................................15

*Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
   2020 WL 1243808 (S.D.N.Y. Mar. 16, 2020) ...........................................1, 8

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ................................................................ *passim*

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ......................................................................22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ....................................................................18

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    52 F. Supp. 3d 961 (N.D. Cal. 2014), *aff'd* 845 F.3d 1268 (9th Cir. 2017) ..........................1, 5, 6, 19

*Roberts v. Peat, Marwick, Mitchell & Co.*,
    857 F.2d 646 (9th Cir. 1988) ...............................................................................................12

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................................10, 13, 19

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) .............................................................................................17

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...............................................................................................15

*Sanchez v. IXYS Corp.*,
    2018 WL 4787070 (N.D. Cal. Oct. 2, 2018)........................................................................12

*Sgarlata v. Paypal Holdings, Inc.*,
    2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) .....................................................................24

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ...............................................................................................13

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007)...........................................................................9

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).....................................................................................................6

*In re Solarcity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) .................................................................................12

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................................5

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998).......................................................................................17

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
    2011 WL 1253250 (D. Ariz. Mar. 31, 2011) ........................................................................5

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    35 F. Supp. 2d 1063 (N.D. Cal. 2002) .................................................................................16

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) .......................................................................................17, 19

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................7, 9, 11, 15

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

*Vitalone v. Logitech Int'l SA*,
 2012 WL 13041992 (N.D. Cal. July 13, 2012)............................................10

*Webb v. Solarcity Corp.*,
 884 F.3d 844 (9th Cir. 2018) ............................................................15

*Wenger v. Lumisys, Inc.*,
 2 F. Supp. 2d 1231 (N.D. Cal. 1998) ....................................................5

*Williams v. WMX Techs., Inc.*,
 112 F.3d 175 (5th Cir. 1997) ............................................................1

*In re Worlds of Wonder Sec. Litig.*,
 35 F.3d 1407 (9th Cir. 1994) ...........................................................18

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014) ...........................................................17

*Youngers v. Virtus Inv. Partners Inc.*,
 195 F. Supp. 3d 499 (S.D.N.Y. 2016)....................................................14

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) .................................................... *passim*

**Statutes**

15 U.S.C. § 78u-4(b)(2) ................................................................13

15 U.S.C. § 78u-5(c)(1) .................................................................8

Exchange Act Section 10(b) ......................................................4, 12, 24

Exchange Act Section 20(a) ..........................................................4, 24

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................1

Fed. R. Civ. P. 12(b)(6) ................................................................1

Rule 10b-5.......................................................................4, 12, 23

## MOTION TO DISMISS

Defendants Wynn Resorts, Limited ("Wynn Resorts," or the "Company"); J. Edward Virtue, Clark T. Randt, Jr., Robert J. Miller, Ray R. Irani, Daniel B. Wayson, John J. Hagenbuch, Jay L. Johnson, Patricia Mulroy, and Alvin V. Shoemaker (collectively, the "Directors"); and Matthew Maddox and Craig Scott Billings (collectively, the "Officers"), hereby move to dismiss, pursuant to Fed. R. Civ. P. 9 (b), 12(b)(6), and 15 U.S.C. § 78u–4, the Second Amended Class Action Complaint ("SAC," ECF No. 122)[1] filed against them by Lead Plaintiffs John V. Ferris and Joann M. Ferris, and named Plaintiff Jeffrey Larsen, individually and on behalf of all others similarly situated ("Plaintiffs"). This motion is supported by the attached Memorandum of Points and Authorities, the Declaration of Michael Shipley,[2] Defendants' Request for Judicial Notice, as well as the other papers and pleadings on file herein, and any oral argument this Court may choose to consider.

DATED: August 14, 2020                    KIRKLAND & ELLIS LLP

                                          */s/ Mark Holscher*

---

[1]   Citations to "¶" are to the paragraphs of the SAC.

[2]   Citations to "Ex." are to the exhibits to the Declaration of Michael Shipley, of which Defendants request the Court take judicial notice. Each Exhibit is either incorporated by reference into the Second Amended Complaint, filed publicly with the SEC, and/or a matter of public record. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings are subject to judicial notice); *Reyn's Pasta Bella, LLC v. Vita USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants."); ECF No. 119 at 15–17 (citing cases and granting Defendants' requests for judicial notice). Citations to "App'x" are to Appendices A and B, attached to this motion.

MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

# INTRODUCTION

Plaintiffs' third attempt at pleading actionable claims for securities fraud fares no better than their prior two. Plaintiffs allege "sexual abuse and harassment by Defendant Stephen Wynn," the Company's former CEO and Chairman. They describe accusations made against Mr. Wynn, various settlements, and subsequent developments. But they still do not allege any actionable securities fraud. Although the SAC is prolix, it fails to include the particularity this Court made clear is required: it alleges no specific facts explaining why any statements were false or misleading, no specific allegations of scienter, and no meaningful differentiation of allegations as to each Defendant. ECF No. 119 ("Order") at 36; *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) ("A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail.").

The vast majority of the SAC re-states statements that the Court has already dismissed as inactionable. *See* Order at 23–35. Many of the already-dismissed statements are vague, aspirational statements that *de jure* cannot support claims for securities fraud. *Id.* The few remaining statements that Plaintiffs have identified, including statements regarding general legal compliance and statements made *after* Plaintiffs purchased their shares, are not actionable either. In cases based on similar allegations of a CEO's undisclosed misconduct, the Ninth Circuit and numerous district courts have affirmed that Plaintiffs' approach fails as a matter of law. *See generally Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017).[3] Scandal is not synonymous with securities fraud.

Plaintiffs' claims fail for several additional reasons. ***First***, Plaintiffs have not alleged scienter. Their generalized allegations, "though voluminous, are not pled with the particularity required to survive a Federal Rule of Civil Procedure 12(b)(6) dismissal under the standards enumerated in Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1008 (9th Cir. 2009). ***Second***, Plaintiffs fail to allege loss causation. They devote only two generic paragraphs to loss causation and do not connect any misstatements to corrective disclosures capable of causing their

---

[3]     *See also Oklahoma Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 2020 WL 1243808 (S.D.N.Y. Mar. 16, 2020); *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515 (S.D.N.Y. 2020); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706 (S.D.N.Y. 2018).

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

losses. ***Third***, Plaintiffs' boilerplate allegations of "authority" and "control" are insufficient to state claims for securities fraud against the Directors and Officers.

In short, because Plaintiffs have not and cannot allege fraud with particularity, their claims must be dismissed with prejudice.

## BACKGROUND

### I.   The Parties.

Wynn Resorts is a leading developer, owner, and operator of casino resorts. ¶ 2. The Company recently reopened its resorts in Las Vegas, Nevada, following months of closure related to COVID-19. The Directors are current and former directors of Wynn Resorts. ¶¶ 28–36. These Directors, who include a former Governor of Nevada, a former Nevada Gaming Commissioner, an Ambassador to China, and a United States Navy Admiral, brought decades of business and governance experience to Wynn Resorts.[4] Maddox joined the Company in 2002. ¶ 20. He was the Company's CFO from March 2008 to May 2014, President from November 2013 to May 2019, and is its current CEO. *Id.* Billings has served as the Company's CFO since March 1, 2017, and is also its current President. ¶ 23.

Plaintiffs are individuals who allegedly acquired Company securities during the Class Period. ¶¶ 16, 17.

### II.   Allegations Relating to Mr. Wynn's Sexual Misconduct.

Plaintiffs allege a "decades-long pattern of sexual misconduct" by Mr. Wynn, much of which predated the Class Period and even the founding of Wynn Resorts. ¶¶ 56–102. Defendants are not alleged to have known of any historical allegations against Mr. Wynn, let alone to have misrepresented them.

Plaintiffs' allegations stem from a January 26, 2018 newspaper article, which reported accusations of sexual misconduct against Mr. Wynn. ¶¶ 4, 262. The day the article was published, "Wynn Resorts' stock price fell $20.31, or 10.12%, to close at $180.29." ¶ 263. On February 12, 2018, after police reports were filed alleging misconduct by Mr. Wynn in the 1970s, the stock price fell "$3.30, or 2%." ¶ 288. The stock price, however, bounced back. By early May 2018, it was trading higher than before the article. Ex.

---

[4]   Directors Mulroy and Randt, who joined in October 2015, and Director Johnson, who joined in August 2016, are still on the Board. ¶¶ 32, 30, 33. Director Hagenbuch sat on the Board from 2012 to May 2018 (¶¶ 28, 291); Governor Miller from 2002 to May 2018 (¶¶ 31, 291); Director Shoemaker from 2002 to December 2018 (¶ 34); Director Virtue from 2012 to May 2018 (¶ 35); Director Wayson from 2003 to November 2018 (¶¶ 36, 292); and Dr. Irani from 2007 to March 2018 (¶ 29).

1 (Stock Chart). Shareholders suing the Company for breach of fiduciary duty in Nevada state court have acknowledged that continuously holding stockholders "have absolutely no financial loss—not one red cent." Ex. 2 (May 24, 2018 Rogers Opp'n) at 4.

Plaintiffs acknowledge the Company responded decisively to the allegations against Mr. Wynn. On January 26, 2018—the same day as the article—the Board formed a Special Committee of independent directors to investigate the allegations. ¶ 271. In April 2018, the Company added three new independent directors: Betsy Atkins, Margaret "Dee Dee" Myers, and Winifred "Wendy" Webb. ¶ 290. In August 2018, the Company added two more independent directors: Phil Satre, the new non-executive Chairman, and Richard Byrne. ¶¶ 292, 313. Following the article, the Company advanced its workplace environment, including through initiatives focused on diversity and inclusion, gender equality, fair treatment in the workplace, and community engagement. ¶ 313; Ex. 3 (Apr. 30, 2019 Order, "MGC Order") at 42.

Gaming regulators with the Nevada Gaming Control Board ("NGCB") and the Massachusetts Gaming Commission ("MGC") also opened investigations. ¶ 272. On January 25, 2019, the Company settled with NGCB. ¶ 294. While NGCB's complaint identifies certain members of Wynn Resorts' management who allegedly learned of allegations against Mr. Wynn, those individuals have all left the Company. ¶¶ 294–309. In fact, "[a]ny employee who was aware of allegations of sexual assault against Steve Wynn and did not investigate or report it is no longer with the [C]ompany." Ex. 4 (Jan. 28, 2019 Press Release). None of the Directors or Officers is identified—much less *implicated*—in NGCB's complaint. ¶¶ 294–309. NGCB took no adverse action against any of the Officers and Directors. The Company's settlement with NGCB lauded Maddox's leadership following the January 26 article. Ex. 5 (NGCB Settlement) ¶ 7.

MGC entered its order on April 30, 2019. ¶ 314. MGC found no substantial evidence that the Directors and Officers were aware of the sexual misconduct allegations against Mr. Wynn or related settlements until after the allegations were made public, in a complaint filed by Elaine Wynn on March 28, 2016. ¶ 316; Ex. 3 (MGC Order) at 4–9, 23. MGC also determined "that there is no substantial evidence that Wynn Resorts, Wynn MA, LLC, or any of its associated qualifiers or close associates willfully provided false or misleading information to the [MGC]." Ex. 3 (MGC Order) at 21. Thus, MGC found that the Company and each of its qualifiers—including Maddox, Billings, and Mulroy—were suitable to

hold gaming licenses in Massachusetts. *Id.* at 1, 34–35. MGC took no adverse action against any of the Directors.

In the wake of the January 26 article, shareholders filed lawsuits in Nevada state court against the Officers and Directors asserting breach of fiduciary duty. The Board established a Special Litigation Committee ("SLC") to investigate plaintiffs' derivative allegations. On November 27, 2019, the Company announced a settlement in the consolidated derivative lawsuit under which the Company would receive $41 million—$20 million from Mr. Wynn and $21 million from insurance carriers—signed by the SLC. Ex. 6 (Nov. 27, 2019 Press Release); Ex. 7 (Settlement). On March 10, 2020, the settlement was approved, resolving the consolidated derivative claims. Ex. 8 (Mar. 10, 2020 Order). Several remaining shareholder claims were recently dismissed by the Nevada Supreme Court. Ex. 9 (July 27, 2020 Order).

## III. The Court Dismisses the FAC.

Plaintiffs filed this action on February 20, 2018, and filed their First Amended Complaint ("FAC") on March 1, 2019. Plaintiffs claimed violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 20(a) of the Exchange Act between February 28, 2014 and February 12, 2018 ("Class Period").

The FAC asserted fraud over seven categories of generic statements about the Company's ethics, compliance, and culture: (1) code of conduct statements; (2) statements regarding compliance with laws; (3) statements disclosing regulatory risks; (4) statements regarding Defendant Wynn's skills and possible departure from the Company; (5) statements about corporate culture; (6) press release statements concerning allegations of Elaine Wynn; and (7) other statements. Order at 6–15. Defendants moved to dismiss the FAC on numerous grounds. On May 27, 2020, the Court granted Defendants' motion. *Id.* at 37. This Court determined that the challenged statements could not support Plaintiffs' claims because they were inactionable and Plaintiffs had failed to plead falsity with particularity. *Id.* at 23–35. The Court did not address Defendants' other grounds for dismissal, including loss causation and scienter. *Id.* at 35. Although the Court permitted Plaintiffs to amend, it cautioned Plaintiffs that claims premised on similarly generic statements and non-specific allegations would not be sufficient:

> Accordingly, the Court will grant Plaintiff leave to file an amended complaint. The Court, however, cautions that an amended complaint must plead facts, with particularity, as to why statements were false or misleading at the time they were made. Additionally, any allegations of scienter must be specific to a Defendant's state of mind at the time he or she made the

statements. Moreover, Plaintiffs must differentiate their allegations as to each Defendant and refrain from lumping multiple Defendants together (*id.* at 36).

## IV.  Plaintiffs File the SAC.

Plaintiffs filed the SAC on July 1, 2020. Despite adding 80 pages, Plaintiffs added little substance. Plaintiffs re-alleged every statement the Court already found inactionable as a matter of law and included yet more irrelevant allegations of "falsity." ¶¶ 103–261. The only new statements alleged are a generic statement about the Company's "track record of promoting diversity" and two statements made after the January 26 article and the dates when Plaintiffs purchased shares. ¶¶ 188, 265, 267.[5] Again, Plaintiffs do not allege that Defendants ever made any representations about Mr. Wynn's behavior, much less any statements contradicted by the allegations against Mr. Wynn. The SAC should be dismissed.

## ARGUMENT

As courts have rightly observed in dismissing securities complaints like this one, "a long-winded, even prolix style of pleading is not an uncommon mask for an absence of detail." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 2011 WL 1253250, at \*34 (D. Ariz. Mar. 31, 2011) (quotations omitted). Plaintiffs assume "'that compiling a large quantity of otherwise questionable allegations' will satisfy the particularity pleading requirements.'" *Id.* (quoting *Zucco*, 552 F.3d at 1008). It does not. The SAC can and should be dismissed for this reason alone.[6]

As described below, Plaintiffs have failed to allege with particularity any actionable misstatement made with scienter that caused their losses. They have therefore failed to plead claims for securities fraud.

## I.  The Challenged Statements the Court Already Dismissed Remain Inactionable.

Plaintiffs' additional, irrelevant "reasons" why the previously-dismissed statements are purportedly false are entirely beside the point. Additional irrelevant facts cannot somehow render general, vague, and aspirational statements actionable under the securities laws. *See, e.g.*, *Hewlett-Packard*, 845

---

[5]  A redline comparison of Plaintiffs' FAC and SAC is attached as Exhibit 29.

[6]  Plaintiffs' "prolix and discursive complaint does not satisfy the PSLRA's stringent pleading standards." *Teamsters Local*, 2011 WL 1253250, at \*34; *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78–79 (S.D.N.Y. 2003) (dismissing securities complaint "steeped with impertinent and verbose material" because it failed to assert "a short and plain statement of Plaintiffs' claim"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (dismissing securities complaint because plaintiffs "failed to set forth a 'short and plain' statement"); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243–44 (N.D. Cal. 1998) (dismissing securities complaint containing "redundant, and often irrelevant allegations" that "repeats many allegations three or four times" because "plaintiff has failed to set forth a 'short and plain statement'").

---

F.3d at 1277 (rejecting argument that "context . . . transforms what would otherwise be aspirational into statements capable of objective verification"); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment.").

For example, the Court dismissed Plaintiffs' allegations regarding the Company's Code of Conduct because "these are precisely the type of statements which the *Hewlett-Packard* court deemed aspirational" and the Company is required by law to adopt and publish a code. Order at 24; *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (holding that similar ethics code statements "are a textbook example of 'puffery'"). Plaintiffs re-alleged and supplemented their Code of Conduct allegations with pages of additional detail concerning Mr. Wynn's alleged conduct and who knew about it. *E.g.*, ¶¶ 106–08. Plaintiffs also excerpt testimony from Mr. Wynn concerning "legalese" in the Company's sexual harassment policy, but do not explain how any of this contradicts the aspirational statements reflected in the separate Code of Conduct. ¶¶ 110–11.[7] To the extent the statements in the Code of Conduct were actionable—and they are not, Order at 23–25—none of the additional information Plaintiffs allege would render the statements false, much less materially so. Plaintiffs have not established that the Company did not, in fact, aspire toward an "ethical way of doing business" or intend to "prevent the occurrence of conduct not in compliance with the Code." ¶¶ 104, 114. In short, "[t]he promotion of ethical conduct at [Wynn Resorts] did not reasonably suggest that there would be no violations of the [Code of Conduct] by the CEO or anyone else. Nor did [Mr. Wynn's] own statements warrant that he had been personally compliant or that he personally would comply with the [Code of Conduct] in the future." *Hewlett-Packard*, 845 F.3d at 1278. "[I]t simply cannot be that every time a violation of that code [of conduct] occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory." Order at 24–25 (quoting *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 686 (D. Colo. 2007)).

Plaintiffs also seek to augment their allegations regarding the Company's statements, made in

---

[7] Unlike the Code of Conduct, the Company's sexual harassment policy is not public or otherwise published for investors to read.

connection with the *Okada* litigation, that "the Company believes that it is in full compliance with all applicable laws." The Court dismissed these statements because they were unrelated to Mr. Wynn's alleged misconduct and Plaintiffs "fail[ed] to provide any particular facts showing that Defendants did not hold the belief that the Company was in compliance with all applicable laws or facts showing that said belief was objectively untrue." Order at 27. The SAC addresses neither issue. No allegations can change the fact that the Company's statements say nothing about "Defendant Wynn or his alleged sexual misconduct." *Id.* at 26. Although Plaintiffs point to Mr. Wynn's alleged conduct and regulatory findings made years after the Class Period, ¶¶ 130–34, nothing undermines the Company's belief—*before* the findings Plaintiffs identify and *before* regulators had even opened investigations—that it was "in full compliance with all applicable laws." Order at 27. Plaintiffs allege no facts showing that any Defendant knew that any such conduct violated gaming regulations. Defendants had no duty to predict and disclose regulatory findings years in advance. *See, e.g., In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) ("At the time this statement was made, the FTC only stated an intent to investigate Facebook, but had not made any formal finding that Facebook violated the decree order. . . . Thus, Defendants had no requirement to elaborate on any potential privacy breaches.").

For the same reasons, Plaintiffs fail to salvage their claims relating to statements disclosing regulatory risks. The Court previously held these statements were inactionable because they do not "affirmatively intimate that Defendant Wynn had never been accused of sexual misconduct by a Wynn Resorts employee." Order at 28–30. No new allegations address this deficiency. Plaintiffs make the same allegations as before: Mr. Wynn engaged in misconduct, others knew about it, and that created regulatory exposure. *E.g.*, ¶¶ 140, 211. None of the challenged statements warranted anything about Mr. Wynn's conduct or the Company's compliance with gaming regulations. For these risk disclosures to be actionable, Plaintiffs must establish that the Company was "(1) in violation of [applicable regulations] ***at the time*** the risk disclosure statements were made and (2) Defendants were aware of such violation." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 809 (N.D. Cal. 2019) (emphasis in original). They have not and cannot. The NGCB and MGC findings trailed the Class Period by a year or more. *See In re Facebook*, 405 F. Supp. 3d at 841 ("Plaintiffs have offered no proof that future risks stated in the risk disclosures had 'already affected' Facebook's reputation or stock because the risks of negative media attention or

1   regulatory action had not yet materialized.").

2    Plaintiffs' allegations relating to Mr. Wynn's skills and possible departure are likewise deficient.

3   As the Court held: "[T]he omitted fact of Defendant Wynn's alleged sexual misconduct does not show

4   that Wynn Resorts did not rely on Defendant Wynn's skills and expertise or that Defendant Wynn did not

5   provide a 'distinct advantage over other gaming enterprises.'" Order at 31. Plaintiffs have alleged further

6   details regarding Mr. Wynn's "egregious pattern of predatory sexual conduct," ¶¶ 147–48, but they have

7   not alleged any facts undermining Mr. Wynn's importance to the Company. "What is more, the statements

8   did not suggest that Defendant Wynn had not engaged in the undisclosed misconduct." Order at 31. As

9   before, "[s]tatements regarding [Mr. Wynn's] importance to the Company were not misleading for having

10   omitted unadjudicated allegations that might one day lead to his ouster." *Papa John's*, 2020 WL 1243808,

11   at *9; *see Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 718–19 (S.D.N.Y. 2018) (holding that

12   statements relating to CEO's importance to company were inactionable). Moreover, statements warning

13   of the consequences of Mr. Wynn's possible departure are forward-looking statements protected by the

14   PSLRA's safe harbor provision. Order at 32–33 (holding that "the challenged statements . . . are precisely

15   the 'meaningful cautionary statements' required under 15 U.S.C. § 78u-5(c)(1)").

16    Finally, Plaintiffs again challenge generic statements regarding corporate culture and other topics.

17   *E.g.*, ¶¶ 166, 187–88. These are classic "examples of puffery and corporate optimism." Order at 23.

18   Indeed, "[s]tatements about corporate culture and integrity are typically considered to be inactionable

19   puffery." *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *24 (S.D.N.Y. Sept.

20   28, 2010). Plaintiffs' allegations cannot convert these "generalized, vague and unspecific assertions" into

21   actionable securities fraud. *See Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir.

22   2003). Investors do not rely on puffery when making investment decisions. *In re Cutera Sec. Litig.*, 610

23   F.3d 1103, 1111 (9th Cir. 2010). Such statements therefore do not "amount[ ] to a securities violation."

24   *Id.*; *see Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (explaining that

25   "'[p]uffing' concerns expressions of opinion, as opposed to knowingly false statements of fact," and that

26   puffing "would not induce the reliance of a reasonable investor").[8]

27     [8] To the extent Plaintiffs allege that Sarbanes-Oxley certifications were themselves actionable

28   misstatements, ¶¶ 155–57, these allegations fail. *See Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013) (SOX certification "not actionable as the failure to detect fraud

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

The Court should dismiss these statements once again.[9]

## II. Plaintiffs Fail to Allege Falsity with Respect to the Remaining Statements.

The remaining statements—contained in two press releases responding to allegations by Elaine Wynn and statements responding to the January 26 article, ¶¶ 217, 225, 265, 267—should also be dismissed. These statements are inactionable and not false.

### A. Press Releases Regarding Allegations by Elaine Wynn Are Inactionable.

This Court already held that much of the Company's response to Elaine Wynn's March 28, 2016 press release is inactionable as a matter of law. *See* Order at 34 (dismissing statements that "Wynn Resorts prides itself on its transparency and full disclosure" and statements regarding "sense of family and community"). These statements are "too general to cause reliance by a reasonable investor and [are] also incapable of objective verification." *Id.* In the SAC, Plaintiffs challenge yet additional statements; these statements are also inactionable.

The Company's denial of "allegations made by Ms. Wynn that the company would hide any relevant activities from [its] regulators" is not false. This statement is a generalized description of the Company's approach to compliance. "Courts often hold that statements regarding general legal compliance are too vague to be actionable misrepresentations or omissions." *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *23 (D. Ariz. Feb. 16, 2017) (citing cases).[10] Like the inactionable statements in these decisions, the Company's statement "lacks detailed factual assertions" and is "too generalized to be actionable." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019). The statement merely describes how the Company generally "would" approach disclosure of "any relevant activities" to regulators. That is classic inactionable puffery. *See City of Pontiac*, 752 F.3d at 183 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' . . . particularly [  ] where, as here, the statements are explicitly aspirational,

---

does not itself render false standard certifications about the adequacy of internal controls"); *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007). In any event, because no statements in the underlying SEC filings are actionable, neither are the accompanying certifications.

[9]  For the Court's convenience, attached to this motion is a chart of Plaintiffs' alleged misstatements, their alleged attributions, and the reasons they are inactionable as a matter of law. *See* App'x A.

[10]  *See also In re Facebook*, 405 F. Supp. 3d at 835–36 (dismissing statement that "We've worked hard to make sure that we comply with [the FTC order]"); *Karam v. Corinthian Colleges, Inc.*, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (dismissing "a number of statements in which Defendants emphasized that Corinthian was committed to regulatory compliance").

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

with qualifiers such as 'aims to,' 'wants to,' and 'should.'").

Plaintiffs do not allege particular facts establishing that this statement was false, much less that any Defendant *knew* this statement was false. Order at 34–35 (finding allegations deficient because Plaintiffs did "not specify what was allegedly withheld, why it was 'unlawful,' why it was 'material,' or who withheld it" and failed to "identify what each Defendant knew at the time this statement was made").[11] Nowhere do Plaintiffs allege that any Defendant was aware that Mr. Wynn's alleged personal misconduct was relevant to gaming authorities, knew this information should have been disclosed to them, and knew this information had been hidden from them. Indeed, Plaintiffs allege that the Directors and Maddox learned of the allegations referenced in Elaine Wynn's cross-claim only *after* it was filed, years later than the purportedly deficient regulatory disclosures. ¶¶ 77, 219, 222 (noting regulatory reviews "in 2013 and 2014"). Plaintiffs nowhere allege that the Directors or Maddox knew of the allegations at the time of the Company's March 28 press release. More to the point, that press release was public. ¶ 217; Ex. 10 (Mar. 28, 2016 Press Release). The underlying cross-claim was public. ¶¶ 215–16; Ex. 13 (Mar. 28, 2016 Cross-Claim). NGCB was alerted to the cross-claim before it was filed. ¶ 77. There is simply no indication that Defendants were "hid[ing] any relevant activities from . . . regulators."

Plaintiffs also selectively excerpt language from the MGC Order concerning "the application process for [the Company's] Massachusetts gaming license," but omit that the MGC found that "[n]one of the applications contained any questions that specifically required the disclosure of information related to the allegations, settlements, or other evidence of wrongdoing at issue." ¶ 221; Ex. 3 (MGC Order) at 18; *id.* at 20 ("[N]o specific questions were asked eliciting information relative to the allegations and settlements of wrongdoing."). Plaintiffs do not explain how Defendants could have "hidden" information they were never asked to provide. Far from indicating that Defendants knew Mr. Wynn's alleged personal indiscretions should have been disclosed, the MGC Order states that counsel had advised "that certain of the allegations and settlements need not be disclosed to regulators." *Id.* at 20 (stating that Defendants relied on legal advice regarding duty to disclose information to regulators). Thus, MGC found "a lack of

---

[11] *See also Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (statements must be "false or misleading at the time by the people who made them"); *Vitalone v. Logitech Int'l SA*, 2012 WL 13041992, at *5 (N.D. Cal. July 13, 2012) ("To demonstrate falsity, the CCAC must present facts showing statements were false when made, not that defendants learned of the falsity months later.").

substantial evidence that Wynn Resorts, Wynn MA, LLC, or any of its associated qualifiers or close associates willfully provided false or misleading information to the Commission." *Id.* To the extent that, in April 2019, MGC indicated certain allegations should have been disclosed even if not requested, that finding cannot be imputed retroactively to Defendants in March 2016, years before MGC started investigating.[12]

Plaintiffs also fail to plead falsity with respect to the Company's denial of Ms. Wynn's allegations "regarding the use of company assets." ¶¶ 217, 225; Ex. 11 (April 5, 2016 Press Release). Plaintiffs purport to contradict the Company's statement by asserting that "Defendant Wynn had, in fact, improperly misused corporate assets by using corporate funds" to pay a settlement in 2008, but that settlement is not mentioned in Ms. Wynn's cross-claim. ¶¶ 220, 225; Ex. 13 (Mar. 28, 2016 Cross-Claim). Her allegations regarding "company assets" were directed toward a 2005 settlement, in which Mr. Wynn allegedly paid $7.5 million with *personal funds*, and Mr. Wynn's "legendary lifestyle," such as entertainment and travel expenditures. ¶ 71 (Mr. Wynn personally funded 2005 settlement), ¶ 77 (Elaine Wynn's cross-claim referenced the 2005 settlement), ¶ 216 (excerpt from Elaine Wynn cross-claim). Neither relates to the 2008 settlement. "When read in context, no reasonable investor would infer from the challenged [   ] statements" anything related to the 2008 settlement. Order at 26. In all events, Plaintiffs do not explain how Wynn Las Vegas' settlement of an employment dispute with a previously terminated employee establishes that Mr. Wynn "improperly misused corporate assets." ¶¶ 82, 220; Ex. 3 (MGC Order) at 6 (stating that "[t]he Company used corporate funds to pay the settlement"). Despite exhaustive reviews, no regulator has ever made that finding.

**B.  Statements After the January 26 Article Are Not Actionable.**

Plaintiffs attempt to allege the falsity of two additional statements responding to allegations from the newspaper article—one by Mr. Wynn, ¶¶ 265–66, and one by the Company, ¶¶ 267–68. Ex. 12 (Jan. 26, 2018 Statements). The Company's statements are neither actionable nor false. The Company's characterization of Elaine Wynn's motivations and lawsuit are puffery, an expression of opinion not

---

[12]   *See LendingClub Corp.*, 423 F. Supp. 3d at 806 ("[T]he mere existence of an FTC investigation . . . does not mean that Defendants were aware of the conduct eventually alleged in the FTC action nearly two years later, or that such conduct violated FTC rules."); *In re Facebook*, 405 F. Supp. 3d at 836 (holding that defendants "had no requirement to elaborate on any potential privacy breaches" because the FTC "had not made any formal finding that Facebook had violated the decree order").

capable of objective verification. *See Apollo*, 774 F.3d at 606. Moreover, Plaintiffs allege no particular facts showing that the January 26 article did not "reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn." ¶ 267. The article itself affirms the 2005 incident "was referenced, in broad terms, in a lawsuit [filed by] Mr. Wynn's ex-wife, Elaine Wynn." Ex. 14 (Jan. 26, 2018 Article) at 2. Nor were the Company's statements false regarding an employee hotline. ¶ 267. Plaintiffs admit that the Company did, in fact, "always ha[ve] a hotline where employees could report things anonymously." ¶ 270. Plaintiffs assert this statement was misleading because the Company had received "sexual harassment complaints made against Defendant Wynn, including a rape allegation leading to the 2005 settlement." *Id.* But again, that information was reflected in the January 26 article itself. The article reported that the employee "filed a detailed report to the casino's human-resources department recounting the" 2005 incident. Ex. 14 (Jan. 26, 2018 Article) at 2. Because, as Plaintiffs allege, the January 26 article "revealed the extent of [Mr. Wynn's] egregious conduct and forced his ouster from the Company," ¶ 108, the Company's response to the article cannot support claims for securities fraud. "Publicly available information cannot be a material omission under federal securities laws." *Sanchez v. IXYS Corp.*, 2018 WL 4787070, at *3 (N.D. Cal. Oct. 2, 2018).

Even if these statements were false and material, they would not be actionable. These statements were made on January 26, 2018,[13] *after* Plaintiffs had purchased their shares.[14] Because reliance on a misstatement in connection with a purchase or sale of securities is an essential element of a Rule 10b-5 claim, "[a]s a matter of law, conduct actionable under Rule 10b-5 must occur *before* investors purchase the securities." *Binder v. Gillespie,* 184 F.3d 1059, 1066 (9th Cir. 1999) (quotation omitted and emphasis added); *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1487 (9th Cir. 1991); *see also Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646, 651 (9th Cir. 1988) (explaining that "actionable conduct must occur before the investors become purchasers of securities" (quotation omitted)). Thus, "as a matter of law, these statements are nonactionable under § 10(b) and Rule 10b-5." *In re Solarcity Corp. Sec. Litig.*,

---

[13]   The Company's statement is not dated. ¶ 267. But the SAC cites a CNN article that lists both Mr. Wynn and the Company's statements as occurring on January 26, 2018. ¶ 265 n.14; Ex. 12 (Jan. 26, 2018 Statements).

[14]   Lead Plaintiffs John and Jo-Ann Ferris bought 2,000 shares of Wynn Resorts stock on January 23, 2018. *See* ECF No. 1-2. Additional Plaintiff Jeffrey Larsen bought 900 shares of Wynn Resorts stock on April 22, 2014, and 100 shares on July 28, 2017. *See* ECF No. 30-1 at Ex 2.

274 F. Supp. 3d 972, 1008 (N.D. Cal. 2017).

**III.    The SAC Fails to Allege Scienter.**

**A.    The SAC Does Not Plead Scienter as to the Directors and Officers.**

Plaintiffs have failed to plead scienter as to each Defendant and each separate alleged act or omission. The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The PSLRA's 'strong inference' requirement has teeth. It is an exacting pleading obligation that present[s] no small hurdle for the securities fraud plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (internal citations omitted). Plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999); *see Tellabs*, 551 U.S. at 313.[15] Though the Court did not reach the issue of scienter in its Order, the Court was clear that Plaintiffs had to do more to meet the PSLRA's scienter requirements. The Court warned Plaintiffs that "any allegations of scienter must be specific to a Defendant's state of mind at the time he or she made the statements. Moreover, Plaintiffs must differentiate their allegations as to each Defendant and refrain from lumping multiple Defendants together." Order at 36. Plaintiffs ignored this. Instead, Plaintiffs have impermissibly alleged general scienter for each of the individual Defendants without connecting that scienter to particular misstatements. ¶¶ 325–423. For that reason alone, the SAC fails. 15 U.S.C. § 78u–4(b)(2); *see Ronconi*, 253 F.3d at 432.

Plaintiffs' generalized allegations of scienter are insufficient in any event. The SAC claims that the same four types of generic evidence are proof of the Directors' and Officers' scienter: (1) their knowledge of the allegations in Elaine Wynn's publicly-filed complaint; (2) their positions at the Company; (3) the core operations doctrine; (4) certain Director Defendants' decisions to leave the Company or not seek re-election after the January 26 article; (5) the Sarbanes-Oxley certification requirement and (6) their purported "motive and opportunity" to engage in fraud. Plaintiffs fail to plead

---

[15] "To meet this pleading requirement, the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432. "[T]he court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original). An inference of malicious intent must be "at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314.

scienter as to each Defendant and each separate alleged act or omission.

*First,* the SAC alleges that the Directors and Maddox knew the nature of the allegations against Mr. Wynn by virtue of the public allegations in Elaine Wynn's 2016 cross-claim.[16] This knowledge cannot support scienter: "Numerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent." *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 519 (S.D.N.Y. 2016). Moreover, Defendants' awareness of *allegations* against Mr. Wynn does not amount to knowledge of contradictory *facts*.[17] "Because allegations from [ ] complaints are unproven and contested, they do not amount to 'facts' sufficient to establish a strong inference of scienter." *In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011).[18] Following Elaine Wynn's public cross-claim, the Directors "were advised on several occasions that the [2005] incident was an outlier, which was paid for with Mr. Wynn's personal funds" and "that the relationship was consensual." Ex. 3 (MGC Order) at 32. They were not advised "about any other allegations or settlements." *Id.* at 9. Nothing supports a strong inference of scienter as to the Directors.

Plaintiffs draw on the MGC Order to assert that Maddox was aware of a 2008 settlement and purported "sensual massage" request in 2014, but neither incident involved knowledge of sexual misconduct. ¶¶ 87, 316. Plaintiffs concede that Maddox understood the 2008 settlement was a payment to a former employee who needed financial assistance, *see* ¶¶ 85, 220; Ex. 3 (MGC Order) at 25, and that the "sensual massage" was for Mr. Wynn and his wife. Maddox "never imagined that any sort of misconduct could be involved." ¶ 316; Ex. 3 (MGC Order) at 24. Thus, after an exhaustive review, MGC concluded that "[t]here is no substantial evidence that Mr. Maddox definitively knew about any of the

---

[16] *See, e.g.*, SAC ¶¶ 352 (Maddox), 369 (Hagenbuch), 375 (Irani), 381 (Johnson), 386 (Miller), 391 (Mulroy), 398 (Randt), 403 (Shoemaker), 408 (Virtue), 413 (Wayson).

[17] Thus, any implication by Plaintiffs that scienter can be established or inferred by various Defendants' alleged failures to disclose separate, unrelated allegations to investors also fails. *See, e.g.*, SAC ¶ 377 (alleging scienter based on a failure to disclose human trafficking allegations against Defendant Irani); ¶ 413 (alleging scienter based on Wayson's knowledge of a lawsuit filed publicly in 1997).

[18] *Accord Youngers*, 195 F. Supp. 3d at 519 (dismissing complaint where "news articles only provided [defendants] . . . with knowledge of accusations, not with facts contradictory to their statements") (emphasis in original); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("Accusations differ from proof; business executives are not charged with 'knowing' the truth of" unproven assertions.); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) ("[A]llegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter.").

-14-

settlements or fully knew about the allegations of wrongdoing involving Mr. Wynn until 2016 after Ms. Wynn filed her amended cross-claim in the *Okada* litigation." ¶ 316; Ex. 3 (MGC Order) at 23. Even then, Plaintiffs admit that Maddox was informed merely "that there was a consensual event that occurred between Mr. Wynn and a Company employee around the opening of the Wynn Las Vegas and that the matter, which had been overseen by the prior general counsel and by outside counsel, had been settled." ¶ 316. Plaintiffs have not identified any particular facts showing that Maddox intended to defraud investors.

*Second,* Plaintiffs argue that Defendants' senior positions at the Company while allegations were made establishes their scienter. But knowledge of falsity can only be assumed where "the falsity of the information was obvious from the operations of the company." *Zucco*, 552 F.3d at 1001; *see also In re Arrowhead Research Corp. Sec. Litig.*, 2016 WL 6681180, at *4 (C.D. Cal. Aug. 18, 2016), *aff'd*, 711 F. App'x 434 (9th Cir. 2018) ("Where a plaintiff relies on only the management's role in the company to plead scienter, the reporting of false information will only be indicative of scienter where the falsity is patently obvious.") (internal citations omitted). Here, the Directors and Officers were charged with running a casino. That affords no basis to *presume* their knowledge of Mr. Wynn's conduct.

*Third*, Plaintiffs are likewise unsuccessful in triggering the "core operations" inference of scienter. ¶¶ 420–21. Where, as here, the complaint lacks "particularized allegations concerning defendants' access to relevant information," the "core operations inference" only permits courts to impute knowledge of facts critical to a business's core operations or an important transaction. *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *30–31 (C.D. Cal. Apr. 14, 2015); *LendingClub Corp.*, 423 F. Supp. 3d at 816; *see also Webb v. Solarcity Corp.*, 884 F.3d 844, 855, 857 (9th Cir. 2018) (fact supporting "core operations" inference must be "so dramatic that it would be *absurd* to think that [defendants] did not know that something was wrong") (emphasis in original). Mr. Wynn's alleged private conduct falls well outside the core of Wynn Resorts' operations, and certainly does not "constitute nearly all of [Wynn Resorts'] business."[19] *Ixia*, 2015 WL 1775221, at *30. The core operations inference does not apply.

---

[19]   Nor does this calculus change because the "gaming industry is highly regulated" and Mr. Wynn was one qualifier for the Company's gaming license. *See* ¶ 421. "[C]ases in which the core operations inference, without more, is sufficient under the PSLRA [to establish scienter]" are "exceedingly rare." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008). That is in part because "[c]ourts applying the doctrine have generally 'required that the operation in question constitute *nearly all* of a

*Fourth,* for a handful of Directors, Plaintiffs allege that their decisions not to seek re-election[20] to the Company's Board of Directors or to resign[21] following the January 26 article is evidence of scienter. That too falls short. It is not surprising that a few directors, most of whom had served the Company for more than a decade, rotated off the Board. "[A]n employee's resignation supports an inference of scienter only when 'the resignation at issue was uncharacteristic . . . or was accompanied by suspicious circumstances.' Otherwise, 'the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (internal citations omitted); *see also In re U.S. Aggregates, Inc. Sec. Litig.,* 35 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002). Because none of the Directors' departures was related to the alleged fraud, these allegations do not support scienter.[22]

*Fifth,* Plaintiffs assert that the Sarbanes-Oxley mandated certifications of Defendants Wynn, Maddox, and Cootey "underscored" their, and the Company's, scienter. ¶ 422. But a "Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008). This Court has already determined that the Company's SEC filings did not contain actionable misstatements (Order at 25–33), and Plaintiffs have alleged no connection between these certifications and the purported misstatements on which the Court has not yet ruled.[23]

---

company's business before finding scienter.'" *Ixia*, 2015 WL 1775221, at *30 (emphasis added). Moreover, as described above, both NGCB and MGC have concluded that the Company and its executives remain qualified to hold gaming licenses.

20   *See, e.g.,* ¶ 370 (Hagenbuch); ¶ 409 (Virtue).

21   *See, e.g.,* ¶ 376 (Irani); ¶ 387 (Miller); ¶ 404 (Shoemaker); ¶ 414 (Wayson).

22   While Plaintiffs allege that the decision by some retired directors not to participate in MGC's investigation is evidence of scienter, *see, e.g.,* ¶¶ 370, 376, 387, 409, that inference is unsupported. There is no reason to expect that former Board members would actively participate in an investigation taking place under the purview of a reconstituted Board.

23   Further, in regard to the filings Plaintiffs allege Maddox certified—the 2013 10-K, the April 22, 2014 8-K, the 2013 Wynn Macau Annual Report, and the 2014 Q1 10-Q—these filings all predate Maddox's knowledge of the 2005 settlement. The MGC Order, which found that "[t]here is no substantial evidence that Mr. Maddox knew about any of the settlements or fully knew about the allegations of wrongdoing involving Mr. Wynn until 2016" (¶ 316), belies any allegation that Maddox's knowledge of the 2008 Settlement and the 2014 massage therapist incident render his SEC certifications "severely reckless."

*Finally,* Plaintiffs make the generic allegation that Defendants had "motive and opportunity" to "engage in fraud and conceal the allegations of sexual misconduct."[24] This allegation is makeweight without compelling evidence of deliberately reckless or conscious misconduct. *Zucco,* 552 F.3d at 998; *Brown v. Kinross Gold, U.S.A.*, 343 F. Supp. 2d 957, 964 (D. Nev. 2004); *see also Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) (affirming dismissal where "motive allegations" were too general to "support a strong inference of scienter"). Plaintiffs allege none here. To the contrary, the "motives" Plaintiffs ascribe to Defendants are, at base, to protect the Company and stay employed.[25] Far from being evidence of fraud, such allegations "are possessed, to a certain degree, by every corporate officer, or every officer with an interest in a related company." *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1116 (D. Nev. 1998).

Plaintiffs have not established that the Directors and Officers possessed the necessary scienter. *See Zucco,* 552 F.3d at 1008 (Merely "compiling a large quantity of otherwise questionable allegations . . . cannot transform a series of inadequate allegations into a viable inference of scienter.").

## B.   The Directors' and Officers' Trading Negates an Inference of Scienter.

"[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco,* 552 F.3d at 1005 (quotations omitted). Further, less weight should be given to the timing of sales when the class period is prolonged. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002); *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) ("[A] lengthy class period makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company.").

Plaintiffs allege *no trades* by around half the Directors and Officers—Billings, Irani, Johnson, Miller, and Virtue—and none of the facts needed to assess trading by anyone else. While Plaintiffs allege that Maddox, Hagenbuch, Mulroy, Randt, Shoemaker, and Wayson sold stock during the Class Period,

---

[24]   *See* SAC ¶ 356 (Maddox); ¶ 366 (Billings); ¶ 372 (Hagenbuch); ¶ 376 (Irani); ¶ 383 (Johnson); ¶ 388 (Miller); ¶ 395 (Mulroy); ¶ 400 (Randt); ¶ 405 (Shoemaker); ¶ 410 (Virtue); ¶ 416 (Wayson).

[25]   Plaintiffs allege only that Defendants had motives (i) "to conceal allegations" regarding Steve Wynn's alleged misconduct to protect him from reputational damage, civil and criminal exposure, and risk regulators finding him, Sinatra, and Maddox unsuitable, which would result in their ouster from the Company; (ii) to defeat claims against the Company in the *Okada* matter; and (iii) to preserve their positions. ¶¶ 356, 366, 372, 377, 383, 388, 395, 400, 405, 410, 416.

the SAC is silent on the percentage of shares sold and Defendants' trading histories. ¶¶ 355, 371, 394, 399, 404, 414. Without this information, the Court cannot contextualize Defendants' Class Period trades and determine whether they are suspicious or merely normal. *Zucco*, 552 F.3d at 1005.  As a result, "no inference of scienter can be gleaned from [Plaintiffs'] stock sale assertions." *Id.* at 1005–06 (citations omitted); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1064 (9th Cir. 2014).

In fact, Defendants' trading histories *negate* an inference of scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994). Every Director and Officer either gained or retained significant shares during the Class Period. App'x B; *see In re Worlds of Wonder*, 35 F.3d at 1427 (no scienter where defendants "reap[ed] the same large losses as did Plaintiffs"); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) (no scienter where most defendants "retained the majority of their stock holdings"). If the Directors and Officers did trade during the Class Period, most sold a small fraction of their holdings. For example, Hagenbuch's Class Period trades accounted for less than *ten percent* of his holdings. App'x B; Ex. 18 (Form 4). Further, certain Defendants actually *slowed* their trading during the Class Period. For example, Maddox sold an average of 55,789.25 shares per year during the four-year Class Period. ¶ 355. But in the four years before the Class Period, he sold an average of 59,110. App'x B. So too with Shoemaker, who sold exponentially more shares before the Class Period than during. *Compare* ¶ 404 (selling an average 2,915.5 shares of stock per year during the Class Period) *with* App'x B (selling an average of 11,036 shares of stock per year prior to Class Period). Defendants' marginal Class Period sales negate scienter. *See Metzler*, 540 F.3d at 1067 ("Moore sold only 37% of his total stock holdings during the Class Period. We typically require larger sales amounts.").

Nor does the timing of any trading suggest fraud. Mulroy and Randt joined the Board in 2015 and held no shares before the Class Period. They sold shares during the Class Period upon receiving them, when the stock was trading nearly $80 below its Class Period peak. Exs. 17, 19 (Form 4s). Defendants' trading clustered around the release of Wynn Resorts' quarterly results, within prescribed trading windows, when directors and officers "commonly make stock transactions." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002); *see* Ex. 21 (Code of Conduct) at 8 (prohibiting trading "at a time

when you are in possession of 'material non-public information'").[26] If Defendants were looking to monetize a fraudulent scheme, they would have liquidated their holdings late in the Class Period, when the stock was trading near all-time highs. *Ronconi*, 253 F.3d at 435; *Vantive*, 283 F.3d at 1093–94. But only two of the Directors and Officers are alleged to have sold shares as late as November 2017—Maddox and Shoemaker—and they retained large stakes. App'x B; Exs. 15, 16 (Form 4s). Defendants sold low, if at all, and retained substantial holdings throughout the Class Period. Their trading suggests no fraud.

### C.    The Exculpatory Inference Is More Compelling.

The more plausible—indeed, the *only* plausible—inference to draw from Plaintiffs' allegations is that the Directors and Officers either did not know of Mr. Wynn's alleged misconduct or did not know it needed to be disclosed. It is well settled that companies and their officers have no duty to disclose unsubstantiated and unadjudicated allegations of personal misconduct. *See* Order at 29 (citing cases); *see also Retail Wholesale & Dep't Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 971 (N.D. Cal. 2014), *aff'd* 845 F.3d 1268 (9th Cir. 2017) ("Plaintiff's theory of liability appears to be that a corporation or senior executive is liable whenever that executive is involved in misconduct that might lead to his or her resignation or termination, regardless of the nature of that misconduct, unless the conduct is disclosed. But that is not the law."). The SAC offers no allegations to establish that Defendants knew or even suspected that they had any duty to disclose unsubstantiated allegations concerning Mr. Wynn's personal misconduct to investors. Plaintiffs have therefore failed to plead any intent to defraud.

### D.    The SAC Does Not Plead Scienter as to the Company.

The allegations as to the Company are likewise insufficient to state a "strong inference" of scienter. Plaintiffs assert that the alleged scienter of Defendants and senior Wynn executives, officers, and directors—unnamed in this action, but who purportedly had knowledge of the allegations of the sexual misconduct and related settlements prior to the Class Period—may be imputed to the Company. ¶¶ 417–18. Because "a corporation can only act through its employees and agents," it can "only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015); *see*

---

[26]   For example, Maddox traded within days of the Company's announcement of its first quarter results in 2014; Shoemaker within days of the announcement of fourth quarter results in 2015; and multiple Defendants traded on the heels of announcements in 2017. *Compare* App'x B *with* Ex. 22 (May 1, 2014 Press Release), Ex. 23 (Feb. 3, 2015 Press Release); Exs. 24–27 (2017 Earnings Releases).

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

*Apollo*, 774 F.3d at 607 ("Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants.") (citing *Glazer*, 549 F.3d at 743–44). But as explained above, and in the motions to dismiss filed by the other Defendants in this action, Plaintiffs have failed to allege scienter as to any Defendant.

Nor have Plaintiffs adequately pled scienter as to any non-party Wynn executives, officers, and directors. Plaintiffs' block quoting of the MGC Order—which generally alludes to the "failures by certain executives and qualifiers with knowledge of accusations" to investigate and report Mr. Wynn's alleged misconduct—does not indicate that these non-parties made or certified actionable misstatements, much less with an intent to deceive investors. *See In re Maxwell Techs. Inc., Sec. Litig.*, 18 F. Supp. 3d 1023, 1032–33 (S.D. Cal. 2014) (alleged scienter of non-defendant executive could not be imputed to corporation, because "[t]he fact that . . . a non-defendant[] allegedly had knowledge of misconduct does not indicate that any statements were made with the necessary mental state").

Plaintiffs' allegations therefore do not support corporate scienter.

## IV.   The SAC's Loss Causation Allegations Are Insufficient.

To plead loss causation, Plaintiffs must establish "a causal connection between the material misrepresentation and the loss." *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "Price inflation alone is insufficient." *In re Novatel Wireless Secs. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). Instead, Plaintiffs must plausibly allege that "the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063.

Plaintiffs' loss causation theory rests entirely on speculative conclusions. Only two paragraphs in the SAC are directed to this element and they are virtually identical to the prior complaint. These paragraphs assert without factual support that Defendants' "false" statements regarding "legal compliance and [the] Code of Conduct" and "fail[ure] to disclose" Mr. Wynn's alleged misconduct inflated the Company's stock price, which fell as "the truth . . . was disclosed to the market." ¶¶ 424–25. Plaintiffs do not allege how Defendants' alleged fraud caused them to buy Wynn Resorts' stock or buy at an inflated price, what the alleged corrective disclosures were, how they relate to the alleged fraud, and how they (rather than other factors) caused Plaintiffs' alleged losses. These are the basic facts required to allege loss causation, and Plaintiffs allege none of them. *See De Sejournet v. Mohidin LLP*, 2014 WL 7723573, at

*11 (C.D. Cal. May 21, 2014) ("Plaintiffs must allege how [the defendant's] misstatements or omissions . . . caused them to buy the stock, or caused them to buy stock at an inflated price."); *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (plaintiff must allege "that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors").

Plaintiffs have not even identified corrective disclosures. A securities plaintiff must "allege specific statements made by the [d]efendants that were made untrue or called into question by subsequent public disclosures." *Apollo*, 774 F.3d at 608. While Plaintiffs point to articles reporting misconduct allegations in January and February 2018 (¶¶ 262–63, 287–88), these articles did not reveal any *fraud*. Defendants never made any representations related to Mr. Wynn's behavior; consequently, allegations that Mr. Wynn engaged in misconduct did not contradict anything Defendants said before. Because Plaintiffs have not identified "which of the Defendants' statements were made untrue by" later disclosures, they have not alleged loss causation. *Apollo*, 774 F.3d at 608; *see also Loos*, 762 F.3d at 888.

The disclosures Plaintiffs allege are insufficient for an additional reason: they reported allegations of personal misconduct rather than fraud. The SAC identifies only two disclosures that affected Wynn Resorts' stock price: (1) the January 26, 2018 article and (2) February 12, 2018 articles reporting alleged assaults in the 1970s. ¶¶ 4, 6, 10, 262–63, 287–88. These disclosures did not reveal any fraud. They did not even reveal *facts*. Rather, Plaintiffs acknowledge that these reports disclosed "allegations" and "accusations," which Mr. Wynn swiftly denied.[27] Mere allegations of misconduct cannot support a claim for securities fraud. Under Ninth Circuit law, allegations "are analogous to an announcement of internal or regulatory investigations into misconduct, which have been held insufficient, on their own, to serve as corrective disclosures." *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1139 (S.D. Cal. 2018) (citing *Curry v. Yelp*, 875 F.3d 1219, 1225 (9th Cir. 2017) (2,000 complaints and news article alleging manipulation were insufficient disclosures)); *see also City of Fort Lauderdale Gen. Emps.' Ret. Sys. v.*

---

[27]   *See, e.g.*, ¶ 265 (Mr. Wynn "denied the *accusations*" in the January 26 article), ¶ 271 (on January 26, 2018, the Board formed a Special Committee "to investigate the *allegations* in the January 2018 article"), ¶ (the Massachusetts Gaming Commission commenced an investigation "in light of the sexual misconduct *allegations* reported in the January 2018 *WSJ* Article and elsewhere"), ¶ 287 (on February 12, 2018, the Las Vegas Police Department revealed two reports "*alleging* that [Mr. Wynn] had sexually assaulted them in the 1970s") (all emphasis added).

*Edison Int'l*, 786 F. App'x 685, 686 (9th Cir. 2019) (affirming dismissal for failure to plead loss causation where corrective disclosure was analogous to announcement of a governmental investigation).[28] To be sure, an "announcement of an investigation can form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant" which effectively confirms earlier allegations of fraud. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). But here, Plaintiffs do not allege Defendants made any subsequent disclosure.[29] To the contrary, Clark County District Court Judge Ronald Israel recently ruled that one of the 1970s accusers defamed Mr. Wynn with her claims. *See* Ex. 28 (Mar. 26, 2020 Order).

Even if Plaintiffs could identify sufficient corrective disclosures, their loss causation theory would fail because it depends on speculative and illogical inferences. *See Metzler*, 540 F.3d at 1064–65. Plaintiffs' theory is that Wynn Resorts' stock price dropped as investors reflected upon "Defendants' prior false statements, misrepresentations, and fraudulent conduct." ¶ 239. Plaintiffs support this inference with no facts. While several paragraphs in the SAC detail the "market reaction" to the allegations against Mr. Wynn, there is no mention of any fraud. In fact, Plaintiffs affirmatively allege that investors reacted not to Defendants' alleged fraud, but the impact of Mr. Wynn's alleged misconduct, including whether the allegations could force him to step down or imperil the Company's gaming licenses. ¶¶ 273–79.

In other words, Plaintiffs allege that investors reacted to the very risks the Company had anticipated and disclosed: Mr. Wynn was integral to the Company; his departure could "harm [the] business"; and regulatory violations could entail severe repercussions. ¶¶ 135, 139, 145, 178, 180. This is not a viable theory of loss causation. "[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). Plaintiffs' allegations show that the market reacted to the

---

[28]   To the extent Plaintiffs are alleging that either the January 29, 2019 NGCB Complaint or the October 14, 2019 NGCB Wynn Complaint constitute a disclosure, that claim fails for the same reason: announcement of a regulatory investigation cannot serve as a corrective disclosure.

[29]   Nor could the April 30, 2019 IEB Report or the January 29, 2019 NGCB Complaint or Settlement constitute subsequent corrective disclosures pursuant to *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016), where they occurred nearly a year after the Class Period. *See Inchen Huang v. Higgins*, 2020 WL 1450520, at *16 (N.D. Cal. Mar. 11, 2020) (report "issued six months after the class period ended . . . cannot logically constitute a corrective disclosure") (quotations omitted). Moreover, Plaintiffs do not allege how these events affected Wynn Resorts' share price.

revelation of allegations regarding Mr. Wynn's behavior, not any fraudulent practices.

As for the March 28 and April 5 press releases, Plaintiffs do not even attempt to tie the statements to their losses. Neither of Plaintiffs' alleged corrective disclosures—the January 26 article and the February 12 police reports—pertain to the Company's regulatory compliance or Mr. Wynn's use of corporate assets. ¶¶ 262, 287. Rather, these disclosures revealed only allegations of sexual misconduct against Mr. Wynn. Plaintiffs have therefore failed to plead loss causation as to these statements. *See Apollo*, 774 F.3d at 608 (dismissing complaint because "Plaintiffs do not allege specific statements made by the Defendants that were made untrue or called into question by subsequent public disclosures").[30]

## V.   The SAC Fails to Attribute Actionable Statements to the Directors and Officers.

Defendants can be liable under Rule 10b-5 only for alleged misstatements they have "made," *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–44 (2011), or "disseminated," *Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, 2020 WL 611506, at *8 (S.D.N.Y. Feb. 7, 2020) (citing *Lorenzo v. SEC*, 139 S. Ct. 1094, 1103–04 (2019)). While Plaintiffs allege that the Directors and Officers signed certain SEC filings containing allegedly misleading statements, those statements have already been dismissed by the Court.[31] The SAC does not and cannot salvage these statements.

As to the remaining statements,[32] Plaintiffs allege no particular facts showing any Director or Officer had "ultimate control" over the statements or was involved in their dissemination. *See Janus*, 564 U.S. at 143; *Genovese*, 2020 WL 611506, at *8. Instead, Plaintiffs attempt to attribute the statements to individuals based solely on their positions at the Company. For example, Plaintiffs assert that a *Company* press release responding to Elaine Wynn's allegations is attributable to *Maddox*, merely because Maddox was an officer and was "directly involved in its day-to-day affairs at the time." ¶ 218. Plaintiffs repeat these generic allegations in connection with other statements made by the Company and even statements made personally by Mr. Wynn. ¶¶ 266, 268. The SAC alleges zero facts establishing that the Directors and Officers had anything to do with these statements, much less that they had "ultimate control" over

---

[30]   With respect to the disclosures responding to the January 26 article, loss causation is not pled either. ¶¶ 264–70. The SAC alleges that "Wynn Resorts' stock price fell $20.31, or 10.12%, to close at $180.29 on January 26, 2018." ¶ 6. Plaintiffs do not articulate how a statement on that very day could have artificially *inflated* the stock price. Much less can they explain how some later corrective disclosure revealed the statements were false and affected the price of the stock. *See Metzler*, 540 F.3d 1063.

[31]   *See* ¶¶ 348, 363, 368, 374, 379, 385, 390, 397, 402, 407, 412.

[32]   *See* ¶¶ 144, 182, 212, 217, 225, 246, 265, 267.

them or disseminated them. Plaintiffs' generic allegations that Defendants' titles render them liable for securities fraud based on others' alleged misstatements do not suffice. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (rejecting conclusory allegations of "control and authority" by virtue of positions as officers of the company); *Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 WL 1705522, at *6 (S.D. Cal. Apr. 28, 2014) ("Plaintiff relies solely on Wilhide's role within the company to argue that the statements of Valley Forge can be attributed to him. This is insufficient under *Janus*."); *Bruce v. Suntech Power Holdings Co. Ltd.*, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013) ("[T]he conclusory allegations that [CFO] 'had the authority to and did control the making of [those] statements' 'by virtue of [his] responsibilities and activities as [CFO] . . .' lack the requisite specificity."); *Genovese*, 2020 WL 611506, at *8 (plaintiff's allegations were insufficient under *Lorenzo* where defendant was "not alleged to have disseminated the statements").

## VI.    The SAC Fails to Make Out a Section 20(a) Claim against the Officers.

Because Plaintiffs have not stated a primary claim under Section 10(b), their Section 20(a) claim should also be dismissed. *Apollo*, 774 F.3d at 610. Moreover, Plaintiffs' Section 20(a) claims fail against Maddox and Billings because Plaintiffs allege no facts suggesting these Defendants controlled the Company's day-to-day operations during the Class Period. For the vast majority of the Class Period, Maddox was not even a C-suite executive. *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007) (President was not liable under § 20(a) where the complaint did not allege how he "exercise[d] control over . . . his supervisors" or "cause[ the defendant] to file any misstated financial statements"). Plaintiffs' boilerplate allegations that the Officers, lumped together as one, held "positions of control and authority" and "control[led] the content of" statements, are insufficient. ¶ 446; *see Sgarlata v. Paypal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018); *Hansen*, 527 F. Supp. 2d at 1163. Because there is no specific allegation in the SAC as to the Officers' control, the claims must be dismissed. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 952 (N.D. Cal. 2010); *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *11 (N.D. Cal. Apr. 6, 2009).

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the SAC should be dismissed with prejudice.

-24-

1   DATED: August 14, 2020          KIRKLAND & ELLIS LLP

2

3                                   */s/ Mark Holscher*
                                    ────────────────────────────
                                    Mark Holscher (*Pro Hac Vice*)
4                                   Michael J. Shipley (*Pro Hac Vice*)
                                    KIRKLAND & ELLIS LLP
5                                   333 South Hope Street
                                    Los Angeles, California  90071
6                                   Telephone: 213.680.8190
                                    Facsimile: 213.808.8097
7                                   Email:  mark.holscher@kirkland.com
                                            michael.shipley@kirkland.com
8
                                    Matthew Solum (*Pro Hac Vice*)
9                                   KIRKLAND & ELLIS LLP
                                    601 Lexington Avenue
10                                  New York, New York  10022-4611
                                    Telephone: 212.446.4688
11                                  Facsimile: 212.446.4900
                                    Email: matthew.solum@kirkland.com
12
                                    Patrick G. Byrne (Nevada Bar #007636)
13                                  Alex L. Fugazzi (Nevada Bar #9022)
                                    Vance R. Bohman (Nevada Bar #13075)
14                                  SNELL & WILMER L.L.P.
                                    3883 Howard Hughes Parkway, Suite 1100
15                                  Las Vegas, Nevada  89169
                                    Telephone: 702.784.5200
16                                  Facsimile: 702.784.5252
                                    Email:  pbyrne@swlaw.com
17                                          afugazzi@swlaw.com
                                            vbohman@swlaw.com
18
                                    *Attorneys for Defendants Wynn Resorts, Ltd.,*
19                                  *Craig Scott Billings, Matthew O. Maddox,*
                                    *John J. Hagenbuch, Robert J. Miller, Ray R.*
20                                  *Irani, Patricia Mulroy, Clark T. Randt Jr.,*
                                    *Alvin V. Shoemaker, Daniel B. Wayson, Jay*
21                                  *L. Johnson, and J. Edward Virtue*

22

23

24

25

26

27

28

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

Appendix A: Bases for Dismissal with Respect to Each Allegedly False or Misleading Statement

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|-----|--------|---------------------|-----------|--------|----------------------|-------------------------|-----------------|
| | | | **1. Code Of Conduct Statements** | | | | |
| 1 | The Code of Conduct | The Company | The Code of Conduct's stated purposes were "to comply with federal securities laws" and "to reinforce and enhance the Company's commitment to an ethical way of doing business." "the basis for the Company to continue a tradition of high ethical business standards." | 104 | X | X | |
| 2 | The Code of Conduct | The Company and each individual defendant Attribution to individuals alleged based solely on role at the company. | "The Company is an equal opportunity employer committed to complying with all state and federal fair employment practice laws, as well as maintaining a workforce that reflects the diversity of the community. The Company believes in and supports equal opportunity in employment to all persons regardless of race, color, national origin, citizenship status, sex, marital status, | 113 | X | X | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | | gender identity or expression, sexual orientation or perceived sexual orientation, age, religion, veteran status, military status, disability, history of disability or perceived disability. Harassment or discrimination of any sort will not be tolerated." | | | | |
| 3 | Code of Conduct | The Company and each individual defendant

Attribution to individuals alleged based solely on role at the company. | The Code of Conduct purported to apply to "all employees, officers, directors, agents, and representatives of the Company and its affiliates ('Covered Persons')" as well as "certain independent contractors and consultants who work at the Company's facilities or on the Company's behalf." | 112 | X | X | |
| 4 | The Company's 10-Ks | 2013 Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson and Maddox signed the 10-K | "As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and | 141, 175, 204, 237 | X | X | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|-----|--------|---------------------|-----------|--------|----------------------|--------------------------|------------------|
| | | Mr. Wynn + Maddox signed Sarbanes-Oxley certifications | employees of the Company and its subsidiaries." | | | | |
| | | 2014 | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Miller Shoemaker, Virtue, Wayson, Cootey signed the 10-K | | | | | |
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| | | 2015 | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey | | | | | |
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| | | 2016 | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, | | | | | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| 5 | The Code of Conduct | The Company and each individual defendant<br><br>Attribution to individuals alleged based solely on role at the company. | "If you know of or suspect a violation of applicable laws, rules or regulations, the Code, or the Company's related policies, you must immediately report that information as described in Section 1.4 of this Code."<br><br>"All reported violations of the Code will be taken seriously and promptly investigated . . . . The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery." | 114 | X | X | |

4

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| 6 | The Code of Conduct | The Company and each individual defendant Attribution to individuals alleged based solely on role at the company. | "The Company has additional policies that supplement the policies in this Code." | 115 | X | X | |
| 7 | Code of Conduct's Letter from Stephen A. Wynn | The Company and each individual defendant Attribution to individuals alleged based solely on role at the company. | "We live in an age where legal and ethical missteps of others have resulted in the law imposing special duties on our personal and business lives. In the midst of this unfortunate environment, the good name and reputation of Wynn Resorts are a result of the dedication and hard work of all of us. Together, we are responsible for preserving and strengthening this reputation. Our goal is not just to comply with the laws, rules and regulations that apply to our business; we also continuously strive to abide by high standards of ethical business conduct. | 105 | X | X | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|-----|--------|---------------------|-----------|--------|----------------------|--------------------------|------------------|
| | | | This booklet is not to be ignored or taken lightly. All employees, officers and directors, agents and representatives of Wynn Resorts and its affiliates must comply with the Code. Please read the Code carefully and make sure that you understand it, the consequences of non-compliance, and the Code's importance to the success of the Company. Your signature on the acknowledgement form at the conclusion of the Code certifies that you have read, understood and complied with its contents."<br><br>"Each of us is responsible for knowing and understanding the policies and guidelines contained in the following pages[.]"<br><br>"Our conduct should reflect the Company's values, demonstrate ethical leadership, and promote a work environment that | | | | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|-----|--------|---------------------|-----------|--------|----------------------|-------------------------|-----------------|
| | | | upholds the Company's reputation for integrity, ethical conduct and trust." | | | | |
| **2. Statements Regarding Compliance With Applicable Laws** | | | | | | | |
| 8 | The Company's 10-Ks | <u>2013</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br><u>2014</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, | "While the Company believes that it is in full compliance with all applicable laws, any such investigations could result in actions by regulators against the Company."[1] | 129, 173, 206, 239 | X | X | X |

---

[1] The Second Amended Complaint also challenges similar statements contained within 8-Ks and 10-Qs. ¶¶ 149, 156, 159, 163, 164, 192, 195, 201, 228, 231, 234, 252, 257, 260

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|---|---|---|---|---|---|---|---|
| | | Wayson, Cootey signed the 10-K | | | | | |
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| | | 2015 | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | | | | | |
| | | Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| | | 2016 | | | | | |
| | | Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | | | | | |
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | <u>2017</u><br>Mr. Wynn + Billings signed Sarbanes-Oxley certifications | | | | | |
| 9 | The Company's Earnings Call | Stephen A. Wynn and the Company | "We worked very hard to compete for the right to operate in Massachusetts, as you know, and it was expensive to do that process, and time-consuming."<br><br>"We've got a serious presence there in Massachusetts. And we're delighted to have that position and we finished the design of the hotel. And I think it's – along with the Palace, the best work we've ever done, based upon 40 years of experience. Best of all, with the same group of executives that have learned from all of our past experiences and projects, and hopefully, our next stuff that | 166 | X | X | X |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | | comes up will reflect the evolution and the enlightenment that we've been able to achieve because of those experiences...." | | | | |
| 10 | The Company's 10-Ks | **2014**<br>Mr. Wynn, Hagenbuch, Irani, Miller Shoemaker, Virtue, Wayson, Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>**2015**<br>Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | "'[T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.'"[2] | 172, 203, 236 | X | X | |

---

[2] The Second Amended Complaint also challenges similar statements contained within 10-Qs. ¶¶ 155, 158, 162, 191, 194, 200, 227, 230, 233, 236, 251, 256, 259

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/Misleading | Immaterial/Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2016<br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| **3. Statements Disclosing Regulatory Risks** | | | | | | | |
| 11 | The Company's 10-Ks | 2013<br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson and Maddox signed the 10-K | "Consequences of Violating Gaming Laws. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, we and | 139, 180, 210, 243 | X | X | X |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br>2014<br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2015<br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2016<br><br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, | the persons involved could be subject to substantial fines for each separate violation of the Nevada Gaming Control Act, or of the regulations of the Nevada Gaming Commission, at the discretion of the Nevada Gaming Commission. Further, the Nevada Gaming Commission could appoint a supervisor to operate our Las Vegas Operations and, under specified circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of any of our gaming licenses and the appointment of a supervisor could, and revocation of any gaming license would, have a significant negative effect on our gaming operations." | | | | |

12

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| 12 | The Company's 10-Ks | 2014<br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2015<br>Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | "Wynn Resorts and all individual qualifiers were found suitable by the MGC[.]"<br><br>"Consequences of Violating Gaming Laws. If the MGC determines that we have violated the Gaming Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license. In addition, the MGC set forth certain conditions in our gaming license. Any violation of the Gaming Act, its regulations or any of our license conditions resulting in a limitation, conditioning or suspension of our gaming license would | 180, 210, 243 | X | X | X |

13

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2016<br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Wynn + Cootey signed Sarbanes-Oxley certifications | have a significant negative effect on our Massachusetts Gaming operations."<br><br>"Consequences of Violating Gaming Laws. If the Nevada Gaming Commission determines that we have violated the Nevada Gaming Control Act or any of its regulations, it could limit, condition, suspend or revoke our registrations and gaming license." | | | | |
| 13 | The Company's Earnings Call | Stephen A. Wynn and the Company | "And every one of our operators went instantly and did it without hesitation. And that impressed the folks in Boston. We were happy to do it because we wouldn't want to do business with anybody that couldn't pass such an examination.<br><br>So, the regulatory issue is the one that I think is at stake here[.]" | 254 | X | X | |

14

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | **4. Statements Regarding Defendant Wynn's Skills And His Possible Departure** | | | | | |
| 14 | The Company's 10-Ks | <u>2013</u><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br><u>2015</u><br>Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br><u>2016</u><br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, | "We believe that Steve Wynn is the preeminent designer, developer and operator of destination casino resorts and has developed brand name status. Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises."<br><br>"Given his extensive design and operational experience across numerous gaming jurisdictions, we believe that Mr. Wynn's involvement with our resorts provides a distinct advantage over other gaming enterprises." | 135, 178, 208, 241 | X | X | X |

15

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Shoemaker, Virtue, Wayson, and Cootey<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| 15 | The Company's 10-Ks | 2013<br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br>2014<br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications<br><br>2015 | "Our ability to maintain our competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the Board, Chief Executive Officer and one of the principal stockholders of Wynn Resorts." | 135, 178, 208, 241 | X | X | X |

16

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|---|---|---|---|---|---|---|---|
| | | Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn Wynn + Cootey signed Sarbanes-Oxley certifications<br><br><u>2016</u><br><br>Mr. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K<br><br>Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| 16 | The Company's Definitive Proxy Statement | <u>2014</u><br>The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Miller, | "Experience, qualifications attributes and skills. Mr. Wynn is the founder and creative and organizational force of Wynn Resorts." | 145, 183, 213, 247 | X | X | X |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Shoemaker, Virtue, and Wayson | "Mr. Wynn's 45 years of experience in the industry have contributed to his brand name status as the preeminent designer, developer and operator of destination casino resorts." | | | | |
| | | <u>2015</u> The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey | "Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises. As founder, Chairman and Chief Executive Officer, he has a unique perspective into the operations and vision for the Company." | | | | |
| | | <u>2016</u> The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey | "He brings extraordinary talent to our Company that is unrivaled by others in our industry." | | | | |
| | | <u>2017</u> The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey | "Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success." "The Compensation Committee is mindful that | | | | |

18

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|-----|--------|---------------------|-----------|--------|-----------------------|--------------------------|-----------------|
| | | Attributed individuals did not sign proxy statement | gaming companies have historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands…" | | | | |
| 17 | The Company's 10-Ks | <u>2013</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson and Maddox signed the 10-K<br><br>Mr. Wynn + Maddox signed Sarbanes-Oxley certifications<br><br><u>2014</u><br><br>Mr. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K | "The loss of Stephen A. Wynn could significantly harm our business." | 135, 178, 208 | X | X | X |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | Mr. Wynn + Cootey signed Sarbanes-Oxley certifications 2015 Mr. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey signed the 10-K Mr. Wynn + Cootey signed Sarbanes-Oxley certifications | | | | | |
| | | | **5. Statements About Corporate Culture** | | | | |
| 18 | The Company's Definitive Proxy Statement | The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey Attributed individuals did not sign proxy statement | "Wynn Resorts has a track record of promoting diversity." "Wynn Resorts' commitment to diversity is reflected by the number of women in senior leadership roles throughout the Company." "Importantly, the Nominating and Corporate Governance Committee recognizes that | 187 | X | X | X |

20

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | | gender diversity is important for the Board, not only to make sure that the Board and the Company benefit from diverse perspectives, but also to set the right 'tone at the top.'" | | | | |
| 19 | The Company's Definitive Proxy Statement | The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey<br><br>Attributed individuals did not sign proxy statement | "Wynn resorts has a strong track record of promoting Diversity and is committed to improving diversity on the board of directors"<br><br>"Wynn Resorts is proud of its commitment to diversity. This commitment is reflected by the number of women in senior leadership roles throughout the Company, which includes 34% of employees at the level of Vice President or above and 38% of employees at the levels of Executive Director or Assistant Vice President. The Corporate Governance Committee evaluates diversity on many levels, including breadth of experience and the | 188 | X | X | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | | ability to bring new and different perspectives to the Board. However, the Corporate Governance Committee and the Board also recognize that gender diversity is important for the Board, not only to make sure that the Board and the Company benefit from diverse perspectives, but also to set the right "tone at the top." | | | | |
| 20 | The Company's Earnings Call | Stephen A. Wynn and the Company | "In 45 years, I've never had a layoff. I think we once dropped 100 people in this company. 45 years. We don't do layoffs. People come to work for us. They get job security. And I've never broken a promise about job security to my employees in my entire career, and I don't like facing that possibility one bit." | 197 | X | X | |

22

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|---|---|---|---|---|---|---|---|
| | | | **6. Press Release Statements Concerning Allegations of Elaine Wynn** | | | | |
| 21 | The Company's Press Release | The Company, Mr. Wynn, Maddox, Sinatra, and Cootey Attribution to individuals alleged based solely on role at the company. | "Ms. Wynn's latest allegations regarding our Board, its composition and its independence are simply not true and are rehashed from her previous, unfounded statements made during her proxy campaign." "Her allegations regarding the use of company assets are without merit." "The use of company assets is governed by many internal policies and is closely supervised both by the Audit Committee, which is comprised solely of independent directors, and our external auditors." "As a leader in a highly regulated industry, Wynn Resorts prides itself on its transparency and full disclosure to regulations and shareholders." | 217 | X | X | |

23

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | | "None of what Wynn Resorts has accomplished would be possible without its extraordinary employees and the sense of family and community that Mr. Wynn has created. Ms. Wynn's actions today run counter to the culture of everything Mr. Wynn has worked so hard to create." | | | | |
| 22 | The Company's Press Release | The Company, Mr. Wynn, Sinatra, Cootey, and Maddox  Attribution to individuals alleged based solely on role at the company. | "Ms. Wynn's comments regarding our Board of Directors, their independence and their actions in this matter are false."  Ms. Wynn's "previous allegations that Mr. Wynn applied company resources for personal use are false[.]" | 225 | X | | |

24

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|-----|--------|---------------------|-----------|--------|----------------------|--------------------------|------------------|
| | | | **7. Other Statements** | | | | |
| 23 | The Company's Definitive Proxy Statement | The Company and Mr. Wynn, Maddox, Sinatra, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey Attributed individuals did not sign proxy statement | Ms. Wynn "has placed her individual interests ahead of her director duties" and her ongoing dispute with Mr. Wynn has "reduced the effectiveness of her participation on the Board." "[T]he independent directors' view is that over the past three years Ms. Wynn's personal goals have interfered with her effectiveness as a director." | 186 | X | X | |
| 24 | The Company's Earnings Call | Stephen A. Wynn and the Company | "[T]hen we're going to open this place in Boston in two dozen months, and we're going to have a case study of how a grand hotel, built in a major metropolitan city, can change the neighborhood for the better. And be the largest private investment in the Commonwealth of Massachusetts and the second largest employer in the Commonwealth of | 249 | X | X | X |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|-----|--------|---------------------|-----------|--------|----------------------|--------------------------|-----------------|
| | | | Massachusetts, behind Mass General Hospital.<br><br>So I'd like the direction we're in and I'm feeling comfortable about the pace of our growth. And, you know, I don't feel like anybody's after us. I think we're moving along exactly the way we should be. And my colleagues join me in that confidence." | | | | |
| **8. Statements Made After The January 26 Article** | | | | | | | |
| 25 | Wall Street Journal Article | The Company, Mr. Wynn, Sinatra, and Maddox<br><br>Statement made by Steve Wynn but attribution to other individuals alleged based solely on role at the company. | "The idea that I ever assaulted any woman is preposterous. We find ourselves in a world where people can make allegations, regardless of the truth, and a person is left with the choice of weathering insulting publicity or engaging in multi-year lawsuits. It is deplorable for anyone to find themselves in this situation."<br><br>The instigation of these accusations is the continued | 265 | X | X | |

26

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward-Looking |
|---|---|---|---|---|---|---|---|
| | | | work of my ex-wife Elaine Wynn, with whom I am involved in a terrible and nasty lawsuit in which she is seeking a revised divorce settlement …." In response, I remain focused on Wynn Resorts, our employees and our shareholders and will not be distracted from those efforts. | | | | |
| 26 | The Company's Press Release | The Company, Mr. Wynn, Sinatra, and Maddox<br><br>Attribution to individuals alleged based solely on role at the company. | "The recent allegations about Mr. Wynn reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with him and the company. It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him. It is noteworthy that although Ms. Wynn says she knew about the 2005 allegations involving | 267 | X | X | |

| No. | Source | Alleged Attribution | Statement | SAC ¶¶ | Not False/ Misleading | Immaterial/ Inactionable | Forward- Looking |
|-----|--------|---------------------|-----------|--------|----------------------|--------------------------|------------------|
| | | | Mr. Wynn in 2009, she never made them known to the board of directors, of which she was then a member, and she did not raise them until after Mr. Wynn remarried and the shareholders of Wynn Resorts voted not to elect her to the board." "Wynn Resorts is committed to operating with the highest ethical standards and maintaining a safe and respectful culture that has made Wynn Resorts the employer of choice for 23,000 employees worldwide. The Company requires all employees to receive annual anti-harassment training and offers an independent hotline that any employee can use anonymously, without fear of retaliation. Since the inception of the company, not one complaint was made to that hotline regarding Mr. Wynn." | | | | |

## Appendix B[1]

*Matt Maddox*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Pre-Class Period Sales** | | | |
| 11/28/2006 | 8,000 | 15,500 | 51.6% |
| 5/4/2010 | 83,000 | 163,000 | 50.9% |
| 8/26/2010 | 30,000 | 110,000 | 27.2% |
| 11/24/2010 | 37,000 | 97,000 | 38.1% |
| 5/25/2011 | 30,000 | 90,000 | 33.3% |
| 5/6/2013 | 18,600 | 116,355 | 16.0% |
| 2/3/2014 | 30,000 | 103,560 | 28.0% |
| **Total Pre-Class Period Shares Sold** | **236,600** | | |
| **Alleged Class Period Sales** | | | |
| 5/12/2014 | 16,688 | 103,560 | 16.1% |
| 4/27/2017 | 60,000 | 354,895 | 16.9% |
| 6/16/2017 | 44,309 | 344,895 | 12.8% |
| 9/15/2017 | 42,900 | 350,586 | 12.2% |
| 11/13/2017 | 59,260 | 387,686 | 15.3% |
| **Total Class Period Shares Sold** | **223,157** | | |
| **Total Class Period Shares Held** | **329,428** | | |

---

[1]    Listed herein is trading data for the Director and Officer Defendants alleged to have traded during the Class Period. Plaintiffs do not allege any Class Period sales for Defendants Billings, Irani, Miller, Johnson, or Virtue. Data for sales before and during the Class Period are reflected in Defendants' Form 4s. *See* Shipley Exs. 15–20.

*Alvin V. Shoemaker*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Pre-Class Period Sales** | | | |
| 9/13/2010 | 5,000 | 17,500 | 28.6% |
| 3/2/2011 | 5,000 | 12,500 | 40% |
| 6/5/2012 | 10,000 | 17,500 | 57.1% |
| 5/8/2013 | 5,000 | 7,500 | 66.6% |
| 2/6/2014 | 10,000 | 12,500 | 80% |
| **Total Pre-Class Period Shares Sold** | **35,000** | | |
| **Alleged Class Period Sales** | | | |
| 2/13/2015 | 10,000 | 12,500 | 80% |
| 11/8/2017 | 15,000 | 24,162 | 62.1% |
| **Total Class Period Shares Sold** | **25,000** | | |
| **Total Class Period Shares Held** | **9,162** | | |

*Patricia Mulroy*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 5/16/2017 | 2,226 | 8,011 | 27.8% |
| **Total Class Period Shares Sold** | **2,226** | | |
| **Total Class Period Shares Held** | **5,785** | | |

*John J. Hagenbuch*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 5/16/2017 | 1,100 | 12,812 | 8.6% |
| 5/17/2017 | 50 | 11,212 | 0.4% |
| **Total Class Period Shares Sold** | **1,150** | | |
| **Total Class Period Shares Held** | **11,662** | | |

*Clark T. Randt*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 7/31/2017 | 3,000 | 7,711 | 38.9% |
| **Total Class Period Shares Sold** | **3,000** | | |
| **Total Class Period Shares Held** | **4,711** | | |

*D. Boone Wayson*

| Date of Sale | Total Shares Sold | Number of Shares Held Prior to Sale | Percentage of Holdings Sold |
|---|---|---|---|
| **Alleged Class Period Sales** | | | |
| 11/9/2016 | 37,500 | 92,010 | 40.8% |
| **Total Class Period Shares Sold** | **37,500** | | |
| **Total Class Period Shares Held** | **54,510** | | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

On August 14, 2020, I served the foregoing document on all parties appearing in this case when filing said document through the Court's PACER system with automatic e-service on all persons who have registered for e-service on PACER for this case.

_____*/s/Laura Bay*_____
An employee of KIRKLAND & ELLIS LLP

**CERTIFICATE OF SERVICE**