# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOHN V. FERRIS, et al.,

    Plaintiffs

v.

WYNN RESORTS LIMITED, et al.,

    Defendants

Case No.: 2:18-cv-00479-APG-DJA

**Order Granting in Part Motions to Dismiss, Granting Motion for Leave to File Surreply, and Granting Motion for Leave to File Supplemental Authority**

[ECF Nos. 125, 128, 140, 160, 164]

    This is a securities fraud class-action suit against Wynn Resorts (the Company), Stephen Wynn, and several Company officers and board members.  Wynn Resorts develops, owns, and operates resort casinos in Las Vegas, Macau, and Massachusetts.  Stephen Wynn, the founder and former CEO and chairman of the board, resigned in 2018 after a Wall Street Journal article reported on allegations that he sexually assaulted and harassed several employees over the course of more than a decade.  On the day of the article's publication, Company share prices dropped 10.12%.  Lead plaintiffs John V. Ferris and JoAnn M. Ferris and named plaintiff Jeffrey Larsen allege that Company officers, board members, and other senior-level management knew about or recklessly disregarded the allegations of Wynn's misconduct and concealed them.

    The plaintiffs allege that in concealing the misconduct, the defendants made material misrepresentations or omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5.  They also assert a control-person liability claim alleging that Wynn and certain other defendants violated Section 20(a) of the Exchange Act.  The defendants move to dismiss the second amended complaint (SAC) on many grounds.  Defendants Wynn and

Kimmarie Sinatra each move separately to dismiss and join in the other defendants' motion to dismiss.  Defendant Stephen Cootey also joins in that motion to dismiss.

I grant in part the motions to dismiss because the plaintiffs have adequately alleged that only two sets of statements are actionable: (1) the Company's press releases responding to Elaine Wynn's allegations in her cross claim regarding serious misconduct and misuse of Company resources by Stephen Wynn, and (2) the Company's and Wynn's statements responding to the 2018 Wall Street Journal article (WSJ article).  So, I deny the motions as to those two sets of statements.  I grant the motions to dismiss claims against Sinatra and Matthew Maddox as to Wynn's separate statement responding to the WSJ article because they are not makers of the statement.  I grant the motions to dismiss with respect to the other categories of alleged misrepresentations because the plaintiffs have not adequately alleged falsity.

## I.  Background

The SAC asserts claims against three groups of defendants.  The individual defendants are Stephen Wynn, Matthew Maddox (president and CEO), Kimmarie Sinatra (former executive vice president, general counsel, and secretary), Stephen Cootey (former CFO, senior vice president, and treasurer), and Craig Billings (CFO, principal accounting officer, and treasurer).  The director defendants are John Hagenbuch, Ray Irani, Jay Johnson, Robert Miller, Patricia Mulroy, Clark Randt, Jr., Alvin Shoemaker, J. Edward Virtue, and D. Boone Wayson.  Wynn Resorts is the corporate defendant.

The alleged misrepresentations and omissions arise out of Wynn's alleged sexual misconduct, which the SAC alleges is a decades-long pattern.  His alleged misconduct came to light when the Wall Street Journal published an article detailing several allegations against him.  The plaintiffs allege that the defendants made misrepresentations in response to that article, as

well as in statements involving the Company's code of conduct, SEC filings, earnings calls, and in response to Elaine Wynn's cross claim in a lawsuit involving the Company and Kazuo Okada, a former beneficial shareholder of the Company.

**A. The *Okada* Litigation**

The *Okada* litigation "arose out of the fact that the Company used the Code of Conduct to find Kazuo Okada—an early investor and formerly the largest single shareholder of Wynn Resorts—unsuitable to be a shareholder in the company," leading to "his ouster from the Board of Directors [and] Wynn Resorts redeeming his shares." ECF No. 122 at 53.  On March 28, 2016, as part of the *Okada* litigation, Elaine Wynn filed a cross claim alleging that Stephen Wynn "made a multimillion dollar payment after apparently being threatened with allegations of serious misconduct occurring on Company property against a Wynn Resorts employee." *Id.* at 96.  The cross claim alleged that Sinatra knew about the alleged settlement. *Id.* at 94-96.  The cross claim also stated that Wynn "misused Company resources to support his legendary lifestyle[,]" without effective oversight by the board. *Id.* at 96.

In response to Elaine Wynn's cross claim, the Company issued a press release the same day, stating that "Ms. Wynn's latest allegations regarding our Board, its composition and its independence are simply not true and are rehashed from her previous, unfounded statements made during her proxy campaign." *Id.* at 97.  The press release further stated, in relevant part:

> Her allegations regarding the use of company assets are without merit.  The use of company assets is governed by many internal policies and is closely supervised both by the Audit Committee[ ] . . . and our external auditors.  As outlined in recent proxy statements, Mr. Wynn reimburses the Company for his accommodations at the hotel, his personal use of corporate aircraft and all other company assets subject to company policy.  These policies and any perquisites he receives have always been set forth in our proxy statements.

> As a leader in a highly regulated industry, Wynn Resorts prides itself on its transparency and full disclosure to regulators and shareholders. Allegations made by Ms. Wynn that the company would hide any relevant activities from our regulators are patently false.

*Id.* at 98. Days later, Elaine Wynn issued a press release related to the allegations in her cross claim. The Company responded with its own press release the next day, stating in relevant part:

> Neither her nor the company's recent filings contain any new facts or revelations, as she so passionately claims. Ms. Wynn's comments regarding our Board of Directors, their independence and their actions in this matter are false. . . .

> Her previous allegations that Mr. Wynn applied company resources for personal use are false; Mr. Wynn's use of company assets is fully audited by both the Board and our external auditors, as well as completely outlined in our proxy statements.

*Id.* at 105. In addition to directly addressing Elaine Wynn's allegations in press releases, the Company also addressed the *Okada* litigation in various SEC filings. For example, in May 2016, the Company filed a quarterly report on Form 10-Q for the first quarter. *Id.* at 106. It referenced the *Okada* litigation and the possibility of "separate investigations" by other regulators, and stated that "the Company believes that it is in full compliance with all applicable laws[.]" *Id.* The SAC alleges that all of these statements are material misrepresentations or omissions.

## B. The Wall Street Journal Article and Other Allegations

On January 26, 2018, the Wall Street Journal published an article revealing allegations of Wynn's sexual misconduct. *Id.* at 121. It stated that "dozens of people . . . who have worked at Mr. Wynn's casinos told of behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn." *Id.* The article revealed that Wynn had paid a Company employee $7.5 million "after being accused of forcing the employee to have sex with him." *Id.* On the day the article came out, the Company's "share price fell $20.31, or 10.12%, to close at $180.29." *Id.* at 122. A few days later, the stock closed at $163.48. *Id.*

In response to the WSJ article, Wynn denied the allegations, stating, "The idea that I ever assaulted any woman is preposterous." *Id.* He further stated, "The instigation of these accusations is the continued work of my ex-wife Elaine Wynn, with whom I am involved in a terrible and nasty lawsuit in which she is seeking a revised divorce settlement." *Id.* The Company also issued a statement in response to the article, stating in relevant part:

> The recent allegations about Mr. Wynn reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with him and the company. It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him. . . .
>
> The Company requires all employees to receive annual anti-harassment training and offers an independent hotline that any employee can use anonymously, without fear of retaliation. Since the inception of the company, not one complaint was made to that hotline regarding Mr. Wynn.

*Id.* at 123-24. The SAC alleges that both statements include material misrepresentations.

In reaction to the WSJ article, analysts speculated that Wynn's departure could be harmful to the Company. *Id.* at 126-28. Previously, the Company had addressed Wynn's importance to the Company in SEC filings stating that his "involvement . . . provides a distinct advantage over other gaming enterprises"; the "loss of [Wynn] could significantly harm our business"; his "talent, image and likeness are key to [the Company's] continued success"; and he has a "unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands." *Id.* at 57, 61-62.

The Company announced Wynn's resignation on February 6, 2018. *Id.* at 130. On February 12, the Las Vegas Metropolitan Police Department announced that in January and February 2018, two women filed reports alleging that Wynn sexually assaulted them in the

1970s. *Id.* at 133.  On the day of that announcement, the Company's share price closed at $169.92, which is a 2% drop compared to the February 9 closing price. *Id.*

### C.  Regulatory Investigations

Soon after the WSJ article, the Massachusetts Gaming Commission's (MGC) Investigations and Enforcement Bureau (IEB) started an investigation "to determine whether Wynn Resorts was qualified to hold a gaming license under Massachusetts law in light of the" recent sexual misconduct allegations. *Id.* at 126.  The Nevada Gaming Control Board (NGCB) also started an investigation. *Id.* at 126.  In 2013, the MGC had "issued a positive determination of suitability" to Wynn Resorts. *Id.* n.15.  Both Nevada and Massachusetts regulate gaming licensees "to ensure that they—as well as their officers, directors, and employees—have the necessary character, qualifications, and integrity to be suitable to hold that privilege so as not to pose a threat to the public or the integrity" of gaming regulation. *Id.* at 16.  Nevada gaming regulators, for example, seek to require that gaming establishments "be operated in a manner suitable to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada." *Id.* at 17 (quoting Nevada Gaming Commission Regulation 5.010).  Unsuitable methods of operations are "grounds for disciplinary action." *Id.* at 18.

### 1.  The NGCB Complaint and Settlement

The NGCB filed a complaint against the Company and an accompanying settlement on January 25, 2019.  *Id.* at 137.  The complaint "listed eight instances of sexual harassment claims by employees against . . . Wynn that were not investigated by the Company, and further stated that at least seven former executives knew of sexual harassment allegations made by female employees and did not investigate." *Id.*  In the settlement, which Maddox signed, the Company admitted many of the allegations in the complaint. *Id.*

### a.  2005 Settlement

The complaint details an allegation from 2005 that Wynn raped an employee and she became pregnant. *Id.*  The employee's managers reported the allegation to the Company's human resources department, and Marc Schorr (former president and COO), Doreen Whennen (former vice president of hotel operations), and Arte Nathan (former senior vice president and chief human resources officer) all knew about the allegation but did not initiate an investigation. *Id.* at 137-38.  Wynn reached a confidential settlement with the employee in which he paid $7.5 million through a separate legal entity funded by him. *Id.* at 138.

### b.  2006 Settlement

According to the NGCB complaint, and as admitted by the Company, another employee accused Wynn "of pressuring her into a nonconsensual sexual relationship that lasted from 2005 through her departure from [the Company] . . . in 2006[.]" *Id.*  Wynn reached a confidential settlement with the employee and her parents for $975,000 in December 2006. *Id.*  Schorr, Nathan, and Kevin Tourek (former vice president and general counsel) knew about these allegations but failed to investigate. *Id.*

### c.  Other Allegations

In 2014, a former employee accused Wynn of sexual misconduct against her that occurred in 2005. *Id.* at 139.  The Company admitted the allegation that Tourek and Maurice Wooden (former president) knew about the allegation. *Id.*  But they did not start an investigation. *Id.*

Also in 2014, three additional employees who worked at the Wynn Encore spa alleged that Wynn sexually harassed them during massages he received in 2014. *Id.*  They reported the

allegations to Wynn management, but the allegations never reached human resources even though they were reported to other management. *Id.*

An employee who worked as a flight attendant with LV Jet, LLC, a wholly owned Wynn subsidiary, wrote a letter to Stephen Wynn in 2016 alleging that he had sexually harassed multiple LV Jet flight attendants. *Id.*  Wynn's personal assistant forwarded the letter to Sinatra and Stacie Michaels (former Wynn general counsel), but they did not report the allegations to human resources or ensure that the allegations were reported according to the Company's policies and procedures. *Id.*

Lastly, the NGCB complaint alleged that Wynn engaged in sexual misconduct against cocktail servers. *Id.* at 140.  An employee allegedly facilitated sexual relationships between Wynn and cocktail servers. *Id.*  Nathan was aware of these rumors but did not investigate them. *Id.*  In 2007, Tourek received an email stating that a former executive "loves sleeping with cocktail servers," but he did not start an investigation. *Id.*

### d.  Admissions and Wynn's Failure to Comply With Policy

The Company admitted that it and its executives failed to investigate in violation of "NRS 463.170(8) and/or Nevada Gaming Commission Regulations 5.010, 5.011(1) and 5.011(1)." *Id.*  It further admitted that these failures were "an unsuitable method of operation" and "grounds for disciplinary action against" the Company. *Id.*

The NGCB complaint also summarized Wynn's failures to comply with the Company's policies. *Id.*  He did not follow policies and procedures applying to Wynn spas and requiring attendance at annual compliance training. *Id.*  He also did not follow policies on conflicts of interests "for several settlements, including, but not limited to, the 2005 Settlement, and the 2006

1  Settlement." *Id* at 141.  The Company failed to ensure compliance with policies, which

2  constituted a violation of Nevada law. *Id.*

3  ### 2.  The MGC Decision and Order

4  On April 30, 2019, the MGC issued its decision and order related to its investigation into

5  the suitability of Wynn MA, LLC and its qualifiers. *Id.* at 146.  The order addressed many of the

6  findings discussed in the NGCB complaint.  It stated that "it is difficult to fathom why the

7  existence of the allegations and settlements was not disclosed to the Commission in 2013 and

8  2014 during the RFA-1 and RFA-2 reviews." *Id.* at 147.  And it noted that Maddox knew about

9  allegations against Wynn once Elaine Wynn filed her 2016 cross claim. *Id.* at 148.  Maddox then

10  asked Sinatra about the details of the settlement, and she told him "that there was a consensual

11  event that occurred between Mr. Wynn and a Company employee around the opening of the

12  Wynn Las Vegas and that the matter . . . had been settled." *Id.* at 148-49.  Maddox "never

13  initiated any sort of investigation or even asked Mr. Wynn himself for an explanation[,]" which

14  the MGC found "difficult to comprehend." *Id.* at 149.

15  The MGC order also discussed a 2008 settlement that the Company reached after another

16  allegation of sexual misconduct against Wynn. *Id.* at 33.  According to the SAC, a previously

17  terminated employee alleged, among other things, that "she had a previous 'intimate

18  relationship' with Mr. Wynn when she was his subordinate at Mirage Resorts." *Id.*  The

19  Company paid $700,000 for the settlement using corporate funds. *Id.*  The SAC alleges that

20  Wynn and Tourek knew about the allegation and settlement, and Sinatra was present at two

21  meetings about it. *Id.*  When Maddox saw the $700,000 settlement on a memo in 2008, "he was

22  told that the payment was paid to a former employee who had fallen on hard times and whom

23

Steve and Elaine Wynn wanted to help." *Id.* at 150.  Maddox "did not pursue the matter further," according to the SAC. *Id.* at 34.

### D.  Relevant Procedural History

Judge Navarro previously dismissed the plaintiffs' first amended complaint, finding that it did not sufficiently allege material misrepresentations. ECF No. 119.  The plaintiffs then filed the SAC, and the defendants now move to dismiss.  The plaintiffs move for leave to file a surreply, and the defendants move for leave to file supplemental authority in support of their motion to dismiss.

## II.  Requests for Judicial Notice

The defendants request that I take judicial notice of 29 exhibits, which they argue are either incorporated by reference into the SAC, public SEC filings, or matters of public record. ECF Nos. 128; 131.  Sinatra requests judicial notice of the April 30, 2019 MGC decision and order and 10 Form 4s filed with the SEC. ECF Nos. 125; 127 at 2.  The plaintiffs do not oppose the defendants' requests for judicial notice and note only that "judicial notice is limited to the existence and terms of the record." ECF No. 146 at 27.  The plaintiffs state that the MGC order, the NGCB complaints, and the NGCB settlement are incorporated by reference into the SAC. ECF No. 146 at 19 & n.7.

### A.  Incorporation by Reference

The defendants argue that exhibits 3-5, 10-14, and 21 are quoted or referenced in the SAC.  These exhibits include: (3) the April 30, 2019 MGC order, (4) a January 28, 2019 Wynn Resorts press release, (5) a February 26, 2019 settlement between the NGCB and Wynn Resorts, (10) a March 28, 2016 Wynn Resorts press release, (11) an April 5, 2016 Wynn Resorts press release, (12) a January 26, 2018 CNN Business article, (13) the March 28, 2016 Elaine Wynn

cross claim filed in the *Okada* litigation in Nevada state court, (14) the WSJ article, and (21) the

Wynn Resorts Code of Business Conduct and Ethics, amended as of August 1, 2016.

A document "may be incorporated by reference into a complaint if the plaintiff refers

extensively to the document or the document forms the basis of the plaintiff's claim." *United*

*States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Under *Ritchie*, "the mere mention of the

existence of a document is insufficient to incorporate the contents of a document." *Khoja v.*

*Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quotation omitted).  Here,

exhibits 3-5, 10-14,[1] and 21 are extensively quoted or referenced in the SAC.  I find that these

documents are incorporated by reference into the SAC.  Additionally, the plaintiffs contend that

the NGCB complaint, NGCB settlement, and NGCB Wynn complaint are incorporated by

reference into the SAC.  The SAC extensively references them, so I consider them incorporated.

**B.  Judicial Notice**

The defendants propose two categories of documents that are judicially noticeable.

Under Federal Rule of Evidence 201(b), courts "may judicially notice a fact that is not subject to

reasonable dispute."  "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or

'can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)(1)-(2)).  Thus, courts "may

take judicial notice of matters of public record," but courts "cannot take judicial notice of

disputed facts contained in such public records." *Id.* (quotation and citation omitted).

Additionally, a court must consider and identify "which fact or facts it is noticing from" a given

document. *Id.*

---

[1] I only incorporate exhibit 12 by reference assuming that it is the same January 26, 2018 CNN article referenced in the SAC. ECF No. 122 at 122 n.14.

First, the defendants argue that exhibits 1, 4, 6, 10-12, 14, and 21 are public news articles, press releases, or trading information.  I have already incorporated exhibits 4, 10-12, 14, and 21, so only exhibits 1 and 6 remain relevant for purposes of judicial notice.  The defendants have not clarified why they seek judicial notice of these documents, or what facts they request that I judicially notice.  They cite case law within the Ninth Circuit, but not *Khoja* or cases coming after *Khoja*, which "aim[ed] . . . to clarify when it is proper to take judicial notice of facts in documents[.]" 899 F.3d at 999.  I deny the defendants' request as to those documents.

Second, they argue that exhibits 14-20 and 22-27 were filed with the SEC and exhibits 2, 7-9, 13, and 28 are publicly filed court documents.  I have incorporated exhibits 13 and 14 into the SAC, so I consider the remaining exhibits: 7-9, 15-20, 22-27, and 28.  Again, the defendants do not explain why they seek judicial notice of these documents or what facts they want judicially noticed.  "Judges are not like pigs, hunting for truffles buried in briefs," so I will not scour the defendants' brief for explanation. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  However, the defendants' motion to dismiss discusses stock trading histories at length in relation to scienter.  I still decline the requests for judicial notice as to documents relevant to stock trading histories because even if I consider them, they do not impact the scienter analysis, as discussed below.  I deny the defendants' request for judicial notice as to these documents.  For the same reason, I also deny Sinatra's request for judicial notice of the same type of documents.

## III.  Motions to Dismiss

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" related to the purchase or sale of securities when that use violates the regulations promulgated by the SEC. 15 U.S.C. § 78j(b).  Under SEC Rule 10b-5, it is unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material

1  fact necessary in order to make the statements made, in the light of the circumstances under

2  which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  "To recover damages for

3  violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material

4  misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

5  misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

6  misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v.*

7  *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quotation omitted).

8       At the pleading stage, a complaint alleging violations of Section 10(b) must meet the

9  heightened pleading requirements for fraud claims under Federal Rule of Civil Procedure 9(b)

10  and the "exacting pleading requirements" of the Private Securities Litigation Reform Act

11  (PSLRA). *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quotation

12  omitted).  Rule 9(b) requires that the complaint "state with particularity the circumstances

13  constituting fraud." Fed. R. Civ. P. 9(b).  The PSLRA requires that the complaint "state with

14  particularity facts giving rise to a strong inference that the defendant acted with the required state

15  of mind." 15 U.S.C. § 78u-4(b)(2)(A).

16       **A.  Material Misrepresentations or Omissions**

17       The defendants argue that the plaintiffs failed to plead any actionable false statement

18  because the alleged misrepresentations are inactionable puffery or are not pleaded with

19  particularity.  "An actionable material misrepresentation or omission has two components."

20  *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d

21  1268, 1274 (9th Cir. 2017).  First, the complaint must "specify each statement alleged to have

22  been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–

23  4(b)(1).  "Second, applying an objective standard, that misrepresentation or omission must have

1  been material to investors." *Retail Wholesale*, 845 F.3d at 1274 (citing 15 U.S.C. § 78u–

2  4(b)(1)(A)–(B)).  A misrepresentation or omission is material when "there is a substantial

3  likelihood that [it] would have been viewed by the reasonable investor as having significantly

4  altered the total mix of information made available for the purpose of decisionmaking by

5  stockholders concerning their investments." *Id.* (quotation omitted).

6         The defendants primarily argue the plaintiffs have not adequately alleged that the

7  statements were false or misleading.  "Falsity is alleged when a plaintiff points to defendant's

8  statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at

9  1008.  And a "statement is misleading if it would give a reasonable investor the impression of a

10  state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale*,

11  845 F.3d at 1275 (quotation omitted).

12         There are seven categories of alleged misrepresentations or omissions.

13                    **1.  Responses to the WSJ Article**

14         The plaintiffs allege that Wynn's and the Company's responses to the WSJ article are

15  material misrepresentations.  First, Wynn stated, "The idea that I ever assaulted any woman is

16  preposterous." ECF No. 122 at 122.  Wynn argues that this statement is not false because he is

17  not required to admit wrongdoing and none of the accusations against him have been proven

18  true.  However, the statement would give a reasonable investor the impression that the

19  allegations against Wynn were "preposterous," when the SAC alleges several instances of sexual

20  assault by Wynn.  Taking the allegations in the SAC as true, the plaintiffs have sufficiently

21  alleged the falsity of the statement at this stage.  I deny Wynn's motion on this basis.

22         Second, the Company's response cast the allegations as part of a "negative public

23  relations campaign" by Elaine Wynn:

1
2
3

The recent allegations about Mr. Wynn reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with him and the company. It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him.

4  *Id.* The plaintiffs assert that this statement is attributable to Wynn, Sinatra, and Maddox. The

5  defendants argue that the statement is puffery and not capable of objective verification. They

6  further argue it is not false because it did not deny the misconduct described in the WSJ article.

7  At this early stage, the plaintiffs have sufficiently alleged the falsity of this statement because a

8  reasonable investor would get the impression that the allegations are false and fabricated by

9  Elaine Wynn as part of her "negative public relations campaign" to "tarnish" Stephen Wynn's

10 reputation and "pressure a revised divorce settlement from him." The SAC alleges that a

11 materially different state of affairs existed because the Company had received multiple

12 complaints about Wynn's sexual misconduct by that point and various Company executives were

13 aware of that. I thus deny the defendants' motion to dismiss on this basis.

14 Third, the Company's response described a reporting hotline available to Company

15 employees: "The Company requires all employees to receive annual anti-harassment training and

16 offers an independent hotline that any employee can use anonymously, without fear of

17 retaliation. Since the inception of the company, not one complaint was made to that hotline

18 regarding Mr. Wynn." *Id.* at 124. The defendants argue it is true that the Company had a hotline

19 that any employee could use anonymously. But the SAC alleges that according to the IEB

20 report, while a hotline did exist the instructions for it "focused on the reporting of financial and

21 accounting misinformation and misconduct under the Sarbanes-Oxley Act, and did not direct

22 employees to utilize the hotline for reports of sexual harassment." *Id.* at 125. Moreover, the IEB

23 report states that "[a]fter the publication of the WSJ article, the Company re-wrote the

instructions for the hotline to include instructions for the reporting of sexual harassment." *Id.* The plaintiffs have sufficiently alleged that this statement is false. It gives a reasonable investor the impression that a specific process for reporting sexual misconduct on the hotline existed "[s]ince the inception of the company," even though the SAC alleges the hotline was for reporting financial misinformation. It also gives the impression that the Company received no documented sexual misconduct complaints about Wynn through this supposedly established mechanism for receiving such complaints, when according to the SAC, the Company received multiple sexual misconduct complaints against him. I therefore deny the defendants' motions to dismiss as to these statements.[2]

### 2. Responses to the Allegations in Elaine Wynn's Cross Claim

The plaintiffs allege that the defendants made material misrepresentations in response to Elaine Wynn's cross claim in the *Okada* litigation and her press release regarding the same. The plaintiffs assert that the misrepresentations are attributable to the Company, Wynn, Maddox, Sinatra, and Cootey. I divide the statements into three actionable categories: denials of Elaine Wynn's allegations, the use of Company assets, and the Company's full disclosure to regulators.

First, the statements include broad denials of the cross claim allegations. This includes statements such as, "Ms. Wynn's allegations regarding our Board, its composition and its independence are simply not true and are rehashed from her previous, unfounded statements made during her proxy campaign." *Id.* at 97. And, "Neither her nor the company's recent filings

---

[2] The defendants appear to argue that because the WSJ article was public, they cannot be liable for omitting information about the allegations in their response to it. But their response included affirmative misrepresentations giving investors the impression that the allegations were fabricated by Elaine Wynn and that the Company never received a complaint about Wynn on its hotline meant for sexual misconduct complaints. The defendants' argument is undeveloped, and the only case they cited is not on point.

contain any new facts or revelations, as she so passionately claims.  Ms. Wynn's comments

regarding our Board of Directors, their independence and their actions in this matter are false."

*Id.* at 105.  The defendants contend that these statements are too vague to be false and do not

explicitly address Stephen Wynn's misconduct.  But the SAC has sufficiently pleaded the falsity

of these statements at this early stage.  While the statements do not explicitly refer to Wynn's

alleged sexual misconduct, they refer generally to Elaine Wynn's "allegations regarding [the]

Board," of which Stephen Wynn was the chairman.  And they refer generally to Elaine Wynn's

"recent filings" and "comments regarding our Board of Directors."  These statements would give

a reasonable investor the impression that the Company denied all of Elaine Wynn's allegations,

which addressed Stephen Wynn's "serious misconduct" against an employee and a resultant

multi-million dollar settlement.  The SAC alleges that in reality, by the time this statement was

made, the Company had received multiple complaints about Wynn's sexual misconduct, and

multiple Company executives knew about it.  I therefore deny the defendants' motion to dismiss

on this basis.

Second, the Company made statements about the use of Company assets.  One press

release stated, "Her allegations regarding the use of company assets are without merit." *Id.* at 98.

The other press release stated, "Her previous allegations that Mr. Wynn applied company

resources for personal use are false; Mr. Wynn's use of company assets is fully audited by both

the Board and our external auditors, as well as completely outlined in our proxy statements." *Id.*

at 105.  Taking the SAC's allegations as true, the plaintiffs have sufficiently pleaded the falsity

of these statements.  According to the SAC, a former employee alleged in part that "she had a

previous 'intimate relationship' with Mr. Wynn when she was his subordinate at Mirage

Resorts," and the Company reached a settlement with her for $700,000 paid with corporate

1  funds. *Id.* at 33.  The defendants argue that no investor would infer anything related to the 2008

2  settlement because Elaine Wynn's cross claim referred to the 2005 settlement, but Stephen Wynn

3  allegedly used Company funds for the 2008 settlement.  This argument is unconvincing because

4  the challenged statements give reasonable investors the impression that Stephen Wynn did not

5  use Company resources for his personal use, but at this stage, the SAC adequately alleges that he

6  did.  I thus deny the defendants' motion to dismiss as to this set of statements.

7       Third, the Company's press release discussed the Company's full disclosure to

8  regulators: "Allegations made by Ms. Wynn that the company would hide any relevant activities

9  from our regulators are patently false." *Id.* at 98.  The defendants contend the plaintiffs have not

10  shown that the relevant defendants knew in March 2016 that the misconduct allegations should

11  have been disclosed to the MGC.[3]  But the statement is false, for purposes of the motions to

12  dismiss.  It denies that "that the company would hide any relevant activities from [its]

13  regulators," but the SAC adequately alleges that the Company did not disclose Wynn's alleged

14  misconduct to regulators, even when the MGC emailed Sinatra and others to ask for documents

15  involving "the high profile issues that Mr. Wynn and WR are dealing or have dealt with in the

16  past.  These matters may involve litigation and personal relationships as well as business

17  matters." ECF No. 133-3 at 19.  The MGC's email further stated that "any, or all, of them may

18  be viewed as suitability related issues." *Id.*  The SAC's allegations, taken as true, further show

19  that several executives at the Company knew about Wynn's alleged misconduct but did not

20

21

22

23
[3] The defendants also point out that according to the MGC order, Tourek "spoke with Chair A.G.
Burnett of the [NGCB] about [Elaine Wynn's] cross-claim" before it was filed, but that is vague
and does not mean the Company properly disclosed the allegations. *Id.* at 32.  Moreover, the
MGC order states that the Company did not report the cross claim to the MGC. *Id.* at 173.

1  disclose it.[4] *See, e.g.,* ECF No. 122 at 49, 51-52, 137-140.  I have considered the defendant's

2  additional arguments and they do not change the outcome.  The plaintiffs' allegations are

3  sufficient at this early stage, so I deny the defendants' motion to dismiss on this basis.

4        Last, the defendants argue that other statements in the press releases are too general to be

5  false.  For example, the Company stated that "[n]one of what Wynn Resorts has accomplished

6  would be possible without its extraordinary employees and the sense of family and community

7  that Mr. Wynn has created." *Id.* at 98.  These statements are not actionable because they are not

8  capable of being objectively false.  I grant the defendants' motion with respect to these

9  statements.

10             **3. Code of Conduct**

11        The plaintiffs allege that several statements in or regarding the Company's code of

12  conduct are material misrepresentations.  The Company's code opened with a letter from Wynn

13  stating that "[o]ur goal is not just to comply with the laws, rules and regulations that apply to our

14  business; we also continuously strive to abide by high standards of ethical business conduct." *Id.*

15  at 41.  The letter also states that the code "is not to be ignored or taken lightly.  All employees,

16  officers and directors, agents and representatives of Wynn Resorts and its affiliates must comply

17  with the Code," which was "important[t] to the success of the Company." *Id.*  The code states

18  that "[h]arassment or discrimination of any sort will not be tolerated[,]" and "[i]f you know of or

19  suspect a violation of applicable laws, rules or regulations, the Code, or the Company's related

20  policies, you must immediately report that information as described in Section 1.4 of this Code."

21  *Id.* at 46-47.  "All reported violations of the Code will be taken seriously and promptly

22

23  [4] The defendants' argument about their mental states in making the statements appears more relevant to scienter.  As explained below, I have concluded that there is a strong inference of scienter as to each defendant who made these statements.

1   investigated," and "[t]he Company intends to use every reasonable effort to prevent the

2   occurrence of conduct not in compliance with the Code and to halt any such conduct that may

3   occur as soon as reasonably possible after its discovery." *Id.*[5]  Additionally, a 2013 10-K states

4   that the code is "applicable to all directors, officers and employees," and "[i]n the event we

5   determine to amend or waive certain provisions of this code of ethics, we intend to disclose such

6   amendments or waivers on our website." *Id.* at 59.  10-Ks from subsequent years also made this

7   statement. *Id.* at 74, 86, 109.

8        The plaintiffs allege that these statements are misrepresentations because the Company

9   did not apply these policies to Wynn's alleged misconduct.  They further allege that Wynn's

10  statement about the code's importance was misleading because he considered the code

11  "counterintuitive" to "good management" of the Company, did not apply the code's policies to

12  his alleged misconduct, and wanted to change the code to allow relationships between employees

13  and supervisors.  The defendants contend the statements are not actionable because they are

14  aspirational and not materially false.

15       The statements involving the code of conduct are not actionable because they are

16  aspirational, and even if there were any affirmative misrepresentation, it could not be material.

17  Aspirational statements in a code of conduct are not misleading. *Retail Wholesale*, 845 F.3d at

18  1276.  And the statements are not material because "[i]t cannot be said that there is a substantial

19  likelihood that the [code] and related representations altered the total mix of information made

20

21  ─────────────────────────
    [5] The SAC alleges that the NGCB complaint described a Company policy supplementing the

22  code, which covered sexual harassment, a personal relationships policy, and how to investigate
    violations. *Id.* at 47-48.  However, the defendants argue that this sexual harassment policy "is not

23  public or otherwise published for investors to read." ECF No. 128 at 14 n.7.  The plaintiffs do
    not dispute that point, so I will not consider statements from the separate sexual harassment
    policy because the statements were not available to investors.

available for use in stockholder decisionmaking." *Id.* at 1277 (quotation omitted).  I grant the

defendant's motion to dismiss with respect to these statements.

### 4.  Statements Regarding Full Compliance With All Applicable Laws

In SEC filings, the Company addressed the *Okada* litigation and its belief "that it is in

full compliance with all applicable laws":

> Other regulators may pursue separate investigations into Wynn Resorts' compliance with
> applicable laws arising from the allegations in the matters described above and in
> response to the Counterclaim and other litigation filed by Mr. Okada suggesting
> improprieties in connection with Wynn Resorts' donation to the University of Macau.
> While Wynn Resorts believes that it is in full compliance with all applicable laws, any
> such investigations could result in actions by regulators against Wynn Resorts.

ECF No. 122 at 63.  The plaintiffs contend this statement includes a material omission and

"created a false impression that Defendants were 'in full compliance with all applicable laws.'"

*Id.* at 64.  The plaintiffs assert that the statement failed to disclose that the Company knowingly

failed to investigate and report allegations of sexual misconduct.  The defendants argue this

omission theory fails because the statements "have nothing to do with Mr. Wynn," so a duty to

disclose did not arise. ECF No. 157 at 11.  They further argue that the statement only refers to

the *Okada* litigation, to which the plaintiffs respond that at a minimum, the same statements

issued after Elaine Wynn's 2016 cross claim could be interpreted as applying to the misconduct

she alleged.

When proceeding under an omission theory, "[t]he investor must identify particular (and

material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did

or did not conduct or the knowledge it did or did not have—whose omission makes the opinion

statement at issue misleading to a reasonable person reading the statement fairly and in context."

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194

(2015).[6]  "[T]he complaint must . . . call into question the issuer's basis for offering the opinion." *Id.*  Under the Ninth Circuit's standard, which is "substantively similar[,]" plaintiffs may establish falsity if "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (citation omitted).

The challenged statement is not "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.  In context, the statement does not give the impression that the Company is in full compliance with all laws generally because it is specifically discussing the *Okada* litigation.  As to the plaintiffs' argument that these statements were at least misleading once the cross claim was filed, they are still not misleading because they refer only to "the Counterclaim and other litigation filed by Mr. Okada suggesting improprieties in connection with Wynn Resorts' donation to the University of Macau." ECF No. 122 at 63.  I grant the motion to dismiss with respect to these statements.

### 5.  Statements Regarding Regulatory Risks

The plaintiffs allege that in statements describing the consequences of violating gaming laws, the defendants "failed to disclose that Wynn had already engaged in a pattern of sexual misconduct that violated those laws." ECF No. 146 at 43.  The defendants argue that the statements are inactionable because none of them "warranted anything about Mr. Wynn's conduct or the Company's compliance with gaming regulations." ECF No. 128 at 15.

The challenged statements are not actionable because the alleged omission does not make the statements misleading.  Federal securities laws require disclosure of material information

---

[6] *Omnicare*'s reasoning applies to "the falsity pleading standard for Section 10(b) claims based on opinion statements." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).

1   "only when necessary 'to make . . . statements made, in the light of the circumstances under

2   which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44

3   (2011) (quoting 17 C.F.R. § 240.10b–5(b)).  The statements merely describe possible measures

4   regulators could take if they determine that the Company violated a regulation, so the omission

5   of Wynn's alleged pattern of misconduct does not make the statements misleading.  I therefore

6   grant the defendants' motion to dismiss on this basis.

### 6. Statements Regarding Wynn's Skills and Possible Departure

8        The plaintiffs further assert that the defendants made misleading statements related to

9   Wynn's skills, unique value, and possible departure because they omitted "the huge liability

10  posed by his alleged misconduct." ECF No. 146 at 45.  The alleged false statements describe his

11  "vision, direction, and the public's association of his name and likeness with [the] casino" as

12  "integral components of [the Company's] success." ECF No. 122 at 61.  Additional statements

13  describe his "unique blend of . . . skills required to be successful in gaming and certain

14  regulatory and other extraordinary demands," and state that "[t]he loss of Stephen A. Wynn

15  could significantly harm [the Company's] business." *Id.* at 57, 62.  The defendants argue that it is

16  true that Wynn was important to the Company and the statements did not imply that Wynn had

17  not engaged in misconduct.

18       The challenged statements are not misleading.  In *Berson v. Applied Signal Technology,*

19  *Inc.*, the defendants touted a backlog of uncompleted contracts even though it contained delayed

20  work "at serious risk of being cancelled altogether." 527 F.3d 982, 986 (9th Cir. 2008).  While

21  the statement referenced the customers' rights to cancel or modify contracts, it was misleading

22  because it spoke "entirely of as-yet-unrealized risks and contingencies" and did not "alert[ ] the

23  reader that some of these risks may already have come to fruition." *Id.*  Here, the challenged

1  statements only describe Wynn's value and possible departure in a general manner and did not

2  create a duty to disclose his alleged misconduct.  There is no suggestion that he did not engage in

3  misconduct that would pose a risk to his ability to stay at the Company.  I therefore grant the

4  defendants' motion to dismiss as to these statements.[7]

### 7.  Statements Regarding Corporate Culture and Other Topics

6        Last, the plaintiffs allege that statements regarding corporate culture are misleading.

7  These statements refer to topics such as the Company's commitment to diversity and Wynn's

8  comfort with the Company's "pace of . . . growth" in Massachusetts. ECF No. 122 at 80, 116.

9  The defendants argue that these statements are puffery, and I agree.  I grant the defendants'

10  motion to dismiss on this basis.

### B.  Whether the Post-Purchase Statements Are Actionable

12        The defendants argue that even if the statements in response to the WSJ article were

13  false, they are not actionable because they were made after the plaintiffs had purchased their

14  shares in the Company.  They argue that because reliance on a misstatement in connection with a

15  purchase or sale of securities is an element of a Rule 10b-5 claim, actionable statements must

16  occur before investors purchase the securities.  The plaintiffs respond that the post-purchase

17  statements are actionable because they are suing "on behalf of a class of purchasers allegedly

18  defrauded over a period of time by similar misrepresentations." ECF No. 146 at 38.  They

19  contend that the Company's "January 2018 denials continued the same theme as the 2016 Press

20  Releases disputing the credibility of allegations of misconduct as being instigated by Elaine

21  Wynn to gain an unfair edge in her divorce." *Id.* at 37.

22

23  _____

[7] The defendants also argue that the statements regarding Wynn's possible departure are forward-looking and thus protected by the PSLRA's safe harbor provision.  Given my conclusion that the statements are not misleading, I need not consider that argument.

1    "As a matter of law, conduct actionable under Rule 10b–5 must occur before investors

2    purchase the securities." *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999) (quotation

3    omitted).  But when the alleged misrepresentations are part of a "common course of conduct,"

4    "the questions common to all investors will be relatively substantial." *Blackie v. Barrack*, 524

5    F.2d 891, 902-03 (9th Cir. 1975) (quotation omitted).  A "common course of conduct" is alleged

6    where "misrepresentations are interrelated, interdependent, and cumulative." *Id.* at 903

7    (quotation omitted).  For example, "the test is more than satisfied when a series of financial

8    reports uniformly misrepresent a particular item in the financial statement." *Id.*

9    At this early stage, the plaintiffs have sufficiently alleged that the 2018 statements were

10   part of a common scheme.  They have alleged that the 2018 and 2016 statements deny some of

11   the same misconduct allegations by portraying them as fabricated by Elaine Wynn.  The issue

12   raised by the defendants may be more relevant at the class certification stage, and if so, it can be

13   addressed at that time by naming an additional plaintiff.  But at this stage, I deny the defendants'

14   motion to dismiss on this basis.

15   **C.  Whether the Defendants Are the Maker of a Statement**

16   The defendants next argue the SAC does not allege that any individual defendant was the

17   maker of a statement under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135

18   (2011), because the SAC does not allege with specificity that any individual defendant had

19   ultimate authority over a statement.  The plaintiffs respond that defendants Wynn Resorts, Wynn,

20   Sinatra, and Maddox are liable for the statements in the 2016 press releases and the response to

21   the WSJ article.  The plaintiffs assert that Cootey is also liable for the 2016 press releases.  They

22   argue that the SAC sufficiently alleges that these defendants were senior executives involved in

23

day-to-day affairs, their statements responded to allegations made against Wynn, Sinatra, and the Company, and Sinatra played a significant role in drafting these statements.

In *Janus*, the Supreme Court held that a person can be held liable under Section 10(b) of the Exchange Act only if he or she is the "maker of a statement." *Id.* at 142-43. "[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." *Id.* at 143. "One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 143-44.

For purposes of the motions to dismiss, the SAC sufficiently alleges that Wynn, Sinatra, and Maddox made the Company's statements in the response to the cross claim and WSJ article, and Cootey also was a maker of the Company's statements in response to the cross claim. The SAC alleges that these defendants were among the Company's most senior executives, were involved in the Company's day-to-day affairs, and "were provided with copies of the Company's SEC filings and press releases . . . prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected." ECF No. 122 at 12, 159, 163, 166, 169. Attribution to these defendants is also implicit from the circumstances because the statements directly responded to allegations against the Company, Wynn, and Sinatra. As to Cootey, he was the CFO when the 2016 press releases also responded to allegations of improper use of corporate assets. Therefore, I deny the defendants' motions to dismiss on this basis.

As to Wynn's statement in which he separately responded to the WSJ article, the SAC sufficiently alleges that Wynn made the statement, but it does not sufficiently allege that Sinatra and Maddox were makers of that statement. His statement was written using the first person, and

1    it is not plausible from the SAC's allegations that Maddox and Sinatra would have authority over

2    the content of Wynn's own statement refuting misconduct allegations against him.  The

3    allegation that Sinatra was involved in its preparation is not enough to render her a maker of the

4    statement.  The SAC alleges that the Company gave Wynn's statement to the WSJ and that

5    Company employees participated in drafting it, so the SAC sufficiently alleges that the Company

6    also made the statement because Wynn had apparent authority to make it. *See Glickenhaus &*

7    *Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) ("Nothing in *Janus* undid the

8    long-standing rule that [a] corporation is liable for statements by employees who have apparent

9    authority to make them." (quotation omitted)).  For similar reasons, the Company is also liable as

10   a maker of the other statements at issue.  I thus grant in part the defendants' motions in that the

11   SAC does not sufficiently allege that Sinatra and Maddox were makers of Wynn's response to

12   the WSJ article, but I deny the motions with respect to the other statements.[8]

13       **D.  Scienter**

14       The defendants argue that the plaintiffs fail to plead scienter.  Plaintiffs "must prove that

15   the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or

16   defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quotation

17   omitted).  To show that a defendant acted with scienter, "a complaint must allege that the

18   defendants made false or misleading statements either intentionally or with deliberate

19   recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as*

20   *amended* (Feb. 10, 2009) (quotation omitted).  "'[D]eliberate recklessness' is more than

21   '*mere* recklessness or a motive to commit fraud.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414

22

23   [8] The plaintiffs argue that even if Sinatra was not the maker of a statement, she is still liable under Rules 10b-5(a) and (c).  However, Sinatra and the defendants moved to dismiss only the plaintiffs' Rule 10b-5(b) claims, so I do not consider the plaintiffs' argument.

27

(9th Cir. 2020) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)).
Rather, "deliberate recklessness is an *extreme* departure from the standards of ordinary care . . .
which presents a danger of misleading buyers or sellers that is either known to the defendant or
is so *obvious* that the actor must have been aware of it." *Schueneman*, 840 F.3d at 705 (quotation
omitted).

Under the PSLRA, the plaintiffs must "state with particularity facts giving rise to a strong
inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).
This "strong inference" requirement "is an exacting pleading obligation." *Nguyen*, 962 F.3d at
414 (quotation omitted).  Under this standard, "a complaint will survive a motion to dismiss
'only if a reasonable person would deem the inference of scienter cogent and at least as
compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting
*Tellabs*, 551 U.S. at 324).  To assess whether the SAC meets this standard, I "must ask: When
the allegations are accepted as true and taken collectively, would a reasonable person deem the
inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.
Because only two sets of misrepresentations remain, I address only the relevant allegations of
scienter.

### 1.  Allegations Regarding the Defendants' Awareness of the Alleged Misconduct

The plaintiffs allege that Wynn, as the alleged perpetrator, knew about his own conduct.
They also allege that Maddox, Sinatra, and Cootey knew about at least some of Wynn's alleged
misconduct.

/ / / /

/ / / /

### a. Wynn

The SAC pleads a strong inference of Wynn's scienter.  He allegedly engaged in the sexual misconduct at the center of the alleged fraud, and most of the misconduct alleged by the SAC happened long before the 2016 press releases.  The SAC alleges that he knew or recklessly disregarded that he and the Company did not investigate his alleged misconduct and instead concealed it. ECF No. 122 at 160.  The SAC further alleges that his actions violated the Company's code of conduct and gaming regulations on suitability. *Id.*  To settle some of the allegations, Wynn allegedly obtained assistance from lawyers, created an entity to make settlement payments, and paid settlements that sometimes used his personal funds. *Id.*  It is reasonable to infer that Wynn knew about or recklessly disregarded the Company's failure to investigate and disclose the alleged misconduct to regulators, given his status as Wynn Resorts' co-founder, CEO, and chairman of the board. *Id.* at 159.  The Company was "founder-led." *Id.* The SAC thus pleads a strong inference of scienter as to Wynn.

### b. Maddox

The SAC also pleads a strong inference of scienter as to Maddox.  It alleges that he was aware of or recklessly disregarded allegations of Wynn's sexual misconduct and the Company's failure to investigate and disclose the allegations.  First, in 2008 or 2009, when Maddox was the CFO, he saw and asked about an entry on a quarterly disbursement memo statement showing a $700,000 payment using Company funds that was identified as a legal settlement payable to a specific law firm. *Id.* at 34, 150, 167.  According to the MGC order, Maddox "was told" that Wynn and Elaine Wynn "wanted to help out a struggling employee," and Maddox "did not pursue the matter further." *Id.* at 34, 150.

Second, the SAC relies on the MGC order to allege that in 2014 or 2015, Wooden (then the Company's president) told Maddox that "employees in the spa were uncomfortable by a request from Mr. Wynn for a sensual massage." *Id.* at 149.  Wynn allegedly made this request "in the lead-up to a couple's massage planned for Mr. Wynn and his wife." *Id.*  Maddox was confused because "he did not know the meaning of 'sensual massage'" and "never imagined that any sort of misconduct could be involved." *Id.*  Maddox handled this matter by telling Wooden to directly tell Wynn "that people were uncomfortable so 'knock it off.'" *Id.*

Third, the SAC alleges that once Elaine Wynn filed her *Okada* cross claim, Maddox knew about the 2005 settlement and Wynn's underlying alleged misconduct.  According to the SAC, he "did not pursue the matter beyond obtaining Ms. Sinatra's summary of the facts." *Id.* at 31.  These allegations establish a strong inference of Maddox's scienter in making the statements in response to Elaine Wynn's cross claim and the WSJ article.  His scienter as to the response to the WSJ article is further supported by the allegation that in 2017, while preparing for his *Okada* deposition, he allegedly "learned that a separate matter in 2005 may have involved some type of assault" but "concluded that this characterization was likely just an aggressive litigation tactic." *Id.* at 151.

### c. Sinatra

The plaintiffs allege a strong inference of Sinatra's scienter.  They assert that she was involved in concealing allegations against Wynn. *Id.* at 163.  She allegedly discussed the 2005 settlement and allegations with Elaine Wynn in 2009, attended two meetings regarding the 2008 settlement in which the Company paid $700,000 to a previously terminated employee who alleged she had an "intimate relationship" with Wynn, and received a copy in 2014 of the Abbott memorandum describing a former cocktail waitress's allegation that Wynn raped her in 2005. *Id.*

at 163-64.  In 2016, she allegedly described the 2005 settlement to outside counsel as "old and cold" and a "one-off." *Id.* at 31.  The SAC alleges that Sinatra never disclosed to the MGC what she knew about the allegations even though she "was intimately involved in the licensing process" as the general counsel and a qualifier for the 2013 Massachusetts gaming license. *Id.* at 147.[9]  The plaintiffs have pleaded a strong inference that Sinatra knew about Wynn's alleged misconduct long before she made the two sets of statements at issue.

### d. Cootey

The SAC's allegations as to Cootey's awareness of the alleged misconduct are not as strong but are still sufficient to plead a strong inference of scienter.  The SAC alleges that in 2014—while Cootey was the CFO, senior vice president, and treasurer—the Company paid a $9,000 settlement to a terminated cocktail server after she told the Company's outside counsel that Wynn raped her in 2005. *Id.* at 34.  The SAC also asserts that "numerous incidents of sexual assault" by Wynn "were alleged prior to and while Cootey was employed at the Company, including as CFO." *Id.* at 170.  Lastly, the SAC alleges that Cootey knew about or recklessly disregarded the settlements and allegations once Elaine Wynn filed her cross claim.  It is reasonable to infer that Cootey, as CFO, was at least deliberately reckless in disregarding Wynn's alleged misconduct by immediately making a statement publicly denying that misconduct and then denying it again days later.  The inference that Cootey knew about or was deliberately reckless in disregarding the allegations when he made the statements is at least as

---

[9] Sinatra argues that the MGC order shows she was not a qualifier, but she does not cite or quote where the order explained that.  In fact, the MGC order states that "[v]arious individuals, including but not limited to Mr. Wynn, Ms. Wynn, and Ms. Sinatra, . . . filed RFA-1 applications as individual qualifiers based upon their roles in Wynn Resorts, Limited." ECF No. 133-3 at 8.  Moreover, I must take the plaintiffs' allegations as true while considering competing plausible inferences.

1  compelling as the inference that he denied the allegations because he believed the summary of

2  events likely available to him without an investigation—Sinatra's description of the incident as

3  an outlier and consensual. *See id.* at 148-49.  The SAC supports a strong inference of Cootey's

4  scienter.

5          **e.  Whether Awareness of Elaine Wynn's Cross Claim Can Support
                an Inference of Scienter**

6

7          The defendants argue that awareness of Elaine Wynn's cross claim cannot support

8  scienter because it was public and contained only allegations.  This argument is mainly relevant

9  to Cootey and Maddox because the SAC adequately alleges that Wynn and Sinatra were already

10  aware of the sexual misconduct allegation described in the cross claim.  In making this argument,

11  the defendants rely on case law that does not appear relevant.  The defendants suggest that the

12  public nature of the cross claim's allegations weakens an inference of scienter, but the

13  misleading statements at issue publicly refuted those allegations.

14          The defendants' argument that the cross claim cannot support scienter because it

15  contained only "unproven allegations" similarly fails.  The plaintiffs are not relying on the cross

16  claim to establish, for example, that Wynn sexually assaulted an employee in 2005.  Rather, the

17  plaintiffs allege that the cross claim, at a minimum, informed the defendants about the

18  allegations against Wynn, and the defendants misleadingly responded to those allegations by

19  denying them.  Accordingly, the defendants' argument fails.

20          **2.  Stock Trading**

21          The plaintiffs allege that insider trading by Sinatra and Maddox supports an inference of

22  scienter.  The SAC alleges that between 2014 and 2017, Sinatra's stock sales amounted to over

23  $16 million and Maddox's to over $32 million. *Id.* at 165, 168.  Maddox argues that his trading

1 history actually negates an inference of scienter, and Sinatra argues that her trading history

2 shows that the class period sales were not suspicious.

3       "Unusual or suspicious stock sales by corporate insiders may constitute circumstantial

4 evidence of scienter." *In re Quality Sys.*, 865 F.3d at 1146.  I must consider three factors: "(1) the

5 amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior

6 trading history." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232

7 (9th Cir. 2004).

8       The plaintiffs list several trades made by Sinatra and Maddox but do not include their

9 prior trading histories.  Now that the defendants have requested judicial notice of documents

10 showing their trading histories, the plaintiffs argue that these histories support scienter.

11      The trading by Maddox and Sinatra does not support an inference of scienter but does not

12 negate scienter.  Maddox and the plaintiffs have not sufficiently developed their arguments.

13 "[J]udges need not paw over the files without assistance from the parties." *Orr v. Bank of Am.,*

14 *NT & SA*, 285 F.3d 764, 775 (9th Cir. 2002) (quotation omitted).  The plaintiffs have not shown

15 that the trades were inconsistent with the trading histories, and Maddox has not shown that his

16 trading negates an inference of scienter.  As to Sinatra, her class period trading does not appear

17 to be inconsistent with her prior trading history, but she provided only trading volumes without

18 pricing information.

19             **3.  Collective Analysis**

20      Considering the allegations collectively, the plaintiffs have pleaded a strong inference of

21 scienter as to Wynn, Maddox, Sinatra, and Cootey.  At this stage, the plaintiffs have sufficiently

22 alleged that Wynn, Maddox, Sinatra, and Cootey were aware of information contradicting their

23

statements that denied misconduct allegations.[10]  The inference that these defendants were aware of Wynn's alleged misconduct at the time of their statements is cogent and compelling.  Less compelling are the defendants' preferred inferences: that Wynn, Sinatra, Maddox, and Cootey did not know about any alleged misconduct, even after they became aware of the Elaine Wynn cross claim, or that they simply did not know that these allegations needed to be disclosed despite years of experience as high-level casino executives and their status as qualifiers[11] before gaming regulators.

Similarly, Wynn's preferred inference does not prevail.  He argues it is more plausible to infer that he "sought to resolve serious potential claims made against him in order to eliminate the distraction that allegations of that nature would necessarily entail, and so that he could continue about the business of running a successful company." ECF No. 140 at 16.  It is at least as compelling to infer that he wanted to "eliminate the distraction" of allegations and "continue about the business of running" the Company, and in doing so, he sought to conceal and avoid disclosure of the allegations to eliminate distractions such as bad press, regulatory investigations, and civil lawsuits.

### 4. The Company's Scienter

Because the SAC alleges a strong inference of scienter as to Wynn, Sinatra, Maddox, and Cootey for the respective statements made by each of them, the plaintiffs have adequately alleged the Company's scienter.  Wynn was the CEO and chairman of the board; Sinatra was

---

[10] The plaintiffs additionally allege that the defendants' senior positions, core operations, departures, and motives to commit fraud support an inference of scienter, and the defendants oppose.  I have considered all of these allegations and arguments.  The SAC has adequately alleged that Wynn was motivated to conceal the allegations against him.  The other allegations are either too generalized or only sufficient for a weak inference of scienter at most.

[11] It is unclear which defendants were qualifiers, but according to the MGC order, at least Wynn and Sinatra were qualifiers at the time the statements at issue were made. ECF No. 133-3 at 8.

1  executive vice president, general counsel, and secretary of the board; Maddox was president; and

2  Cootey was CFO, senior vice president, and treasurer.  These senior positions are adequate to

3  impute the scienter of these defendants to the Company. *See In re ChinaCast Educ. Corp. Sec.*

4  *Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("In the context of Rule 10b–5, we have adopted the

5  general rule of imputation and held that a corporation is responsible for a corporate officer's

6  fraud committed within the scope of his employment or for a misleading statement made by an

7  employee or other agent who has actual or apparent authority." (quotation omitted)).  I thus deny

8  the defendants' motions to dismiss on scienter grounds.

9      **E.  Loss Causation**

10      Finally, the defendants argue that the plaintiffs have not properly pleaded loss causation

11  for several reasons.  They primarily contend that the plaintiffs' factual allegations are

12  insufficient, the 2018 articles revealed misconduct allegations rather than fraud, and investors

13  reacted to the impact of Wynn's alleged misconduct not to the Company's alleged fraud.  The

14  plaintiffs respond that the January 26, 2018 WSJ article and February 2018 announcement by the

15  police regarding further allegations exposed the falsity of the defendants' misrepresentations.

16      In analyzing loss causation, "the ultimate issue is whether the defendant's misstatement,

17  as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*,

18  811 F.3d 1200, 1210 (9th Cir. 2016).  "Typically, to establish loss causation, a plaintiff must

19  show that the defendants' alleged misstatements artificially inflated the price of stock and that,

20  once the market learned of the deception, the value of the stock declined." *Irving Firemen's*

21  *Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) (citation omitted).

22  This theory is referred to as "fraud-on-the-market." *Id.*  When proceeding under this theory, "the

23  plaintiff must show that after purchasing her shares and before selling, the following occurred:

1  (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the

2  stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789

3  (9th Cir. 2020) (quotation omitted).  To survive a motion to dismiss, "the plaintiff's task is to

4  allege with particularity facts plausibly suggesting that both showings can be made." *Id.* at 791

5  (citation omitted).

6          To show the first element, plaintiffs commonly "identify one or more corrective

7  disclosures." *Id.* at 790.  "A corrective disclosure occurs when information correcting the

8  misstatement or omission that is the basis for the action is disseminated to the market." *Id.*

9  (quotation omitted).  A disclosure is corrective if it "reveals new facts that, taken as true, render

10 some aspect of the defendant's prior statements false or misleading." *Id.* (citation omitted).

11 Accordingly, a corrective disclosure "need not precisely mirror the earlier misrepresentation*."*

12 *Id.* (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)).

13         As to the second element, a plaintiff must show that "disclosure of the truth caused the

14 company's stock price to decline and the inflation attributable to the misstatements to dissipate."

15 *Id.*  This analysis "includes a temporal component—a disclosure followed by an immediate drop

16 in stock price is more likely to have caused the decline." *Id.*  A plaintiff need not show "that a

17 misrepresentation was the *sole* reason for the investment's decline in value." *Id.* (quotation

18 omitted).  Instead, "as long as the misrepresentation is one substantial cause of the investment's

19 decline in value, other contributing forces will not bar recovery under the loss causation

20 requirement." *Id.* (quotation omitted).

21         The plaintiffs have adequately pleaded loss causation.  The SAC alleges that the WSJ

22 article and the February 2018 police announcement reported on several allegations of Wynn's

23 sexual misconduct, thus revealing the truth to the market, and stock prices dropped after each

1  disclosure. *See* ECF No. 122 at 122, 133.  The facts alleged in the SAC plausibly suggest that

2  these showings can be made.

3          The defendants' additional arguments are unavailing.  First, they argue that the plaintiffs

4  have not identified corrective disclosures, but the SAC alleges that the WSJ article and February

5  2018 announcement—which reported allegations by two additional accusers from the 1970s—

6  revealed the truth and were followed by stock price drops. *Id.* at 122, 133.  Second, the Ninth

7  Circuit has rejected the argument that "mere allegations of misconduct cannot support" a

8  securities fraud claim. ECF No. 128 at 29; *In re BofI*, 977 F.3d at 792 ("But short of an

9  admission by the defendant or a formal finding of fraud—neither of which is required—any

10  corrective disclosure will necessarily take the form of contestable allegations of wrongdoing."

11  (citations omitted)).  Third, the defendants contend the SAC alleges that investors reacted to the

12  possibility of Wynn's departure and imperiled gaming licenses, not fraud.  However, the SAC

13  also describes media outlets' reactions to the possibility that Wynn and others engaged in

14  "serious wrongdoing," violated the code of conduct, misled the MGC, and were "involved in the

15  decision to cover it up." ECF No. 122 at 126-27, 129.  At this stage, the plaintiffs have

16  adequately alleged that the misrepresentations were a substantial cause of the stock price drops.

17  *See, e.g., In re BofI*, 977 F.3d at 790.

18          Next, the defendants argue that the March and April 2016 press releases are not tied to

19  the plaintiffs' losses because the corrective disclosures relate only to sexual misconduct

20  allegations, rather than the Company's regulatory compliance or Wynn's use of Company

21  assets.[12]  But taken as true, the corrective disclosures "render some aspect of the defendant's

22

23

---

[12] As to the Elaine Wynn-related part of their response to the WSJ article, the defendants argue in their reply that there can be no loss causation because her cross claim "was the source of some

prior statements false or misleading." *Id.* (citing *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014)); *Amedisys*, 769 F.3d at 321 ("The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true."). Wynn's alleged use of Company funds for a settlement is an aspect of the entire years-long pattern of sexual misconduct and concealment alleged by the plaintiffs, so the WSJ article and February announcement "relate back to the misrepresentation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (quoting *Williams*, 558 F.3d at 1140)).

Last, the defendants contend that the SAC does not plead loss causation as to the misrepresentations responding to the WSJ article. They argue that the plaintiffs do not explain how a statement on the same day could artificially inflate the stock price, or how "some later corrective disclosure revealed the statements were false and affected" the stock price. ECF No. 128 at 31 n.30. Wynn makes a similar argument regarding the timing of his statement. The plaintiffs respond that it is plausible that the statements curbed the decline of the Company's stock price. The Ninth Circuit has not addressed the inflation maintenance theory, but I find cases accepting it persuasive. *See, e.g., In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016) ("[S]ecurities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."). Moreover, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir.

---

misconduct allegations." ECF No. 157 at 23. This argument was not raised in their motion to dismiss, so I will not consider it. The same applies to their argument about the hotline statement.

2008).  For purposes of the motions to dismiss, the plaintiffs have plausibly alleged that the WSJ article and February announcement made the market aware of the defendants' alleged cover-up of Wynn's alleged misconduct.  I deny the defendants' motions to dismiss on this basis.

### F.  Section 20(a)

The defendants move to dismiss the Section 20(a) claim because they argue that the plaintiffs have not stated a primary claim under Section 10(b).  I disagree.

The defendants next argue that the Section 20(a) claims fail because the SAC insufficiently alleges that they controlled the Company's day-to-day operations during the class period.  Similarly, Sinatra argues that the SAC fails to allege facts showing that she exercised actual power or control over any primary violator of Section 10(b), and she contends that she was a subordinate of the other defendants.  The plaintiffs respond that the SAC sufficiently alleges the defendants' "ability to control the Company through their involvement in day-to-day affairs as officers." ECF No. 146 at 71.

Section 20(a) of the PSLRA establishes joint and several liability for controlling persons who aid and abet securities violations. 15 U.S.C. § 78t(a).  Under this section, "a defendant may be liable for securities violations if (1) there is a violation of the Act and (2) the defendant directly or indirectly controls any person liable for the violation." *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (citation omitted).  In analyzing "'control person' status, the issue is whether the defendant exercised power or control over the primary violator, and the plaintiff need not show that the defendant was a culpable participant in the violation." *Id.* (quotation omitted).  "This inquiry is normally an intensely factual question." *Zucco*, 552 F.3d at 990 (quotation omitted).  And this inquiry involves "scrutiny of the defendant's participation in the

1 day-to-day affairs of the corporation and the defendant's power to control corporate actions."

2 *Todd*, 642 F.3d at 1223 (quotation omitted).

3     "The fact that a person is a CEO or other high-ranking officer within a company does not

4 create a presumption that he or she is a 'controlling person.'" *Id.* (citation omitted).  Instead,

5 "indicia of 'control' include whether the person managed the company on a day-to-day basis and

6 was involved in the formulation of financial statements, which is sufficient to presume control

7 over the transactions giving rise to the alleged securities violation." *Id.* (quotation omitted).

8 Additionally, "actual authority over the preparation and presentation to the public of financial

9 statements is sufficient to demonstrate control." *Id.* (citation omitted).  "Courts have found

10 general allegations concerning an individual's title and responsibilities to be sufficient to

11 establish control at the motion to dismiss stage." *In re Energy Recovery Inc. Sec. Litig.*, 2016

12 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016) (quotation omitted).

13     At this stage, the plaintiffs have sufficiently pleaded the control person status of each

14 remaining individual defendant: Wynn, Maddox, Sinatra, and Cootey.  Wynn does not separately

15 contest his control person status, but it is shown by allegations regarding his position as CEO and

16 the "founder-led" nature of the Company.  The SAC alleges that Sinatra, Maddox, and Cootey

17 were officers involved in the Company's day-to-day affairs.  Each was allegedly involved in

18 preparing and making the alleged misrepresentations in this case.  Sinatra contends that she was

19 subordinate to the other defendants, but the plaintiffs allege that she was a qualifier before the

20 MGC, she participated in drafting Wynn's response to the WSJ article, and she had the ability to

21 stop Wynn from changing the Company's sexual harassment policy to allow relationships

22 between supervisors and employees. ECF No. 122 at 44-45, 122.   I thus deny the defendants'

23 motions to dismiss the control person liability claims.

## IV.  Summary

I deny the motions with respect to statements made in response to Elaine Wynn's cross claim and the WSJ article.  I grant the motions to dismiss as to statements regarding the code of conduct, the Company's full compliance with all applicable laws, regulatory and compliance risks, Stephen Wynn's unique skills and possible departure, and corporate culture and other topics.  I also grant the motions to dismiss claims against Sinatra and Maddox with respect to Wynn's statement in response to the WSJ article because the plaintiffs have not plausibly alleged they were makers of that statement.

I grant the plaintiffs leave to amend only as to that statement by Wynn if they can adequately allege that Sinatra and Maddox were also makers of the statement.  I do not grant the plaintiffs leave to amend as to anything else.  This is the second amended complaint.  Judge Navarro's previous order identified deficiencies in alleging material misrepresentations, the plaintiffs had an opportunity to provide further allegations if they had a basis to do so, and further amendment would be futile as to those statements.

## V.  Conclusion

I THEREFORE ORDER that the defendants' motion to dismiss **(ECF No. 128) is granted in part**.  Defendant Stephen Wynn's motion to dismiss **(ECF No. 140) is granted in part**.  And defendant Kimmarie Sinatra's motion to dismiss **(ECF No. 125) is granted in part**. These three motions are granted in part consistent with this order.

I FURTHER ORDER that the plaintiffs' motion for leave to file a surreply **(ECF No. 160) is granted**.

I FURTHER ORDER that the defendants' motion for leave to file supplemental authority **(ECF No. 164) is granted**.

1        I FURTHER ORDER that the plaintiffs may file an amended complaint by September 3,

2  2021.

3        DATED this 28th day of July, 2021.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE