Patrick G. Byrne (Nevada Bar #7636)
Bradley T. Austin (Nevada Bar #13064)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Telephone: 702.784.5200
Facsimile: 702.784.5252
Email: pbyrne@swlaw.com
        baustin@swlaw.com

*Attorneys for Defendants Wynn Resorts, Ltd.
and Matthew O. Maddox*

(*additional counsel on signature page*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

JOHN V. FERRIS, et al.,

           Plaintiffs,

vs.

WYNN RESORTS LIMITED, et al.,

           Defendants.

Case No. 2:18-CV-00479-APG-BNW

**WYNN RESORTS, LTD. AND MATTHEW
O. MADDOX'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON
ALLEGED FEBRUARY 12, 2018
CORRECTIVE DISCLOSURES**

**ORAL ARGUMENT REQUESTED**

---

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rules 7-2 and 56-1, and Federal Rule of Civil Procedure 56, Defendants Wynn Resorts, Ltd. and Matthew Maddox (collectively, the "Company Defendants"), by and through counsel, file their Motion for Partial Summary Judgment on February 12, 2018 Corrective Disclosures.

This Motion is supported by the following Memorandum of Points and Authorities, the Declaration of Edward Hillenbrand and exhibits filed concurrently herewith, the Declaration of Faten Sabry, Ph.D. filed concurrently herewith, the referenced documents and pleadings on file with the Court, and any oral argument the Court may entertain on behalf of the Company Defendants.

DATED: November 14, 2023                KIRKLAND & ELLIS LLP

*/s/ Mark S. Holscher*

Mark Holscher (*Pro Hac Vice*)
Michael J. Shipley (*Pro Hac Vice*)
Edward Hillenbrand (*Pro Hac Vice*)
Nathaniel Edward Haas (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
555 South Flower Street, Ste. 3700
Los Angeles, California 90071
Telephone: 213.680.8190
Facsimile: 213.808.8097
Email: mark.holscher@kirkland.com
         michael.shipley@kirkland.com
         edward.hillenbrand@kirkland.com
         nathaniel.haas@kirkland.com

Matthew Solum (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: 212.446.4688
Facsimile: 212.446.4900
Email: matthew.solum@kirkland.com

Patrick G. Byrne (Nevada Bar #7636)
Bradley T. Austin (Nevada Bar #13064)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Telephone: 702.784.5200
Facsimile: 702.784.5252
Email: pbyrne@swlaw.com
         baustin@swlaw.com

*Attorneys for Defendants Wynn Resorts, Ltd. and Matthew O. Maddox*

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ..........................................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND...................................................5

    A.  The Court Has Already Narrowed Plaintiffs' Claims............................................5

        1.  The Court's Order on Defendants' Motions to Dismiss the SAC. ..........................5

        2.  The Court's Order Certifying the Class. .......................................................6

    B.  Plaintiffs' Remaining Theory of Liability. .......................................................7

        1.  Alleged Misstatement #1. .......................................................................7

        2.  Alleged Misstatement #2. .......................................................................8

        3.  Alleged Misstatement #3. .......................................................................8

        4.  Alleged Misstatement #4. .......................................................................8

        5.  Alleged Misstatement #5. .......................................................................8

        6.  Alleged Misstatement #6. .......................................................................9

III. STATEMENT OF UNDISPUTED FACTS .............................................................9

    A.  Mr. Wynn and the Company's Responses to Elaine Wynn's Allegations in 2016. ......................9

    B.  Mr. Wynn and the Company's Responses to the January 26, 2018 WSJ Article.........................10

    C.  Mr. Wynn's Resignation from the Company on February 6, 2018. ...............................12

    D.  The Confounding News Events on February 9–12, 2018.............................................12

    E.  Other Regulatory and Legal Proceedings. .......................................................14

    F.  The Company's Response to the January 26, 2018 WSJ Article. ...............................15

IV. LEGAL STANDARD.....................................................................................16

V.  ARGUMENT ..............................................................................................17

    A.  Plaintiffs Cannot Identify Statements That Were Made Untrue by the February 12, 2018 Disclosures..............................................................................................17

    B.  As a Matter of Law, Plaintiffs Cannot Satisfy Their Burden to Prove Loss Causation. ..............18

        1.  The NGCB Portal Report and LVMPD Report Are Not Corrective Disclosures...................20

        2.  The Company's Stock Price Movement on February 12, 2018 Was Not Statistically Significant. .......................................................................................21

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

3.  The Company's Stock Price Movement After 11:25 a.m. on February 12, 2018 Was
    Not Statistically Significant. .......................................................................................24

4.  Plaintiffs Cannot Meet Their Burden of Disaggregating Fraud-Induced Stock Price
    Movements from Movements Caused By Other News. ..............................................25

VI. CONCLUSION...............................................................................................................................27

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allergan PLC Sec. Litig.*,
  2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) ...................................................16

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
  189 F.3d 1017 (9th Cir. 1999) .........................................................................18

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..........................................................................................16

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018) .........................................................................21, 22

*In re Barclays Bank PLC Sec. Litig.*,
  756 F. App'x 41 (2d Cir. 2018) .......................................................................22

*Billhofer v. Flamel Techs., SA*,
  663 F. Supp. 2d 288 (S.D.N.Y. 2009) ..............................................................24

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) (Lee, K. concurring) ...............................2, 20, 28

*In re Brazier Forest Prod.*,
  921 F.2d 221 (9th Cir. 1990) .........................................................................5, 16

*Bricklayers & Trowel Trades Intern. Pension Fund v. Credit Suisse First Boston*,
  853 F. Supp. 2d 181 (D. Mass. 2012) ...............................................16, 22, 25, 26

*Broussard v. Hagenbuch*,
  Case No. 2:18-cv-00293-KJD-DJA (D. Nev.) .................................................15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..........................................................................................16

*In re Cirrus Logic Sec. Litig.*,
  946 F. Supp. 1446 (N.D. Cal. 1996) ................................................................17

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) .........................................................................18

*Dean v. China Agritech*,
  2012 WL 1835708 (C.D. Cal. May 3, 2012) ....................................................23

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................. *passim*

*Eng v. Edison Int'l*,
  2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) .................................................21

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).............................................................................................25

*Erica P. John Fund v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015).........................................................................23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)............................................................................19, 20

*Fosbre v. Las Vegas Sands Corp.*,
   2017 WL 55878 (D. Nev. Jan. 3, 2017)....................................................... *passim*

*Glickenhaus & Co. v. Household Intl.*,
   787 F.3d 408 (7th Cir. 2015) .............................................................................4, 19

*Gross v. GFI Grp., Inc.*,
   310 F. Supp. 3d 384 (S.D.N.Y. 2018).................................................................16

*In re High-Tech Emp. Antitrust Litig.*,
   2014 WL 1351040 (N.D. Cal. Apr. 4, 2014)......................................................22

*In re Intuitive Surg. Sec. Litig.*,
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)....................................................22

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018).........................................................24, 28

*Limcaco v. Wynn*,
   Case No. 2:20-cv-11372-RSWL-MAA (C.D. Cal.) ...........................................15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008)............................................................................4, 21

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .............................................................................2

*Mineworkers' Pen. Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ....................................................................... *passim*

*In re Moody's Corp. Sec. Litig.*,
   2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013)................................................16, 26

*In re Mylan N.V. Sec. Litig.*,
   2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023)................................................16, 19

*Nelson v. Pima Cmty. Coll.*,
   83 F.3d 1075 (9th Cir. 1996) ..............................................................................16

*Nielsen v. Wynn*,
   Case No. A-19-803879-C (Clark Cnty. Dist. Ct.)...............................................15

*In re Northern Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000).................................................................17

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ...............................................................21

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) ............................................................... *passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) .............................................................17

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ...............................................................22, 26

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ............................................................... *passim*

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ..................................................................3, 17

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) .............................................................16

*In re Qualcomm Inc. Sec. Litig.*,
    2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ...........................................22

*In re Remec Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ...........................................16, 21, 26

*In re Retek Inc., Sec. Litig.*,
    621 F. Supp. 2d 690 (D. Minn. 2009) .............................................................17

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .............................................................17

*Rogers v. Wynn*,
    Case No. A-18-773024-B (Clark Cnty. Dist. Ct.) ............................................15

*In re Sci. Atlanta, Inc. Sec. Litig.*,
    754 F. Supp. 2d 1339 (N.D. Ga. 2010) .............................................................16

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) .............................................................16

*Thomas DiNapoli v. Wynn*,
    Case No. A-18-770013-B (Clark Cnty. Dist. Ct.) ............................................15

*In re Vivendi Universal S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) .............................................................25, 27

*West v. Prudential Sec., Inc.*,
    282 F.3d 935 (7th Cir. 2002) ...............................................................2

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007) .............................................................17

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*In re Williams Sec. Litigation-WCG Subclass*,
      558 F.3d 1130 (10th Cir. 2009) ..............................................................................4, 19, 26

*Wynn Resorts, Limited v. Okada, et al.*,
      Case No. A-12-656710-B (Clark Cnty., Dist. Ct. Nev.)...............................................9

**Statutes**

15 U.S.C. § 78u–4.............................................................................................................18

**Rules**

Fed. R. Civ. P. 56.............................................................................................................16

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

### TABLE OF ABBREVIATED TERMS

| Abbreviation | Meaning |
|---|---|
| MGC | Massachusetts Gaming Commission |
| NGCB | Nevada Gaming Control Board |
| IEB | Investigations and Enforcement Bureau of the MGC |
| Wynn Resorts or Company | Wynn Resorts, Ltd. |
| Company Defendants | Wynn Resorts, Ltd. and Matthew Maddox |
| Motion to Dismiss Order | This Court's July 28, 2021 Order Granting in Part Motions to Dismiss (ECF 171) |
| Class Certification Order | This Court's March 1, 2023 Order Granting Motion to Certify Class (ECF 283) |
| Jan. 26 WSJ Article | January 26, 2018 article by the WALL STREET JOURNAL entitled *Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn* (**Ex. 6**) |
| NGCB Portal Report | February 12, 2018 article published by the WALL STREET JOURNAL entitled *Nevada Regulator, Inundated with Reports About Steve Wynn, Start Hotline for Tips* (**Ex. 1**) |
| LVMPD Report | February 12, 2018 article published by the WALL STREET JOURNAL entitled *Nevada Regulator, Inundated with Reports About Steve Wynn, Start Hotline for Tips* (**Ex. 1**) |
| Nevada Independent Report | A February 12, 2018 article by THE NEVADA INDEPENDENT entitled *Las Vegas police receive two reports about Wynn in wake of sexual misconduct allegations* (**Ex. 2**) |
| O'Melveny Report | February 9, 2018 article by the WALL STREET JOURNAL entitled *Wynn Resorts Board Cancels Law Firm Investigation of Ex-CEO Steve Wynn's Conduct* (**Ex. 3**) |
| Stockholder Agreement Report | Wynn Resorts' February 9, 2018 Form 8-K filing with the SEC (**Ex. 4**) |
| EW Crossclaim | March 26, 2023 First Amended Answer of Elaine P. Wynn to Aruze and Universal's Fourth Amended Counterclaim;  Fifth Amended Counterclaim and Crossclaim of Elaine P. Wynn,  filed in *Wynn Resorts, Limited v. Okada, et al.*, Case No. A-12-656710-B, (Clark Cnty., Dist. Ct. Nev.) (**Ex. 5**) |
| Cornell University Award Rescission Report | February 12, 2018 article by UWIRE entitled *Hotel School Rescinds Hospitality Icon Award After Allegations of Sexual Misconduct* (**Ex. 42**) |
| Regulatory Risk Report | February 10, 2018 article by THE BOSTON GLOBE entitled *Problems with Wynn casino go deeper than the man* (**Ex. 27**) |
| Wynn's Name on Boston Casino Report | February 10, 2018 article by THE BOSTON GLOBE entitled *Steve Wynn's name has no place in our skyline* (**Ex. 28**) |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Plaintiffs filed this securities fraud action in 2018. After the Court significantly narrowed the case at the pleading stage, the Court certified a class of individuals and entities that acquired Wynn Resorts securities between March 28, 2016 and February 12, 2018. But the Court's order left open the potential that Plaintiffs may fail to prove that their alleged February 12, 2018 "corrective" disclosures are viable. The Company Defendants now move for partial summary judgment and request that the Court dismiss Plaintiffs' two remaining alleged February 12, 2018 "corrective" disclosures—the NGCB Portal Report and the LVMPD Report—for failure to prove falsity and loss causation.

At issue in this motion is Plaintiffs' theory that: (1) the Company and Mr. Wynn made material misstatements when responding to the January 26, 2018 WSJ Article; (2) those statements artificially inflated the Company's stock price; (3) the truth of those statements was revealed on February 12, 2018 by the NGCB Portal Report and LVMPD Report; and (4) the Company's stock price fell on February 12 as a result. *See* ECF 241 at 6–7. Though the crux of this case concerns the Jan. 26 WSJ Article (as a "corrective" disclosure) and the market's purported reaction to it, which is not the subject of this motion, Plaintiffs have relentlessly tried to extend the Class Period by two more weeks to February 12, 2018.[1] Their reason for doing so is obvious: based upon Plaintiffs' unreliable estimates and assumptions, extending the Class Period to February 12 would increase their potential damages by nearly 600%, from $96 million to $568 million. That is because, for the two-year Class Period leading up to and through the Jan. 26 WSJ Article, class members ***actually made money***.[2] That Plaintiffs are nonetheless likely going to claim $96 million in damages for this time period is offensive.

Plaintiffs' attempted expansion of their damages by sixfold by extending the Class Period to

---

[1]    Plaintiffs managed to do so at class certification only by injecting new corrective disclosures into the case, two of which the Court accepted (the NGCB Portal Report and LVMPD Report) and two of which the Court rejected (the O'Melveny Report and Stockholder Agreement Report). ECF 283 at 17.

[2]    Wynn Resorts' stock price more than doubled between March 28, 2016 and the Jan. 26 WSJ Article (from roughly $93 to $200), which substantially limits the out-of-pocket losses and potentially recoverable damages for class members that bought stock during that time period. By extending the Class Period by just two more weeks, Plaintiffs seek to drastically increase their potential recovery.

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

February 12, 2018 is even more offensive. Plaintiffs are attempting to game the way that damages are calculated in an effort to use this lawsuit as an "*in terrorem* device to bludgeon [Wynn Resorts] into settling claims to 'avoid the cost and burden of litigation.'" *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 800 (9th Cir. 2020) (Lee, K. concurring) (quoting *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013)); *see also West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002). Plaintiffs cannot extend the Class Period in this way, however, because there is no basis in law to do so. The Court in its Class Certification Order deferred any decision on merits issues, including loss causation. ECF 283 at 15, 22, 24, 25. The Company Defendants now seek summary judgment on this narrow but consequential issue, which exclusively relies on facts in the public domain and matters that do not require any further discovery to resolve.

To prevail on their February 12, 2018 Class Period extension theory, Plaintiffs must show that the February 12 corrective disclosures—the NGCB Portal Report and the LVMPD Report—"reveal[ed] new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading," and that "the disclosure of the truth caused the company's stock price to decline." *In re BofI*, 977 F.3d at 790; *see Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *8 (D. Nev. Jan. 3, 2017), *aff'd*, 732 F. App'x 543 (9th Cir. 2018) ("The plaintiffs cannot rely on a theory that this statement artificially inflated the stock price without also showing a loss after the relevant truth was revealed."), *affirmed by Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 547 (9th Cir. 2018). The NGCB Portal Report only revealed that the NGCB had received complaints about Mr. Wynn after the Jan. 26 WSJ Article was published, and that the NGCB was creating an online portal to receive confidential complaints related to its investigation into allegations against Mr. Wynn as well as any other ongoing investigation. **Ex. 1** at 1.[3] The LVMPD Report merely reflected that two individuals lodged complaints with the LVMPD about Mr. Wynn, after the Jan. 26 WSJ Article was published. *Id.* at 1, 3; **Ex. 2** at 1. The undisputed facts show that Plaintiffs do not have a scintilla of proof that either of these disclosures was actually corrective, i.e., that either report revealed the truth about a prior statement by Defendants or that the revelation of any of this information caused the Company's stock price to decline.

---

[3]  All bolded exhibit citations refer to the concurrently-filed Declaration of Edward Hillenbrand.

*First*, Plaintiffs lack evidence of any false statements tied to the February 12, 2018 disclosures. Securities fraud plaintiffs must identify "specific statements made by the Defendants that were made untrue or called into question by subsequent public disclosures." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014). Here, the alleged disclosures merely stated that the NGCB and LVMPD received "complaints" about Mr. Wynn after the January 26, 2018 WSJ Article was published and after the alleged misstatements. But the Company and Mr. Wynn never spoke about, much less denied, whether complaints might have been made to the NGCB or LVMPD.

In fact, the unspecified "complaints" were made to the NGCB and LVMPD only *after* the Jan. 26 WSJ Article and Defendants' responses to it. **Ex. 1** at 1 (the NGCB received "a number of reports about Mr. Wynn in the days after the [Jan. 26 WSJ Article]"); *see also* **Ex. 2** at 1 (the LVMPD received two complaints against Mr. Wynn on January 29 and February 5, respectively). When Defendants spoke on January 26, 2018, they cannot have misrepresented anything about these later "complaints" for the simple reality that these "complaints" did not yet exist. As a result, Plaintiffs cannot identify any "claims made by the Defendants [that] were invalidated by" the February 12 disclosures, meaning their claims fail as a matter of law. *Apollo*, 774 F.3d at 608.

*Second*, and relatedly, neither of the February 12, 2018 disclosures is "corrective" of the alleged January 26, 2018 misstatements. At summary judgment, Plaintiffs must produce evidence that an alleged corrective disclosure actually revealed the allegedly concealed facts for the first time to the market. *See Mineworkers' Pen. Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (a plaintiff must show that the stock price's decline was caused by the revelation of the "very facts misrepresented . . . by the defendant"). Nothing that Defendants said on January 26 denied, misrepresented, or concealed that additional unspecified "complaints" may surface after the Jan. 26 WSJ Article. Because Plaintiffs cannot "trac[e] the loss back to the very facts about which [Defendants] lied," Defendants are entitled to summary judgment. *Id.* (quotations omitted).

*Third*, the Company's stock price movement over the entire trading day on February 12, 2018 was not statistically significant at all. Nor was it statistically significant after the two remaining February 12,

2018 "corrective" disclosures were first published in an 11:25 a.m. *Wall Street Journal* article.[4] To defeat summary judgment, Plaintiffs must show that Wynn Resorts' "share price fell significantly after the truth became known." *Fosbre*, 2017 WL 55878, at *2 (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008)). They cannot do so. Defendants' expert, Dr. Faten Sabry, has conducted an analysis of Wynn Resorts' stock price movement and trading volume on February 12, 2018, and has established that neither was statistically significant—either over the course of the entire trading day, or after 11:25 a.m., when the disclosures were first published. *See* Declaration of Faten Sabry, Ph.D. ("Sabry Decl.") ¶ 10, filed concurrently herewith. Instead of moving the stock price, the disclosures were a dud. No equity analysts covering the Company's stock ever discussed either the NGCB Portal Report or the LVMPD report, let alone suggested that they in any way impacted the Company's stock price. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 (9th Cir. 2010) (citing analyst reports as "overwhelming evidence" of a lack of loss causation).

**Finally**, Plaintiffs cannot "isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors." *Glickenhaus & Co. v. Household Intl.*, 787 F.3d 408, 421 (7th Cir. 2015); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005) (a lower stock price may reflect "not the earlier misrepresentation, but . . . new industry-specific and firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"); *Fosbre*, 2017 WL 55878, at *2 (quoting *Dura Pharm.*, 544 U.S. at 342). The failure to present evidence disaggregating confounding variables is a "fatal flaw" mandating summary judgment. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009).

There are at least a dozen other Wynn Resorts and industry-specific news stories between the close of trading hours on February 9, 2018 and the end of trading on February 12, 2018 that Plaintiffs cannot disaggregate. Sabry Decl. ¶ 55, Figure 13. Further, Plaintiffs themselves have identified at least two non-fraud news events that "would have impacted Wynn Resorts' stock price on February 12th"—the O'Melveny Report (**Ex. 3**) and the Stockholder Agreement Report (**Ex. 4**). *See* ECF 270 at 8. As Plaintiffs noted, several equity analysts commented on the impact and potential consequences of the Stockholder

---

[4]     Unless otherwise stated, all times set forth in this brief are in Eastern Time.

Agreement Report. *Id*. After having represented that these non-fraud events did impact the stock price, Plaintiffs cannot now reverse course and claim the opposite to be true. They lack any reliable methodology to disaggregate those and other non-fraud events from the losses purportedly caused by the NGCB Portal Report and LVMPD Report.

The complete absence of evidence showing falsity relating to the February 12, 2018 disclosures, that the February 12, 2018 disclosures were "corrective," or that they caused any investor losses means summary judgment is warranted. *In re Brazier Forest Prod.*, 921 F.2d 221, 223 (9th Cir. 1990) ("If the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case."). The Court should grant Defendants' motion for partial summary judgment and order that the Class Period ends on January 29, 2018, or the last trading day the Jan. 26 WSJ Article allegedly impacted Wynn Resorts' stock price.[5]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Court Has Already Narrowed Plaintiffs' Claims.

To establish loss causation, Plaintiffs must show a causal link between allegedly false statements that inflated the value of Wynn Resorts stock—or, under Plaintiffs' theory, that prevented it from dropping—and "corrective disclosures" that caused the artificial inflation to dissipate. It is thus imperative to understand, on one hand, the actionable misrepresentations at issue, and on the other, the disclosures that Plaintiffs say corrected them and caused Wynn Resorts' stock price to drop.

#### 1.    The Court's Order on Defendants' Motions to Dismiss the SAC.

On July 28, 2021, the Court granted Defendants' motions to dismiss the Second Amended Complaint ("SAC"), in significant part. ECF 171. The Court found that most of the alleged misrepresentations—including all of the alleged misstatements in Defendants' SEC filings—were "not actionable" because they were "aspirational and not materially false," and granted the motion on that basis. *Id.* at 19, 20, 22, 24. The Court, however, denied the motion as to two discrete sets of statements. *Id.* at

---

[5]    The Company Defendants reserve the right to move for summary judgment on additional grounds, including as to falsity and loss causation with respect to the alleged 2016 misstatements and the Jan. 26 WSJ Article, at the appropriate time.

14–19. The first set was the Company's March 28 and April 5, 2016 responses to allegations made in the EW Crossclaim and a follow-on press release that alleged Mr. Wynn engaged in "reckless, risk-taking behavior" and "made a multimillion dollar payment after apparently being threatened with allegations of serious misconduct occurring on Company property against a Wynn Resorts employee." *Id.* at 3, 16–19; *see also* **Ex. 5** at 35. Second, the Court found that Mr. Wynn and the Company's responses on January 26, 2018, to allegations leveled against Mr. Wynn in the WSJ Article were actionable. ECF 171 at 2, 14–16; *see also* **Ex. 6**.

### 2.    The Court's Order Certifying the Class.

On March 2, 2023, the Court granted Plaintiffs' motion for class certification and certified Plaintiffs' proposed class of all individuals and entities that purchased or otherwise acquired Wynn Resorts securities between March 28, 2016 and February 12, 2018. ECF 283 at 27. The Court granted certification based on both sets of the remaining alleged misstatements. Importantly, however, the Court repeatedly noted in its order that it did not evaluate merits issues, including loss causation and disaggregation. *Id.* at 15 (stating that whether "any inflation the alleged misstatements caused in 2016 equals the price drop following the WSJ Article nearly two years later …. [i]s a loss causation argument, ***which I do not address at the class certification stage***" (emphasis added)); *id.* at 22 ("Thus, there is a sufficient match, ***at this stage***, to support an inference of price impact." (emphasis added)); *id.* at 25 (stating that whether "Nye should take into consideration other confounding events that may explain some or all of the back-end price drop is a loss causation argument that ***I do not address at the class certification stage***" (emphasis added)).

As to the alleged 2016 misstatements responding to allegations in the EW Crossclaim, the Court found that it was irrelevant whether there was a front-end price impact because Plaintiffs had alleged an inflation maintenance theory. *Id.* at 14–15. The Court further concluded that the 2016 misstatements and the Jan. 26 WSJ Article were "sufficient[ly] match[ed], at this stage, to support an inference of price impact." *Id.* at 20–22.

As to the alleged 2018 misrepresentations responding to allegations in the Jan. 26 WSJ Article, the Court extended the Class Period to February 12. *Id.* at 18, 22. The Court accepted only two of Plaintiffs' four proposed corrective disclosures—(1) "the Nevada Gaming Control Board opened an online

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

portal for people to submit confidential statements . . . because the board's office had received a deluge of calls in the wake of the allegations against Mr. Wynn" (the NGCB Portal Report), and (2) "the Las Vegas Metropolitan Police Department (LVMPD) revealed that two women had filed reports against Stephen Wynn alleging he sexually assaulted them in the 1970s" (the LVMPD Report). *Id.* at 16–18. For purposes of class certification, the Court found these disclosures to be corrective and not "mismatched" because they supposedly contradicted statements by the Company and Mr. Wynn in response to the Jan. 26 WSJ Article. *Id.* at 22. The Court rejected, however, Plaintiffs' two other alleged corrective disclosures—(3) a report that Wynn Resorts had terminated the law firm hired by the Company's special committee to internally investigate the allegations against Mr. Wynn (the O'Melveny Report), and (4) an announcement that Mr. Wynn had agreed to release Ms. Wynn from a stockholders agreement (the Stockholder Agreement Report). *Id.* at 17 n.5, 22–23.

Importantly, Plaintiffs initially claimed that all four of those disclosures "would have impacted Wynn Resorts' stock price on February 12th." ECF 270 at 8.

## B.   Plaintiffs' Remaining Theory of Liability.

After the Court's Motion to Dismiss Order (ECF 171 at 19, 20, 22, 24) and Class Certification Order (ECF 283 at 27), Plaintiffs' remaining theories of material misrepresentations, falsity, and corrective disclosures are as follows:

### 1.   Alleged Misstatement #1.

Alleged Misstatement by Wynn Resorts on March 28 (**Ex. 7**) and April 5, 2016 (**Ex. 8**): "Ms. Wynn's latest allegations regarding our Board, its composition and its independence are simply not true"; and "Ms. Wynn's comments regarding our Board of Directors, their independence, and their actions in this matter are false."

Why the Court Said It Was False: "These statements would give a reasonable investor the impression that the Company denied all of Elaine Wynn's allegations, which addressed Stephen Wynn's 'serious misconduct' against an employee and a resultant multi-million dollar settlement." ECF 171 at 17.

Alleged Corrective Disclosure: Jan. 26 WSJ Article (**Ex. 6**).

### 2. Alleged Misstatement #2.

Alleged Misstatement by Wynn Resorts on March 28 (**Ex. 7**) and April 5, 2016 (**Ex. 8**): "[Ms. Wynn's] allegations regarding the use of company assets are without merit. The use of company assets is governed by many internal policies and is closely supervised both by the Audit Committee . . . and our external auditors"; and "[Ms. Wynn's] previous allegations that Mr. Wynn applied company resources for personal use are false."

Why the Court Said It Was False: "Stephen Wynn allegedly used Company funds for [a] 2008 settlement." ECF 171 at 18.

Alleged Corrective Disclosure: None.

### 3. Alleged Misstatement #3.

Alleged Misstatement by Wynn Resorts on March 28, 2016 (**Ex. 7**): "Allegations made by Ms. Wynn that the company would hide any relevant activities from our regulators are patently false."

Why the Court Said It Was False: "The Company did not disclose Wynn's alleged misconduct to regulators, even when the MGC emailed Sinatra and others to ask for documents involving 'the high profile issues that Mr. Wynn and WR are dealing or have dealt with in the past.'" ECF 171 at 18.

Alleged Corrective Disclosure: None.

### 4. Alleged Misstatement #4.

Alleged Misstatement by Mr. Wynn on January 26, 2018 (**Ex. 9**): "The idea that I ever assaulted any woman is preposterous."

Why the Court Said It Was False: "[T]he SAC alleges several instances of sexual assault by Wynn." ECF 171 at 14.

Alleged Corrective Disclosure: NGCB Portal Report (**Ex. 1**) and LVMPD Report (*Id.*).

### 5. Alleged Misstatement #5.

Alleged Misstatement by Wynn Resorts on January 26, 2018 (**Ex. 9**): "It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish his reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him."

Why the Court Said It Was False: "[A] reasonable investor would get the impression that the allegations are false and fabricated by [Ms. Wynn] as part of her 'negative public relations campaign' to

'tarnish' [Mr. Wynn's] reputation and 'pressure a revised divorce settlement from him'" but "a materially different state of affairs existed because the Company had received multiple complaints about Wynn's sexual misconduct by that point and various Company executives were aware of that." ECF 171 at 15.

Alleged Corrective Disclosure: NGCB Portal Report (**Ex. 2**) and LVMPD Report (*Id.*).

### 6.    Alleged Misstatement #6.

Alleged Misstatement by Wynn Resorts on January 26, 2018 (**Ex. 9**): "The Company . . . offers an independent hotline that any employee can use anonymously, without fear of retaliation. Since the inception of the company, not one complaint was made to that hotline regarding Mr. Wynn."

Why the Court Said It Was False: "According to the IEB report, while a hotline did exist the instructions for it focused on the reporting of financial and accounting misinformation and misconduct under the Sarbanes-Oxley Act, and did not direct employees to utilize the hotline for reports of sexual harassment." ECF 171 at 15 (internal quotations omitted).

Alleged Corrective Disclosure: None

## III.    STATEMENT OF UNDISPUTED FACTS

### A.    Mr. Wynn and the Company's Responses to Elaine Wynn's Allegations in 2016.

Beginning in 2012, Wynn Resorts and its Board (including Mr. Wynn and Ms. Wynn) were parties in a lawsuit related to the Company's redemption of stock held by former shareholder, Kazuo Okada. *Wynn Resorts, Limited v. Okada, et al.*, Case No. A-12-656710-B, (Clark Cnty., Dist. Ct. Nev.). As a part of that same lawsuit, in 2012, Ms. Wynn filed a crossclaim against Mr. Wynn and the Company to be released from a 2010 Stockholders' Agreement she had signed with Mr. Wynn and Mr. Okada. **Ex. 10**. Following a highly-contentious proxy fight that led to Ms. Wynn leaving the Company's Board in 2015, she amended her crossclaim on March 28, 2016 to allege that Mr. Wynn was accused of engaging in "serious misconduct" by a Company employee "on Company property," which resulted in a multi-million dollar settlement, and Mr. Wynn "had used Company resources to conceal the allegations." **Ex. 5** at 45. Ms. Wynn's reference to a "multi-million dollar settlement" concerned the 2005 settlement, as indicated by her testimony under oath. **Ex. 11** at 41:13–42:10; **Ex. 12** at 157:8–12, 159:10–161:10, 182:15–183:8; **Ex. 13** at 30-31 (finding that Ms. Wynn "became aware of the 2005 settlement agreement" in 2009, but not other allegations of sexual harassment).

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

In response to the EW Crossclaim, Mr. Wynn issued a press release acknowledging the 2005 settlement and clarifying that he had paid the 2005 settlement with his own personal funds: "[Ms. Wynn] *has been aware of the settlement Mr. Wynn made with the Wynn employee in question using his personal funds since 2009*." **Ex. 14** (emphasis added). The Company also responded in a press release after Mr. Wynn's statement, explaining that Ms. Wynn's "allegations regarding the use of company assets are without merit." **Ex. 7**. The Company made clear that "Mr. Wynn reimburses the Company for his accommodations at the hotel, his personal use of corporate aircraft and all other company assets subject to company policy." *Id.*

One week after she filed the EW Crossclaim, on April 4, 2016, Ms. Wynn issued a press release of her own, reiterating allegations that Mr. Wynn "engaged in reckless, risk-taking behavior, leaving himself vulnerable to allegations of serious wrongdoing—that he made a multi-million dollar payment and used Company resources to silence . . . ." **Ex. 15**. As just explained, these allegations related to the 2005 settlement, and only the 2005 settlement.

The Company responded that Ms. Wynn's "comments regarding our Board of Directors, their independence and their actions in this matter are false," and her "previous allegations that Mr. Wynn applied company resources for personal use are false." **Ex. 8**. The Company did not deny the existence of the 2005 settlement. In fact, the Company expressly admitted that the 2005 settlement existed in its publicly-filed Answer to the EW Crossclaim: "Wynn Resorts admits that Mr. Wynn reached a settlement using his personal funds with a former Company employee referenced in paragraph 52, and avers that Ms. Wynn was aware of this fact since at least 2009." **Ex. 16 ¶ 52.**[6]

**B.    Mr. Wynn and the Company's Responses to the January 26, 2018 WSJ Article.**

On Friday, January 26, 2018, at 11:59 a.m., the *Wall Street Journal* published an article detailing what it called "a decades-long pattern of sexual misconduct" by Mr. Wynn. **Ex. 6** at 2. The article went well beyond the allegations contained in the 2016 EW Crossclaim, which only concerned the 2005

---

[6]    The Company also repeatedly disclosed the allegations of misconduct against Mr. Wynn in the EW Crossclaim in annual and quarterly SEC filings: "The amended crossclaim substantially repeats its earlier allegations and further alleges that Mr. Wynn engaged in acts of misconduct . . . ." **Ex. 17** at 2, 4, 6, 8, 10, 12, 14, 16, 18, 20–21.

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   settlement and the underlying "serious misconduct" that led to that 2005 settlement. **Ex. 5** at 45. The WSJ

2   Article began with new and previously unreported details about the 2005 settlement allegations, including

3   that a manicurist had accused Mr. Wynn of a rape that occurred in his office, and that the settlement

4   amount was $7.5 million. **Ex. 6** at 1–2. The article acknowledged that the 2016 EW Crossclaim had

5   referenced the 2005 settlement "in broad terms" and the "[s]pecifics of the allegation and the size of the

6   settlement haven't been previously reported." *Id*. at 2. Thereafter, the article stated that "[b]eyond this

7   incident, dozens of people . . . who have worked at Mr. Wynn's casinos told of behavior that cumulatively

8   would amount to a decades-long pattern of sexual misconduct by Mr. Wynn." *Id*. The article went on to

9   provide specifics about several other alleged incidents involving Mr. Wynn that were never mentioned in

10  the EW Crossclaim (and could not have been because Ms. Wynn has stated she had no knowledge of them

11  at the time the EW Crossclaim was filed). *Id*. at 2–7; **Ex. 11** at 41:13–42:10; **Ex. 12** at 157:8–12, 159:10–

12  161:10, 182:15–183:8. It also included quotes from the responses provided by Mr. Wynn and the

13  Company to the *Wall Street Journal* in the lead up to publication of the article. **Ex. 6** at 2–3.

14        Roughly one hour later, at 1:09 p.m., the Company and Mr. Wynn released their full statements

15  provided to the *Wall Street Journal*. **Ex. 9**. The Company said "[t]he recent allegations about Mr. Wynn

16  reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with

17  him and the company," "[i]t is clear that Mr. Wynn's ex-wife has sought to use a negative public relations

18  campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn

19  in an attempt to pressure a revised divorce settlement from him," and "[s]ince the inception of the

20  Company, not one complaint was made to [the Company's independent hotline] regarding Mr. Wynn."

21  *Id*. Mr. Wynn separately said "[t]he idea that I ever assaulted any woman is preposterous," and "[w]e find

22  ourselves in a world where people can make allegations, regardless of the truth, and a person is left with

23  the choice of weathering insulting publicity or engaging in multi-year lawsuits." *Id.* The full statements

24  are provided in **Appendix A** to this brief.

25        Later in the afternoon of January 26, the NGCB announced that it was launching an investigation

26  into the allegations, the MGC similarly announced it would be launching an investigation, and the

27  Company's Board of Directors announced that it was creating a special committee to investigate the

28  allegations as well. **Exs. 18**, **19**. On the following Saturday, January 27, Mr. Wynn announced that he

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

would be stepping down as finance chairman of the Republican National Committee. **Ex. 19**.

Wynn Resorts' stock price dropped by $20.31 (or 10.12%) to close at $180.29 on January 26, 2018. **Ex. 20** at 1. The stock price declined to $163.48 on the next trading day, January 29, 2018. *Id.* at 2.

### C.    Mr. Wynn's Resignation from the Company on February 6, 2018.

On February 6, 2018, at 9:32 p.m., Wynn Resorts announced that Mr. Wynn was resigning as CEO and Chairman of Board of the Company, effective immediately. **Ex. 21**. In his statement, Mr. Wynn cited the "avalanche of negative publicity" and stated that he "reached the conclusion I cannot continue to be effective in my current roles." *Id.* at 2. On the following trading day, February 7, Wynn Resorts stock price increased by $1.76 (or 1%). **Ex. 20** at 3.

### D.    The Confounding News Events on February 9–12, 2018.

Several Wynn Resorts and Steve Wynn-specific news events were published during the February 9–12, 2018 time period. Sabry Decl. ¶ 55, Figure 13; **Exs. 3–4**, **22–42**. They include:

The O'Melveny Report: The *Wall Street Journal* published an article on Friday, February 9 at 6:22 p.m. (after the market closed for the trading day) that disclosed the end of O'Melveny & Myers' retention by the Company's special committee. **Ex. 3** at 1. The article also reported that both the NGCB and MGC intended to continue with their investigations of the Company despite Mr. Wynn's resignation. *Id.* at 3. The *Wall Street Journal* updated the article on Monday, February 12 at 9:02 a.m. *Id.* at 2–4. The *Wall Street Journal* also included the news about O'Melveny & Myers in other articles about the Company on February 12. **Ex. 1** at 2, 4.

The Stockholder Agreement Report: Also after the close of trading on February 9, 2018, the Company issued a Form 8-K announcing that Mr. Wynn, "in light of the significant changed circumstances triggered by Mr. Wynn's resignation as the Chief Executive Officer and Chairman of the Board of the Company," no longer would contest that the Amended and Restated Stockholder Agreement, dated January 6, 2010, is "invalid and unenforceable." **Ex. 4** at 2. Mr. Wynn further agreed that the Stockholder Agreement "no longer binds" Ms. Wynn's sale of her more than 9 million shares of the Company's stock. *Id.* The potential sale of such a significant amount of stock (representing approximately 9% of the Company's outstanding shares) could negatively impact the Company's stock price.

As discussed in Nye's class certification rebuttal report, several media outlets (including the *Wall*

*Street Journal* and *The Deal*) reported on the Form 8-K, and several equity analysts (BofAML, Deutsche Bank, Jeffries, UBS, and Morgan Stanley) covered the announcement through February 12, 2018. **Ex. 43** ¶¶ 28–30; **Exs. 44–49**. For example, on February 11, an analyst from BofAML noted that Ms. Wynn's sale of her 9% stake in the Company "could create an overhang on the stock, either from a sale/liquidation or if there are concerns it could fall into hands deemed unfriendly" to the Company's long-term interest. **Ex. 45** at 1. Jeffries, on the morning of February 12, 2018, noted that "our view remains that the potential outcomes are many and include valuation upside from present levels." **Ex. 47** at 1. And *The Street* reported on February 12, 2018 at 1:50 p.m. that "it is a real possibility that an activist investor could step in and seek to break up the chain of resorts. If Elaine [Wynn] sell[s] her shares that means that there is a good chance Steve will have control of a much smaller block of shares that would vote against that outcome." **Ex. 50** at 4.

The Cornell University Award Rescission Report: On February 9, 2018, the Cornell University School of Hotel Administration rescinded the Hospitality Icon award previously given to Mr. Wynn in 2017. **Ex. 42**. According to Plaintiffs' Complaint, this news also impacted Wynn Resorts' stock price on February 12. SAC ¶ 283.

The Regulatory Risk Report: On February 10, 2018, the *Boston Globe* reported that Mr. Wynn's departure from the Company did not "end the questions for Massachusetts about what other Wynn executives or board members knew about a rash of sexual misconduct allegations against the casino mogul, including" the 2005 settlement. **Ex. 27**.

The Wynn's Name on Boston Casino Report: On February 10, 2018, the *Boston Globe* reported that the Boston Rape Area Crisis Center ("BARCC") had a released a statement asking the MGC, Massachusetts Governor Charlie Baker, and other Massachusetts leaders to "demand the removal of Wynn's name from" the Company's then-named *Wynn Boston Harbor* resort-casino under construction in Everett, Massachusetts. **Ex. 28**.

The NGCB Portal Report: The *Wall Street Journal* reported at 11:25 a.m. on February 12 that the NGCB planned "to introduce a new online system for the public to send in confidential complaints and tips after receiving a number of reports about Steve Wynn in the days after [t]he *Wall Street Journal* published an article detailing sexual-misconduct allegations against the casino mogul." **Ex. 1** at 1. The

NGCB's chair, Becky Harris, told the *Wall Street Journal* that the portal was "meant to be a channel for any case the board is investigating," and all communications would remain confidential. *Id.* Not one of the many equity analysts covering the Company's stock commented on the NGCB's online portal or the news that the NGCB had received complaints about Mr. Wynn. Sabry Decl. ¶¶ 47–49, Figure 11.

The LVMPD Report: The *Wall Street Journal* reported at 11:25 a.m. on February 12 that the LVMPD had received "multiple complaints about Mr. Wynn in the wake of the [Jan. 26 WSJ Article], according to a person familiar with the matter," and was "coordinating with the [NGCB] and running point on any reports that could potentially involve criminal allegations." **Ex. 1** at 1. The article noted that the LVMPD "didn't immediately provide comment," and did not provide any specifics about those "multiple complaints." *Id.* at 2. There was no indication as to who made the complaints, whether the complaints concerned allegations of sexual misconduct, and, if they did concern sexual misconduct, whether the complaints were from an employee or former employee of Wynn Resorts or someone else. *Id.*

The *Wall Street Journal* updated the article at 4:20 p.m., after trading hours, to report that two women had recently filed complaints with the LVMPD alleging sexual misconduct by Mr. Wynn in the 1970s—decades before Wynn Resorts existed. *Id.* at 2–4. The article stated that a "spokesman for the department said in a Monday statement that it has received two sexual-assault complaints against Mr. Wynn since the [Jan. 26 WSJ Article] was published." *Id.* at 4. The *Nevada Independent* thereafter published an article about the LVMPD Report at 5:48 p.m., also after trading had closed. **Ex. 2**. The first accuser made the report from St. Louis on January 29, 2018 and alleged that Mr. Wynn sexually assaulted her in the 1970s.[7] *Id.* at 1. The other accuser filed a report one week later on February 5, 2018 alleging that Mr. Wynn had assaulted her in the 1970s. *Id.* Again, not a single equity analyst covering the Company's stock price commented on the LVMPD Report. Sabry Decl. ¶¶ 47–49, Figure 11.

### E.     Other Regulatory and Legal Proceedings.

Gaming regulators in Nevada (NGCB) and Massachusetts (MGC) separately investigated the allegations and published their findings in the form of a Complaint and Investigative Report, respectively. **Exs. 52**, **53**. The Company settled with the NGCB on January 25, 2019, and eventually paid a $20 million

---

[7]     A Nevada state court would later rule that the accuser defamed Mr. Wynn, calling her claim of sexual assault "clearly fanciful." **Ex. 51** at 3, 5.

fine. **Exs. 54**, **55**. The settlement identified certain Company executives who allegedly learned of certain, limited allegations against Mr. Wynn, but there was no finding that "dozens" of individuals had claimed sexual harassment by Mr. Wynn or that any of the Defendants were aware of such claims. *Id.* For its part, the MGC issued a Decision & Order on April 30, 2019, expressly finding that there was no evidence that the Company or any of its executives provided false information to the regulator. **Ex. 13** at 1–2, 17–21. In fact, the MGC's Investigation and Enforcement Bureau (IEB) noted that only a "limited group of executives" had knowledge of any allegations against Mr. Wynn, and those allegations were far fewer than the "dozens" referenced in the WSJ Article. **Ex. 52** at 199. The Company paid a $35 million fine, and Mr. Maddox paid a $500,000 fine, but the MGC found that the Company and its executives remained suitable to operate within Massachusetts, where the Company continues to operate a resort-casino to this day. **Ex. 13** at 49–50, 52.

The allegations against Mr. Wynn also have been the subject of several other securities and derivative lawsuits, all of which have been dismissed or settled. *See, e.g.*, *Broussard v. Hagenbuch*, Case No. 2:18-cv-00293-KJD-DJA (D. Nev.) (dismissed federal derivative lawsuit); *Rogers v. Wynn*, Case No. A-18-773024-B (Clark Cnty. Dist. Ct.) (consolidated with *Bannister v. Wynn*, *Talamas v. Wynn*, *Meadows v. Wynn*, *Donigian v. Wynn*, *Clerks v. Wynn*, *Tillotson v. Wynn*, *Kalish v. Wynn*, *Myers v. Wynn*, *Caproni v. Wynn*, *John v. Wynn*, *Nazzaro v. Wynn*, and *Weiner v. Wynn*) (dismissed state stock drop lawsuits); *Limcaco v. Wynn*, Case No. 2:20-cv-11372-RSWL-MAA (C.D. Cal.) (dismissed federal RICO lawsuit); *Thomas DiNapoli v. Wynn*, Case No. A-18-770013-B (Clark Cnty. Dist. Ct.) (settled state derivative lawsuit); *Nielsen v. Wynn*, Case No. A-19-803879-C (Clark Cnty. Dist. Ct.) (settled state invasion of privacy and tortious interference lawsuit).

## F.    The Company's Response to the January 26, 2018 WSJ Article.

The Company responded promptly to the allegations against Mr. Wynn. On the same day that the Jan. 26 WSJ Article was published, Wynn Resorts announced the formation of a special committee comprised solely of independent directors to investigate the allegations. **Ex. 59** at 17. Mr. Maddox succeeded Mr. Wynn as CEO less than two weeks later, and the Company was wholly transformed at his direction. **Ex. 56**.

The Company embarked on a comprehensive workplace review and retained multiple experts to

1    scrutinize and advise on the Company's harassment and human resource policies, which were further

2    scrutinized by the special committee. **Ex. 59** at 17. Among other things, the Company revised and

3    broadened its Preventing Harassment and Discrimination Policy, enhanced its reporting and investigative

4    process, and implemented a revised (and now best-in-class) Compliance Program. **Ex. 13** at 42–43. The

5    Board was reshaped and diversified as well. **Ex. 57** at 6. Wynn Resorts added several new Board members,

6    including four women. *Id.* Management also underwent a refresh, including the addition of new CEO

7    Maddox, and new Executive Vice President, General Counsel, and Secretary Ellen Whittemore, a world-

8    renowned gaming and regulatory attorney. **Ex. 13** at 37.

9    **IV.    LEGAL STANDARD**

10            Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate

11   "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

12   law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the

13   governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the

14   evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party

15   seeking summary judgment bears the initial burden of informing the court of the basis for its motion and

16   identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.

17   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the nonmoving party bears the burden of proof on

18   an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy

19   its burden. The moving party may simply point to the absence of evidence to support the nonmoving

20   party's case." *In re Brazier Forest Prod., Inc.*, 921 F.2d 221, 223 (9th Cir. 1990) (citation omitted).

21   "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate

22   specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627

23   F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*).

24            In assessing this burden, "a[] trial court can only consider admissible evidence[.]" *Orr v. Bank of*

25   *Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "[M]ere allegation and speculation do not create a

26   factual dispute for . . . summary judgment[.]" *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th

27   Cir. 1996). To defeat summary judgment, "the nonmoving party may not merely state that it will discredit

28   the moving party's evidence at trial and proceed in the hope that something can be developed[.]" *T.W.*

1    *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).[8]

2    **V.    ARGUMENT**

3        **A.    Plaintiffs Cannot Identify Statements That Were Made Untrue by the February 12, 2018 Disclosures.**

4

5            Securities fraud plaintiffs must identify "specific statements made by the Defendants that were

6    made untrue or called into question by subsequent public disclosures." *Apollo*, 774 F.3d at 608. Stated

7    differently, for each alleged corrective disclosure, plaintiffs must "trac[e] the loss back to the 'very facts

8    about which the defendant lied.'" *Mineworkers*, 881 F.3d at 753. Plaintiffs cannot do so here.

9            The NGCB Report and LVMPD Report reported that unspecified "complaints" had been made

10   against Mr. Wynn after the Jan. 26 WSJ Article was published. **Ex. 1**. But that is not a fact that Defendants

11   ever spoke about or denied. Plaintiffs can point to no statement by any Defendant at any time stating, in

12   sum or substance, that no further allegations would be made against Mr. Wynn—to the *Wall Street*

13   *Journal*, the NGCB, the LVMPD, or anyone else. Indeed, Mr. Wynn's statement on January 26 expressly

14   contemplated that additional allegations could be made: "We find ourselves in a world where people can

15   make allegations, regardless of the truth, and a person is left with the choice of weathering insulting

16   publicity or engaging in multi-year lawsuits." **Ex. 9**.

17           To the extent Plaintiffs attempt to tie the NGCB Portal Report and LVMPD Report to Defendants'

18   statements on January 26, 2018, it is undisputed that these February 12 disclosures concerned events that

19   occurred only ***after*** publication of the Jan. 26 WSJ Article and ***after*** Defendants' statements responding

20   to it. *See* **Ex. 1** at 1 (stating that the NGCB received "a number of reports about Steve Wynn in the days

21   after the [Jan. 26 WSJ Article]"); **Ex. 2** at 1 (stating that the LVMPD received two complaints against

22   _____

23   [8]    Numerous courts across the country, including within the Ninth Circuit, have similarly entered
     summary judgment against all or substantial portions of deficient securities fraud cases. *See, e.g.*, *In re*
24   *Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023); *In re Allergan PLC Sec. Litig.*, 2022
     WL 17584155 (S.D.N.Y. Dec. 12, 2022); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384 (S.D.N.Y. 2018);
25   *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013); *Bricklayers & Trowel*
     *Trades Intern. Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012); *In re*
26   *Remec Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F.
     Supp. 2d 1339 (N.D. Ga. 2010); *In re Retek Inc., Sec. Litig.*, 621 F. Supp. 2d 690 (D. Minn. 2009); *In re*
27   *Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008); *In re Williams Sec. Litig.*, 496 F.
     Supp. 2d 1195 (N.D. Okla. 2007); *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y.
28   2000); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446 (N.D. Cal. 1996).

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mr. Wynn on January 29, 2018 and February 5, 2018, respectively). Neither the Company nor Mr. Wynn could have possibly stated anything false or misleading about these complaints because they did not exist on January 26, 2018. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012) (stating that a Plaintiffs must establish "why the statements were false or misleading at the time they were made" (quotation omitted)). Their statements likewise could not have possibly given "a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exist[ed]" because, again, no such complaints existed at the time. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010).

To carry their burden on falsity tied to the February 12, 2018 disclosures, Plaintiffs would need to identify a prior representation by Defendants that no additional allegations would surface in the future against Mr. Wynn. Because no such statement exists, Defendants are entitled to summary judgment.

## B. As a Matter of Law, Plaintiffs Cannot Satisfy Their Burden to Prove Loss Causation.

The securities laws were not enacted "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm.*, 544 U.S. at 345. Thus, as with common law fraud, securities "plaintiffs need to **prove** proximate causation and economic loss[.]" *Id.* at 346. The PSLRA accordingly "imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" *Id.* 345–46 (quoting 15 U.S.C. § 78u–4(b)(4)). This required element of a securities claim is called "loss causation." *Id.*

"Loss causation is the causal connection between a defendant's material misrepresentation and a plaintiff's loss." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers*, 881 F.3d at 753. "[T]he loss causation requirement limits the ability of plaintiffs to recover for losses sustained on the basis of factors unrelated to any misrepresentation or fraud." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999). A "decline in investment value caused by events unrelated to any fraud cannot serve as the basis for fraud liability[.]" *Id.* at 1029.

"To show loss causation," the plaintiff must "demonstrate a causal connection between" the

alleged misstatement and the "economic loss [plaintiff] suffered." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121 (9th Cir. 2013). In a fraud on the market case, "[l]oss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *Oracle*, 627 F.3d at 392. But "in order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015); *see also Fosbre*, 2017 WL 55878, at *2 ("A plaintiff thus must show that the market learned of and reacted to the alleged fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.").

The plaintiff bears the burden of "reasonably distinguish[ing]" losses caused by the ultimate disclosure of a fraud from the "tangle of factors" other than the revelation of a fraud that can affect a stock's price. *Nuveen*, 730 F.3d at 1123. "*Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura Pharm.,* 544 U.S. at 343); *see also Nuveen*, 730 F.3d at 1123. If the plaintiff is unable to "distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events[,]" the plaintiff cannot come forward with loss causation evidence, and the defendant is entitled to summary judgment. *Id.* (quoting *In re Williams,* 558 F.3d at 1132); *see also In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552, at *35 (S.D.N.Y. Mar. 30, 2023) ("Disaggregation is a threshold evidentiary showing that a plaintiff must meet to withstand summary judgment.").

Plaintiffs cannot meet their burden on loss causation because: (1) they cannot establish that the NGCB Portal Report or LVMPD Report were "corrective" of the alleged January 26, 2018 misstatements; (2) they cannot establish that the Company's stock price movement was statistically significant on February 12, 2018; (3) they cannot establish that the Company's stock price movement was statistically significant after the February 12 disclosures were reported to the market; and (4) they cannot disaggregate non-fraud events, including the O'Melveny Report and Stockholder Agreement Report that Plaintiffs already claimed "impacted Wynn Resorts' stock price" on February 12.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.     The NGCB Portal Report and LVMPD Report Are Not Corrective Disclosures.

In the oft-cited case, *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, the Second Circuit recently outlined the exacting scrutiny courts must practice in cases that, like this one, involve generic misstatements and inflation maintenance theories. *See* 77 F.4th 74, 102–105 (2d Cir. 2023) ("*Goldman II*"). Indeed, the *Goldman II* court singled out this very case in its opinion in identifying a potential mismatch. *Id.* at 102 n.14 (discussing the Court's Class Certification Order and Defendant's arguments). While the *Goldman II* opinion makes clear that courts must employ rigorous scrutiny of the contents of alleged misstatements and corrective disclosures at the class certification stage, the hurdle plaintiffs must clear to defeat summary judgment is significantly higher still.

A corrective disclosure must "reveal[] new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI*, 977 F.3d at 791. At summary judgment, loss causation is established only if the stock price's decline is caused by revelation of the "very facts misrepresented or omitted by the defendant." *Mineworkers*, 881 F.3d at 753; *accord Nuveen*, 730 F.3d at 1120 ("A plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the ***very facts*** that were a substantial factor in causing the plaintiff's economic loss."). "The plaintiffs cannot rely on a theory that [a misstatement] artificially inflated the stock price without also showing a loss after the relevant truth was revealed." *Fosbre*, 2017 WL 55878, at *8. If there is no evidence that an alleged corrective disclosure actually revealed the concealed facts for the first time to the market, the accompanying stock price drop cannot, as a matter of law, establish loss causation, and Defendants are entitled to summary judgment. *See In re Oracle*, 627 F.3d at 392.

The NGCB Portal Report is not a corrective disclosure. That report merely stated that the NGCB "plan[ned] to introduce a new online system for the public to send in confidential complaints and tips after receiving a number of reports about Steve Wynn." **Ex. 1** at 1. Defendants' January 26, 2018 statements did not misrepresent or omit any disclosure of these facts. Defendants did not even speak about the NGCB's plans to open a portal, much less misrepresent or conceal those plans. Nor did Defendants ever comment on the NGCB's receipt of "a number of reports about Steve Wynn." Indeed, the Jan. 26 WSJ Article made no mention of any complaints to the Company's regulators. Consequently, this statement

did not reveal any "facts misrepresented or omitted by [Defendants]," and simply cannot be a corrective disclosure. *See Mineworkers*, 881 F.3d at 753.

The LVMPD Report is not a corrective disclosure either. The *Wall Street Journal* merely reported during the trading day that the LVMPD "has also received multiple complaints about Mr. Wynn." **Ex. 1** at 1. These are not facts that Defendants misrepresented or omitted on January 26, 2018. Defendants never commented on whether the LVMPD had received "multiple complaints." Plaintiffs claim that Defendants "denied the accusations" and "allegations" against Mr. Wynn reported by the *Wall Street Journal*, but that is not true. The Company's statement pointed out that that the allegations against Mr. Wynn stemmed from ongoing litigation (as was acknowledged in the Jan. 26 WSJ Article) and were designed to tarnish his reputation. **Ex. 9**. There was no denial or claim by the Company that the allegations were "unfounded." ECF 283 at 22. Mr. Wynn separately said "[t]he idea that I ever assaulted any woman is preposterous[,]" and "[w]e find ourselves in a world where people can make allegations, regardless of the truth, and a person is left with the choice of weathering insulting publicity or engaging in multi-year lawsuits." **Ex. 9**. Again, this is not a denial that any accusation was made; in fact, Mr. Wynn's statement says the opposite— accusations could be made, "regardless of the truth." *Id*. Moreover, the Jan. 26 WSJ Article said nothing about whether the LVMPD received any complaints about Mr. Wynn. Because the *Wall Street Journal*'s "multiple complaints" disclosure also did not reveal any "facts misrepresented or omitted by [Defendants]," it cannot be a corrective disclosure either. *See Mineworkers*, 881 F.3d at 753.

## 2. The Company's Stock Price Movement on February 12, 2018 Was Not Statistically Significant.

Wynn Resorts' stock price movement on February 12, 2018, five days after Mr. Wynn resigned as CEO and Chairman of the Company, was not statistically significant.

The traditional methodology for calculating loss causation and damages requires statistically significant stock price reactions following specific corrective disclosures. *REMEC*, 702 F. Supp. 2d at 1266 ("[T]he decline in stock price caused by the revelation of that truth must be statistically significant."); *Fosbre*, 2017 WL 55878, at *2 ("[T]he plaintiff must show 'that the defendant's share price fell significantly after the truth became known.'" (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008))); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal.

2011) (same); *Eng v. Edison Int'l*, 2018 WL 1367419, at *3 (S.D. Cal. Mar. 16, 2018), *aff'd*, 786 F. App'x 685 (9th Cir. 2019) ("[T]he decline in stock price must be 'statistically significant.'"). A decline must be statistically significant because a certain level of randomness is expected in stock price movements. *Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018). A stock decline that is not statistically significant "is indistinguishable from random price fluctuations." *Id.*

Thus, courts have repeatedly granted summary judgment and dismissed securities fraud claims where plaintiffs lacked evidence of statistical significance. *See, e.g.*, *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *5 n.11 (S.D. Cal. Mar. 20, 2023) (noting that plaintiffs had conceded that one of five alleged corrective disclosures "did not have a statistically significant impact on stock prices and thus, is not a corrective disclosure"); *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *8–12 (N.D. Cal. Apr. 4, 2014) (discussing and applying statistical significance at the 5% significance level (or 95% confidence level), and rejecting a 50% significance level (or 50% confidence level)); *see also In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 48–52 (2d Cir. 2018) (citing the absence of statistically significant price movements as a basis for affirming summary judgment in favor of defendants on loss causation); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 505 (2d Cir. 2010) (affirming summary judgment order in favor of defendants, in part, because "Omnicom's stock never experienced any statistically significant drop in value at or near the time of these news reports"); *Bricklayers and Trowel Trades Int'l Pension Fund*, 853 F. Supp. 2d 181, 186 (D. Mass. 2012) ("If the difference between the expected return and the actual return on an event day is statistically significant, it may be attributed to the event occurring on that day, provided that the study controls for confounding factors.").

Dr. Sabry conducted an analysis and determined that the movement in Wynn Resorts' stock price on February 12, 2018 was not statistically significant. Sabry Decl. ¶¶ 11–27, Figures 1–3. To reach her conclusion, Dr. Sabry performed an event study that (1) defined the event being studied (the remaining February 12, 2018 corrective disclosures), (2) used a market model regression to estimate how the Company's stock price performs relative to the broader market and an index of companies in the same industry, (3) defined a market model estimation period which usually precedes the event being studied, (4) estimated the excess return as the difference between the actual and expected return, and (5) determined whether the excess return was "statistically significant, that is unlikely to have occurred

by chance."[9] Sabry Decl. ¶¶ 12–27. Dr. Sabry determined that when using both an estimation window ending on the prior trading day (February 12, 2017 to February 9, 2018) and an estimation window ending on the day before the Class Period (March 28, 2015 to March 27, 2016), *the Company's stock price movement on February 12, 2018 was not even close to statistically significant* (85.07% confidence level and 52.29% confidence level, respectively).

Another potential indicator of significant movement is trading volume, as significant events tend to trigger increased trading activity. Dr. Sabry concluded that the trading volume on February 12, 2018 also was not close to statistically significant under three different model specifications (33.10% confidence level, 74.10% confidence level, and 49.34% confidence level, respectively). Indeed, the volume on February 12 was the lowest of any trading day since the Jan. 26 WSJ Article was published, further proving that trading in Wynn Resorts' stock was not event driven that day. Sabry Decl. ¶¶ 23–25, Figure 2.

Nye's analysis employed a significant methodological flaw: He used a different estimation window for February 12 that ended on January 25 (the day before the Jan. 26 WSJ Article was published).[10] In doing so, Nye failed to account for the most recent economic conditions pertaining to the Company's stock price. Sabry Decl. ¶¶ 10(a), 15; *see also* **Ex. 43**, Ex. 11B at 157. Correcting Nye's error

---

[9]    Neither Plaintiffs nor Nye disputed that the generally accepted threshold for statistical significance is a 5% significant level, which is also referred to as a 95% confidence level—"meaning, there is a 5% or less chance that a movement as large or larger than the actual movement in a company's stock price would have occurred if the alleged misrepresentation (or corrective disclosure) had not impacted the stock price." Sabry Decl. ¶ 14; *see also* ECF 251 at 7 (citing *In re Intuitive Surg. Sec. Litig.*, 2016 WL 7425926, at *15–16 (N.D. Cal. Dec. 22, 2016) (citing *Erica P. John Fund v. Halliburton Co.*, 309 F.R.D. 251, 270 (N.D. Tex. 2015)); *Dean v. China Agritech*, 2012 WL 1835708, at *7 (C.D. Cal. May 3, 2012)).

[10]    As part of his market efficiency analysis at class certification, Plaintiffs' expert conducted an event study to analyze the statistical significance of movements in Wynn Resorts' stock. **Ex. 43** ¶¶ 47–53. To conduct his event study, Nye used a regression analysis to determine the relationship between Wynn Resorts' stock returns and the returns of both the S&P 500 Index and the Russell 1000 Casino and Gambling Index. *Id.* ¶¶ 65–69. Nye identified eight Company earnings announcements from the Class Period to analyze (i.e., the "events"). *Id.* ¶ 51. To estimate the impact of each of those events on Wynn Resorts' stock price, he looked at how the stock price moved on "the first trading day on which the information disclosed could have impacted the market price" (the "event window") and used a control period of the "calendar year immediately preceding" the event (the "estimation window"). *Id.* ¶ 66. Nye also excluded any "event windows" from the estimation window for a subsequent announcement (meaning, if Announcement A fell within the estimation period for Announcement B, then Nye excluded Announcement A's "event window" from Announcement B's "estimation window"). *Id.*

revealed that his regression analysis had substantially overstated the statistical significance of the stock price movement on February 12. Sabry Decl. ¶¶ 19-21, Figure 1. While Nye's regression analysis indicated that the February 12 stock price movement was just barely statistically significant (96.6% confidence), Dr. Sabry's correction showed that the stock price movement that day was not statistically significant (85.07% confidence level). *Id.* Therefore, Plaintiffs lack any quantitative evidence of loss causation for February 12, 2018.

This result accords with the qualitative evidence—namely, the discussion of equity analysts from large, sophisticated financial institutions that follow and cover the Company's stock. *See Oracle*, 627 F.3d at 393 (citing analyst reports as "overwhelming evidence" of a lack of loss causation). While several analysts issued reports following the February 12 disclosures, none of them mentioned the NGCB Portal Report or the LVMPD Report. Sabry Decl. ¶¶ 47–49, Figure 11. Nor did any analysts reduce their recommendations or price targets for the Company's stock. Sabry Decl. ¶¶ 45–46, Figure 10. In other words, much like the quantitative evidence, there is no qualitative evidence in the analyst reports showing that any market participant thought the news in the February 12 disclosures was material enough to affect its views about the value of the Company's stock. This makes sense—Mr. Wynn had already resigned from the Company, so additional reports about his alleged transgressions would be immaterial.

Given this lack of quantitative and qualitative evidence, "Plaintiffs cannot establish loss causation." *Oracle*, 627 F.3d at 394.

### 3. The Company's Stock Price Movement After 11:25 a.m. on February 12, 2018 Was Not Statistically Significant.

The two alleged February 12 corrective disclosures remaining in this case did not become public until after the 11:25 a.m. *Wall Street Journal* article. **Ex. 1** at 1. Therefore, they could not have impacted Wynn Resorts' stock price prior to 11:25 a.m. on February 12. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 486 (S.D.N.Y. 2018) (excluding an event study that assumed "changes in LIBOR manage to travel backward in time in order to affect EDF prices in the past"); *Billhofer v. Flamel Techs., SA*, 663 F. Supp. 2d 288, 297 (S.D.N.Y. 2009) (citing the "inescapable rule of causality that a cause must precede its effect").

The stock price movement after 11:25 a.m. was not statistically significant. Dr. Sabry conducted

intraday analysis to determine how, if at all, the Company's stock price reacted to the remaining alleged corrective disclosures. Sabry Decl. ¶¶ 28–40, Figures 4–9. Dr. Sabry concluded that (1) the Company's stock price movement after the 11:25 *Wall Street Journal* article was not statistically significant using either of her estimation windows (80.13% confidence level and 66.79 confidence level, respectively), (2) it was not statistically significant even under Nye's flawed model (87.12% confidence level), (3) the trading volume after 11:25 a.m. was ***lower*** than the trading volume before the article was published, and (4) the Company's stock price—which the Court concluded trades in an efficient market—***increased*** in the first 30 minutes after the article was published. *Id*. Because there is no statistically significant stock price movement after the alleged corrective disclosures were disclosed to the market, Plaintiffs cannot establish loss causation. *Oracle*, 627 F.3d at 394.

> **4. Plaintiffs Cannot Meet Their Burden of Disaggregating Fraud-Induced Stock Price Movements from Movements Caused By Other News.**

Even if the stock price movement on February 12 was statistically significant—it was not—Plaintiffs have the burden to disaggregate the stock price drop caused by fraud-related and non-fraud-related news. Plaintiffs cannot meet this burden because they have already asserted that at least two other non-fraud events impacted Wynn Resorts' stock price on February 12—the O'Melveny Report and the Stockholder Agreement Report. ECF 270 at 8. And they also must disaggregate more than a dozen others.

As noted, to establish loss causation, Plaintiffs must "demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd*, 811 F.3d at 1209. Plaintiffs must demonstrate that the purported fraud caused their alleged losses, rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("If one of those factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent."). To do so, Plaintiffs must proffer expert analysis determining "which declines were caused by such extraneous factors and which were caused by [the alleged fraud]." *In re Vivendi Universal S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (explaining that such an analysis is "almost obligatory" to establish loss causation). Merely making a "judgment call as to confounding

information without any methodological underpinning" is insufficient to survive summary judgment. *Bricklayers*, 752 F.3d at 95.

The failure to disaggregate confounding variables is a "fatal flaw" mandating summary judgment. *In re Williams*, 558 F.3d at 1143; *see also Dura Pharm.*, 544 U.S. at 343 (stating that "[g]iven the tangle of factors affecting price," plaintiffs must draw a causal connection between the alleged fraud and their losses); *Nuveen*, 730 F.3d at 1123 (plaintiffs must provide evidence that "reasonably distinguish[es] the impact[s]" of the fraud from confounding factors); *Bricklayers*, 752 F.3d at 95 (affirming summary judgment where plaintiff's expert "did not establish any reliable means of" disaggregation, instead "ma[king] a judgment call as to confounding information without any methodological underpinning"); *In re Omnicom*, 597 F.3d at 512 (affirming summary judgment because plaintiff's expert did not "suffice to draw the requisite causal connection between the information in the June 12 article and the fraud alleged in the complaint"); *In re Williams*, 558 F.3d at 1137 (affirming summary judgment where plaintiff's expert "saw no need to separate fraud-related from non-fraud-related losses, because he assumed any and all losses were of the former variety"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010) (excluding expert and granting summary judgment where plaintiff's expert "fail[ed] to separate the loss caused by the disclosure of corrective information (new, negative, company-specific, revealing a prior misrepresentation or omission) from the loss caused by the disclosure of other company-specific information"); *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013) (granting summary judgment for defendants on loss causation where plaintiff's theory rested on "factually unsupported assumption" that entirety of stock drop related to the alleged fraud).

Plaintiffs must account for additional confounding factors. At least 14 Wynn-specific and industry-specific events, among them the Regulatory Risk Report and Wynn's Name on Boston Casino Report, were disclosed between February 9 and 12, 2018, including in major publications like *Bloomberg*, the *Boston Globe*, *CNN*, *Boston Herald*, *Politico*, *Reuters*, and the *Wall Street Journal*. Sabry Decl. ¶ 55, Figure 13; **Exs. 22–42**. The other news related to topics of importance for shareholders, including speculation that Wynn Resorts may be vulnerable to a corporate takeover (Feb. 9, 2018); reporting that Wynn Resorts' suitability to operate in Massachusetts remained in question following Mr. Wynn's resignation (Feb. 10, 2018); and reporting on a tweet by then-President Trump relating to the allegations

against Mr. Wynn (Feb. 11, 2018). Sabry Decl. ¶ 55, Figure 13; **Exs. 23**, **27**, **31**. Plaintiffs have already cited one of them—the February 9, 2018 news that Cornell University School of Hotel Administration had rescinded the Hospitality Icon award to Mr. Wynn (**Ex. 42**)—as news impacting Wynn Resorts' stock price on February 12. SAC ¶ 283.

Further, Plaintiffs themselves have repeatedly argued that the Company's stock price on February 12, 2018 was influenced by both fraud events—NGCB Portal Report and LVMPD Report—and at least two confounding non-fraud events—the O'Melveny Report and the Stockholder Agreement Report. *See* ECF 270 at 8. Indeed, Plaintiffs affirmatively claimed these additional non-fraud events "would have impacted Wynn Resorts' stock price on February 12th," ECF 270 at 8. Unlike Plaintiffs' alleged corrective disclosures, these non-fraud events are supported, at least in part, by qualitative evidence. Specifically, several equity analysts covering the Company's stock price commented on the Stockholder Agreement Report, with some expressing concerns that it would create an "overhang" on the Company's stock price, as investors wrestled with concerns that Elaine Wynn might sell her 9% ownership stake or engender a corporate takeover. Sabry Decl. ¶¶ 51–53, Figure 12; *see also* **Ex. 44**; **Ex. 45** at 1; **Ex. 46**; **Ex. 47**; **Ex. 48**; **Ex. 49**. For Plaintiffs to carry their burden on loss causation, they must disaggregate these non-fraud events after already making the case that they did impact Wynn Resorts' stock price. *Nuveen*, 730 F.3d at 1123. They cannot do so.

To survive summary judgment, Plaintiffs must disaggregate the multitude of "extraneous factors" from the alleged fraud-induced stock declines. *See In re Vivendi*, 634 F. Supp. 2d at 364. Because Plaintiffs, by their own representations, have not and cannot do so, Defendants are entitled to summary judgment. *Nuveen*, 730 F.3d at 1143.

## VI.     CONCLUSION

Defendants understand that the Court must take Plaintiffs' allegations as true at the motion to dismiss stage, and that Defendants bore the burden of disproving any price impact at the class certification stage. At this stage, when it is Plaintiffs' burden to prove falsity and loss causation, the Court can fairly scrutinize Plaintiffs' theories and test the evidence supposedly in support of them. And with even the slightest amount of scrutiny, Plaintiffs' attempt to extend the Class Period to February 12, 2018 based on mundane news reports issued before, during, and after the close of trading falls flat. No amount of

discovery can change the substance and timing of Defendants' alleged misstatements or the purported corrective disclosures, or the fact that neither of the two remaining February 12, 2018 disclosures had any effect on Wynn Resorts' stock price.

This is not a situation where Plaintiffs are legitimately seeking to compensate shareholders who may have suffered a financial loss—because again, for most of the two-year Class Period leading up to and through the Jan. 26 WSJ Article, class members actually made money. Rather, this is a situation where Plaintiffs are seeking to rewrite history (*i.e.,* the facts) so as to artificially inflate the alleged damages (and thus any potential settlement) by nearly 600%. *See In re LIBOR*, 299 F. Supp. 3d at 545 ("To the extent a putative class includes a substantial number of members who were not ultimately damaged, the 'negative' value rational for superiority advanced by Exchange plaintiffs is properly evaluated against a concern regarding the *in terrorem* effect that a certified class may have." (citations omitted)). Defendants' concerns are not hypothetical. To justify their extremely burdensome discovery demands, requiring the review of roughly 1,000,000 additional documents, Plaintiffs recently claimed that their extended class action claims are worth nearly $1 billion. **Ex. 58** at 1.

With class actions susceptible to exorbitant damages claims and securities fraud trials "virtually extinct," exacting scrutiny at the summary judgment stage is imperative. *See In re BofI*, 977 F.3d at 800 (Lee, K. concurring) (stating that "securities fraud trials are virtually extinct" and "the loss causation requirement acts as a critical bulwark against frivolous securities fraud lawsuits"). Otherwise, Plaintiffs will continue to use this lawsuit as an "*in terrorem* device to bludgeon [Wynn Resorts] into settling claims to 'avoid the cost and burden of litigation.'" *Id.*

For that and for all of the reasons set forth above, the Company Defendants respectfully request that the Court grant partial summary judgment and dismiss Plaintiffs' claims as to the alleged February 12 "corrective" disclosures. The Class Period should end no later than January 29, 2018, or the last day Plaintiffs allege that the Jan. 26 WSJ Article impacted Wynn Resorts' stock price.

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

DATED: November 14, 2023                KIRKLAND & ELLIS LLP

                                        /s/ Mark S. Holscher
                                        Mark Holscher (*Pro Hac Vice*)
                                        Austin Norris (*Pro Hac Vice*)
                                        Michael J. Shipley (*Pro Hac Vice*)
                                        Edward Hillenbrand (*Pro Hac Vice*)
                                        KIRKLAND & ELLIS LLP
                                        555 South Flower Street, Ste. 3700
                                        Los Angeles, California 90071
                                        Telephone: 213.680.8190
                                        Facsimile: 213.808.8097
                                        Email: mark.holscher@kirkland.com
                                               austin.norris@kirkland.com
                                               michael.shipley@kirkland.com
                                               edward.hillenbrand@kirkland.com


                                        Matthew Solum (*Pro Hac Vice*)
                                        KIRKLAND & ELLIS LLP
                                        601 Lexington Avenue
                                        New York, New York 10022-4611
                                        Telephone: 212.446.4688
                                        Facsimile: 212.446.4900
                                        Email: matthew.solum@kirkland.com

                                        Patrick G. Byrne (Nevada Bar #7636)
                                        Bradley T. Austin (Nevada Bar #13064)
                                        SNELL & WILMER L.L.P.
                                        3883 Howard Hughes Parkway, Suite 1100
                                        Las Vegas, Nevada 89169
                                        Telephone: 702.784.5200
                                        Facsimile: 702.784.5252
                                        Email: pbyrne@swlaw.com
                                               baustin@swlaw.com

                                        *Attorneys for Defendants Wynn Resorts, Ltd.*
                                        *and Matthew O. Maddox*

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## APPENDIX A – ALLEGED JANUARY 26, 2018 MISSTATEMENTS

The Company and Mr. Wynn's full statements from January 26, 2018 are provided below, with the alleged false statements emphasized:

| Source | Statement |
|---|---|
| Wynn Resorts (January 26, 2018) (**Ex. 9**) | The recent allegations about Mr. Wynn reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with him and the company. ***It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him***. <br><br> It is noteworthy that although Ms. Wynn says she knew about the 2005 allegations involving Mr. Wynn in 2009, ***she never made them known to the board of directors, of which she was then a member, and she did not raise them until after Mr. Wynn remarried and the shareholders of Wynn Resorts voted not to elect her to the board***. <br><br> Wynn Resorts is committed to operating with the highest ethical standards and maintaining a safe and respectful culture that has made Wynn Resorts the employer of choice for 23,000 employees worldwide. ***The Company requires all employees to receive annual anti-harassment training and offers an independent hotline that any employee can use anonymously, without fear of retaliation. Since the inception of the company, not one complaint was made to that hotline regarding Mr. Wynn***. |
| Mr. Wynn (January 26, 2018) (**Ex. 9**) | ***The idea that I ever assaulted any woman is preposterous.*** We find ourselves in a world where people can make allegations, regardless of the truth, and a person is left with the choice of weathering insulting publicity or engaging in multi-year lawsuits. It is deplorable for anyone to find themselves in this situation. <br><br> The instigation of these accusations is the continued work of my ex-wife Elaine Wynn, with whom I am involved in a terrible and nasty lawsuit in which she is seeking a revised divorce settlement. Elaine has explicitly threatened to slander and destroy me and I am surprised that the media is allowing itself to be used to advance this agenda. The conduct of Elaine Wynn during the court of the pending lawsuits has been shocking and deeply disturbing to me personally and as the CEO of Wynn Resorts. Despite such conduct, I have repeatedly refused to capitulate to her demands. In response, I remain focused on Wynn Resorts, our employees and our shareholders and will not be distracted from those efforts. |

**THE COMPANY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

**CERTIFICATE OF SERVICE**

2

3        On November 14, 2023, I served the foregoing document on all parties appearing in this case

4   when filing said document through the Court's PACER system with automatic e-service on all persons

    who have registered for e-service on PACER for this case.

5

6                                                            */s/Laura Bay*_____
                                                             An employee of KIRKLAND & ELLIS LLP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**CERTIFICATE OF SERVICE**